## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | |
|---|---|
| **MI FAMILIA VOTA, TEXAS STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, MICAELA RODRIGUEZ and GUADALUPE TORRES**<br><br>**Plaintiffs**<br><br>vs.<br><br>**GREG ABBOTT, Governor of Texas; RUTH HUGHS, Texas Secretary of State,**<br><br>**Defendants.** | **No. 5:20-cv-00830** |

## PLAINTIFFS' COMPLAINT

## INTRODUCTION

1.      In this time of unprecedented crisis, as the novel coronavirus and the resulting respiratory illness, COVID-19, ravage our country and threaten the health and life of anyone who contracts the disease, Defendants have failed to ensure that voters in Texas will be able to safely cast their ballots in upcoming elections.  As a result, voters in Texas will be forced to face a constitutionally unacceptable choice: exercising their right to vote, or protecting their own lives and the lives of their loved ones and community.  Plaintiffs bring this case because there are practical and constitutionally-required measures that both protect the public health and guarantee the right to vote: namely, opening additional polling stations and expanding the availability of early voting (thereby reducing long wait times and large crowds), and ensuring that voters may

use paper ballots in lieu of electronic voting machines (thereby reducing the risk of contamination of using a heavily-trafficked touch-screen voting device and long delays associated with disinfecting voting machines between uses).

2.      Across the country, more than 138,000 people have already died, and more than 3.4 million cases have been confirmed.

3.      There is no vaccine for the coronavirus, and there is likely not going to be one for at least another year, if then.  There is no cure, and only limited treatments.

4.      The Texas 2020 elections will put voters at risk of transmitting or being infected with the coronavirus.  But the risk will not be shared equally.  Some voters will be able to vote easily by mail.  Others will not.  Some will have easy access to early voting locations.  Others will not.  And some will be able to vote quickly on Election Day by a hand-marked paper ballot handled by a single poll worker, or on a properly disinfected machine.  Others will have to wait for hours at understaffed locations, without the option to vote on a hand-marked paper ballot, forced to vote on a machine used by dozens or hundreds of voters, which should, but might not, be properly disinfected after each use, much less protected from aerosolized particles from the last voter's breathing in the same space.  Even if election administrators take some steps to protect public health, under current plans, those steps are not sufficient to protect voters and may, in some cases, exacerbate lines and the risk of virus transmission. Texas proposes to rely on election policies that, during the pandemic, will create inordinate burdens on the right to vote. The burden will be particularly high for Black and Latino voters. Without the relief this lawsuit requests, voters' exercise of the franchise will be compromised.

5.      Black, Latino, and Native American voters have been disproportionately affected by the pandemic, experiencing higher incidences of coronavirus infection, hospitalization, and

fatalities.  They also face greater risks to their health by voting, particularly because Defendants have reduced the number of polling places available in their communities, exacerbating the health and safety risks of overcrowding during the pandemic.

6.      In the last ten years, the State of Texas, by and through Defendants, has made participation in elections less accessible to voters in a variety of ways: it has shuttered more than 750 polling places, limited counties' ability to provide flexible early voting places and hours, and passed a rigid voter identification law repeatedly found to have violated Section 2 of the Voting Rights Act.  All of these actions create an election system in which the right to vote is already in a precarious position.  In the midst of the pandemic, these election practices will impose an unconstitutional burden on the right to vote.

7.      Many counties in Texas require all voters to use electronic voting machines, forcing all voters to handle shared surfaces and often to be in close quarters with poll workers, not to mention the unreasonably burdensome delays that would be associated with using such machines if proper disinfection procedures are implemented between uses.

8.      Under normal conditions, the aforementioned measures already undermine the freedom and fairness of Texas elections.  For example, in Texas's most recent election, held on March 3, 2020 (before social distancing measures were put in place because of COVID-19), voters throughout Texas waited for hours after the polls closed to vote because of insufficient polling places, voting machines, and poll workers.  *See* Alex Ura, "Texas Lawmakers to Hold Hearing into Excessive Super Tuesday Voting Lines," Texas Tribune (Mar. 5, 2020), https://www.texastribune.org/2020/03/05/texas-lawmakers-excessive-voting-lines-primary/.

9.      Now, during the pandemic, insufficient polling places, unreliable and unsafe voting machines, long lines, crowds, and other barriers will *de facto* force voters out of the political process.

10.      Regardless of the lawfulness of these voting burdens under standard conditions, under pandemic conditions, Defendants' actions and the resulting Texas voting infrastructure unlawfully burden Texans' right to vote.

11.      Other states have failed to take appropriate steps to protect voters during the pandemic, and the results have been disastrous for voters and the states as a whole.  In April, ahead of its primary election, Wisconsin abruptly closed a number of its polling places and was unprepared for the deluge of vote-by-mail requests it received.  As a result, thousands of people were disenfranchised, and dozens of people can now trace their coronavirus infections directly to having voted in person in Wisconsin.  Nicholas Reimann, "Coronavirus Infections Spiked in Wisconsin After In-Person Election, Study Says," Forbes, May 19, 2020, https://bit.ly/31gjR5w.

12.      Georgia's primary elections in June were plagued by closed polling locations, a shortage of poll workers, e-pollbook and voting machine failures, and a lack of back-up paper pollbooks and ballots.  Thousands of voters had to wait in line for hours in many counties throughout the state, including in Fulton County, where Atlanta is located.  As a result, many voters were forced to either go home without voting, or to remain in line for hours in conditions conducive to the spread of COVID-19. Amy Gardner, et al., "In Georgia, Primary Day Snarled By Long Lines, Problems With Voting Machines—A Potential Preview of November," Wash. Post, June 9, 2020, https://wapo.st/3eybzcW.

13.      Defendants must take swift action to avoid placing Texas voters at similar risk and to protect Texans' right to vote in upcoming elections.

14.     Defendants must make immediate changes to in-person voting protocols to ensure that all voters—no matter how they choose or need to vote—can do so safely and with minimal risk to their health and to other voters, poll workers, and the Texas community.

## JURISDICTION AND VENUE

15.     Plaintiffs bring this action pursuant to 42 U.S.C. §§ 1983 and 1988 for violations of their rights under the First, Fourteenth, and Fifteenth Amendments to the U.S. Constitution; and Section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973.

16.     This Court has jurisdiction under Article III, § 2 of the United States Constitution, and pursuant to 28 U.S.C. §§ 1331, 1343, and 1357.

17.     This Court has authority to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

18.     Venue in this district is proper under 28 U.S.C. § 1391 because some of the parties, including at least one of the Defendants, reside in this District, and a substantial part of the events or omissions giving rise to this claim occurred in this District.

## PARTIES

### I.     Plaintiffs

19.     Plaintiff Mi Familia Vota is a national, non-profit civic engagement organization that unites Latino, immigrant, and allied communities to promote social and economic justice. Mi Familia Vota encourages voter registration and participation, and has challenged voter suppression around the nation. It has operations in six states, including Texas.

20.     Plaintiff Mi Familia Vota has had to divert personnel, time, and resources away from its planned activities due to the conduct alleged here. Specifically, Mi Familia Vota has spent money, time, and other resources to provide voter registration support and educate voters about the voting restrictions listed above that already disparately impact Latino voters, to focus

on Texas's failure to adequately prepare to hold elections during the pandemic, and to try to protect Latino and immigrant communities from contracting coronavirus on Election Day. Plaintiff Mi Familia Vota will continue to suffer such injuries, spending additional money and time, throughout the duration of the pandemic unless Texas takes appropriate steps to protect the free and fair exercise of the right to vote.

21.     Texas's failure to protect voters from unnecessary health risks during the pandemic has detracted from Mi Familia Vota's fundamental mission, which includes supporting Latino voters and encouraging voting. Mi Familia Vota will be injured by Texas's continued refusal to protect voters' rights during the pandemic.  For example, Defendants' failure to provide sufficient opportunities for early voting, to open additional polling locations, or to permit voting by paper ballot are all likely to contribute to public distrust in the safety of polling locations as well as very long voting lines.  Thus, Mi Familia Vota will have to commit additional resources, and divert them from other programs, in order to educate voters about the best ways to vote safely and to encourage them to vote notwithstanding the unreasonable burdens imposed by Defendants, as alleged herein.

22.     Plaintiff Texas State Conference of the National Association for the Advancement of Colored People ("NAACP") brings this action on its own behalf and on behalf of its members and constituents.  The NAACP is a nonpartisan, nonprofit organization founded in 1909.  The first Texas branches of the NAACP were formed in 1915, and the Texas State Conference was formally organized in 1937.  The Texas State Conference of the NAACP's primary office is located in Austin, but the organization has over 100 units statewide, including in San Antonio.  A large portion of the organization's more than 10,000 members are Texas residents who are registered to vote in Texas.  The NAACP's membership consists largely of African Americans,

and it considers its constituents and supporters to be people of color and/or members of other underrepresented and vulnerable populations, such as those with disabilities. The NAACP's members and constituents are more likely than other populations to live in poverty, and suffer from underlying conditions that put them at risk of becoming more seriously ill from COVID-19.

23.     The NAACP's mission is to secure the political, educational, social, and economic equality of rights in order to eliminate race-based discrimination and ensure the health and well-being of all persons. To achieve its mission, the NAACP engages in voter education and registration activities such as Project VIER ("Voter Information, Education, and Registration") in churches, neighborhoods, and on college campuses across the state to reach voters and help them to register and, eventually, to vote. Project VIER was created in 2015 to celebrate the 100-year anniversary of the Voting Rights Act. Defendants' voting procedures and acts and omissions described herein frustrate the NAACP's mission and cause the NAACP to divert resources from other programs and initiatives in order to assist the NAACP's members and constituents, and the public generally, in Texas with overcoming the burdens imposed on their right to vote by Defendants. In the context of COVID-19, these burdens are even more severe, and the resources that NAACP will need to divert from its other programs in order to combat burdens imposed by Defendants' challenged actions are even more substantial. For example, Defendants' failure to provide sufficient opportunities for early voting, to open additional polling locations, or to permit voting by paper ballot are all likely to contribute to public distrust in the safety of polling locations as well as very long voting lines. Thus, NAACP will have to commit additional resources, and divert them from other programs, in order to educate voters about the best ways to vote safely and to encourage them to vote notwithstanding the unreasonable burdens imposed by Defendants, as alleged herein. NAACP has already done

so by initiating campaigns calling on Election Officials to, among other things, enforce social distancing, introduce social barriers separating voters from election officials, provide readily available alcohol-based wipes known to kill the virus, retain twice the number of poll workers as the 2016 elections, ensure sanitization of all areas likely to be touched by voters between uses, require persons at polling places to wear masks, supply poll workers with sufficient gloves and sanitizer for their personal use, use spacious locations with adequate room for lines, add additional polling places, allocate machines where there are slow lines and large crowds with adequate personnel to operate them, and permit curbside voting.

24.     Plaintiff Micaela Rodriguez is a registered voter in Texas.  She lives in Cypress, Texas, and has voted in midterm and general elections since approximately 2015.  She voted in the March 2020 primary elections, but had to wait in line for more than two hours in order to vote.  She has always voted in person, and has voted on rotary-style voting machines.  However, she currently lives with several family members, including her young children and her mother who is nearly 60 years old and suffers from a number of health issues that place her at high risk for serious COVID-19 illness.  She plans to vote in the November 2020 elections, but may not be able to do so if the procedures in place for elections make voting practically impossible because they create a serious risk of virus transmission.

25.     Plaintiff Guadalupe Torres is a registered voter in Texas.  She lives in Lewisville, Texas, and voted in person on Election Day in Texas during the 2018 general election and the 2020 primary election. She wants to vote in the 2020 general election.  However, she lives with her parents, and her father is at high risk for serious COVID-19 illness.  Her family is practicing social distancing and taking precautions to protect themselves from the coronavirus.  She does

not currently qualify to vote by mail under Texas rules.  Thus, to exercise her right to vote, Texas officials require her to present in-person at a physical polling place.

**II.**     <u>**Defendants**</u>

26.     Defendant Greg Abbott is the Governor of Texas, who is sued in his official capacity.

27.     Defendant Ruth Hughs is the Texas Secretary of State, who is sued in her official capacity.

<u>**FACTS**</u>

**I.**     <u>**The COVID-19 Pandemic**</u>

    **A.**     <u>**General Background: The Contagious Virus Is Difficult to Stop and Masks Have Limited Effectiveness**</u>

28.     The SARS-CoV-2 coronavirus ("coronavirus") causes Coronavirus Disease 2019 ("COVID-19"), which has been spreading throughout the United States since approximately January 2020.

29.     On March 11, 2020, the World Health Organization's Director-General declared that the rapid and global spread of SARS-CoV-2 could be characterized as a pandemic.[1]  The United States-based Centers for Disease Control and Prevention followed suit on March 27, 2020.[2]

30.     The coronavirus primarily spreads between people through respiratory droplets produced by the infected person.  The risk that the coronavirus will spread to another person increases when the infected person sneezes, coughs, exhales deeply, or speaks—whereby droplets with virus may be suspended in air for up to hours at a time—and when an infected

---

[1]   https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020
[2]   https://wwwnc.cdc.gov/travel/notices/warning/coronavirus-global

person stands within six feet of other people for an extended period of time.  This means that a heavily trafficked machine will substantially increase the risk of COVID-19 transmission.

31.     The coronavirus can also spread when a person touches a surface or object that has the virus on it and then touches his or her own mouth, nose, or eyes.  The surface contamination may last several days.  For example, the coronavirus has been found to survive on plastic for 3 days.  Neeltje van Doremalen et al., "Aerosol and Surface Stability of SARS-CoV-2 as Compared With SARS-CoV-1," Letter to the Editor, New England Journal of Medicine (Mar. 17, 2020), https://bit.ly/2Uibd28.  Other coronaviruses have been found to survive for 4 to 5 days on glass surfaces. G. Kampf et al., "Persistence of Coronaviruses on Inanimate Surfaces and Their Inactivation With Biocidal Agents," 104 J. of Hospital Infection 246 (Mar. 2020), https://bit.ly/3fnITn1.  Thus, without frequent disinfection, there is a significant risk that a surface touched by an infected person will contaminate others.

32.     Further, persons who contract the virus but do not exhibit symptoms can spread the virus to others.  Thus, attempts to contain the virus merely by avoiding persons who show symptoms have limited preventative effect because asymptomatic carriers play a significant role in its spread.

33.     To prevent infection, the CDC recommends that people wash their hands often, maintain a distance of at least six feet from other people, refrain from gathering in groups or going to crowded places (known as "social distancing"), routinely clean and disinfect frequently touched surfaces, and wear cloth face covers.

34.     The CDC cautions that wearing cloth face covers is not a substitute for social distancing because masks merely mitigate, but do not eliminate, the risk of contracting or spreading coronavirus.

35.     Because of the highly contagious nature of the coronavirus, the CDC and the

Texas Health and Human Services Department instruct people who have COVID-19 to stay at

home except to seek medical care, and not to go to public places.  CDC, "What To Do If You

Are Sick," updated May 8, 2020, https://bit.ly/3d0WSxg; Texas Dep't Health and Human

Services, "Coronavirus Disease 2019 (Covid 19): What To Do If You Are Sick,"

https://bit.ly/2B1n39S (recommending that people with COVID-19 call their doctors and stay

home, and follow CDC recommendations).

36.     The CDC recommends that people at higher risk for severe illness "stay home and

avoid close contact" whenever possible.  This includes people over the age of 65, people who

live in nursing homes and long-term care facilities, people with underlying medical conditions

including chronic lung disease, moderate to severe asthma, and serious heart conditions, people

who are immunocompromised (due to cancer treatment, smoking, bone marrow or organ

transplants, immune deficiencies, HIV/AIDs, or prolonged use of corticosteroids and other

immune weakening medications), people with severe obesity, people with diabetes, people with

chronic kidney disease, and people with liver disease.  *See* CDC, "How to Protect Yourself &

Others," https://bit.ly/3dS54Be; CDC, "People Who Are At Higher Risk for Severe Illness,"

https://bit.ly/3hip2r4.

37.     The CDC has recognized homeless people as being a "particularly vulnerable

group" during the pandemic.  CDC, "People Experiencing Homelessness," https://bit.ly/3f93L18.

38.     The CDC also recommends that people should "Stay home and avoid close

contact" if they "may have issues getting assistance if [they] get sick." CDC, "How to Protect

Yourself & Others," https://bit.ly/3dS54Be.

**B.      Health Effects:  Death, Hospitalization, and Permanent Organ Damage**

39.      As the commissioner of Texas's Department of State Health Services declared on March 19, 2020, COVID-19 "has created an immediate threat, poses a high risk of death to a large number of people, and creates a substantial risk of public exposure because of the disease's method of transmission and evidence that there is community spread in Texas."[3]

40.      According to the CDC, "anyone can have mild to severe symptoms," symptoms may appear 2-14 days after exposure to the virus, and symptoms may include: fever or chills, cough, shortness of breath, fatigue, muscle and body aches, headache, new loss of taste or smell, sore throat, congestion or runny nose, nausea or vomiting, and diarrhea.[4]

41.      Critical forms of the illness can result in respiratory failure, shock, or multi-organ system dysfunction.[5]

42.      Scientists continue to study the long-term health consequences of COVID-19 on individuals who recover, but early reports indicate that the virus may cause strokes and blood clots; renal failure; permanent damage to the cardiovascular system;  permanent damage to the lungs; and neurological complications such as muscular weakness, numbness, and burning or prickling sensations.[6]  Moreover, even people who are not in high risk categories—such as younger individuals who are otherwise healthy—may suffer these long-term health effects if they contract the coronavirus.

43.      COVID-19 also can be fatal.  As of this date, the pandemic has killed more than 138,000 Americans.

---

[3]  https://dshs.texas.gov/news/updates.shtm
[4]  https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html
[5]  https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html
[6]  https://www.advisory.com/daily-briefing/2020/06/02/covid-health-effects;
https://www.centralillinoisproud.com/news/local-news/surviving-covid-19-is-only-part-of-the-battle-health-officials-say-long-term-effects-will-determine-if-they-fully-recover/;
https://www.vox.com/2020/5/8/21251899/coronavirus-long-term-effects-symptoms.

44.     As of July 15, 2020, the Texas Department of Health and Human Services has reported more than 275,000 infections and 3,322 deaths from the novel coronavirus.

45.     COVID-19 has a significantly higher mortality rate than the common flu, and it spreads more easily than the common flu.

46.     Finally, recent studies suggest that an infected person's immunity to the novel coronavirus may only last for a short time.  *See* Prof. Marina Pollan, MD and Miguel A. Hernan, *Prevalence of SARS-CoV-2 in Spain (ENE-COVID): a nationwide, population-based seroepidemiological study*, The Lancet (July 6, 2020), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(20)31483-5/fulltext (finding that a majority of the Spanish population did not test positive for the presence of antibodies, even in hotspot areas); *see also* Amanda Heidt, *Studies report rapid loss of COVID-19 antibodies*, The Scientist (June 19, 2020), https://www.the-scientist.com/news-opinion/studies-report-rapid-loss-of-covid-19-antibodies-67650 (reporting patients may lose antibodies associated with long-term immunity "within weeks or months after recovery").  This finding makes it all the more difficult for people to protect themselves and, as The Lancet researchers found, "emphasizes the need for maintaining public health measures to avoid a new epidemic wave."

### C.     Disproportionate Impact on Black, Latino, and Underserved Voters

47.     Black and Latino people are disproportionately likely to contract COVID-19 and, once they are infected, are disproportionately likely to die from the disease.  As Governor Abbott and the Texas Division of Emergency Management have acknowledged, "underserved and minority communities . . . have been disproportionately impacted by the virus," and, in June, they began working with local officials to establish better testing options for these cities and communities.  Press Release, "Governor Abbott, TDEM Announce Expanded Testing in

Underserved Communities Disproportionately Impacted By COVID-19," June 8, 2020,

https://bit.ly/2XOdhAV.

48.     Nationwide, Black people account for 13% of the population but 24% of COVID-19 fatalities where the race is known, indicating that Black people are dying at a rate nearly two times higher than their population share.  Because of underreported race data, this rate may be higher than reported.  The COVID Racial Data Tracker, https://covidtracking.com/race.

49.     U.S. Surgeon General Jerome Adams explained in April that people of color are experiencing higher rates of infection, illness, and death because they are less likely to be able to work from home, and more likely to live in dense, multi-generational housing.  White House April 10, 2020 Press Briefing, https://bit.ly/2MoimJx.

50.     Recent investigations suggest that these disparities hold true nation-wide, and there is no reason to suspect that the results are different in Texas.  According to a study by The New York Times, the average rate of coronavirus infection is over three times higher for Black and Latino people than for white people.  Richard A. Oppel Jr., et al., *The Fullest Look Yet at the Racial Inequity of Coronavirus*, N.Y. Times (July 5, 2020), https://www.nytimes.com/interactive/2020/07/05/us/coronavirus-latinos-african-americans-cdc-data.html.  According to The New York Times:

> Early numbers had shown that Black and Latino people were being harmed by the virus at higher rates.  But the new federal data—made available after The New York Times sued the Centers for Disease Control and Prevention—reveals a clearer and more complete picture: Black and Latino people have been disproportionately affected by the coronavirus in a widespread manner that spans the country, throughout hundreds of counties in urban, suburban, and rural areas, and across all age groups.  Latino and African-American residents of the United States have been three times as likely to become infected as their white neighbors, according to the new data, which provides detailed characteristics of 640,000 infections detected in nearly 1,000 U.S. counties.  And

Black and Latino people have been nearly twice as likely to die
from the virus as white people, the data shows.

51.     Limited access to health and wealth have led to racial ethnic disparities in

COVID-19 infection and fatality rates.  Black and Latino people are over-represented in essential

jobs that require them to work out of the home, experience high rates of poverty, have less access

to quality health care, and are more likely to live in multi-generational housing conditions, all of

which increase the risk of exposure and community spread in Black and Latino communities,

and increase the risk that exposure will result in serious COVID-19 illness.  Maria Goody, "What

Do Coronavirus Racial Disparities Look Like State By State?" NPR, May 30, 2020,

https://n.pr/2YymPAy.

52.     The same trends hold true in Texas, although the State of Texas has made it more

difficult to track those trends by limiting the type of information collected from residents.

53.     Statewide, Texas has reported race and ethnicity data for only 8% of reported

COVID-19 cases, and only 20% of COVID-19 fatalities.  COVID Tracking Project, Racial Data

Dashboard, https://covidtracking.com/race/dashboard (last accessed July 15, 2020).

54.     Of the cases for which race and ethnicity data is available, Black and Latino

Texans are disproportionately impacted by COVID-19.

55.     In Travis County, Latino residents comprise 51% of COVID-19 hospitalizations

but only 33.9% of the population.  Alyssa Goard, "Hispanic and Black Residents Make Up a

Disproportionate Number of Austin COVID-19 Hospitalizations," May 5, 2020,

https://bit.ly/2AvHA6d.

56.     Further, Moore County, Texas, has one of the top twenty highest rates of infection

in the country.  The COVID Racial Data Tracker, https://covidtracking.com/race.

Approximately 55% of Moore County's population identify as Hispanic or Latino.  U.S. Census, Moore County, Texas, https://bit.ly/3gM29vQ.

57.     Numbers of infection and fatality rates for Latino and Black people in Texas are likely underreported due to unequal availability of testing.  For example, in four major cities in Texas—Dallas, El Paso, Austin, and Fort Worth—public COVID-19 testing sites are disproportionately distributed in whiter neighborhoods.  Stephanie Adeline, "In Large Texas Cities, Access To Coronavirus Testing May Depend on Where You Live," NPR, May 27, 2020, https://n.pr/2Y0ZIx3.

58.     Texas has not gathered demographic data on many COVID-19 patients and fatalities and has failed to provide sufficient data to allow researchers to clearly distinguish between Latino and non-Latino white Texans, which means that infections and fatalities may be underreported in key communities, including amongst Latino Texans.  And Texas does not report race and ethnicity according to U.S. Census categories.  For instance, Native Americans with COVID-19 are labeled as "Other," which means that data on infections amongst Native American voters are not being collected or reported.

59.     The disproportionate infection rate and the more severe health consequences that Black and Latino people face from the coronavirus mean that voting procedures that fail to provide the necessary health and safety protections to *all* voters in the context of this pandemic will disproportionately burden the rights of Black and Latino voters, in particular.  Thus, Texas's voting procedures abridge and deny the equal rights of Black and Latino communities to participate in the voting process on account of their race.

60.     Voting in Texas is racially polarized: in 2014, the Pew Research Center reported that 58% of white Texans identified as "Republican/lean Republican," in comparison with 9% of

Black Texans and 25% of Latino Texans.  *Party affiliation among adults in Texas by race/ethnicity*, PEW RESEARCH CENTER, https://www.pewforum.org/religious-landscape-study/compare/party-affiliation/by/racial-and-ethnic-composition/among/state/texas/.  In the 2016 Presidential election, 69% of white Texas voters voted for Donald Trump as compared to 11% of Black Texas voters and 34% of Latino Texas voters.  *Exit Polls*, CNN (Nov. 15, 2016, 1:01 PM), https://www.cnn.com/election/2016/results/exit-polls/texas/president.

61.     In addition, as the Fifth Circuit has acknowledged, Texas has a long and sordid history of racial discrimination impeding the right to vote, which "cannot be ignored."  *Veasey v. Abbott*, 830 F.3d 216, 257-58 & n.53 (5th Cir. 2016) (en banc) (affirming district court's finding of discriminatory effect of voter identification law, including historic and contemporary examples of official voting discrimination in Texas).  This history includes all-white primary elections, literacy and secret ballot restrictions, poll taxes in state and federal elections, unconstitutional voter purges, and redistricting plan after redistricting plan found to be in violation of the Voting Rights Act.  *Id.*  A report from the Texas Advisory Committee to the U.S. Commission on Civil Rights reported that Texas "ranks as the 44th worst state for voter registration in the 2016 election," and "the current Texas electorate does not adequately represent the State's citizen voting age population . . . .  Instead, those currently registered to vote are more likely to be Anglo (*i.e.*, non-Hispanic Caucasian) and more likely to be older than those who are not on the rolls."  ADVISORY MEMORANDUM OF THE TEXAS ADVISORY COMMITTEE TO THE U.S. COMMISSION ON CIVIL RIGHTS 5 (2018), https://www.usccr.gov/pubs/2018/07-23-TX-Voting-Rights.pdf.  These and other practices have enhanced the opportunity for discrimination throughout the State, and these disparities will only escalate if Texas's upcoming election proceeds under the current voting procedures.

**D.**     **The Pandemic Has Not Abated: It Continues to Spread in Texas**

62.     Despite the efforts of public health officials to contain the spread of the virus, it has not abated and does not show signs of doing so before the November 2020 elections.

63.     To the contrary, the number of infections increased by 71% over a rolling 14-day period ending on June 6, 2020, and the percentage of positive tests has risen approximately 62% over the same rolling 14-day period.  Carla Astudillo, "In Texas, COVID-19 Cases Totals and Hospitalizations Are Rising. The State Says Prisons and Meatpacking Plants are Key Factors," Texas Tribune (June 8, 2020), https://bit.ly/2XKEiVK.  As of July 14, there were 10,569 Texans hospitalized for the coronavirus (1,283 more than the prior week), 10,745 new cases reported on July 14 alone, and 3.322 deaths reported. "Coronavirus in Texas: How Many Cases, Deaths, and Tests," Texas Tribune, https://bit.ly/3htjBpl (last visited July 15, 2020).

64.     Because Texas has tested only a small percentage of residents for coronavirus infection, it is likely that the true rate of infection and fatalities is higher than reported.

65.     After Texas began to reopen its economy on May 1, 2020, the Texas Department of State Health Services reported record-breaking numbers of COVID-19 hospitalizations. Vanessa Romo, "Texas Reports Record-Breaking COVID-19 Hospitalizations As State Reopens," NPR.org, June 8, 2020, https://n.pr/3hboOSr.

66.     The first known case of COVID-19 in Texas was reported on March 4, 2020, and as of July 15, 2020, Texas had more than 275,000 reported cases of COVID-19, including approximately 129,000 active cases.

67.     Texas has reported more than 3,000 new cases of COVID-19 each day since June 16, 2020.  Texas reported over 8,000 new cases per day for every day but one between July 7, 2020 and July 14, 2020.  Indeed, in that week alone, there were over 74,500 new cases reported.

68.     Hospitalizations due to COVID-19 have more than doubled since the beginning of June, and hospitals have treated a record number of COVID-19 patients for 13 days in a row. Sarah R. Champagne & Shannon Najmabadi, "Texas' Coronavirus Positive Rate Exceeds 'Warning Flag' Level Abbott Set as Businesses Reopened," Texas Tribune, June 24, 2020, https://bit.ly/3exXQTs.

69.     The United States may face an ongoing, second, or worse wave of coronavirus infections in the fall and winter of 2020.  *See* Audrey Cher, "WHO's Chief Scientist Says There's a 'Very Real Risk' of a Second Wave of Coronavirus as Economies Reopen," CNBC, June 9, 2020, https://cnb.cx/2MM8p97; Len Strazewski, "Harvard Epidemiologist: Beware COVID-19's Second Wave This Fall," American Medical Ass'n, May 8, 2020, https://bit.ly/36sTvh3; Zack Budryk, "CDC Director Warns Second Wave of Coronavirus Might Be 'More Difficult,'" The Hill, Apr. 21, 2020, https://bit.ly/3eLlWtr.

### E.      The Economic Consequences of the Pandemic Affect the Health of Voters and Their Access to Voting

70.     The pandemic has also had serious economic consequences for many people. Many people have lost their jobs or have had their work hours cut since March 2020, with federal data estimating a loss of 2.3 million jobs in Texas and state data estimating a loss of nearly 3 million jobs since March.  Erin Douglas, "Texas Unemployment Benefits Extended, Jobless Claims Tick Up," Houston Chronicle, June 4, 2020, https://bit.ly/3e58i4k.

71.     Black, Asian, and Latino workers have experienced a disproportionate percentage of job losses during this time; nationwide in May, unemployment rates were 12.4% for white people, 16.8% for Black people, 15% for Asian people, and 17.6% for Hispanic or Latino people. Bureau of Labor Statistics News Release June 5, 2020, https://bit.ly/2B3uope.

72.     Applications for unemployment and for Supplemental Nutrition Assistance Program (SNAP) benefits have also risen sharply since the pandemic began. Texas Workforce Commission, "Unemployment Claims By Numbers," https://bit.ly/3cUqKvo; Stacy Fernandez, "Texas Families Filing for SNAP Food Assistance Almost Doubled in April," Texas Tribune, May 21, 2020, https://bit.ly/2XRnzA6.

73.     The pandemic-related recession may create housing insecurity for thousands of Texans.

74.     Poverty, housing insecurity, and food insecurity increase voters' vulnerability to serious outcomes due to COVID-19 infections.

75.     People who experience housing insecurity and food insecurity are associated with poor access to health care and high use of acute care.  Margot Kushel et al., "Housing Instability and Food Insecurity as Barriers to Health Care Among Low-Income Americans," 21 J. Gen. Inter. Med. 71 (2006).

76.     People who are experiencing housing insecurity are unlikely to be able to vote by mail, even if otherwise eligible.  They will not have access to a stable address at which to receive their mailed ballot or be able to afford the costs associated with voting by mail.  Therefore, they will have to vote in person in order to be able to vote.

II.     **Texas's Election Policies During the Pandemic**

77.     On March 13, 2020, Texas declared a state of emergency in response to the pandemic, and on March 19, 2020, Texas declared a public health disaster.

78.     On March 20, Defendants deferred the state's primary election runoffs, previously scheduled for May 26, to July 14.

79.     On April 6, Director of Elections Keith Ingram issued Election Advisory No.

2020-14 to address COVID-19 (Coronavirus) Voting and Election Procedures ("April 6

Advisory"), https://www.sos.state.tx.us/elections/laws/advisory2020-14.shtml.

80.     The April 6 Advisory clarified, but authorized no changes to, the state's laws and

rules regarding late voting, early voting, or curbside voting.

81.     The April 6 Advisory acknowledged that voting in person might not be an

"available option for all voters, including those affected by quarantines," but did not authorize

changes to voting laws or procedures.

82.     Instead, the April 6 Advisory recommends—but does not require—that county

officials "consider seeking a court order to authorize exceptions to the voting procedures

outlined in certain chapters of the Texas Election Code."

83.     The April 6 Advisory recommends—but does not require—that county election

officials check with vendors about proper cleaning of voting equipment.

84.     The April 6 Advisory summarizes CDC guidelines for preventing the spread of

coronavirus in election polling places, but provides no support or resources, nor mandates any

requirement, for ensuring that counties can satisfy these suggestions, which include washing

hands frequently, routinely cleaning frequently touched surfaces, and disinfecting surfaces.

85.     The April 6 Advisory recommends that county officials review and potentially

relocate polling places, and that county officials set up voting stations to allow for six feet

between voters and to otherwise maintain spacing between voters in the polling place, but the

Advisory does not mandate these actions nor provide resources to ensure that polling places are

safe and set up for social distancing.

86.     The April 6 Advisory does not provide guidance on how to maintain social distancing outside of the polling place or for long lines of voters, let alone require such safeguards.

87.     The April 6 Advisory recommends that counties recruit and train additional workers, but does not require such efforts, nor provide resources or support for counties to accomplish this recommendation.

88.     The April 6 Advisory does not require poll workers, voters, or any other persons at a polling site to wear a mask, although the overwhelming consensus of public health officials and professionals is that a mask is an important and minimally burdensome step for mitigating spread of the virus.

89.     Defendants have not made any changes to Texas's election laws or policies to accommodate the pandemic, despite being aware of the high risk of danger to the health and safety of voters if such action is not taken immediately.  Defendants have affirmatively decided not to expand voting by mail, reopen any closed voting places, or ensure that counties have sufficient resources to take precautionary steps to protect voters.

90.     Texas does not offer accessible mail-in vote options.  Individuals with disabilities who wish to vote in secret will have to vote in person.

91.     Defendants refuse to revise voting procedures regarding early voting, paper ballots, and the number of polling places to enable counties to minimize health risks of contracting a potentially deadly illness while ensuring sufficient access to the ballot.  If unchanged, these voting procedures will put the lives and health of voters at risk, and will force voters to choose between exercising their right to vote or contracting a potentially deadly illness.

92.     Defendants' actions will place a severe burden on voters and county election officials.

93.     On June 18, 2020, Director of Elections Keith Ingram issued Election Advisory No. 2020-19 to address Voting in Person During COVID-19 ("June 18 Advisory"), https://www.sos.state.tx.us/elections/laws/advisory2020-19.shtml.

94.     The June 18, 2020 Advisory summarizes the circumstances under which counties can consolidate precincts and close certain polling places during primary runoff elections (including the July 14, 2020 elections) and general elections (including the November 3, 2020 elections). For the November 2020 elections, consolidation is authorized in precincts with less than 500 registered voters or, in counties with populations of 250,000 or more, less than 750 registered voters.

95.     The June 18 Advisory also recommends—but does not require—social distancing and processes for cleaning and sanitizing polling places.

96.     The June 18 Advisory suggests that election officials consider providing voters with styli to use on voting machines, but does not require that styli be provided nor guarantee that they will work on the voting machines.

97.     Although the June 18 Advisory recommends that surfaces be disinfected with EPA-approved cleaners, it also recommends sanitizing certain voting machines with 50% or higher isopropyl alcohol without clarifying that the CDC and EPA have stated that disinfection requires solutions of 70% or higher isopropyl alcohol.

98.     The June 18 Advisory recommends that poll workers "sanitize any equipment that is handled by voters or polling place workers," and that "election officials sanitize equipment

after each use, particularly if a voter is showing any signs or symptoms of COVID-19," but does not require that sanitization occur after each voter uses the machine.

99.     The June 18 Advisory confirms that counties are not required to offer voters the option of voting on paper ballots.

100.     The June 18 Advisory recommends but does not require that polling locations be set up to allow voters to practice social distancing.

101.     Neither the June 18 Advisory nor any other Texas law or regulation requires voters to wear face coverings while voting, even where they are showing symptoms of COVID-19.

102.     On July 2, 2020, Governor Abbott issued a statewide mask mandate, but specifically exempted "any person who is voting, assisting a voter, serving as a poll watcher, or actively administering an election" from the requirement.  Patrick Svitek, *Texas Gov. Greg Abbott's statewide mask mandate exempts voting sites and churches*, The Texas Tribune (July 3, 2020), https://www.texastribune.org/2020/07/03/texas-mask-order-voting-chruches-greg-abbott/. Governor Abbott stated that the exemption was meant to ensure that persons without a mask do not lose their right to vote, even though he acknowledged that "we know that the safest way to go vote is by wearing a mask."  But Governor Abbott did not consider how the failure of potential carriers of the coronavirus to wear a mask could put other voters at serious risk merely for exercising their right to vote.  As Governor Abbott stated, "[y]our constitutional rights [to vote] are not voided simply because of a pandemic."  The obvious (and lawful) solution to this problem, which would respect the health and safety of *all* voters, would be for the State to provide masks at polling sites to persons who do not already have one.

103.    Under the June 18 Advisory, voters who present with COVID-19 symptoms can be encouraged to cover their faces, provided with a disposable face covering, given the chance to vote curbside, or the opportunity to move to the head of the voting line—but the Advisory does not require any election administrators to provide these options, and permits voters to refuse these options.

104.    Election officials will not have the opportunity to assess a voter's health or symptoms until after the line reaches the voting place.

105.    The June 18 Advisory recommends but does not require jurisdictions to issue personal protective equipment (PPE) to election workers or to voters.

106.    The June 18 Advisory authorizes an election judge to ask a voter to lower or remove their face covering for the purpose of voter identification.  If a voter refuses, that voter will only be allowed to cast a provisional ballot, and can have their vote counted only if they later go to the voter registrar's office to "cure the deficiency."  Voters who cannot make this trip will not have their votes counted.

107.    Neither Advisory takes the steps necessary to protect Texas voters from unlawful burdens on their right to vote in the context of this pandemic.

## III.    Under Pandemic Conditions, Defendants' Early Voting System Unlawfully Burdens the Right to Vote

108.    Early voting will take place over a two-week period prior to the November general elections.  Early voting takes place for eight hours per weekday, or three hours per weekday in counties of fewer than 1,000 registered voters.  In counties with populations of at least 100,000 people, early voting must be extended to twelve hours per weekday during the last week of early voting and be open on the last weekend of the early voting period.  Texas Election Code § 85.005, 85.006.

109.    Early voting takes place either at the main early voting polling place, typically located in the building in which the county clerk or city secretary conducts usual business, or at another permanent early voting polling place.  Texas Election Code, Title 7, § 85.002, 85.061.

110.    In September 2019, a new law, HB 1888 went into effect to prohibit counties from opening mobile early voting places with flexible locations, hours, and days.  Additional locations may be authorized, but they must "be fixed in one place for the duration of the period that voting is required to be conducted at the polling place," and must maintain the same days and hours as the main early voting polling place.  Texas Election Code, Title 7, § 85.062, 85.063.

111.    These limitations prevent county election officials from making early voting accessible to their voters, and prevent many voters from accessing early voting.  Prior to the passage of HB 1888, county election officials could open mobile and temporary early voting sites for limited periods of time in parts of the county that might not otherwise be able to sustain the costs of a two-week long early voting polling place.  These mobile early voting polling places could maintain irregular hours that made voting more accessible to voters in those areas.

112.    Mobile early voting made it possible for people in rural locations, who live on college campuses or in retirement communities, who live far from permanent early voting places, or who work long hours, to vote early.

113.    Because of the increased risk of person-to-person coronavirus transmission by forcing early voters to congregate in fewer locations over limited hours (or to take mass transportation to access faraway voting sites), limited early voting options on limited days and hours will restrict the ability of voters to vote early, which will increase the number of people who have to vote in person on Election Day, further increasing the lines voters face and burdening the exercise of the franchise.

IV.   **Under Pandemic Conditions, Texas's In-Person Voting System Unlawfully Burdens the Right to Vote**

114.   Texas's voting system creates numerous burdens on the right to vote in the context of this pandemic.  The following aspects of this system contribute to this burden and danger: (1) the requirement to physically touch and exchange physical identification documents; (2) the requirement to stand in the same physical space of multiple prior voters and physically touch voting machines which cannot be disinfected between uses; (3) the limited availability of hand-marked paper ballots which make the voting process considerably safer; (4) the limited availability of curb-side voting, which drastically reduces the potential exposure of voters; (5) the limited availability of early voting which reduces long lines on Election Day; (6) the reduction of polling places, increasing the risk that voters will need to travel long distances, take public transportation, or carpool with others, thus exacerbating the risk of infection; and (7) the likely overcrowding of polling places, further exacerbating the risk of infection due to such over-crowding.

A.   **Physical Contact: Identification Documents**

115.   Texas law requires in-person voters to present an acceptable form of identification, or to present an alternative form of identification and verify that they face a reasonable impediment to procuring an acceptable form of identification.  Poll workers are required to physically hold and examine identification documents, and to pass the verification form to, and receive the completed form from, voters.

116.   The Texas voter ID requirements will require voters without identification to visit government offices and travel in public, in violation of public health recommendations; or to obtain alternative forms of identification that many people, including those who are experiencing poverty or housing insecurity, do not possess.

117.    Although Texas allows voters to cast provisional ballots if they cannot produce identification or follow the reasonable impediment procedures due to a natural disaster, no such exemption has been declared for the pandemic.  This natural disaster exemption also requires voters to appear at the voter registrar's office within the next six calendar days to sign an affidavit swearing to the natural disaster.

118.    Even if the pandemic is declared a natural disaster, this requirement will force voters to make additional trips out in public and to government offices, creating the risk of additional exposure to, or transmission of, the coronavirus.

### B.    Physical Contact:  Electronic Voting Machines

119.    Texas election policies will place individuals who vote in counties that use universal electronic voting machines at high risk of contracting the coronavirus.  The insufficient availability of voting machines and absence of hand-marked paper ballot options at many polling sites will require hundreds of voters to vote on the same machines—and therefore touch the same common surfaces—throughout Election Day.

120.    Texas allows many of its counties to require all voters to vote on electronic voting machines and to refuse to make hand-marked paper ballots available to voters.

121.    Any county that elects to participate in the Countywide Polling Place Program must require all voters to vote on direct recording electronic (DRE) voting machines, a type of electronic voting machine. Tex. Elec. Code Ann. § 43.007(d).

122.    Electronic voting machines have glass and plastic components that will be touched by each voter who uses the machine, as well as by poll workers who set up the machines and assist voters when necessary, increasing the risk of coronavirus transmission.

123.    Many of the electronic voting machines are touch screens, tested and intended to be used by voters touching their fingers to the screen to make selections.

124.     These machines are not certified for use with a stylus or by a gloved hand, and they have not been tested for effectiveness or accuracy when used with a stylus or a gloved hand.

125.     Election officials have not tested whether styli will be effective or accurate over multiple uses or the course of Election Day.

126.     Manufacturers of voting machines have warned that failure to clean the machines according to their instructions may cause the machines to malfunction.

127.     Several manufacturers recommend cleaning equipment with 50% or higher isopropyl alcohol solution without informing users that the CDC recommends cleaners of at least 70% alcohol solution to disinfect surfaces from the coronavirus. Other manufacturers warn against applying cleaner directly to the screen and using only enough cleaner to "lightly dampen" cloths. While these methods may limit the likelihood of damaging the equipment, neither the Defendants nor the voting machine manufacturers have demonstrated that these methods are sufficient to disinfect the machines to prevent coronavirus transmission.

128.     Cleaning each machine properly will take time—potentially increasing delays and the amount of time voters congregate waiting to vote, in turn increasing the risk that voters will be unable to vote during their available time windows and increasing the risk of coronavirus transmission.

129.     If a poll worker uses the wrong cleaner, accidentally touches a button during cleaning, uses too much liquid cleaner, or does not clean according to manufacturer instructions, the machine could break or malfunction, increasing the same risks described above.

130.     If the machine is not cleaned after each person casts a ballot, the coronavirus will remain on the machine's surfaces, such as the screen or keypad, and can be contracted by the next voter.

131.    If poll workers clean each machine after every voter, particularly at the necessary level of care recommended by the manufacturers, then voter lines (and corresponding risk of inability to vote and coronavirus transmission) will increase in counties in which all voters are required to use electronic voting machines.

132.    No amount of cleaning will be able to completely eliminate the risk of transmission from aerosolized particles caused by each voter's heavy breathing, speaking, coughing, or sneezing, making it critical that all voters are provided the option of hand-marked paper ballots to reduce the traffic to voting machines.

133.    Electronic voting machines cause other problems in the context of this pandemic. Voting machines can only be set up where there are accessible electricity sources, which may make it difficult to set up voting stations more than six feet apart, increasing the risk of coronavirus transmission through overcrowding.

134.    In addition, counties that participate in the Countywide Polling Place Program allow voters to vote at any polling place in the county, but have a more limited number of polling places and require all voters to vote on direct recording electronic (DRE) voting machines. Thus, overcrowding is likely in counties with electronic voting options.

135.    Defendants' failure to provide the option to vote using hand-marked paper ballots and to expand the number of people who can vote simultaneously will create unnecessary and substantial risk of overcrowding and long lines, require people to vote on frequently touched surfaces that are difficult and time-consuming to disinfect, and thereby unlawfully burden voters' exercise of the franchise.

C.  **Physical Contact:  Failure to Permit Paper Ballots**

136.    Texas has alternatives that would vastly reduce the risk of spreading the
coronavirus.  For example, for several reasons, hand-marked paper ballots are a safer alternative
to electronic voting machines and will help minimize the risk of spreading the coronavirus.

137.    While universal-use electronic voting machines will be handled and breathed on
repeatedly by poll workers and by all voters, hand-marked paper ballots will be handled only by
the poll worker who hands it to a single voter, and by that voter.

138.    In addition, the coronavirus does not survive as long on paper and cardboard as it
does on glass and plastic. *See* G. Kampf et al., "Persistence of Coronaviruses on Inanimate
Surfaces and Their Inactivation With Biocidal Agents," 104 J. of Hospital Infection 246 (Mar.
2020), https://bit.ly/3fnITn1; Neeltje van Doremalen et al., "Aerosol and Surface Stability of
SARS-CoV-2 as Compared With SARS-CoV-1," Letter to the Editor, New England Journal of
Medicine (Mar. 17, 2020), https://bit.ly/2Uibd28.

139.    Further, hand-marked paper ballots can be filled out on surfaces that are easily
disinfected with any cleaner approved by the CDC.

140.    If hand-marked paper ballots are made available to voters, it will reduce the
burden on electronic voting machines, limit lines, provide poll workers with more time to clean
the machines properly without causing back-ups or delays, minimize the number of people
breathing on and around the machines, and increase the likelihood that voters who need or prefer
to use electronic voting machines will have prompt access to a disinfected machine that has not
been handled or breathed on by hundreds of other voters.

141.    Currently, however, Plaintiffs understand that Defendants do not plan to ensure
that all counties can make hand-marked paper ballots available to all voters.

D.    **Physical Contact:  Limited Options to Pursue Curbside Voting**

142.    Under Texas law, curbside voting is only available for individuals who are physically unable to enter the polling place without assistance or likelihood of injury to his or her health. Texas Election Code Sec. 64.009.

143.    In the April 6 Advisory, Texas Director of Elections Keith Ingram warned that "[t]o provide for voting curbside, the voter must be qualified by the election official before the voter can receive the ballot."

144.    Defendants have not yet provided guidance as to whether fear of exposure to COVID-19, or whether being at high risk for serious illness due to COVID-19 or having symptoms of COVID-19, qualifies a voter to vote curbside.  However, Defendants have taken the position that fear of exposure to COVID-19 does not qualify as a disability that would render a voter eligible to vote by mail.

145.    Voting curbside will not provide protection against COVID-19 transmission for voters who do not qualify for curbside voting or who must walk or take public transportation to the polling place.

E.    **Overcrowding: Reduction of Polling Places**

146.    Since 2012, Texas has shut down approximately 750 polling sites, including 542 sites in 50 counties with high or growing Black and Latino populations.

147.    Fewer sites mean that more people have to vote at each polling place per site, increasing the risk of coronavirus infection at each site.

148.    Fewer polling places also mean that people may have to travel further to get to a voting place.

149.    During Texas's March primaries, thousands of voters were required to wait in line for hours in order to vote.

150.    Some of the causes of these lines included limited voting sites, voting sites that did not open on time, insufficient voting equipment, and insufficient staffing.

151.    Harris County experienced some of the longest lines. There, some polling places experienced lines that exceeded four hours.

152.    Harris County's population is approximately 40% Latino and 19% Black.

153.    Voting site problems, lines, and delays disproportionately affected Black and Latino voters during Texas's March primaries.

154.    Two million people voted in person on Election Day during the Texas March 2020 primaries, while another two million people voted absentee or through early voting.

155.    Millions more Texas voters are expected to vote during the November 2020 General Election than in the March 2020 primary elections.

156.    In 2016, nearly 9 million Texas voters cast ballots for the 2016 General Election.

157.    Defendants' failure to mitigate the public health risk by requiring the opening of more voting sites (thereby reducing the risk of overcrowding at any single location) unlawfully burdens voters' exercise of the franchise.

**F.    Overcrowding:  Failure to Hire Sufficient Number of Poll Workers**

158.    Elections held in other states during the pandemic have been severely impacted by poll worker shortages.

159.    In Texas, as elsewhere in the country, many poll workers are elderly and at high risk for serious COVID-19 illness, and thus can be expected not to be available to assist at the polls this year.

160.    To ensure that polling places are staffed, Defendants will have to recruit and mobilize new poll workers from populations who are at lesser risk of serious COVID-19 infection and will have to take steps to prevent infection at the polls.  Their failure to do so will

cause excessive delays, overcrowding, and health and safety risks that unlawfully burden the right to vote.

161.    The primary elections held on July 14, 2020 confirm that, absent significant changes to the State of Texas's voting policies, voters will face unlawful burdens on their right to vote in the upcoming November elections as a result of closures prompted by poll worker shortages.

162.    For example, The Texas Tribune reported on July 9, 2020 that, as a result of Governor Abbott's decision not to require voters to wear masks, two major Texas counties closed numerous polling locations as poll workers refused to report to work.  Bexar County was expected to close at least eight of its voting locations and Tarrant County agreed to shutter two polling locations.  The Tarrant County elections administrator Heider Garcia confirmed that poll workers who were dropping off were primarily citing concerns over the pandemic.  In Tarrant County, an election judge confirmed that three of the six poll workers who were supposed to staff a polling site quit over coronavirus concerns prompted by the Governor's mask exemption for polling sites.  *See* Alexa Ura, *Two major Texas counties are trimming polling locations as workers pull out over coronavirus*, The Texas Tribune (July 9, 2020), https://www.texastribune.org/2020/07/09/texas-voting-coronavirus/.

163.    Another news report on July 15, 2020, published after the primaries, stated that "[i]n some counties, previously advertised polling places were shuttered at the last minute for lack of workers, some fearing the pandemic or reluctant to risk exposure to voters who were not required to wear masks.  Others walked off the job Tuesday morning after discovering some of their fellow poll workers wouldn't be donning masks."  *See* Alexa Ura, *Runoff elections show Texas not quite ready for November's main event*, The Texas Tribune (July 15, 2020),

https://www.texastribune.org/2020/07/15/texas-primary-runoff-elections-november/.  Bexar

County elections administrator Jacque Callenen stated that "Today, we had three teams decline

to serve, because of the COVID-19 virus.  Please keep in mind that the average judge's age is 72,

so we certainly understand their concerns."  These staffing issues forced Bexar County to close

an additional three voting locations at the last minute, resulting in a total closure of 12 voting

sites.  *Id.*  One poll worker's "shift lasted about 45 minutes after she decided she was unwilling

to sit for 14 hours next to poll workers who weren't wearing masks."  *Id.*

164.     Similar problems are expected to occur during the November elections unless

corrective action is taken.

\*            \*            \*

165.     Under Pandemic Conditions, these policies, individually and cumulatively,

operate to deny voters the right to vote in a safe, free, fair, and accessible election.

166.     To ensure that 2020 elections—and any elections that occur during the ongoing

pandemic—are free, fair, accessible, and safe, Defendants must take swift action to amend Texas

election policies to expand the availability of hand-marked paper ballots and early voting, and to

maintain safe in-person voting options by opening a sufficient number of polling stations,

instituting appropriate safety measures given the severity of the pandemic and the severe risks

associated with getting and transmitting the virus, and retaining a sufficient number of poll

workers to monitor and administer a safe election.

**CLAIMS FOR RELIEF**

**COUNT ONE**
**Undue Burden on the Right to Vote**
**in Violation of the Due Process Clause of the Fourteenth Amendment**
**as Applied to Elections Held during the COVID-19 Pandemic**

167.    Plaintiffs reallege and incorporate by reference as if fully set forth herein each of the preceding paragraphs and allegations.

168.    The Due Process Clause of the Fourteenth Amendment of the U.S. Constitution provides that "[n]o States shall . . . deprive any person of life, liberty or property, without due process of the law." U.S. Const. amend. XIV § 1.

169.    The "political franchise of voting" has long been held to be a "fundamental political right, because [it is] preservative of all rights." *Harper v. Virginia Board of Elections*, 383 U.S. 663, 667 (1966).  When considering the constitutionality of a limitation on the right to vote, a court must consider the burden of that limitation in light of "the precise interest put forward by the State as justifications for the burden imposed by its rule." *Burdick v. Takushi*, 504 U.S. 428, 434 (quoting *Anderson v. Celebrezze,* 460 U.S. 780, 789 (1983)).

170.    During the COVID-19 pandemic, Texas's election laws impose a severe burden on the right to vote without sufficient interests that justify this imposition on Texans' right to safely access the polls.

171.    Texas's election policies during the pandemic will unlawfully abrogate and abridge the constitutionally protected right to vote.

172.    Voters will be disenfranchised because voting will place their lives and health at unacceptable risk, and will be unduly burdensome.

173.    Forcing voters to unreasonably risk their health, safety, or life to vote unjustifiably burdens their right to vote.

174.    During the pandemic, short early voting periods, inaccessible early voting sites, and limited early voting hours will unjustifiably burden voters.  These limitations will force voters who must vote early to travel further distances to get to early polling sites and more people will be voting at the same limited early voting sites during the same limited hours and days.  Individuals who cannot access early voting due to the limited locations and hours will be required to vote in person on Election Day.

175.    Voters who vote in person on Election Day will be unjustifiably burdened because current laws and policies unduly burden the rights of voters during a pandemic.

176.    Voters will have to stand in long lines in large crowds, possibly for hours, in contravention of CDC recommendations.

177.    Because Defendants have closed hundreds of polling places over the last eight years, voters will have to travel further to vote in person and vote in locations that service a higher number of voters, burdening the exercise of the franchise and the risk of person-to-person transmission of the virus.

178.    In other states that have conducted elections during the pandemic, including Wisconsin and Georgia, election officials have closed numerous polling locations, which has contributed to long lines and presented serious obstacles to voters getting to the polls.

179.    Without adequate preparation and recruitment of poll workers, the same is likely to occur in Texas during its upcoming elections.

180.    Closures will create longer lines and larger crowds at polling places, forcing voters to travel even farther to vote.

181.    Curbside voting is limited and not available to most voters.

182.     Voters in counties where all voters are required to vote on electronic voting machines will be required to touch screens and surfaces that have been touched repeatedly by poll workers and by dozens or hundreds of other voters.

183.     Texas's Voter ID law will require poll workers and voters to physically pass identification documentation back and forth, increasing the risk of coronavirus transmission.

184.     Voters who cannot provide necessary identification will have to travel and visit government offices to obtain or renew identification, potentially contravening quarantine guidance/requirements.

185.     As applied to elections held during the COVID-19 pandemic, Texas's refusal to open sufficient number of voting places, offer hand-marked paper ballots, and enact safe, accessible methods of in-person voting together and individually place unconstitutional burdens on the Plaintiffs' right to vote. Texas has no countervailing interest sufficient to justify the burden these policies place on voters' access to the franchise.

186.     If an injunction does not issue to direct the Defendants' conduct during elections that take place during the pandemic, the individual Plaintiffs and members of Plaintiff NAACP will be subject to an unjustifiable burden on their right to vote, and Plaintiffs Mi Familia Vota and NAACP will be forced to continue expending additional resources to protect Texan Latino and African-American voters' right to vote and health.  Plaintiffs will each suffer irreparable injuries for which there is no adequate remedy at law.

## COUNT TWO
**Voters are Denied Equal Protection Under the Law
in Violation of the Fourteenth Amendment
as Applied to Elections Held during the COVID-19 Pandemic**

187.    Plaintiffs reallege and incorporate by reference as if fully set forth herein each of the preceding paragraphs and allegations.

188.    The Fourteenth Amendment prohibits states from depriving "any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV § 1.

189.    Defendants will arbitrarily treat some voters differently than other similarly situated voters in the same elections during the pandemic.

190.    The health risks faced by voters who must vote in person are unjustifiably increased in counties where, because of Defendants' policies and practices described above, voters must wait in line, are not able to socially distance in or outside of the voting places, or are required to use electronic voting machines that have not been adequately disinfected.

191.    Voters who are able to vote in voting places without waiting in line and voters who have the option of voting by hand-marked paper ballot will not contend with the same unjustifiable burden on their exercise of the franchise.

192.    Voters who are at high risk of suffering severe responses to the virus, and voters who are at high risk of spreading the virus to high-risk people—such as essential workers, health care professionals, or people who live or care for elderly or disabled individuals—face a greater burden on their right to vote than other voters and may face disenfranchisement because, under current election practices, they cannot safely vote without unnecessarily putting their health at risk.

193.    Black and Latino voters, including Plaintiffs Rodriguez and Torres, persons on whose behalf Plaintiffs Mi Familia Vota and NAACP have been forced to divert resources, and

members of Plaintiff NAACP, are disproportionately likely to have to stand in long lines and be subject to large crowds in order to vote.

194.   Defendants recommend that counties seek court orders to obtain exceptions to the voting procedures that place voters at risk. Voters who live in counties that do not pursue or obtain court orders will face risks to their lives and health that are not faced by voters who live in counties that do pursue and obtain court orders.

195.   If an injunction does not issue to direct the Defendants' conduct during elections that take place during the pandemic, the individual Plaintiffs, members of Plaintiff NAACP, and persons on whose behalf Plaintiffs Mi Familia Vota and NAACP have diverted their resources, will be treated differently from similarly situated voters by Defendants' failures by facing increased risks of being unable to vote and/or of coronavirus infection.  Plaintiffs will each suffer irreparable injuries for which there is no adequate remedy at law.

<u>**COUNT THREE**</u>
**Undue Burden on the Right to Vote**
**in Violation of the First Amendment**
**as Applied to Elections Held during the COVID-19 Pandemic**

196.   Plaintiffs reallege and incorporate by reference as if fully set forth herein each of the preceding paragraphs and allegations.

197.   The First Amendment, which is applicable to states via the Fourteenth Amendment, prohibits "abridging the freedom of speech." U.S. Const. amend. I.

198.   Voters will be unjustifiably burdened in exercising their right to vote and their right to speak by voting for the candidates of their choice.

199.   Plaintiffs may be forced to give up their rights in order to preserve their lives.

200.   If an injunction does not issue to direct the Defendants' conduct during elections that take place during the pandemic, the individual Plaintiffs, members of Plaintiff NAACP, and

persons on whose behalf Plaintiffs Mi Familia Vota and NAACP have diverted resources, will be subject to an unjustifiable burden on their right to vote and their freedom of speech. Plaintiffs will each suffer irreparable injuries for which there is no adequate remedy at law.

201.    Defendants have no justifiable reason for imposing these burdens upon voters during the pandemic.

## COUNT FOUR
### Race Discrimination
### in Violation of the Fifteenth Amendment (42 U.S.C. § 1983)
### as Applied to Elections Held during the COVID-19 Pandemic

202.    Plaintiffs reallege and incorporate by reference as if fully set forth herein each of the preceding paragraphs and allegations.

203.    The Fifteenth Amendment provides that no State shall deny or abridge the "right of citizens of the United States to vote . . . on account of race, color, or previous condition of servitude." U.S. Const., amend. XV.

204.    By their actions described above, which Defendants took despite knowledge that the risks and harms posed by the coronavirus pandemic disproportionately affected communities of color, the individual Plaintiffs, members of Plaintiff NAACP, persons on whose behalf Plaintiffs Mi Familia Vota and NAACP have diverted resources, and other minority voters have had their right to vote abridged and denied on account of race.

## COUNT FIVE
### Race Discrimination
### in Violation of Section 2 of the Voting Rights Act (52 U.S.C. § 10301)
### as Applied to Elections Held during the COVID-19 Pandemic

205.    Plaintiffs reallege and incorporate by reference as if fully set forth herein each of the preceding paragraphs and allegations.

206.    The Voting Rights Act prohibits any voting standard, practice, or procedure whose application "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color," 52 U.S.C. § 1030.

207.    By their actions described above, which Defendants took despite knowledge that the risks and harms posed by the coronavirus pandemic disproportionately affected communities of color, the individual Plaintiffs, members of Plaintiff NAACP, persons on whose behalf Plaintiffs Mi Familia Vota and NAACP have diverted resources, and other minority voters have had their right to vote abridged and denied on account of race.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

a.    Order Defendants to modify in-person voting procedures during the early voting period and on Election Day to ensure that polling sites are safe and of low risk to the health of all registered voters, and specifically order that Defendants:

i.    Extend the period of early voting to begin on October 5, 2020.

ii.    Require voters, poll-workers, persons assisting voters, and any other person at a polling site to wear a mask, including providing masks to persons who do not already have one, with exceptions only for individuals who cannot wear masks due to a disability;

iii.    Allow counties to offer extended, temporary, and/or mobile early voting locations with flexible hours and days.

iv.    Suspend the requirement that curbside voters must qualify as having a disability or, alternatively, order that any voter may identify as "disabled" due to the threat that the coronavirus poses to his or her health and life, for the purpose of being found eligible to vote curbside.

- 42 -

v.      Open additional polling places and provide enough voting booths and poll workers at each polling place to ensure that voters are not required to wait more than twenty minutes to vote, to minimize coronavirus transmission.

vi.     Staff all polling places with sufficient number of poll workers to keep voter lines to less than 20 minutes, including by actively recruiting new poll workers who are not at high risk for serious illness due to COVID-19.

vii.    Prohibit the closure of polling places currently scheduled to be available on Election Day.  Should a polling place need to be closed or moved in order to meet health and safety requirements, require that a new polling place be made available within the same voting precinct.

viii.   In counties that use electronic voting machines, including counties that participate in the Countywide Polling place Program, make available sufficient numbers of both paper ballots and electronic voting machines so that voters have the option of voting by hand-marking a paper ballot or by voting on the electronic voting machine, to minimize the risk of coronavirus transmission.

ix.     Revise voter identification requirements to allow voters to show identification without requiring poll workers to physically handle identification or documentation, apply the natural disaster exception to the pandemic, and allow voters to sign affidavits regarding the natural disaster exception at the polling place.

x.      Ensure that poll workers are given protective gear, including masks and gloves, in sufficient quantity to allow poll workers to change protective gear frequently. Provide poll workers with ample opportunity to wash their hands.

b.      Order Defendants to enable counties that need to revise election policies in order to protect voters' health to do so, provided that the proposed revisions do not violate any relief ordered by this Court.

c.      Order Defendants to rescind or modify any voting practice or procedure deemed by this Court to unlawfully discriminate against Black, Latino, or other underserved voters on the basis of a protected characteristic, to eliminate such discrimination.

d.      Order that all such relief be extended until there are no existing cases of coronavirus in the state of Texas; or until there is a vaccine freely and readily available to all Texans, whichever comes sooner.

e.      Award Plaintiffs reasonable attorneys' fees and costs.

f.      Retain jurisdiction to ensure all Defendants' ongoing compliance with the foregoing orders.

g.      Grant such other and further relief that this Court deems just and appropriate.

Dated: July 16, 2020

Respectfully submitted,

LYONS & LYONS, P.C.
237 W. Travis Street, Suite 100
San Antonio, Texas 78205
Telephone:     (210) 225-5251
Telefax:       (210) 225-6545

By:      /s/ *Sean Lyons*
         Sean Lyons
         State Bar No. 00792280
         Sean@lyonsandlyons.com
         Clem Lyons
         State Bar No. 12742000
         Clem@lyonsandlyons.com

- 44 -

Courtney Hostetler (*pro hac vice* forthcoming)
chostetler@freespeechforpeople.org
John Bonifaz (*pro hac vice* forthcoming)
jbonifaz@freespeechforpeople.org
Ben Clements (*pro hac vice* forthcoming)
bclements@freespeechforpeople.org
Ronald Fein (*pro hac vice* forthcoming)
rfein@freespeechforpeople.org
FREE SPEECH FOR PEOPLE
1320 Centre Street, Suite 405
Newton, MA 02459
Telephone:    (617) 249-3015

Kelly M. Dermody (*pro hac vice* forthcoming)
Yaman Salahi (*pro hac vice* forthcoming)
Mike Sheen (*pro hac vice* forthcoming)
Evan Ballan (*pro hac vice* forthcoming)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:    (415) 956-1000
Facsimile:    (415) 956-1008

Avery S. Halfon (*pro hac vice* forthcoming)
LIEFF CABRASER HEIMANN & BERNSTEIN LLP
250 Hudson Street, 8th Floor
New York, NY 10013
Telephone:    (212) 355-9500
Facsimile:    (212) 355-9592

Madeline Gomez (*pro hac vice* forthcoming)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
222 2nd Avenue South, Suite 1640
Nashville, TN 37201
Telephone:    (615) 313-9000
Facsimile:    (615) 313-9965

*Counsels for Plaintiffs*