**IN THE WESTERN DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | |
|---|---|
| MI FAMILIA VOTA, TEXAS STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, MICAELA RODRIGUEZ AND GUADALUPE TORRES, <br>       *Plaintiffs,* <br><br> v. <br><br> GREG ABBOTT, GOVERNOR OF TEXAS; AND RUTH HUGHS, TEXAS SECRETARY OF STATE, <br>       *Defendants.* | Civil Action No. 5:20-cv-00830 |

**THE SECRETARY'S MOTION TO DISMISS**

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................................................... ii

INTRODUCTION ............................................................................................................................... 1

ARGUMENT AND AUTHORITIES ...................................................................................................... 2

    I.     No standing exists to bring this suit against the Secretary of State ................................ 2

           A.     Standing principles ............................................................................................... 2

           B.     The NAACP does not have associational standing .............................................. 3

           C.     Neither Mi Vota Familia nor the NAACP has organizational standing .......... 3

           D.     The organizational plaintiffs also lack third-party standing .............................. 5

           E.     The individual plaintiffs' alleged harm does not establish standing ................. 6

           F.     The Plaintiffs' harms are not traceable to or redressable by the
Secretary ............................................................................................................... 7

    II.    This case presents nonjusticiable political questions ........................................................ 8

    III.   Plaintiffs' constitutional claims are barred by sovereign immunity .............................. 10

           A.     *Ex parte Young* does not apply to the Secretary of State in this case .............. 11

           B.     Alternatively, Plaintiffs' requested election precautions would
impinge on Texas's special sovereignty interests ............................................ 12

    IV.   Plaintiffs fail to state a claim upon which relief can be granted ................................... 15

           A.     Plaintiffs did not state a procedural or substantive due process claim .......... 15

           B.     Plaintiffs' equal protection claim also fails ...................................................... 17

           C.     Plaintiffs' fail to state a Fifteenth Amendment claim ...................................... 19

           D.     Plaintiffs' Section 2 claim also fails ................................................................... 20

CONCLUSION ................................................................................................................................. 20

CERTIFICATE OF SERVICE ........................................................................................................... 21

## INTRODUCTION

Plaintiffs seek federal oversight of the Texas election system for the unknowable duration of the COVID-19 pandemic.[1] They request an astounding number of changes to Texas's election laws and propose an astounding degree of federal incursion into the minutiae of election administration.

The State of Texas—like its sister states—is responding to the pandemic with the best solutions that fit within the statutory and constitutional limits that applied before COVID-19, that have applied during COVID-19, and that will continue to apply after this pandemic ends. But for every solution the State has recommended for upcoming elections, Plaintiffs propose problems. Whether it is concern over paper ballots, complying with voting deadlines, or having to show up at a polling place, Plaintiffs claim that anything and everything the State of Texas does is unconstitutional. And not only is it unconstitutional, say Plaintiffs, it is tinged with racism. Not so.

Plaintiffs' views on best practices for elections during a pandemic do not set the constitutional floor, let alone state a claim for relief that this Court should entertain. This Court should dismiss this case for at least five reasons. *First*, no plaintiff adequately alleges facts supporting standing to bring their claims. *Second*, Plaintiffs present nonjusticiable political questions. *Third*, sovereign immunity bars Plaintiffs' claims because the *Ex parte Young* exception does not apply. *Fourth*, *even if*, *Ex parte Young* otherwise applied, the exception to the exception—namely the invasion of Texas's special sovereignty interests—should place this case outside the orbit of *Ex parte Young*. *Fifth*, even if Plaintiffs could hurdle the manifold jurisdictional problems presented by their suit, they still failed to state a claim for relief under a constitutional or statutory theory.

For all these reasons, the Court should dismiss Plaintiffs' Complaint for lack or jurisdiction or, alternatively, for failure to state a claim.

---

[1] Dkt. No. 1 at p. 44 ("Order that all such relief be extended until there are no existing cases of coronavirus in the State of Texas; or until there is a vaccine freely and readily available to all Texans, whichever comes sooner.").

## ARGUMENT AND AUTHORITIES

**I.      No standing exists to bring this suit against the Secretary of State**

**A.      Standing principles**

"[S]tanding is perhaps the most important of the jurisdictional doctrines." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (quotation omitted). Courts persistently inquire into standing because "[w]ithout jurisdiction the court cannot proceed *at all* in any cause." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (quotation omitted) (emphasis added). At the pleading stage, the individual plaintiffs must "clearly . . . allege facts demonstrating each element" of standing. *Spokeo, Inc. v. Robbins*, 136 S. Ct. 1540, 1547 (2016) (quotation omitted). Specifically, a plaintiff must show: (1) an actual or imminent, concrete and particularized "injury-in-fact"; (2) that is fairly traceable to the challenged action of the defendant; and (3) that is likely to be redressed by a favorable decision. *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000).

The organizational plaintiffs have two avenues to allege standing: (1) associational[2] or (2) organizational. *See NAACP v. City of Kyle*, 626 F.3d 233, 237-38 (5th Cir. 2010). Organizational standing requires that the plaintiff establish injury, causation, and redressability. *Id.* For associational standing, the organization must show (1) that its members would independently have standing; (2) that the interests the organization is protecting are germane to the purpose of the organization; and (3) neither the claim asserted nor the relief requested requires participation of individual members. *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 587-88 (5th Cir. 2006).

Neither the organizational plaintiffs nor the individual plaintiffs alleged sufficient facts to demonstrate standing to challenge what they allege are unconstitutional burdens on the right to vote.

---

[2] Plaintiff Mi Familia Vota, unlike Plaintiff NAACP, did not allege that it is suing on behalf of itself and its members. *Compare* Dkt. No. 1 ¶¶ 19-21 (describing Mi Vota Familia's standing allegations), *with id.* ¶ 22 (explaining that the NAACP "brings this action on its own behalf and on behalf of its members and constituents"). Fairly read, Mi Vota Familia is alleging only organizational standing, whereas NAACP is alleging both organizational and associational standing.

## B.    The NAACP does not have associational standing

The NAACP failed to plead associational standing. A plaintiff cannot have associational standing unless one of its members would have standing to sue individually. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Thus, demonstrating standing would require the NAACP to "identify members who have suffered the requisite harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009). Indeed, the Fifth Circuit has applied this rule to the NAACP itself. *See NAACP v. City of Kyle*, 626 F.3d 233, 237 (5th Cir. 2010) (requiring evidence of "a specific member").

Because the NAACP has not alleged the existence of specific members, let alone specific members with individual standing, their claims should be dismissed. *See Ga. Republican Party v. SEC*, 888 F.3d 1198, 1203 (11th Cir. 2018); *Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016) (Souter, J.); *Disability Rights Wis., Inc. v. Walworth Cty. Bd. of Supervisors*, 522 F.3d 796, 804 (7th Cir. 2008).

The only individuals identified in the Complaint are Micaela Rodriguez and Guadalupe Torres, but the Complaint does not allege that either are members of the NAACP. *See* Dkt. No. 1 ¶¶ 24-25. Even if they were members, however, they could not support associational standing because they lack individual standing for the reasons explained below.[3]

## C.    Neither Mi Vota Familia nor the NAACP has organizational standing

An organization has direct organizational standing only if it satisfies the same Article III requirements applicable to individuals: injury-in-fact, causation, and redressability. *City of Kyle*, 626 F.3d at 237. That an organization has an "interest in a problem . . . is not sufficient" for standing, "no

---

[3] The complaint refers to the NAACP's "members and constituents," Dkt. No. 1 ¶ 22, but it does not plausibly allege facts satisfying the "indicia of membership" requirements from *Hunt*, 432 U.S. at 344. That requires members who "elect leadership, serve as the organization's leadership, and finance the organization's activities, including the case's litigation costs." *Tex. Indigenous Council v. Simpkins*, No. 5:11-cv-315, 2014 WL 252024, at *3 (W.D. Tex. Jan. 22, 2014). The NAACP has not alleged facts showing it has such members. It never alleges that its purported members and constituents "participate in and guide the organization's efforts," *Ass'n for Retarded Citizens of Dall. v. Dall. Cty. Mental Health & Mental Retardation Ctr. Bd. of Trs.*, 19 F.3d 241, 244 (5th Cir. 1994), much less that they "alone finance [the NAACP's] activities, including the costs of this lawsuit," *Hunt*, 432 U.S. at 344.

matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem." *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972).

The NAACP bases its standing on an alleged "diversion of resources," but such a diversion can support standing only if "the change in plans [is] in response to a reasonably certain injury imposed by the challenged law." *Zimmerman v. City of Austin*, 881 F.3d 378, 390 (5th Cir. 2018). Plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 402 (2013); *see also La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010) ("[A plaintiff] must instead show that it would have suffered some other injury if it had not diverted resources to counteracting the problem."). In this case, the NAACP does not identify any cognizable injury it would suffer if it did not divert its resources.

Moreover, the NAACP alleged diversion of resources relates to lobbying. The NAACP allegedly "initiat[ed] campaigns calling on Election Officials to" take various actions. Dkt. No. 1 ¶ 23. But an organization lacks standing "when the only 'injury' arises from the effect of the regulations on the organizations' lobbying activities." *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1161 (D.C. Cir. 2005); *see also City of Kyle*, 626 F.3d at 238 (rejecting standing because "Plaintiffs have not explained how the[ir] activities . . . differ from the HBA's routine lobbying activities").

Further, the NAACP has "not identified any specific projects that [it] had to put on hold or otherwise curtail in order to respond to the" laws it challenges. *City of Kyle*, 626 F.3d at 238. The NAACP has "only conjectured that the resources" it diverted "could have been spent on other unspecified [NAACP] activities." *Id.* at 239. That is not enough. *See Def. Distributed v. U.S. Dep't of State*, No. 1:15-cv-372, 2018 WL 3614221, at *4 (W.D. Tex. July 27, 2018).

Mi Familia Vota lacks standing for the same reasons. Like the NAACP, Mi Familia Vota claims to suffer from a self-inflicted "diversion of resources" without identifying any cognizable injury in fact

that the diversion was necessary to avoid. *See* Dkt. No. 1 ¶ 20. And like the NAACP, Mi Familia Vote has "not identified any specific projects that [it] had to put on hold or otherwise curtail in order to respond to the" laws it challenges. *City of Kyle*, 626 F.3d at 238. Instead, it has "only conjectured that the resources" it diverted "could have been spent on other unspecified [] activities." *Id.* at 239.

Both the NAACP and Mi Familia Vota allege that their missions include encouraging voting. *See* Dkt. No. 1 ¶ 19 ("Mi Familia Vota encourages voter registration and participation); *id.* ¶ 23 ("[T]he NAACP engages in voter education and registration"). But the "abstract social interest in maximizing voter turnout . . . cannot confer Article III standing." *Fair Elections Ohio v. Husted*, 770 F.3d 456, 461 (6th Cir. 2014). To the extent Plaintiffs claim an interest in the political consequences of which potential voters vote, they lack standing because federal courts do not hear "case[s] about group political interests." *Gill v. Whitford*, 138 S. Ct. 1916, 1933 (2018).

### D.     The organizational plaintiffs also lack third-party standing

Even if the organizational plaintiffs had Article III standing, they would still lack statutory standing. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127-28 nn.3-4 (2014). Section 1983 provides a cause of action only when *the plaintiff* suffers "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. It does not provide a cause of action to plaintiffs claiming an injury based on the violation of a *third party's* rights. *See Coon v. Ledbetter*, 780 F.2d 1158, 1160 (5th Cir. 1986) ("[L]ike all persons who claim a deprivation of constitutional rights, [plaintiffs] were required to prove some violation of their personal rights.").

Section 1983 "incorporates . . . the Court's 'prudential' principle that the plaintiff may not assert the rights of third parties," but it omits the "exceptions" that occasionally overrode the prudential doctrine. David P. Currie, *Misunderstanding Standing*, 1981 Sup. Ct. Rev. 41, 45. When "[t]he alleged rights at issue" belong to a third party, rather than the plaintiff, the plaintiff lacks statutory

standing, regardless of Article III standing. *Danos v. Jones*, 652 F.3d 577, 582 (5th Cir. 2011); *see also Conn v. Gabbert*, 526 U.S. 286, 292–93 (1999).[4]

Here, the organizational plaintiffs premise their claims on the right to vote. But the organizational plaintiffs are artificial entities that do not have voting rights. "It goes without saying that political parties, although the principal players in the political process, do not have the right to vote." *Vieth v. Pennsylvania*, 188 F. Supp. 2d 532, 546 (M.D. Pa. 2002). The organizational plaintiffs are necessarily asserting the rights of third parties.

The organizational plaintiffs therefore lack statutory standing to sue under Section 1983. Because this follows from the statute itself, exceptions from "prudential standing principles do not apply." *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 359 (2d Cir. 2016); *see also* Currie, 1981 Sup. Ct. Rev. at 45. But even if the organizational plaintiffs could invoke prudential-standing exceptions, their Complaint does not do so. Plaintiffs do not allege that they have "a 'close' relationship with" voters, and there is no reason to think voters face any "hindrance" to protecting their "own interests." *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) (noting the Supreme Court has generally "not looked favorably upon third-party standing").

### E.   The individual plaintiffs' alleged harm does not establish standing

Micaela Rodriguez "plans to vote in the November 2020 elections" but alleges that "she may not be able to do so *if the procedures in place for elections* make voting practically impossible[.]" Dkt. No. 1 ¶ 24. Guadalupe Torres, on the other hand, does not want to vote in person because she lives at home with her parents, and alleges that her father is at "high risk for COVID-19 illness." Dkt. No. 1 ¶ 25. That is the sum total of the individual plaintiffs' standing allegations.

---

[4] Section 2 of the Voting Rights Act also concerns a particular "citizen," not third parties. 52 U.S.C. § 10301(a). To the extent it implies a private cause of action (which the Secretary does not concede), it does so in favor of the individual voter injured, not non-voters suing to vindicate third parties' rights.

"[P]laintiffs must establish standing *for each and every provision they challenge.*" *In re Gee*, 941 F.3d 153, 160 (5th Cir. 2019) (emphasis added). Here, Ms. Rodriguez does not identify anything that may dissuade her from voting, and in fact, says she plans to vote barring some unidentified, unknown procedure that may make voting practically impossible. Ms. Rodriguez cannot establish standing to challenge the volumes of law and policy that the Plaintiffs purport to challenge with the vague assertion that she may decide it's too dangerous to vote at some point in the future.

Similarly, Ms. Torres's allegation that she may decline to vote because she is not eligible to vote by mail is similarly lacking. Ms. Torres cannot rely on a conjectural harm to a third-person to establish her standing to bring a lawsuit. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) ("First, *the plaintiff* must have suffered an 'injury in fact' . . ."). Ms. Torres does not allege that she cannot vote or will not vote, nor does she allege that any specific action by any named defendant will cause her not to vote. She alleges that because she is concerned about the *possibility* that she may catch COVID-19 and the *possibility* that she may pass that along to someone else, she would prefer to vote by mail. That alleged harm is too attenuated and conjectural to satisfy Article III standing. *Clapper*, 568 U.S. at 409.

### F.      The Plaintiffs' harms are not traceable to or redressable by the Secretary

As explained below in Section III, the Secretary of State does not enforce the various laws and policies that Plaintiffs challenge. For that reason, the Secretary does not cause—and relief ordered against her would not redress—Plaintiffs' asserted injuries. Plaintiffs' complaint "confuses [a] *statute*'s immediate coercive effect on the plaintiffs with any coercive effect that might be applied by the *defendants.*" *Okpalobi v. Foster*, 244 F.3d 405, 426 (5th Cir. 2001) (en banc). In the interest of brevity, Secretary asserts that this Court's analysis under *Ex parte Young* also bears on the standing analysis. *See City of Austin v. Paxton*, 943 F.3d 993, 1003 (5th Cir. 2019).[5]

---

[5] Although the Fifth Circuit has, in circumstances not applicable here, found standing to sue the Secretary for claims of "facial invalidity," that ruling has no applicability to the inherently local as-applied claims in this case. *OCA-Greater Hous. v. Texas*, 867 F.3d 604, 613 (5th Cir. 2017).

## II.    This case presents nonjusticiable political questions

While courts have authority to "say what the law is," there are some questions that are "in their nature[,] political" that are beyond the scope of Article III. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170, 177 (1803). In *Coalition for Good Governance v. Raffensperger*, the plaintiffs complained that COVID-19 made in-person voting unsafe unless election officials adopted various changes to both in-person and mail-in voting. No. 1:20-cv-1677, 2020 WL 2509092, at *1 (N.D. Ga. May 14, 2020). They sought some of the same relief that Plaintiffs here seek, including "an order requiring polling locations to use paper ballots." *Id.* But the court concluded the plaintiffs' claims presented "a classic political question"—"whether the executive branch has done enough." *Id.* at *3. "[T]here are no discernable and manageable standards" that would allow a court "to decide issues such as how early is too early to hold the election or how many safety measures are enough." *Id.* The same is true here.

The political-question doctrine is rooted in the separation of powers. *Baker v. Carr*, 369 U.S. 186, 210 (1962). Any one of six factors can render a case nonjusticiable under this doctrine:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker*, 369 U.S. at 217. Cases that require the court to decide a political question must be dismissed for lack of jurisdiction. *Id.* at 217. The scope of the requested relief implicates at least three of the six indicia of a nonjusticiable political question.

*First*, the Elections Clause commits the administration of elections to coordinate departments—Congress and state legislatures—not courts. *Baker*, 369 U.S. at 217; U.S. Const. art. I, § 4, cl. 1. "Plaintiffs ask this Court to assume the roles of state and federal legislatures, urging us to exercise the discretion that has been explicitly reserved to those political bodies." *Agre v. Wolf*, 284 F.

8

Supp. 3d 591, 596 (E.D. Pa. 2018) (three-judge court). The Elections Clause and the history of its adoption demonstrate that "the Framers did not envision such a primary role for the courts." *Id.* at 599. The "manner" of conducting elections includes "the numerous requirements as to procedure and safeguards which experience shows are necessary in order to enforce the fundamental right involved." *Smiley v. Holm*, 285 U.S. 355, 366 (1932). These are reserved to the state legislatures. Courts should focus on enforcement of the First and Fourteenth Amendments, which are "generally unobtrusive to States in promulgating election regulations." *Agre*, 284 F. Supp. 3d at 599.

As discussed above, Plaintiffs' Complaint seeks a court order directing the exact manner of the conduct of elections—that is specifically committed to other parts of government. Plaintiffs' Complaint requires this Court to replace Texas's Election Code with this Court's own judgment about the proper administration of elections (or more specifically implement Plaintiffs' preferred election measures), in violation of the "textually demonstrable constitutional commitment of the issue" to state legislatures and to Congress. *Baker*, 369 U.S. at 217; *Agre*, 284 F. Supp. 3d at 620.

*Second*, Plaintiffs acknowledge that executive-branch officials at all levels have undertaken measures to slow the spread of the coronavirus. *See, e.g.,* Dkt. No. 1 ¶¶ 62, 77, 102. But Plaintiffs believe the measures taken so far are insufficient to protect the health of the individuals involved in the upcoming election. As a result, Plaintiffs' Complaint calls upon the Court to make "an initial policy determination of a kind clearly for nonjudicial discretion." *Baker*, 369 U.S. at 217. Determinations that are clearly entrusted to the State. *See In re Abbott*, 954 F.3d 772, 784-85 (5th Cir. 2020).

Plaintiffs' Complaint requires this Court to determine that the officials charged by statute with making decisions in a declared health emergency have not sufficiently exercised those powers for the benefit and protection of Texas voters. That determination is required before this Court can reach the merits of Plaintiffs' claims. Thus, in order to decide Plaintiffs' claims, this Court must "reconsider what are essentially policy choices," *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 844 (D.C.

Cir. 2010), made by the Governor under his authority to respond to the declared public health emergency. This Court is not being asked to decide the constitutionality of a discrete statute, *Zivotofsky v. Clinton*, 566 U.S. 189, 196 (2012), but to second-guess the policy determinations of executive-branch officials in response to COVID-19. Because Plaintiffs' Complaint requires the Court to reconsider the policy decisions of officials from other branches before it can address Plaintiffs' claims, it presents nonjusticiable political questions that are not within the jurisdiction of this Court to decide.

*Third*, even if this Court did not have to determine the proper policy for a response to the current pandemic, there are still no "judicially discoverable and manageable standards" that this Court can apply to Plaintiffs' claims. Much like cases alleging partisan gerrymandering, where courts were called upon to decide the definition of "fairness" and then "how much is too much," *Rucho v. Common Cause*, 139 S. Ct. 2484, 2500-01 (2019), Plaintiffs ask this Court to define "safety" in the context of an election and then answer "how much is not enough"? *See id.*; *Jacobson v. Fla. Sec'y of State*, 957 F.3d. 1193, 1218 (Pryor, J., concurring). The judiciary is ill-equipped to handle these questions that involve the "complex, subtle, and professional decisions" required to conduct elections because of the lack of manageable standards. *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973). Ultimately, Plaintiffs' Complaint "poses basic questions that are political, not legal." *Rucho*, 139 S. Ct. at 2500; *see also Ctr. for Biological Diversity v. Trump*, 2020 WL 1643657, at *10-11 (D.D.C. Apr. 2, 2020).

## III.   Plaintiffs' constitutional claims are barred by sovereign immunity[6]

*Ex parte Young* allows suits for injunctive or declaratory relief against state officials, provided they have sufficient "connection" to enforcing an allegedly unconstitutional law. *City of Austin*, 943 F.3d at 997. Otherwise, the suit is effectively against the state itself and barred by sovereign immunity. *See Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 253 (2011). If the official sued is

---

[6] The Fifth Circuit recently suggested that Section 2 of the Voting Rights Act abrogates sovereign immunity. *See Fusilier v. Landry*, 963 F.3d 447, 455 (5th Cir. 2020). The Secretary preserves the argument that that case was wrongly decided.

not "statutorily tasked with enforcing the challenged law," then the requisite connection is absent and "our *Young* analysis ends." *City of Austin*, 943 F.3d at 998 (citation omitted).

### A.   *Ex parte Young* does not apply to the Secretary of State in this case

Implementing safe procedures for voting depends on the actions of local officials, not the Secretary. The Secretary does not enforce executive orders pertaining to the COVID-19 pandemic, nor does promulgate executive orders that restrict or expand the application of state laws.

The power to promulgate executive orders rests with the Governor's office. *See In re Abbott*, 954 F.3d 772, 784-85 (5th Cir. 2020); *see also* Tex. Gov't Code § 418.012. The Secretary of State does not have any such authority and does not run local elections. *See, e.g., Lighthourn v. Cty. of El Paso*, 118 F.3d. 421, 428 n.7 (5th Cir. 1997) ("[A]lthough the Texas Election Code designates the Secretary the chief elections official in Texas, the Secretary does not conduct elections."). That distinction matters because the Plaintiffs are not challenging any discrete statute in this lawsuit. Rather, the Plaintiffs are asking that the Secretary of State amend state law and policy. Dkt. No. 1 ¶ 166 ("Defendants must take swift action to amend Texas election policies"); *see also* Dkt. No. 1 ¶¶ 167-207 (causes of action).

That distinction notwithstanding, Plaintiffs point to Election Advisory No. 2020-14, which "clarified, but authorized no changes to, the state's laws and rules regarding late voting early voting, or curbside voting." Dkt. No. 1 ¶ 80. Nor did the Secretary "authorize changes to voting laws or procedures" considering the impact of COVID-19. Dkt. No. 1 ¶ 81. In fact, the Plaintiffs rattle through 9 paragraphs pointing out that the Secretary of State has not unilaterally amended Texas's election laws because of COVD-19 or required local election administrators to change how they administer elections. Dkt No. 1 ¶¶ 80-89.

The reason for that is simple: the Texas Secretary of State does not have authority to change state law. Only the Governor can issue executive orders under state law and only the Texas Legislature has authority to write laws. Nor does the Secretary have authority to conduct local

elections. *See Lightbourn*, 118 F.3d.at 428 n.7. That is the statutorily mandated task of local officials. *Id.* ("[T]he state's 3,000 or so political subdivisions run general and special elections, while the political parties conduct primary elections. In addition, the Secretary does not pick polling sites for elections. Instead, counties and political subdivisions select the location of polling places for general and special elections; county chairs of political parties select polling sites for primary elections.").

Plaintiffs likely will point to *OCA-Greater Houston v. Texas* for the proposition that the Secretary is the chief election officer of the state. 867 F.3d 604 (5th Cir. 2017). Although the court found the Secretary to be a proper defendant in that case, its reasoning does not apply here. First, sovereign immunity had been abrogated, *see id.* at 614, so *OCA-Greater Houston* does not affect the Secretary's *Ex parte Young* argument in this case. Second, *OCA-Greater Houston* distinguished *Okpalobi* on the ground that *Okpalobi* involved a private right of action. *See OCA-Greater Hous.*, 867 F.3d at 613. This case involves a private right of action too. Plaintiffs seek tightened local responses to the COVID-19 pandemic but want this Court to force the Secretary to do the tightening. As noted above, the Secretary has no ability to rewrite state law or issue executive orders. In any event, the extent of the Secretary's power must be determined on a case-by-case basis. *See, e.g., Lightbourn*, 118 F.3d. at 428 n.7. As a result, *OCA-Greater Houston*'s ruling on that issue cannot extend beyond the record and briefing before that court. Third, *OCA-Greater Houston* involved "facial" claims, not the as-applied claims brought here.

At bottom, what the Plaintiffs want the Secretary cannot deliver: a rewrite of the State's election laws. Because Plaintiffs have not identified any enforcement by the Secretary of State that they want to prohibit, their claims against the Secretary are outside of the *Ex parte Young* exception to sovereign immunity.

## B.   Alternatively, Plaintiffs' requested election precautions would impinge on Texas's special sovereignty interests

*Ex Parte Young* does not apply—and thus a suit is barred by the Eleventh Amendment—when a plaintiff's requested relief against state officials "implicates special sovereignty interests" of the

state. *Idaho v. Coeur d' Alene Tribe*, 521 U.S. 261, 281 (1997). In order to implicate the special sovereignty interests of the state, the type of relief sought must implicate the "sovereignty interests and funds *so significantly*" that the *Ex Parte Young* exception does not apply. *Lane v. Cent. Ala. Cmty. Coll.*, 772 F.3d 1349, 1351 (11th Cir. 2014) (emphasis added). Without question, they are implicated here.

Most courts applying *Coeur d' Alene Tribe* have done so in the context of real property. *See, e.g., Hollywood Mobile Estates Ltd. v. Cypress*, 415 F. App'x 207, 211 (11th Cir. 2011). In determining if special sovereignty interests are implicated in other contexts, courts have looked to whether (1) the injunctive relief would involve an area that "derives from [the state's] general sovereign powers," *MCI Telecomm. Corp. v. Bell Atl.-Pa.*, 271 F.3d 491, 515 (3d Cir. 2001); (2) the suit seeks to interfere "with the allocation of state funds" as opposed to "incidental expenditures" involved in complying with an injunction, *Barton v. Summers*, 293 F.3d 944, 949, 951 (6th Cir. 2002); or (3) the suit sought to "rewrite [the state's] property tax code with respect to its application against [] personal property," *ANR Pipeline Co. v. LaFaver*, 150 F.3d 1178, 1194 (10th Cir. 1998). In this case, all three of these criteria are instructive and support sovereign immunity.

To determine the sovereignty interests of states to conduct elections, this Court need only look to the Constitution. The Elections Clause, art. I, § 4, cl. 1, specifies that the "Times, Places and Manner of holding Elections . . . shall be prescribed in each State by the Legislature thereof." This provision was based on the "plain proposition" identified by the Framers that "*every government ought to contain in itself the means of its own preservation.*" The Federalist No. 59 (Alexander Hamilton) (emphasis in original). Leaving the manner of regulating state elections in the hands of the states made sense because allowing the federal government to regulate elections for states would be "an unwarrantable transposition of power, and [] a premeditated engine for the destruction of the State governments." *Id.*

The Supreme Court has likewise repeatedly recognized the sovereign interests of states conducting their own elections: "A State indisputably has a compelling interest in preserving the

integrity of its election process." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (quoting *Eu v. S.F. Cty. Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989)). In denying a challenge to a state election practice, Justice Scalia relied in part on "the Constitution's express commitment of the task [of running elections] to the States." *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 208 (2008) (Scalia, J., concurring in the judgment); *see also Gregory v. Ashcroft*, 501 U.S. 452, 461, 468 (1991). Similarly, this Court should do so here.

Plaintiffs' Complaint invades the sovereignty interests of the State of Texas by seeking an order "directing the precise way in which Texas should conduct voting." The Eleventh Circuit recently questioned whether that such broad-reaching relief could render *Ex parte Young* inapplicable to cases involving elections processes. *See Curling v. Worley*, 761 F. App'x 927, 934 (11th Cir. 2019) (per curiam). Plaintiffs here are not merely asking a federal court to closely scrutinize state laws whose very design infringes on the rights of voters. Rather, Plaintiffs seek to have this Court supervise the administrative details of a local election.

Plaintiffs' proposed overhaul of Texas's election procedures would be a judicial declaration that would "diminish, even extinguish," *Coeur d' Alene Tribe*, 521 U.S. at 282, the State's and nonparty counties' power to control:

- The period of early voting;
- How and whether voters, poll-workers, persons assisting voters, and any other person at a polling site wear a mask and requiring the State to pay for masks for persons who do not already have one;
- Determine whether counties can offer extended, temporary, or mobile early voting locations with flexible hours and days;
- Requirements that curbside voters must qualify as having a disability or, alternatively, order that any voter may identify as "disabled" due to the threat that the coronavirus poses to his or her health and life, for the purpose of being found eligible to vote curbside;
- Opening additional polling places and determining the number of voting booths and poll workers at each polling place;
- The number of staff at polling places;
- Waiting times for voting;
- Poll worker recruiting activities;

- How many polling locations local elections officials can open or close;
- Whether and how to provide electronic voting and paper ballots;
- Determine voter identification requirements;
- Determine how poll workers should physically handle identification or documentation;
- Determine whether to apply the natural disaster exception to the pandemic, and allow voters to sign affidavits regarding the natural disaster exception at the polling place;
- Require elections officials to procure protective gear, including masks and gloves, in sufficient quantity to allow poll workers to change protective gear frequently;
- Dictate when poll workers can and should wash their hands;
- Free county officials from any strictures of Texas law when crafting elections procedures, provided the procedures comply with the directives of the Court; and,
- Rescind or modify any voting practice or procedure deemed by this Court to unlawfully discriminate against Black, Latino, or other underserved voters on the basis of a protected characteristic, to eliminate such discrimination.

Dkt. No. 1 at Prayer. Plaintiffs also request that this Court's supervision over elections practices last until Texas can demonstrate that no coronavirus cases exist in the State or until a vaccine is provided to voters for free upon demand.

Without question, Plaintiffs' proposed relief directly attacks the state's general sovereign powers to regulate elections, as discussed above. *Bell Atl.-Pa.*, 271 F.3d at 514. Plaintiffs' proposed relief would also interfere with state funds by *specifically* requiring state payment for the relief sought. *Barton*, 293 F.3d at 949, 951.

In effect, Plaintiffs ask this Court to rewrite Texas's Election Code and then supervise Texas's election system until the eradication of COVID-19. *ANR Pipeline Co.*, 150 F.3d at 1194. If Plaintiffs' proposed rewrite of Texas's Election Code and invitation to perpetually monitor and direct Texas's elections does not implicate the special sovereignty interests of the State in a way violative of the Eleventh Amendment, it is difficult to conceive a situation where *Coeur d' Alene Tribe* would apply to *any* election case.

## IV.   Plaintiffs fail to state a claim upon which relief can be granted

### A.   Plaintiffs did not state a procedural or substantive due process claim

Plaintiffs do not have a right to vote by any means of their choosing. *Burdick v. Takushi*, 504 U.S. 428, 433 (1992). Of course, Plaintiffs do not claim that their right to vote has been extinguished or diluted. What they are really arguing about is the process or method by which voters will cast in-person or mail-in ballots in upcoming elections while COVID-19 persists. Indeed, Plaintiffs' proposed remedies focus almost exclusively on procedural measures from drive-thru voting to using paper ballots instead of electronic voting machines. Dkt. No. 1 at 42-44.

First, Plaintiffs cannot state a claim under the Due Process Clause because the desire to vote using the procedures Plaintiffs propose is not "life, liberty, or property" under the Fourteenth Amendment. In *Johnson v. Hood*, "voters whose ballots were rejected" argued that they "had been deprived of due process of law" because the procedures had been "arbitrary." 430 F.2d 610, 611-12 (5th Cir. 1970) (per curiam). The Fifth Circuit rejected their claim because "even an improper denial of the right to vote for a candidate for a state office achieved by state action is not a denial of a right of property or liberty secured by the due process clause." *Id.* at 612 (quotation omitted); *cf. Johnson v. Bredesen*, 624 F.3d 742, 752 (6th Cir. 2010) ("[N]o authority recognizes the right to vote in federal elections as a privilege or immunity of United States citizenship."). If the right to vote at all is not "life, liberty, or property," as the Fifth Circuit held, then the desire to vote using Plaintiffs' proposed safety measures cannot be "life, liberty, or property" either.

Second, Texas's procedures for voting are well justified, not unconstitutional. Procedural due process claims require the court to balance the private interest at stake, the risk of an "erroneous deprivation of such interest through the procedures used," potential alternatives, and the government's interest involved, including the "fiscal and administrative burdens" that accompany Plaintiffs' requested relief. *Matthews v. Eldridge*, 424 U.S. 319, 335 (1976). Plaintiffs have not plausibly alleged that the State's procedures lead to an unacceptable risk of erroneous deprivations. They have not alleged anything about the fiscal and administrative burdens of various competing proposals.

To the extent Plaintiffs allege a substantive due process claim, their claim still fails. "[F]ederal courts will not intervene to . . . supervise the administrative details of a local election." *Curry v. Baker*, 802 F.2d 1302, 1314 (11th Cir. 1986). Courts reject substantive due process claims that would require becoming "engulfed in the morass of election details." *Id.* at 1316. Only in extraordinary circumstances not plausibly alleged here could a federal court entertain a request "to oversee the administrative details of a local election." *Pettengill v. Putnam Cty. R-1 Sch. Dist., Unionville, Mo.*, 472 F.2d 121, 122 (8th Cir. 1973); *see also Duncan v. Poythress*, 657 F.2d 691, 701 (5th Cir. Unit B 1981).

Both substantive and procedural due process claims require plaintiffs to allege some government action interferes with their rights. However, Plaintiffs have not identified offensive statutes or regulations, but only vaguely asserted that the existence of COVID-19 creates a risk to voting under laws in place long before COVID-19 became an issue. This omission is fatal to their due process claims. Plaintiffs complain there is a *risk* of voting in person, but "[t]he real problem here is COVID-19, which all but the craziest conspiracy theorists would concede is not the result of any act or failure to act by the Government." *Coalition for Good Governance*, 2020 WL 2509092, at *3 n.2.

## B.    Plaintiffs' equal protection claim also fails

Plaintiffs do not allege intentional discrimination in their suit. Rather, they assert that minority community are impacted more heavily by COVID-19 because they may have longer drives, wait times, or lines for in-person voting. However, even assuming Plaintiffs could show increased impact, disparate racial impacts, standing alone, do not violate the Constitution. See *Washington*, 426 U.S. at 242 ("[W]e have not held that a law, neutral on its face and serving ends otherwise within the power of government to pursue, is invalid under the Equal Protection Clause simply because it may affect a greater proportion of one race than of another."). Even if they did, Plaintiffs do not plausibly allege disparate impact on minority communities.

17

Instead, Plaintiffs assert that some voters will face larger crowds and longer lines, subjecting them to a greater risk of contracting COVID-19. Courts have routinely rejected lines and crowds as a significant harm to a constitutional right—particularly when there is no evidence of improper intent. For example, in *Common Cause Indiana v. Marion County Election Board*, the Southern District of Indiana categorized difficulties such as longer lines and wait times as "nonsevere, nonsubstantial, or slight burden on the general right to vote as a matter of law." 311 F. Supp. 3d 949, 966 (S.D. Ind. 2018), *vacated and remanded*, 925 F.3d 928 (7th Cir. 2019); *see also Jacksonville Coal. for Voter Prot. v. Hood*, 351 F. Supp. 2d 1326, 1335 (M.D. Fla. 2004).

Alleging that the longer lines (not a constitutional concern) should prod the State to do more (not a constitutional imperative) does not amount to a violation of the Equal Protection clause.

To the extent Plaintiffs invoke the *Anderson-Burdick* doctrine, their claim still fails. Those cases utilize a sliding scale balancing test that weighs the "character and magnitude" of the alleged burden against the government's interest in the challenged law. *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). "If a State's election law imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 788).

But the *Anderson/Burdick* analysis does not apply outside the context of specific state action. Plaintiffs cite no cases to the contrary. *See Crawford v. Marion Cty. Elec. Bd.*, 553 U.S. 181, 190 n.8 (2008) (photo identification requirement); *Burdick*, 504 U.S. at 434 (statutory prohibition on write-in candidates); *Anderson*, 460 U.S. at 789 (early filing deadline). In essence, Plaintiffs urge this Court to make the state "do more."[7] But a government's willingness to exceed its statutory obligations does not provide a constitutional basis to require the government go further. *See Gwinnett Cty. NAACP v.*

---

[7] This is also true of Plaintiffs' tag-along First Amendment claim. Because the burden analysis on the free speech claim Plaintiffs' raise mirrors the burden analysis addressed here, Plaintiffs have failed to allege a claim of an unconstitutionally burdensome state action that impinges on their right to vote.

*Gwinnett Cty. Bd. of Registration & Elections*, 1:20-cv-912, 2020 WL 1031897, at *7 (N.D. Ga. Mar. 3, 2020). There is no constitutional imperative to provide the additional protections Plaintiffs seek.

Moreover, the Supreme Court has always analyzed "the magnitude of burdens . . . categorically and [has] not consider[ed] the peculiar circumstances of individual voters or candidates." *Crawford*, 553 U.S. at 206 (Scalia, J., concurring in the judgment). Here, Plaintiffs cannot establish that Texas's procedures impose any "categorical" burdens. In any event, even if the Court could focus on individual voters, Plaintiffs have not identified any individual voters facing severe burdens. Instead, they point to various conditions that vary from polling place to polling place. How widespread will the virus be? Where will polling places be located? Who will they be operated by? What systems will individuals use to vote? The answers to all of these questions, and more, will change from location to location. Plaintiffs cannot use *Anderson-Burdick* to complain that some combinations of conditions and policies in some unspecified locations will be problematic for some unspecific voters.

## C.   Plaintiffs' fail to state a Fifteenth Amendment claim

A Fifteenth Amendment claim requires the plaintiff to plausibly allege discriminatory intent or effect. But here, Plaintiffs have affirmatively alleged the opposite. Plaintiffs complain that Defendants acted "*despite* knowledge that the risks and harms posed by the coronavirus pandemic disproportionately affected communities of color." Dkt. No. 1 ¶ 204 (emphasis added). This allegation is not plausible for the reasons explained below, but even if it were, turning a blind eye to disparate impact is not unconstitutional discriminatory intent. Discriminatory intent requires action "because of, *not merely in spite of*, [the action's] adverse effects upon an identifiable group." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009) (quotation omitted) (emphasis added).

In any event, Plaintiffs have not plausibly alleged discriminatory intent or effect by any Defendants under the framework established in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). Though they argue that the virus has a disparate impact, they

do not allege that any actions taken by Defendants do. *See, e.g.*, Dkt. No. 1 ¶ 47. Plaintiffs allege nothing about "[t]he historical background of the decision[s]" they challenge or "[t]he specific sequence of events leading up to the challenged decision[s]." *Arlington Heights*, 429 U.S. at 267. Plaintiffs never suggest there have been "procedural" or "[s]ubstantive departures" that might suggest discrimination. *Id.* Nor do they say anything about "[t]he legislative or administrative history." *Id.* at 268.

> **D.     Plaintiffs' Section 2 claim also fails**

"Despite its broad language, Section 2 does not prohibit all voting restrictions that may have a racially disproportionate effect." *Johnson v. Gov. of State of Fla.*, 405 F.3d 1214, 1228 (11th Cir. 2005). Rather, Section 2(b) "make[s] clear that an application of the results test requires an inquiry into the totality of the circumstances." *Chisom v. Roemer*, 501 U.S. 380, 394 (1991). This analysis turns on whether the challenged law violates Section 2(a) because it deprives minority voters of an equal opportunity to participate in the electoral process *and* to elect representatives of their choice.

To state a claim for vote denial under Section 2, (1) the challenged law has to "result in" the denial or abridgement of the right to vote; and, (2) the denial or abridgement of the right to vote must be "on account of race or color." In other words, the challenged law must have *caused* the denial or abridgement of the right to vote on account of race. *Greater Birmingham Ministries v. Sec'y of State for Ala.*, 2020 WL 4185801, at *22 (11th Cir. 2020). Disparate impact is not enough. *Id.* (collecting cases). While Plaintiffs allege that there have been issues in other states, Dkt. No. 1 ¶¶ 11-12, Plaintiffs do not draw any lines between voting experiences in Texas and a higher incidence of COVID-19 amongst any group of voters, let alone any minority groups. What's more, the experiences of other states do not speak to the interplay between *Texas* voters and *Texas* practices. In sum, Plaintiffs failed to allege any facts that would support a vote denial claim under Section 2 of the Voting Rights Act.

### CONCLUSION

The Secretary respectfully requests that the Court dismiss Plaintiffs' claims.

Date: August 10, 2020

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

RYAN L. BANGERT
Deputy First Assistant Attorney General

Respectfully submitted.

*/s/ Patrick K. Sweeten*
PATRICK K. SWEETEN
Associate Deputy for Special Litigation

TODD LAWRENCE DISHER
Deputy Chief, Special Litigation Unit

WILLIAM T. THOMPSON
Special Counsel

ERIC A. HUDSON
Special Counsel

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Tel.: (512) 936-1414
Fax: (512) 936-0545
patrick.sweeten@oag.texas.gov
todd.disher@oag.texas.gov
will.thompson@oag.texas.gov
eric.hudson@oag.texas.gov

**COUNSEL FOR THE TEXAS SECRETARY OF STATE**

### CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on August 10, 2020, and that all counsel of record were served by CM/ECF.

*/s/ Patrick K. Sweeten*
PATRICK K. SWEETEN