IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| MI FAMILIA VOTA, TEXAS STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, MICAELA RODRIGUEZ and GUADALUPE TORRES,<br><br>Plaintiffs<br><br>v.<br><br>GREG ABBOTT, Governor of Texas; RUTH HUGHS, Texas Secretary of State,<br><br>Defendants. | NO. 5:20-cv-00830 |

## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ........................................................................................................... 1

II.  BACKGROUND ............................................................................................................ 3

    A.   The COVID-19 Pandemic.................................................................................... 3

    B.   The Impact of COVID-19 On Communities of Color .......................................... 6

    C.   Texas's Voting System Fails to Protect Voters ................................................... 8

    D.   Texas Voters Are Worried, and Voter Turnout Is Likely to Be Affected .......... 12

    E.   Texas Has Several Feasible Alternatives That Adequately Protect Voters ........ 13

III. LEGAL STANDARD ................................................................................................... 15

IV.  ARGUMENT ................................................................................................................ 16

    A.   Plaintiffs Are Likely to Succeed on the Merits................................................... 16

        1.   Texas's Voting System Violates Due Process and the First Amendment ................................................................................................ 16

        2.   Texas's Voting System Violates the Equal Protection Clause ................ 22

    B.   Plaintiffs Are Likely to Suffer Irreparable Harm................................................ 23

    C.   Protecting Voting Rights Serves the Public Interest and Will Cause No Harm .................................................................................................................. 25

V.   CONCLUSION............................................................................................................. 25

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Anderson v. Celebrezze,*
 460 U.S. 780 (1983)............................................................................................. 16, 17, 22

*Arizona Libertarian Party v. Hobbs,*
 925 F.3d 1085 (9th Cir. 2019) ......................................................................................... 17

*Black v. McGuffage,*
 209 F. Supp. 2d 889 (N.D. Ill. 2002) .............................................................................. 23

*Burdick v. Takushi,*
 504 U.S. 428 (1992).......................................................................................... 16, 21, 22

*Bush v. Gore,*
 531 U.S. 98 (2000)..................................................................................................... 22, 23

*Citizens for Legislative Choice v. Miller,*
 144 F.3d 916 (6th Cir. 1998) ......................................................................................... 17

*Common Cause S. Christian Leadership Conference of Greater Los Angeles v. Jones,*
 213 F. Supp. 2d 1106 (C.D. Cal. 2001) .......................................................................... 23

*Crawford v. Marion Cnty. Elec. Bd,*
 553 U.S. 181 (2008)....................................................................................... 16, 19, 21, 22

*De Leon v. Perry,*
 975 F. Supp. 2d 632, 663 (W.D. Tex. 2014), *aff'd sub nom. De Leon v. Abbott,*
 791 F.3d 619 (5th Cir. 2015) .......................................................................................... 23

*Deerfield Medical Ctr. V. City of Deerfield Beach,*
 661 F.2d 328 (5th Cir. Unit B, 1981)......................................................................... 23, 25

*Dunn v. Blumstein,*
 405 U.S. 330 (1972)................................................................................................... 22, 25

*Elrod v. Burns,*
 427 U.S. 347 (1976)......................................................................................................... 23

*Fish v. Schwab,*
 957 F.3d 1105 (10th Cir. 2020) ...................................................................................... 17

*Florida Med. Ass'n, Inc. v. United States Dep't of Health, Educ. & Welfare,*
 601 F.2d 199 (5th Cir. 1979) .......................................................................................... 15

*Georgia Coalition of People's Agenda, Inc. v. Kemp,*
 347 F. Supp. 3d 1251 (N.D. Ga. 2018)........................................................................... 19

*Jackson Women's Health Org. v. Currier,*
 760 F.3d 448 (5th Cir. 2014) ..................................................................................... 15, 25

*League of Women Voters of N.C. v. North Carolina,*
 769 F.3d 224 (4th Cir. 2014) ................................................................................... passim

*League of Women Voters of Ohio v. Brunner,*
 548 F.3d 463 (6th Cir. 2008) .......................................................................................... 23

*League of Women Voters v. Va. State Bd. of Elec.,*
 No. 6:20-cv-00024, 2020 WL 2158249 (W.D. Va. May 5, 2020) .............................. 20

## TABLE OF AUTHORITIES
### (continued)

Page

*Norman v. Reed*,
   502 U.S. 279 (1992) ........................................................................ 17, 21
*Paher v. Cegavske*,
   No. 3:20-cv-00243-MMD-WGC, 2020 WL 2089813 (D. Nev. Apr. 30, 2020) ..................... 21
*Republican Party of Arkansas v. Faulkner Cnty., Ark.*,
   49 F.3d 1289 (8th Cir. 1995) .................................................... 21
*Rush v. Nat'l Bd. of Med. Examiners*,
   268 F. Supp. 2d 673 (N.D. Tex. 2003) ............................ 25
*Texas Indep. Party v. Kirk*,
   84 F. 3d 178 (5th Cir. 1996) ........................................ 16
*Thomas v. Andino*,
   No. 3:20-cv-01552-JMC, 2020 WL 2617329 (D.S.C. May 25, 2020) ........................... 19, 20
*Whole Woman's Health v. Hellerstedt*,
   231 F. Supp. 3d 218 (W.D. Tex. 2017) .................................. 25

**Statutes**
Tex. Elec. Code § 41.001 ....................................................... 9
Tex. Elec. Code § 43.007 ....................................................... 1
Tex. Elec. Code § 43.007 ....................................................... 10
Tex. Elec. Code § 43.007(f) .................................................... 9
Tex. Elec. Code § 63.001(c) ................................................... 10
Tex. Elec. Code § 64.009 ....................................................... 10
Tex. Elec. Code § 85.001 *et seq.* .......................................... 9
Tex. Elec. Code § 85.006 ....................................................... 9
Tex. Elec. Code §§ 82.001-82.004 ........................................ 19
Tex. Elec. Code §§ 85.062-63 ................................................ 9
Tex. Elec. Code §§ 85.062-63 ................................................ 1

**Regulations**
Executive Order GA 29, Relating to the Use of Face Coverings During the COVID-
   19 Disaster (July 2, 2020) ............................................ 8, 11, 13, 18

I.     **INTRODUCTION**

In November, millions of voters across Texas will head to the polls in the middle of a

pandemic that has upended the lives of almost every American. Due to unsafe election

procedures in Texas, voting in person will pose a substantial risk to the lives and health of voters.

This is an unconstitutional burden to place upon voters, one that undermines the right to vote and

the freedom and fairness of Texas elections. Moreover, it is a risk and burden disproportionately

carried by Black, Indigenous, and Latino voters[1]—who are at greater risk of experiencing serious

illness or death if they contract the virus, whose communities are being disproportionately

ravaged by the disease, and who have less access to safe, secure opportunities to vote.

Plaintiffs are entitled to vote in person without unnecessary risk to their lives and health.

Defendants have authority and ability to implement safe, uniform voting procedures across the

state. Instead, Defendants have adopted a Pandemic Voting System[2] that will place millions of

voters at risk, deferring to a patchwork of county-by-county election practices that will protect

---

[1] Texas's inadequate Pandemic Voting System also has outsized effects on other communities of color, including Asian American and Pacific Islanders.

[2] Plaintiffs adopt the phrase "Pandemic Voting System" for ease of reference. This encompasses Texas election law and processes as applied to in-person voting during COVID-19, including: (1) Authorizing counties to open only half the legally required polling places under the countywide polling place program, Tex. Elec. Code § 43.007(f); (2) prohibiting the use of paper ballots in counties in the countywide polling place program, Tex. Elec. Code § 43.007; (3) limiting the early voting period and prohibiting mobile early voting sites, Tex. Elec. Code §§ 85.062-63; (4) a voter identification law that requires voters to obtain identification and allow poll workers to physically handle the identification, Tex. Elec. Code § 63.001(c); and (5) a law limiting curbside voting to individuals who cannot physically enter polling locations, Tex. Elec. Code § 64.009. New election-related policies during the pandemic include: (1) A face covering mandate that specifically *exempts* people at polling places, Executive Order GA-29; (2) an order that expands the early voting period but does not extend hours or offer mobile voting options, Governor's July 27, 2020 Proclamation; (3) Election advisories that recommend but do not require social distancing and other safety measures at the polls, *see* Election Advisory No. 2020-14; and (4) Election advisories that affirm that no changes have been made to existing election laws, even where such laws might lead to unsafe conditions for voters during the pandemic, *see* Election Advisory No. 2020-14 (advising counties to seek a court order to authorize exceptions to the voting procedures as necessary to address COVID-19).

some voters and leave millions of others with no safe way to vote—eroding public confidence in the safety of elections. These practices unconstitutionally burden Plaintiffs' rights under the First Amendment and under the Due Process and Equal Protection Clauses of the Fourteenth Amendment.[3] Defendants' refusal to implement reasonable in-person voting procedures will place an unconstitutional burden upon vulnerable Texans, forcing many of them to stay during the general election in Fall 2020 (early vote through Election Day), forfeiting their fundamental right to vote in order to ensure that they, their families, and their communities survive the pandemic. The Constitution does not allow Texas to require voters to make that choice.

There are many feasible changes that Texas can make to protect both public health and the right to vote. These include implementing basic safety measures recommended by experts (and Defendants) at polling sites, including social distancing, use of face coverings, and sanitation procedures; making paper ballots widely available at all polling places[4]; employing sufficient poll workers, and providing those workers with personal protective equipment, to ensure voter and poll worker safety and to keep lines moving efficiently[5]; opening additional poll sites, including the use of mobile voting units[6]; and providing additional funding necessary to ensure that counties have the support and equipment necessary to implement necessary protective measures.[7]  There is no legitimate reason for Texas's decision to adopt a Pandemic Voting System the does not include such measures.

---

[3] Although Plaintiffs' complaint also alleges violations of the Equal Protection Clause, Fifteenth Amendment, and Section 2 of the Voting Rights Act based on race or ethnicity, Compl. ¶¶ 202-07, those claims do not form the basis of this motion.
[4] *See* Martin Decl. ¶¶ 52-70; Atkeson Decl. ¶¶ 8-18.
[5] Martin Decl. ¶¶ 93-94.
[6] Martin Decl. ¶¶ 95-96.
[7] Martin Decl. ¶¶ 97-98

With no uniformity, no required precautions, and no resources to obtain necessary safety and hygiene equipment, Texas voters will have to decide whether to head to the polls in November when doing so could pose a serious risk to their health and their lives. At bottom, Texas's Pandemic Voting System consists of the State acknowledging the risks of the pandemic, identifying best practices necessary to keep voters safe—and then implementing none of them, instead kicking the can to the various counties in the hopes that they will comply. This "do as I say, not as I do" approach unnecessarily, and improperly, places voters' lives at stake, and forces them to choose between their wellbeing and the franchise. The Constitution requires more.

Because Plaintiffs are likely to demonstrate that Texas's current voting system is unlawful, because loss of the opportunity to vote would cause irreparable harm, and because the public interest and balance of equities unquestionably weigh in favor of a free and fair election, Plaintiffs respectfully request that the Court grant this request for a preliminary injunction to ensure measures necessary to protect the right to vote.

## II.    BACKGROUND

### A.    The COVID-19 Pandemic

COVID-19 is highly contagious and dangerous. Plaintiffs' expert Dr. Catherine Troisi, describes the epidemiology of this virus in her Declaration, submitted herewith. *See* Troisi Decl.[8] As Dr. Troisi explains, Coronavirus Disease 2019 (COVID-19) is caused by a highly contagious novel coronavirus, named SARS-CoV-2. *Id.*, ¶ 10. The disease is spreading rapidly throughout the United States: since the first case was reported in the United States in January,

---

[8] Dr. Troisi is an infectious disease epidemiologist and public health expert, as well as an Associate Professor in the Department of Management, Policy, and Community Health and Department of Epidemiology, Human Genetics, and Environmental Sciences and Center for Infectious Diseases at the University of Texas Health Science Center at Houston, School of Public Health and an Adjunct Associate Professor at Baylor College of Medicine. Troisi Decl. ¶ 1.

over 5.7 million Americans have been infected, and more than 176,000 have died. CDC, "Cases in the U.S.", https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last accessed Aug. 25, 2020).[9] In Texas alone, there have been more than 586,000 confirmed cases and over 11,000 confirmed fatalities. Texas Dep't of State Health Services, "DSHS COVID-19 Dashboard," https://bit.ly/2Y5wuxG (last accessed Aug. 25, 2020). Like many parts of the United States, Texas has experienced a surge of cases over the summer that is expected to continue or worsen during the election season. Troisi Decl. ¶¶ 2, 21. After a peak of new cases and hospitalizations in July, Texas averaged more than 200 COVID-19 deaths per day in August. *Texas Reports Less Than 5,000 People Hospitalized With COVID-19 for the First Time Since June*, Texas Tribune (updated Aug. 25, 2020), https://apps.texastribune.org/features/2020/texas-coronavirus-cases-map/. As of August 25, 2020, Texas has reported more than 37,000 confirmed cases in the last seven days and has the second highest number of cases in the past week in the nation. CDC Data Tracker, https://www.cdc.gov/covid-data-tracker/#cases. Moreover, Texas continues to see high rates of positivity on COVID-19 tests, further indicating that the virus is not under control. *Texas Reports Less Than 5,000 People Hospitalized With COVID-19 for the First Time Since June*, Texas Tribune (updated Aug. 25, 2020), https://apps.texastribune.org/features/2020/texas-coronavirus-cases-map/ (citing positivity rate of 15.4% as of August 25 and quoting Defendant Abbott stating rate over 10% is a "warning flag").

The virus does not affect everyone equally. While some people might experience mild symptoms or none at all, others experience damage to the lungs, heart, kidneys, and intestines. Troisi Decl. ¶ 11. Many people require hospitalization or experience long-term complications. For others, the disease is fatal. Troisi Decl. ¶ 11. Risk for serious COVID-19 illness is higher for

---

[9] All of the cited documents with website addresses are attached as exhibits to the Declaration of Kelly M. Dermody.

some individuals, including people over the age of 65, people experiencing homelessness, people living in nursing homes and long-term care facilities, and people with certain underlying medical conditions including cancer, chronic kidney disease, chronic obstructive pulmonary disease, obesity, serious heart conditions, sickle cell disease, and Type 2 diabetes, as well as those who are immunocompromised. *Id.,* ¶ 12; CDC, "People Who Are At Higher Risk for Severe Illness," https://bit.ly/3hip2r4; CDC, "People Experiencing Homelessness," https://bit.ly/3f93L18.The Centers for Disease Prevention and Control ("CDC") also recognizes that many other underlying medical conditions, including asthma, liver disease, pregnancy, and smoking, may also increase the risk of experiencing a serious COVID-19 illness. CDC, "People Who Are At Higher Risk for Severe Illness," https://bit.ly/3hip2r4.

The virus spreads in two ways: through the air; and through contaminated surfaces. Troisi Decl. ¶ 10. Respiratory transmission typically occurs via droplets containing the virus, but in certain conditions, the virus may transmit via aerosol spread. Because aerosols can linger in the air for longer than droplets, aerosol spread can increase the transmissibility of the virus. *Id.* Anyone infected with the virus—regardless of whether they are experiencing symptoms—can transmit the virus for fourteen days after infection. Troisi Decl. ¶ 14. As CDC has explained, "the more an individual interacts with others, and the longer that interaction, the higher the risk of COVID-19 spread." Troisi Decl. ¶ 20. Because the main route of transmission is through the air, indoor spaces, close contact, crowding, and the duration of contact between individuals are all factors that increase risk of virus transmission. Troisi Decl. ¶ 32.

The virus also can be transmitted when individuals touch a surface contaminated with the virus, which can survive for hours to days on some surfaces. Troisi Decl. ¶ 31. As a result,

2035363.1

election practices that require multiple individuals to touch the same voting machines can contribute to virus transmission. Troisi Decl. ¶ 31.

**B.**      **The Impact of COVID-19 On Communities of Color**

Communities of color, and particularly Black, Indigenous, and Latino communities have been disproportionately affected by the pandemic, and are likely to experience serious COVID-19 illnesses at a disproportionate rate when compared to white COVID-19 patients. *See* Troisi Decl. ¶ 13. Across the United States, Black, Latino, and Indigenous people are far more likely to be infected with COVID-19, and once infected more likely to die of the disease, than white people. *See* Richard Oppel Jr. et al, "The Fullest Look Yet at the Racial Inequality of Coronavirus," N.Y. Times, July 5, 2020, https://nyti.ms/2EbN9sI.

In Texas, data is available on only a limited number of cases. But of the 46,000 completed case investigations conducted by the Department of State Health Services—out of more than 560,000 confirmed cases—Black and Latino Texans are disproportionately represented in terms of confirmed cases and fatalities. *See* DSHS COVID-19 Dashboard, https://bit.ly/2Y5wuxG (last accessed Aug. 20, 2020). There are also serious disparities in access to testing in health care. Testing sites are disproportionately located in predominantly white neighborhoods, while predominantly Black and Latino neighborhoods lack sufficient testing sites, even where known outbreaks are occurring. *See* Stephanie Adeline, *In Large Texas Cities, Access To Coronavirus Testing May Depend On Where You Live*, NPR, May 27, 2020, *available at* https://n.pr/3ggSqfs; Soo Rin Kim, "Which Cities Have the Biggest Racial Gaps in COVID-19 Testing Access?" FiveThirtyEight, July 22, 2020, *available at* https://53eig.ht/3j1USs5.

"Inequalities in the social determinants of health, such as poverty and healthcare access, affecting these groups are interrelated and influence a wide range of health and quality-of-life outcomes and risks." CDC, "Health Equity Considerations and Racial and Ethnic Minority

2035363.1

Groups," July 24, 2020, https://bit.ly/2EjWE94. Black and Latino workers are more likely to work in essential jobs for low wages and have less access to affordable healthcare. *See* Sherita Hill Golden, "Coronavirus in African Americans and Other People of Color," John Hopkins Medicine, Apr. 20, 2020, https://bit.ly/32ix50u. Black and Latino people are also disproportionately likely to live in poverty in Texas. *See* U.S. Census, American Community Survey, Poverty Status in the Past 12 Months, *available at* https://bit.ly/2QdB8oY. These socioeconomic inequalities have not only placed Black and Latino people at increased risk of serious COVID-19 illness if they get the disease, but have also made them even more economically vulnerable than other groups. *See, e.g.*, Torres Aff. ¶¶ 12-13. These factors inform how voters assess whether they can risk going to vote during the pandemic.

The pandemic is also having a disparate impact on counties in Texas, as several counties and urban areas are bearing the brunt of Texas's COVID-19 pandemic. There is substantial overlap between the counties hit hardest, and counties with the highest rates of poverty and inequality. Harris County and Dallas County have the highest total number of cases and the highest number of active cases. There have been major outbreaks around Dallas, Houston, Austin, and San Antonio. Texas Dep't of State Health Services, "DSHS COVID-19 Dashboard," https://bit.ly/2Y5wuxG (last accessed Aug. 17, 2020). And Cameron County—whose population is 89% Latino, with nearly 1/3 of its population living below the poverty line—accounts for nearly 5% of all confirmed COVID-19 fatalities in the state, despite having just 1.5% of the state's population. *See* Emma Platoff & Carla Astudillo, "Across Texas and the Nation, the Novel Coronavirus is Deadlier for People of Color," Texas Tribune, July 30, 2020, *available at*

https://bit.ly/32foWtB. In cities and counties with high rates of virus transmission, voters face

greater risk of infection from community spread.[10]

   C.   **Texas's Voting System Fails to Protect Voters**

Texas's Voting System, as applied during the pandemic, provides voters with virtually no

protections or assurances of safety at polling places. Texas has not imposed any restrictions or

limitations to allow for safe social distance at polling places and on lines, nor for cleaning or

sanitizing polling places. Texas (through Defendant Abbott) has issued a statewide mask

mandate, but specifically exempted voters, poll workers, and poll watchers. *See* Executive Order

GA 29 (July 2, 2020) ¶ 8. Texas's Pandemic Voting System neither requires voters or poll

workers to wear masks, or to engage in other hygiene and safety practices, nor does it take any

effort to make masks or basic sanitation supplies readily available to voters and poll workers. In

this way, Defendants' Pandemic Voting System takes no precautions for Texas voters, and

instead subjects them to an unacceptably high level of risk at the ballot box.

For millions of Texans, voting in person is their only means, their preferred means, or

their only reliable means of voting. Defendants have refused to make voting by mail widely

available, accessible, or reliable. And recent controversy regarding the U.S. Postal Service has

resulted in voters being uncertain that their mail-in ballots will be counted. *See* Adam Clark

Estes, "What's Wrong With the Mail," Vox, Aug. 18, 2020, https://bit.ly/3gkDOf4. During the

pandemic, election policies directly affect whether voting is safe. Policies that result in long lines

---

[10] In Texas, the probability that one out of a group of 25 people has COVID-19 varies by county, but is concerning in counties across the State, with Harris County at 44%, Dallas at 80%, Cameron at 89%, and Bee and Karnes at 99%. Chande, A.T., Gussler, W., Harris, M., Lee, S., Rishishwar, L., Hilley, T., Jordan, I.K., Andris, C.M., and Weitz, J.S., *Interactive COVID-19 Event Risk Assessment Planning Tool*, http://covid19risk.biosci.gatech.edu/.

of voters, hours of waiting, and the requirements that voters repeatedly touch voting machines create the precise conditions that allow for virus transmission. *See* Troisi Decl. ¶ 10.

Remarkably, the Court need not rely solely on Plaintiffs' experts to determine that the State's Pandemic Voting System is not up to par—it can look to Defendants' election officials' own words. For example, on June 18, the State issued Election Advisory No. 2020-19, in which it identified recommended practices based on CDC guidance for counties to follow in establishing and administering polling locations—but did not actually require the implementation of any of those recommendations, nor has the State provided counties with necessary resources to actually follow the recommendations.

Texas laws and policies govern in-person voting across the state. The duration, hours, and locations of in-person early and Election Day voting are determined by state law. *See* Tex. Elec. Code §§ 41.001, 85.001 *et seq*. Counties are required only to open early voting locations during business hours and for limited hours over the last weekend of the early voting period in large counties or where requested by voters, though counties may choose to open on more weekend days during the early voting period. Tex. Elec. Code § 85.006. Counties are now prohibited from offering mobile or temporary early voting sites. Tex. Elec. Code §§ 85.062-63.

For Election Day voting, Texas maintains a Countywide Polling Place Program ("CPPP"). Although Texas law requires that counties maintain a polling place in each precinct, an exception is made for counties participating in the CPPP; such counties are only required to open half as many polling locations. Tex. Elec. Code § 43.007(f). In part due to CPPP, since 2012, Texas has shuttered 750 polling place locations, including 542 in the 50 counties with the greatest increases in Black and Latino residents and which have experienced a combined population rise of more than 2.5 million people. Leadership Conference Education Fund,

Democracy Diverted: Polling Place Closures and the Right to Vote, pp. 24-28 (Sept. 2019), https://bit.ly/3chYUsQ. Richard Salame, "Texas Closes Hundreds of Polling Sites, Making It Harder for Minorities to Vote," The Guardian (Mar. 2, 2020), http://bit.ly/2w7GawU.

Counties participating in CPPP must use electronic voting machines and are not allowed to offer paper ballots to voters. Tex. Elec. Code § 43.007. The voting machines will require frequent disinfection, but the manufacturers' guidance indicates that cleaning the machines carries the risk of machine malfunction, can be done only with special cleansers and instructions, and does not guarantee that the recommended cleaning are capable of killing COVID-19.[11]

Texas has set other statewide standards governing in-person voting. For example, all in-person voters are subject to Texas's voter identification law, which requires voters to provide identification to poll workers for inspection. Tex. Elec. Code § 63.001(c). Texas also makes provisions for voters with disabilities. This includes a curbside voting practice, but only for voters who are "physically unable to enter the polling place without personal assistance or likelihood of injuring the voter's health." Tex. Elec. Code § 64.009.

Texas has not taken appropriate steps to reduce the serious risk of virus transmission that in-person voting poses. Governor Abbott has extended early voting by six days (four business days), *see* Proclamation by the Governor, July 27, 2020, *available at* https://bit.ly/2QbOgLn, but the extension is limited, does not provide for mobile early voting or extended hours, and does not provide resources to support counties. And although Governor Abbott has mandated masks in most public spaces, he has *exempted* "any person who is voting, assisting a voter, serving as a

---

[11] *See* Dominion Voting, "Customer Notification: COVID-19 ("Coronavirus") Information," https://bit.ly/2VhvVPj; ES&S, "Best Practices – Voting System," at 1-2, *available at* https://bit.ly/2JRLYOs; Hart InterCivic, "Hart Equipment Cleaning Recommendations," https://bit.ly/2RmAqH0.

poll watcher, or actively administering an election." Executive Order GA 29, Relating to the Use of Face Coverings During the COVID-19 Disaster (July 2, 2020).

Texas has not otherwise established uniform or sufficient guidelines to protect voters during the pandemic. In the Director of Elections' April 6**,** 2020 Advisory and June 18, 2020 Advisory, counties are encouraged—but not required—to establish social distancing, provide personal protective equipment to poll workers, or disinfect voting machines. *See* Election Advisory No. 2020-14, https://www.sos.texas.gov/elections/laws/advisory2020-14.shtml; Election Advisory No. 2020-19, https://www.sos.state.tx.us/elections/laws/advisory2020-19.shtml. Nor have Defendants offered resources to help local officials comply with their recommendations. The April 6, 2020 Advisory warns that voters who wish to vote curbside "must be qualified by the election officer before the voter can receive the ballot [and] [p]oll watchers and inspectors must be allowed to accompany the election officer"—none of whom are required to wear masks. *Id.* The June 18, 2020 Advisory further provides poll workers with authority to require voters to lower or remove their face coverings for purpose of voter identification. *Id.*

Defendants' Pandemic Voting System does not account for poll worker shortages or provide for their safety, which resulted in polling place closures during the July run-off elections. Alexa Ura, "Two Major Texas Counties are Trimming Polling Locations as Workers Pull Out Over Coronavirus," Texas Tribune, July 9, 2020, https://bit.ly/2QaBMU7. Poll worker shortages and closed polling locations will create longer lines and delays at the remaining polling places.

Defendants' policies will place all voters at unnecessary risk of infection. But because Defendants allow counties to control some elements of the pandemic response, a voter's ability to vote safely in person will depend substantially on their county of residency. Counties with

2035363.1

paper ballots, extended early voting hours, and a sufficient number of polling booths and polling locations will avoid crowds, move voters through quickly, and limit how many voters are touching the same surfaces. Counties that do not mitigate these risks will create in-person voting conditions that facilitate virus transmission.

### D.   Texas Voters Are Worried, and Voter Turnout Is Likely to Be Affected

Texas's failure to adopt sufficient safety measures will result in a severe burden on the right to vote, including causing voters to stay home because they feel unsafe voting in person under the current conditions of Defendants' Pandemic Voting System. Dr. Robert Stein has analyzed Harris County voters' concerns during the pandemic.[12] Dr. Stein's research confirms Plaintiffs' claims—it shows that voters are seriously concerned about the risks to their health and safety posed by voting during a global pandemic—especially in Texas, which has experienced such a high rate of cases. Stein Decl. 2.

Dr. Stein's research demonstrates that Texas voters who would ordinarily cast their votes in person are concerned about contracting and spreading COVID-19 while voting. Stein Decl. 2. Dr. Stein found that the modal reason voters gave for not voting in the July 2020 primary runoff election was concern about the possibility of contracting COVID-19 in person (27.6%). *Id.* at 5. These fears are dramatically greater for Black and Latino voters. *Id.* at 8-10.

Voters also identify a number of concerns and related protective measures that are important to them and will determine whether they feel safe enough to visit their polling place. Stein Decl. 7-8. More than half of voters surveyed stated that the availability of a maximum social distancing floor plan in their polling place would have a "substantial impact" on their

---

[12] Dr. Stein is the Faculty Director for the Center for Civic Leadership, the Lena Gohlman Fox Professor of Political Science, and a researcher at Rice University, where his work focuses on voter behavior as well as emergency-preparedness and election administration. *See* Stein Decl. 2.

decision to vote in person in the November election. *Id.* Additionally, 58.3% of voters stated that availability of PPE for poll workers would have a substantial impact on their decision; 51.1% said the same for availability of hand sanitizer; and 55.1% said the same for the availability of masks for voters. *Id.* Dr. Stein also found that Black, Latino, Asian-American, and other voters of color rated the importance of each of the mitigation factors considerably higher than their white counterparts. Stein Decl. 8-10. Dr. Stein's research shows that voters are genuinely concerned about the risk to their health associated with in-person voting during a pandemic, and absent reasonable, basic protections from Defendants, voters may feel they have no choice but to stay home. Because of its size and demographics, Dr. Stein contends that the results in Harris County are reflective of Texas voters more generally. *Id.* at 2.

     **E.**     **Texas Has Several Feasible Alternatives That Adequately Protect Voters**

Defendants readily have the ability to implement simple, feasible solutions in this moment of national crisis. *See generally* Troisi Decl., Atkesson Decl, Martin Decl. This include:

Use of Face Coverings: Public health officials unanimously agree that wearing masks reduces the risk of spreading the virus. Texas's Pandemic Voting System has no mask-wearing requirement, nor does it provide masks for voters or poll workers. Defendant Abbott's executive order imposing a mask requirement specifically exempts voters and poll workers from compliance. *See* Executive Order GA 29 (July 2, 2020) ¶ 8. Defendants must require all voters, poll workers, individuals who are assisting voters, and other election officials to wear masks, and provide counties with the resources necessary to provide masks to anyone who require one.

Paper Ballots: Texas's Pandemic Voting System does not implement requirements or standards regarding the use of paper ballots at polling places, which means that many voters will still vote using an electronic touch-screen machine that will be handled by many voters in a day and could serve as a vector for virus transmission. Texas can, and should, make paper ballots

available at all polling locations, which will (1) limit the people who must touch the surface of each voting machine; (2) allow more people to vote simultaneously; (3) prevent lines caused by machine malfunctions and machine downtime during disinfection; (4) provide poll workers with more time to disinfect the machines for voters who need or prefer to vote that way; and (5) be easier for new poll workers to understand. *See* Martin Decl. ¶¶ 52-70; Atkeson Decl. ¶¶ 8-18.

Sufficient Voting Booths and Polling Locations: Long lines and crowds create high risk of virus transmission, yet Defendants' Pandemic Voting System does nothing to limit lines or minimize wait time to reduce the risk of transmission among voters who are waiting to cast their ballot. Defendants must set standards to ensure there are enough voting booths and polling locations to minimize the risk of virus transmission in voting lines.

Poll Worker Staffing and Safety: Polling locations cannot open without proper staffing, yet Texas's Pandemic Voting System sets no standards for staffing polling places, as well as for recruiting, training, and providing protection to poll workers. In the absence of safe working conditions for poll workers, it is inevitable that some poll workers will elect not to work their shifts, causing further delays, crowding, and/or closures of polling locations.

Early Voting: Early voting reduces the risk of overcrowding and virus transmission by spreading out the number of voters at any particular location over a longer period of time. Texas has implemented an early voting period from October 13-20, but this narrow period is insufficient unless Texas also takes additional measures Plaintiffs have identified to ensure it does not simply run into the same issues as regular voting at an earlier point in time. *See*, *e.g.*, Martin Decl. ¶ 62 (describing how to implement use of paper ballots during early voting).

Curbside Voting: Curbside voting also protects the safety of voters by reducing opportunities for virus transmission, yet Texas's Pandemic Voting System makes curbside voting

only available on a limited basis. Texas can, and should, make curbside voting available to any voter who requests it, without requiring election officials to assess whether the voter qualifies.

<u>Natural Disaster Exception for Voter ID</u>: While Texas has implemented voter identification laws, those laws provide a natural disaster exception that allows a voter who forgets her ID to sign an affidavit at the polling location, rather than appearing in a public office to complete the affidavit following the election—an additional interaction that poses additional risk of exposure during a pandemic. *See* Tex. Elec. Code § 65.054. Texas's Pandemic Voting System has not invoked this exception here. Additionally, Texas must also clarify that poll workers must examine a voter's identification without handling it, and must not require voters to remove their masks—a practice that endangers both voter and the poll worker.

## III.  **LEGAL STANDARD**

The Court should issue a preliminary injunction if Plaintiffs establish "(1) a substantial likelihood of success on the merits, (2) a substantial threat …[of] irreparable injury if the injunction is denied, (3) that the threatened injury outweighs any damage that the injunction might cause the defendant, and (4) that the injunction will not disserve the public interest." *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 452 (5th Cir. 2014) (citation and internal quotation omitted). None of these elements is controlling. *Florida Med. Ass'n, Inc. v. United States Dep't of Health, Educ. & Welfare*, 601 F.2d 199, 203 n.2 (5th Cir. 1979). Rather, the court must consider the elements jointly on a "sliding scale . . . balancing the hardships associated with the issuance or denial of a preliminary injunction with the degree of likelihood of success on the merits." *Id.*

**IV.     ARGUMENT**

       **A.     Plaintiffs Are Likely to Succeed on the Merits**

            **1.     Texas's Voting System Violates Due Process and the First Amendment**

Plaintiffs are likely to succeed in demonstrating that, as applied during the COVID-19 pandemic, the State's Pandemic Voting System, which includes limited polling locations, lack of guaranteed and widely-available paper ballots, restrictions on early voting, failure to hire sufficient poll workers and to appropriately outfit them with personal protective equipment, and does not include requirements for social distancing, mask wearing, sanitization, or other recommended basic safety procedures, together and individually burdens voters' First and Fourteenth Amendment rights in violation of the Constitution.

Courts considering whether a voting scheme infringes on voters' Due Process and First Amendment rights "must 'weigh the character and magnitude of the asserted injury' … against 'the precise interests put forward by the State as justifications for the burden imposed by [the scheme].'" *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)); *see also Texas Indep. Party v. Kirk*, 84 F. 3d 178, 182 (5th Cir. 1996) (applying the *Burdick-Anderson* standard). This "flexible" standard operates as a sliding scale, requiring a court to calibrate its level of inquiry relative to the level of burden imposed by a restriction on the franchise. *Kirk*, 84 F.3d at 182. Where a restriction on the right to vote does not rise to the level of being "severe," the court must still evaluate whether the State's interest in imposing the restriction sufficiently justifies the burden placed on voters. *See, e.g., Crawford v. Marion Cnty. Elec. Bd*, 553 U.S. 181, 191 (2008) ("However slight that burden may appear … it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation") (internal quotation marks and citation omitted); *Burdick,* 504 U.S. at 434 ("when a

2035363.1

state election law provision imposes only 'reasonable, nondiscriminatory restrictions[,] … the State's important regulatory interests are generally sufficient to justify' the restrictions.") (quoting, first, *Norman v. Reed*, 502 U.S. 279, 289 (1992) and, second, *Anderson*, 460 U.S. at 788; *Fish v. Schwab*, 957 F.3d 1105, 1124 (10th Cir. 2020) ("[T]he scrutiny we apply will wax and wane with the severity of the burden imposed on the right to vote in any given case; heavier burdens will require closer scrutiny, lighter burdens will be approved more easily."); *Arizona Libertarian Party v. Hobbs*, 925 F.3d 1085, 1090 (9th Cir. 2019) ("We have described this approach as a 'sliding scale'—the more severe the burden imposed, the more exacting our scrutiny; the less severe, the more relaxed our scrutiny.").

When the burden imposed by a voting restriction is severe, however, the State must demonstrate that the restriction is "narrowly drawn to advance a state interest of compelling importance."  Courts have determined that a voting regulation imposes a severe burden when it "discriminates based on content instead of neutral factors" or if "voters have few alternate means of access to the ballot."  *Citizens for Legislative Choice v. Miller*, 144 F.3d 916, 921 (6th Cir. 1998). The burdens at issue in this case are severe and limit Texans' access to the ballot. In light of the COVID-19 pandemic, the State's Pandemic Voting System cannot withstand this scrutiny.

### a.  <u>Texas's Election Policies Severely Burden Voters' Rights</u>

Texas's System severely burdens voters' rights because the policies and procedures, as they currently stand, will impede Texans from voting in-person without seriously risking their own health.  *See League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 244 (4th Cir. 2014) ("even one disenfranchised voter—let alone several thousand—is too many").

The State of Texas is experiencing one of the most extreme COVID-19-infection rates of any state in the country.[13] As of this writing, the state has reported 586,730 cases and 11,395 deaths.[14] Troublingly, these numbers have nearly doubled in the days since Plaintiffs filed their Complaint in this Action. *See* Compl. ¶ 4. Evidence shows that communities of color are especially concerned about voting in person in a pandemic, particularly with limited safety measures. *See* Stein Decl. 8-9. Medical experts and epidemiologists recommend Texans practice safety and preventative measures, including social distancing, the use of face masks in public, and avoiding non-essential public outings, congregating in large groups, standing in close proximity to others, and handling objects touched by others without proper disinfection measures. Defendants have advised Texans to take measures to protect themselves and their communities, and to slow the spread of the virus. *See, e.g.*, Texas Dep't Health and Human Services, "Coronavirus Disease 2019 (Covid 19): What To Do If You Are Sick," https://bit.ly/2B1n39S (recommending that people with COVID-19 call their doctors and stay home, and follow CDC recommendations); Executive Order GA 29, Relating to the Use of Face Coverings During the COVID-19 Disaster (July 2, 2020).

In the face of these warnings and recommendations, however, Defendants have not adopted feasible mitigations to limit the risks of exposure for in-person voting. Because Texas does not provide paper ballots to all voters, some voters will be forced to vote using a machine shared with hundreds of other people, including people likely to be infected with COVID-19. Additionally, some voters who would otherwise be eligible to vote by mail in Texas will now

---

[13] Texas Department of State Health Services COVID-19 Dashboard, https://txdshs.maps.arcgis.com/apps/opsdashboard/index.html#/ed483ecd702b4298ab01e8b9cafc8b83 (last visited August 25, 2020); Centers for Disease Control, COVID Data Tracker, https://www.cdc.gov/covid-data-tracker/#cases (last visited August 25, 2020) (showing Texas with third highest infection rate in the nation with over 580,000 total cases); *footnote* 9, *supra*.
[14] *Id.*

vote in person—thus further crowding Texas's already overburdened polling places—as a result of recent concerns that have emerged regarding the reliability the Postal Service. *See* Adam Clark Estes, "What's Wrong With the Mail," Vox, Aug. 18, 2020, https://bit.ly/3gkDOf4. And, because Texas has not provided sufficiently expansive early voting, an adequate number of polling places, a sufficient amount of poll workers, and/or more options for curbside voting, voters are likely to face longer lines and larger crowds on Election Day, meaning they will spend more time at direct risk of exposure.

These circumstances are "beyond the merely inconvenient." *Crawford*, 553 U.S. at 205 (Scalia, J., concurring); *see also Georgia Coalition of People's Agenda, Inc. v. Kemp*, 347 F. Supp. 3d 1251, 1264 (N.D. Ga. 2018) (finding severe requirements that voter make multiple trips to polls, conduct his own research, and track down specific information to be "not a nominal effort" and "beyond … inconvenient"). The hazards presented by the conditions in Texas are far beyond the administrative hurdles identified in *Kemp*. Rather, they threaten voters' lives, and will inevitably lead some, or many, voters to stay home for fear of contracting or spreading COVID-19. Stein Decl. 2. And, unlike in *Crawford,* for most Texans, the State has refused to provide an alternative means of voting to its standard in-person option.[15] Thus, thousands of voters who do not want to risk their own lives and health by voting on an electronic voting machine inside their (likely over-crowded) polling place on Election Day will be left without an available means of casting a ballot. *See Thomas v. Andino*, No. 3:20-cv-01552-JMC, 2020 WL 2617329, at *17 n.20 (D.S.C. May 25, 2020) (recognizing, in a COVID-19-specific challenge, that such a choice is "illusory" and "untenable" and preliminarily enjoining South Carolina

---

[15] Texas allows voters to vote by mail-in ballot only in four instances:  (1) if they will be absent from the county on Election Day and during the times for in-person early voting; (2) if they suffer from a disability; (3) if they are 65 years of age or older; or (4) if they are confined in jail. Tex. Elec. Code §§ 82.001-82.004.

requirement that a witness be present when voter signs his absentee ballot); *League of Women Voters v. Va. State Bd. of Elec.*, No. 6:20-cv-00024, 2020 WL 2158249, at *8 (W.D. Va. May 5, 2020) (in approval of consent decree enjoining a witness signature requirement, noting that "[t]he Constitution does not permit a state to force" its electorate to choose "between adhering to guidance that is meant to protect not only their own health, but the health of those around them, and undertaking their fundamental right– and, indeed, their civic duty– to vote in an election[]").

In *Andino* and *League of Women Voters*, courts determined that requiring voters to expose themselves to the potential risk of contracting COVID-19 in order to secure a signature on an absentee ballot created a constitutionally unacceptable burden. In particular, the courts in *Andino* and *League of Women Voters* focused on the fact that the requirement operated in direct contravention of the advice of medical experts and government officials. These cases are particularly apt here, as they involve voting requirements that force voters to put themselves in close proximity to others, just as Texas's current policies and procedures will require of in-person voters. Moreover, the threat presented to voters by having to be in the presence of a witness long enough to secure a signature pale in comparison to the risk of harm that Texan in-person voters will face.

Under Texas's current System, Texan in-person voters have no alternative but to subject themselves to the risk of COVID-19 exposure. As in *Andino* and *League of Women Voters*, this illusory choice between civic duty and personal and communal health is a severe burden.

### b.      The State Has No Interest Justifying These Burdens

Texas has no interest in failing to account and make accommodations for the safety of its citizens during this pandemic, when feasible and safe voting options exist, and can be readily implemented before the November election. Texas certainly has an interest in maintaining "a

high level of access to the ballot box," but also has an interest in protecting the "safety of voters and poll workers," which counsels in favor of taking steps to mitigate the risks created by COVID-19. *Paher v. Cegavske*, No. 3:20-cv-00243-MMD-WGC, 2020 WL 2089813, at *2, *7 (D. Nev. Apr. 30, 2020) (finding Nevada's asserted interests sufficiently weighty to justify all-mail-in-ballot scheme during pandemic).

Although courts have repeatedly recognized states' interests in promoting organized and well-administered elections, *see, e.g.*, *Crawford*, 553 U.S. at 196 (recognizing interest in "orderly administration" of elections); *Burdick*, 504 U.S. at 439 (approving Hawaii's interest in avoiding "unrestrained factionalism" in general election ) (citation omitted)); *Norman*, 502 U.S. at 290 (acknowledging Illinois' interest in preventing "electoral confusion"), the states' general regulatory authority over elections does not authorize them to place significant burdens on voting rights, particularly when a state can easily take steps to mitigate obviously-present risks. *See Crawford,* 553 U.S. at 197-98 (finding that ability of voters to cast provisional ballot provided "adequate remedy" for potential burdens of Voter ID Law); *Republican Party of Arkansas v. Faulkner Cnty., Ark.*, 49 F.3d 1289, 1294 (8th Cir. 1995) (recognizing in ballot-access cases that "an alternative means of access must be provided absent a sufficiently strong state interest"); *cf. League of Women Voters of N.C.,* 769 F.3d 224 (refusing to enjoin North Carolina's reduction in early voting days because doing so would require North Carolina to begin early voting just days after the order, which would cause North Carolina substantial hardship).

Unlike the steps Indiana took in *Crawford*, Texas has not provided any adequate remedy to the burdens voters will experience because of the State's current voting policies. Furthermore, the burdens here are serious, widespread, and constantly present for all Texans, while in

*Crawford* the potential burdens created by Indiana's Voter ID law were found to be "neither so serious nor so frequent" as to raise substantial concerns about the impact of the law.

Additionally, unlike in *League of Women Voters of N.C.*, the State of Texas has ample time to take the necessary ameliorative steps by making paper ballots widely available, opening more polling locations, expanding access to curbside voting, further expanding early voting, and providing funding to county election commissions to ensure they have sufficient poll workers and that these workers are outfitted with appropriate PPE. These steps are feasible, safe, and can be readily implemented before the November election. Texas has no interest in failing to do so.

Plaintiffs are likely to prevail on their First and Fourteenth Amendments claims.

## 2.  <u>Texas's Voting System Violates the Equal Protection Clause</u>

Under the Equal Protection clause, "a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972). "The right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise." *Bush v. Gore*, 531 U.S. 98, 104 (2000). "Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Id.* at 104-05. In reviewing such claims based on non-suspect classifications, courts apply the same *Anderson-Burdick* balancing approach applied to Plaintiffs' Due Process and First Amendment claims. *See Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 189-91 (2008). For the reasons described with respect to Plaintiffs' Due Process and First Amendment, Plaintiffs are also likely to succeed on the merits of their Equal Protection claim.

Specifically, Plaintiffs allege that Texas's current voting laws, policies, and procedures fail to establish minimum standards for health and safety of voters, leaving local election authorities without guidance or support and voters vulnerable to the luck of whether a county has

the personnel or resources for COVID-19 mitigation. Particularly in light of the ongoing

pandemic, Texas's inadequate statewide policies violate the Equal Protection Clause by

effectively denying voters the fundamental right to vote based on the jurisdiction they happen to

reside in. *Bush*, 531 U.S. at 110; *see also League of Women Voters of Ohio v. Brunner*, 548 F.3d

463, 466, 477-78 (6th Cir. 2008) (holding allegations of a voting statewide system with "non-

uniform standards, processes, and rules" resulting in disproportionate impacts across

jurisdictions were sufficient to state an equal protection claim); *Black v. McGuffage*, 209 F.

Supp. 2d 889, 897-99 (N.D. Ill. 2002) (holding an equal protection claim may lie where state law

permitted local jurisdictions to select their own voting systems); *Common Cause S. Christian*

*Leadership Conference of Greater Los Angeles v. Jones*, 213 F. Supp. 2d 1106, 1109 (C.D. Cal.

2001) (holding plaintiffs stated claim under Fourteenth Amendment where they alleged the

secretary of state's permission to counties to adopt their own voting procedures was

unreasonable and discriminatory).

> ### B.  <u>Plaintiffs Are Likely to Suffer Irreparable Harm</u>

In the absence of a preliminary injunction, Plaintiffs—and voters across Texas—will be

subject to serious violations of their constitutional rights under the Fourteenth and First

Amendments. It is well settled law that loss of constitutional rights "constitutes irreparable injury

justifying the grant of a preliminary injunction." *Deerfield Medical Ctr. V. City of Deerfield*

*Beach*, 661 F.2d 328, 338 (5th Cir. Unit B, 1981) (*citing Elrod v. Burns*, 427 U.S. 347, 373

(1976)); *see also De Leon v. Perry*, 975 F. Supp. 2d 632, 663 (W.D. Tex. 2014), *aff'd sub nom.*

*De Leon v. Abbott*, 791 F.3d 619 (5th Cir. 2015) (explaining that plaintiffs showed infringement

upon their rights under the Fourteenth Amendment, and noting that "[f]ederal courts at all levels

have recognized that violation of constitutional rights constitutes irreparable harm as a matter of

law."). Where the constitutional deprivations burden voters, the urgency is clear: "once the

election occurs, there can be no do-over and no redress. The injury to these voters is real and completely irreparable if nothing is done to enjoin this law." *League of Women Voters of N. Carolina*, 769 F.3d at 247-48.

As described above, Texas voters will face irreparable harm during the November 2020 general election in the absence of a preliminary injunction.

The current conditions for voting in Texas create serious, unacceptable, and unnecessary risk of virus transmission during the pandemic. People who are at high risk of serious COVID-19 illness, who live with high-risk people, who cannot afford the financial repercussions of losing weeks of work due to illness, and who do not have health care are all at substantially greater risk for long-term, debilitating consequences if they get sick while voting. This includes Black, Indigenous, and Latino voters, who are disproportionately affected by the pandemic, and who are at greater risk for getting serious COVID-19 illness, including hospitalization and death. These voters will be subject to the unconstitutional burden of having to risk their health and lives in order to vote.

Plaintiffs are also subject to a deprivation of their right to equal protection under the law. Voters in counties able to maintain safe voting practices—including counties that have hand-marked paper ballots and enough voting locations to avoid lines—will have substantially fewer burdens upon their constitutional rights than voters in counties that do not, or do not have the resources or permission from the Defendants, to maintain safe voting practices. But a voter's address should not dictate whether voting carries a serious risk to life and health.

Voters who vote and get COVID-19 as a result, or voters who must stay home in order to remain healthy, will not get a "do-over" after the pandemic. *See League of Women Voters*, 769

F.3d at 247-48. A preliminary injunction is necessary for ensuring that plaintiffs are not deprived of their constitutional rights, and are able to vote safely during the November 2020 elections.

    **C.**    **Protecting Voting Rights Serves the Public Interest and Will Cause No Harm**

Finally, an injunction will serve the public interest, and the threatened burden on voting rights outweighs any harm that will result from a preliminary injunction. *See*, *e.g.*, *Dunn,* 405 U.S. at 336 (right to vote is of particular public importance because it is "preservative of all rights"); *Jackson Women's Health Org.*, 760 F.3d at 458 n. 9 (affirming preliminary injunction that would prevent constitutional deprivations); *Deerfield Med. Ctr.*, 661 F.2d at 338-39 (public interest is always served by protecting constitutional rights); *Rush v. Nat'l Bd. of Med. Examiners*, 268 F. Supp. 2d 673, 679 (N.D. Tex. 2003) (public interest served by preventing discrimination); *Whole Woman's Health v. Hellerstedt,* 231 F. Supp. 3d 218, 232-33 (W.D. Tex. 2017) (balance of harms favors plaintiffs where constitutional rights are at stake). With COVID-19, the stakes could not be higher to ensure health and safety during voting. The equities overwhelmingly favor Plaintiffs.

**V.**    **CONCLUSION**

For the reasons set forth above, Plaintiffs respectfully request that the Court grant their Motion.

Dated: August 26, 2020

Respectfully submitted,

/s/ *Kelly M. Dermody*

Kelly M. Dermody (pro hac vice)
Yaman Salahi (pro hac vice)
Mike Sheen (pro hac vice)
Evan Ballan (pro hac vice)
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008
kdermody@lchb.com
ysalahi@lchb.com
msheen@lchb.com
eballan@lchb.com

Avery S. Halfon (pro hac vice)
LIEFF CABRASER HEIMANN &
BERNSTEIN LLP
250 Hudson Street, 8th Floor
New York, NY 10013
Telephone: (212) 355-9500
Facsimile: (212) 355-9592
ahalfon@lchb.com

Madeline Gomez (pro hac vice)
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
222 2nd Avenue South, Suite 1640
Nashville, TN 37201
Telephone: (615) 313-9000
Facsimile: (615) 313-9965
mgomez@lchb.com

2035363.1

Sean Lyons, State Bar No. 00792280
Clem Lyons, State Bar No.12742000
LYONS & LYONS, P.C.
237 W. Travis Street, Suite 100
San Antonio, Texas 78205
Telephone: (210) 225-5251
Telefax: (210) 225-6545
sean@lyonsandlyons.com
clem@lyonsandlyons.com

Courtney Hostetler (pro hac vice)
John Bonifaz (pro hac vice)
Ben Clements (pro hac vice)
Ronald Fein (pro hac vice)
FREE SPEECH FOR PEOPLE
1320 Centre Street, Suite 405
Newton, MA 02459
Telephone: (617) 249-3015
chostetler@freespeechforpeople.org
jbonifaz@freespeechforpeople.org
bclements@freespeechforpeople.org
rfein@freespeechforpeople.org

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and accurate copy of the foregoing document was filed electronically

(via CM/ECF) on August 26, 2020, and that all counsel of record were served by CM/ECF.


<u>/s/ *Kelly M. Dermody*     </u>
Kelly M. Dermody

2035363.1