### UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

**MI FAMILIA VOTA, TEXAS STATE
CONFERENCE OF THE NATIONAL
ASSOCIATION FOR THE ADVANCE-
MENT OF COLORED PEOPLE, MI-
CAELA RODRIGUEZ, GUADALUPE
TORRES,**

       No.  SA-20-CV-00830-JKP

         **Plaintiffs,**

**v.**

**GREG ABBOTT, GOVERNOR OF
TEXAS; AND RUTH HUGHS, TEXAS
SECRETARY OF STATE;**

         **Defendants.**

### <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court are Defendants Greg Abbott and Ruth Hughes's Motions to Dismiss and Plaintiffs' Response thereto. *ECF Nos. 19, 20, 27*. Because each Motion to Dismiss presents identical arguments on the issue pertinent to this Memorandum Opinion and Order, the Court will analyze and rule on these two motions together.

Upon consideration, the Court concludes it lacks subject matter jurisdiction to adjudicate this action. Accordingly, Defendants' Motions to Dismiss for lack of subject matter jurisdiction shall be GRANTED. Due to this finding, the Court will not reach the substantive merits of the remainder of issues raised in Defendants' Motions to Dismiss. Plaintiffs' Motion for Preliminary Injunction is DENIED as moot without reaching the substantive merits. All other pending motions are DENIED as moot. The Clerk is directed to close this case.

**Background**

Plaintiffs, Mi Familia Vota, Texas State Conference of the National Association for the Advancement of Colored People, Micaela Rodriguez and Guadalupe Torres, seek to protect from deterrence a most important civil liberty: the right to vote for all people. In light of the public health crisis caused by the COVID-19 pandemic, Plaintiffs contend the election procedures in place create unsafe conditions at polling sites which will unconstitutionally preclude certain protected classes of people from voting in the upcoming election on November 3, 2020 ("the 2020 election"). Plaintiffs bring this action to ensure "practical and constitutionally-required measures that both protect the public health and guarantee the right to vote" to all Texas citizens.

In their Complaint, Plaintiffs contend Black, Latino, and Native American voters are disproportionately affected by the pandemic, experiencing higher incidences of COVID-19 infection, hospitalization, and fatalities. At the same time, these racial classes face greater risk to their health by voting because there exist fewer polling sites in their communities and because many Texas counties require all voters use electronic voting machines, restricting those eligible to utilize the options of curbside and mail-in ballots. Because the increased health risk and physical health barriers will *de facto* force voters out of the political process, Plaintiffs contend Defendants must implement election procedures known to protect the public health.

However, Plaintiffs contend, to date, Texas Director of Elections Keith Ingram declines to approve changes to Texas's in-place voting procedures in all forms, that is, in-person, absentee, early voting, curbside voting or mail-in ballots. While acknowledging that in-person voting might not be an "available option for all voters, including those affected by quarantines," Director Ingram will not authorize changes to voting laws or procedures, but instead, recommends county officials "consider seeking a court order to authorize exceptions to the voting procedures outlined in certain

chapters of the Texas Election Code." Director Ingram further recommends county officials take action to ensure the safety of voters while at the polling sites and to prevent spread of the virus during voting, but he does not require any procedures or modifications to the allocation of polling sites or early voting. At the same time, HB 1888 (effective September 2019) prohibits counties from opening mobile early voting places with flexible locations, hours, and days.[1] Plaintiffs state that prior to the passage of HB 1888, county election officials could open mobile and temporary early voting sites for limited periods of time in parts of the county that might not otherwise be able to sustain the costs of a two-week long early voting polling place.

Plaintiffs argue the health risks created by the COVID-19 pandemic, transposed upon the legislative and executive branch officials' refusal to mandate admitted election procedures necessary to protect public health, create numerous burdens on the right to vote. Without citing specific Election Code provisions or laws, Plaintiffs contend, generally, "Texas's election laws impose a severe burden on the right to vote" and "Texas's election policies during the pandemic will unlawfully abrogate and abridge the constitutionally protected right to vote." These resultant burdens and dangers include: (1) the requirement to physically touch and exchange physical identification documents; (2) the requirement to stand in the same physical space of multiple prior voters and physically touch voting machines which cannot be disinfected between uses; (3) the limited availability of handmarked paper ballots which make the voting process considerably safer; (4) the limited availability of curb-side voting, which drastically reduces the potential exposure of voters; (5) the limited availability of early voting which reduces long lines on Election Day; (6) the reduction of polling places, increasing the risk that voters will need to travel long distances, take public transportation, or carpool with others, thus exacerbating the risk of infection; and (7) the

---

[1] *See* Texas Election Code, Title 7, § 85.062, 85.063.

likely overcrowding of polling places, further exacerbating the risk of infection due to such over-crowding.

As a result, Plaintiffs argue Black, Latino and Native American voters in Texas will be forced to face a constitutionally unacceptable choice: exercising their right to vote - or - protecting their own lives and the lives of their loved ones and community.

For these reasons, Plaintiffs assert causes of action of: (1) Undue burden on the right to vote in violation of the due process clause of the Fourteenth Amendment as applied to elections held during the COVID-19 pandemic; (2) Denial of  Equal Protection under the law in violation of the Fourteenth Amendment as applied to elections held during the COVID-19 pandemic; (3) Undue burden on the right to vote in violation of the First Amendment as applied to elections held during the COVID-19 pandemic; (4) Race discrimination in violation of the Fifteenth Amendment (42 U.S.C. § 1983) as applied to elections held during the COVID-19 pandemic; and (5) Race discrimination in violation of Section 2 of the Voting Rights Act (52 U.S.C. § 10301) as applied to elections held during the COVID-19 pandemic. In filing this action, Plaintiffs request this Court establish procedures which will ensure the election process is as safe as possible to protect all Texas voters from being exposed to or contracting COVID-19 while at a polling site. To protect those in designated higher-risk categories, Plaintiffs seek modification of early, in-person and curbside voting procedures through declaratory relief. Plaintiffs request this Court declare and or-der Defendants:

    a. Extend the period of early voting to begin on October 5, 2020;

    b. Require voters, poll-workers, persons assisting voters, and any other person at a polling site to wear a mask;

    c. Provide masks to persons who do not already have one, with exceptions only for indi-viduals who cannot wear masks due to a disability;

d.  Allow counties to offer extended, temporary, and/or mobile early voting locations with flexible hours and days;

e.  Suspend the requirement that curbside voters must qualify as having a disability or, alternatively, order that any voter may identify as "disabled" due to the threat that the coronavirus poses to his or her health and life, solely for the purpose of being found eligible to vote curbside;

f.  Open additional polling places and provide enough voting booths and poll workers at each polling place to ensure that voters are not required to wait more than twenty minutes to vote;

g.  Staff all polling places with a sufficient number of poll workers to keep voter lines to less than 20 minutes, including by actively recruiting new poll workers who are not at high risk for serious illness due to COVID-19;

h.  Prohibit the closure of polling places currently scheduled to be available on election day. Should a polling place need to be closed or moved to meet health and safety requirements, require that a new polling place be made available within the same voting precinct.

i.  In counties that use electronic voting machines, including counties that participate in the Countywide Polling place Program, make available a sufficient number of both paper ballots and electronic voting machines to allow voters the option of voting by hand-marking a paper ballot or by voting on the electronic voting machine;

j.  Revise voter identification requirements to allow voters to show identification without requiring poll workers to physically handle identification or documentation;

k.  Apply the natural disaster exception for this election during the pandemic to allow voters to sign affidavits regarding the natural disaster exception at the polling place;

l.  Ensure poll workers are given protective gear, including masks and gloves, in sufficient quantity to allow poll workers to change protective gear frequently;

m. Provide poll workers with ample opportunity to wash their hands.

In addition, Plaintiffs request this Court:

a.  Order Defendants to enable counties that need to revise election policies to protect voters' health to do so, provided the proposed revisions do not violate any relief ordered by this Court;

b.  Order Defendants to rescind or modify any voting practice or procedure deemed by this Court to unlawfully discriminate against Black, Latino, or other underserved voters on the basis of a protected characteristic;

5

    c.   Order that all such relief be extended until there are no existing cases of coronavirus in the state of Texas, or until there is a vaccine freely and readily available to all Texans, whichever comes sooner;

    d.   Award Plaintiffs reasonable attorneys' fees and costs; and

    e.   Retain jurisdiction to ensure all Defendants' ongoing compliance with the foregoing orders.

On August 19, 2020, the Court held a status conference to discuss pending issues and matters that are the subject of this litigation as well as any matters that might be resolved by general agreement or settlement. On August 26, 2020, Plaintiffs moved for a preliminary injunction. *ECF No. 29*. On September 4, 2020, the Court held a hearing on Defendants' Motions to Dismiss for lack of subject matter jurisdiction pursuant to Federal Rule 12(b)(1) and for failure to state a claim pursuant to Federal Rule 12(b)(6).

### **Motions to Dismiss for Lack of Subject Matter Jurisdiction**

Defendants move to dismiss this action for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1).[2] Defendants argue Plaintiffs assert causes of action that present nonjusticiable political questions over which this Court has no subject matter jurisdiction and seek remedies which this Court has no authority or jurisdiction to administer.[3]

---

[2] The Motion to Dismiss asserts it is filed pursuant to Federal Rule of Civil Procedure 12(b)(6). However, at the hearing held on August 19, 2020, Defendants clarified this portion of the motion to be filed pursuant to Federal Rule 12(b)(1).

[3] In the Fifth Circuit, the issue whether a case presents a nonjusticiable political question concerns the Court's subject-matter jurisdiction. *See Spectrum Stores, Inc. v. Citgo Petroleum Corp.*, 632 F.3d 938, 948 (5th Cir. 2011); *see also Tex. Democratic Party v. Abbott*, 961 F.3d 389, 398 & n.14 (5th Cir. 2020). This Court recognizes the Supreme Court in *Baker v. Carr* distinguished "nonjusticiability" from lack of subject matter jurisdiction, stating, "[i]n the instance of nonjusticiability, consideration of the cause is not wholly and immediately foreclosed; rather, the Court's inquiry necessarily proceeds to the point of deciding whether the duty asserted can be judicially identified and its breach judicially determined, and whether protection for the right asserted can be judicially molded." Whereas, with regard to subject matter jurisdiction, "Article III, § 2, of the Federal Constitution provides that 'The judicial Power shall

## Legal Standard

Federal courts hold limited jurisdiction, possessing only the power authorized by the Constitution and statute, which may not to be expanded by judicial decree. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). When analyzing its jurisdiction, a Court must presume a suit lies outside this limited jurisdiction. The burden of establishing subject matter jurisdiction rests with the party seeking to invoke it. *Howery v. Allstate Ins. Co.*, 243 F.3d 912, 916 (5th Cir. 2001).

A Court must dismiss a cause for lack of subject matter jurisdiction "when the court lacks the statutory or constitutional power to adjudicate the case." *Home Builders Assn. of Mississippi, Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998). Federal Rule 12(b)(1) provides the means for a party to challenge the subject matter jurisdiction of the district court to hear a case. Fed. R. Civ. P. 12(b)(1). "When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). Dismissal of a case based upon lack of subject matter jurisdiction is not a determination of the merits. *Id.*

In examining a Federal Rule 12(b)(1) motion, the district court is empowered to weigh the evidence and consider disputed facts. *See Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981); *See Montez v. Dep't of Navy*, 392 F.3d 147, 149 (5th Cir. 2004). The extent of the Court's consideration of disputed facts depends upon whether the jurisdictional attack is "facial" or "factual". *See Williamson*, 645 F.2d at 413; *Superior MRI Servs., Inc. v. Alliance Healthcare Servs., Inc.*, 778 F.3d 502, 504 (5th Cir. 2015). If the defendant submits affidavits, testimony, or other

---

extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority." *See Baker v. Carr*, 369 U.S. 186, 211 (1962).

evidentiary materials, the jurisdictional attack is factual, rather than facial. *Williamson*, 645 F.2d at 413; *Superior MRI Servs., Inc.*, 778 F.3d at 504. If, as here, the Defendant does not submit evidentiary matters with a Federal Rule 12(b)(1) motion to dismiss, the attack is facial, which requires the Court to construe the allegations of the Complaint as true. *Williamson*, 645 F.2d at 413; *United of Omaha Life Ins. Co. v. Womack-Rodriguez*, SA-19-CV-0814-JKP, 2020 WL 2513573, at *4 (W.D. Tex. May 15, 2020).

**Analysis**

Article III of the Constitution limits federal courts' authority to determination of "Cases" and "Controversies." *Rucho v. Common Cause*, 139 S. Ct. 2484, 2493–94 (2019). This limitation is interpreted to mean federal courts can address only questions "capable of resolution through the judicial process." *Id.*; *Flast v. Cohen*, 392 U.S. 83, 95 (1968). In some cases, the question presented is not capable of resolution through the judicial process because it is entrusted to another political branch or involves no judicially enforceable rights. *Rucho*, 139 S. Ct. at 2494; *Vieth v. Jubelirer*, 541 U.S. 267, 277 (2004). In such a case the claim is said to present a "political question" and to be nonjusticiable because the presented issues of law and questions are beyond the scope of this separation of power. *Marbury v. Madison*, 5 U.S. 137, 170, 177 (1803). This, "the political-question doctrine", is rooted in and protects the separation of powers by preventing federal courts from overstepping their constitutionally defined role. *Baker v. Carr*, 369 U.S. 186, 210 (1962).

A case must be dismissed under the political-question doctrine if it would require the Court to decide a question with one of the following characteristics: (1) a textually demonstrable constitutional commitment of the presented issues to a coordinate political department; or (2) a lack of judicially discoverable and manageable standards for resolving the presented issues; or (3) the impossibility of deciding the presented issues without an initial policy determination of a kind

clearly for nonjudicial discretion; or (4) the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or (5) an unusual need for unquestioning adherence to a political decision already made; or (6) the potentiality of embarrassment from multifarious pronouncements by various departments on one question. *Baker*, 369 U.S. at 217 (citing *Marbury v. Madison*, 5 U.S. at 170).

This case, and more specifically the issues to be decided and action requested of this court through the relief sought, possesses four characteristics indicative of a nonjusticiable political question: (1) a textually demonstrable constitutional commitment of the administration of elections and implementation of election procedures to state legislatures and Congress; (2) a lack of judicially discoverable and manageable standards for measuring the efficacy of the requested changes to election procedures in reducing public health risk and ensuring the appropriate parties comply with the requested standards; (3) the impossibility of deciding the danger to the public health of the current election procedures and the reduction of such risk created by the requested relief without an initial policy determination of a kind clearly for nonjudicial discretion; and (4) the impossibility of this court's undertaking the requested independent resolution without expressing lack of the respect due coordinate branches of government.

**(1) Factors (1) Constitutional Commitment to State Legislature and Congress; (3) Impossibility of Determination Without a Nonjudicial Policy Determination; and (4) Resolution Demonstrates Lack of the Respect Due Coordinate Branch**

Within the unique setting of this case, the first, third and fourth characteristics manifest based upon the same reasons. Therefore, they will be discussed together.

First, "[t]he Elections Clause has two functions: upon the States it imposes the duty to prescribe the time, place, and manner of electing [federal] Representatives and Senators; upon Congress it confers the power to alter those regulations or supplant them altogether." *Arizona v. Inter*

*Tribal Council of Arizona, Inc.*, 570 U.S. 1, 7-8 (2013); U.S. Const. art. I, § 4, cl. 1. Thus, the Elections Clause commits the "time, place, and manner" administration of federal congressional elections to state legislatures and to Congress. *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. at 7-8; *Baker*, 369 U.S. at 217; U.S. Const. art. I, § 4, cl. 1. Thereby, the state legislature holds "broad power" to prescribe the procedural mechanisms for holding congressional elections; however, it may not use this broad power to dictate electoral outcomes, to favor or disfavor a class of candidates, or to evade important constitutional restraints. *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 217 (1986); *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 833-834 (1995).

In this context, the term "manner" "encompasses matters like 'notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns.'" *Cook v. Gralike*, 531 U.S. 510, 523–24 (2001) (quoting *Smiley v. Holm*, 285 U.S. 355, 366 (1932)); *see also U.S. Term Limits, Inc. v. Thornton*, 514 U.S. at 833. These matters are among the numerous procedural safeguards necessary to enforce the fundamental right to vote and to ensure elections are "fair and honest," and "some sort of order, rather than chaos, is to accompany the democratic process," *Cook*, 531 U.S. at 523–24; *Smiley*, 285 U.S. at 366; *Storer v. Brown*, 415 U.S. 724, 730 (1974).

Here, the actions Plaintiffs request this Court take to ensure the safety of voters in the 2020 election fall within the "manner" of elections administration designated to state legislators. While the specific causes of action Plaintiffs assert, normally, do fall within this Court's subject matter jurisdiction, the relief and action requested and the issues to be resolved do not. Should it exercise the authority Plaintiffs propose, the Court would mandate and implement its own judgment about

the proper administration of elections, thereby encroaching upon the "constitutional commitment" of the administration of elections to the state legislatures and to Congress. *Baker*, 369 U.S. at 217. By asking this Court to order specific action and administer specific procedures for the administration of the 2020 election, Plaintiffs ask this Court to assume the role of the Texas legislature and exercise the discretion and authority explicitly reserved to that branch.

Assumption of this role would necessarily convey a "lack of the respect due coordinate branches of government." Additionally, Plaintiffs' requests would require this Court to make an initial policy determination clearly designated for nonjudicial discretion. Analysis of the causes of action asserted necessarily requires determination of the danger to the public health of the current election procedures, and disparate impact, if any, on protected classes of citizens to devise and determine proper procedures to reduce this public health risk. In doing so, this Court would override any policy decisions to micromanage Texas's election process.

This Court is not asked to decide the constitutionality of a specific statute or specific election policies. Instead, Plaintiffs generally challenge "Texas's election laws" and "Texas's election policies during the pandemic." This general challenge is not within this Court's Article III power. This Court concludes the administration of elections and determination and implementation of election procedures are constitutionally committed to the state legislative branch and its designated governmental bodies. In accord, any directive would also require an initial policy determination outside of judicial discretion and require an undertaking that would inherently demonstrate a lack of respect due the legislative branch and its designated governmental actors.

Based upon a finding of these three characteristics, the Court concludes this case presents a nonjusticiable political question.

**Factor (2): Lack of Judicially Discoverable and Manageable Standards for Resolution**

Next, the lack of judicially discoverable and manageable standards for resolving the necessary issues also precludes this Court from addressing the causes of action asserted and imposing the specific relief Plaintiffs seek. As stated previously, Plaintiffs enumerate seven dangers and burdens on the 2020 election created by the election policies in place. Some allegations supporting these enumerated burdens and the alleged constitutional violations include:

- Defendants' failure to provide sufficient opportunities for early voting, to open additional polling locations, or to permit voting by paper ballot are all likely to contribute to public distrust in the safety of polling locations as well as very long voting lines;

- Plaintiff Micaela Rodriguez plans to vote in the November 2020 elections, but may not be able to do so if the procedures in place for elections make voting practically impossible because they create a serious risk of virus transmission;

- The disproportionate infection rate and the more severe health consequences that Black and Latino people face from the coronavirus mean that voting procedures that fail to provide the necessary health and safety protections to all voters in the context of this pandemic will disproportionately burden the rights of Black and Latino voters, in particular. Thus, Texas's voting procedures abridge and deny the equal rights of Black and Latino communities to participate in the voting process on account of their race;

- Defendants refuse to revise voting procedures regarding early voting, paper ballots, and the number of polling places to enable counties to minimize health risks of contracting a potentially deadly illness while ensuring sufficient access to the ballot. If unchanged, these voting procedures will put the lives and health of voters at risk, and will force voters to choose between exercising their right to vote or contracting a potentially deadly illness;

- Texas election policies will place individuals who vote in counties that use universal electronic voting machines at high risk of contracting the coronavirus. The insufficient availability of voting machines and absence of hand-marked paper ballot options at many polling sites will require hundreds of voters to vote on the same machines—and therefore touch the same common surfaces . . . increasing the risk of coronavirus transmission;

- Cleaning each machine properly will take time—potentially increasing delays and the amount of time voters congregate waiting to vote, in turn

increasing the risk that voters will be unable to vote during their available time windows and increasing the risk of coronavirus transmission. If a poll worker uses the wrong cleaner, accidentally touches a button during cleaning, uses too much liquid cleaner, or does not clean according to manufacturer instructions, the machine could break or malfunction, increasing the same risks described above. If the machine is not cleaned after each person casts a ballot, the coronavirus will remain on the machine's surfaces, such as the screen or keypad, and can be contracted by the next voter;

- Defendants' failure to provide the option to vote using hand-marked paper ballots and to expand the number of people who can vote simultaneously will create unnecessary and substantial risk of overcrowding and long lines, require people to vote on frequently touched surfaces that are difficult and time-consuming to disinfect, and thereby unlawfully burden voters' exercise of the franchise;

- If hand-marked paper ballots are made available to voters, it will reduce the burden on electronic voting machines, limit lines, provide poll workers with more time to clean the machines properly without causing back-ups or delays, minimize the number of people breathing on and around the machines, and increase the likelihood that voters who need or prefer to use electronic voting machines will have prompt access to a disinfected machine that has not been handled or breathed on by hundreds of other voters;

To cure the enumerated dangers and burdens, Plaintiffs request this Court enter an order of declaratory relief to include suspending the requirement that curbside voters must qualify as having a disability; open and provide enough voting booths and poll workers to ensure voters do not wait more than twenty minutes to vote; make available a sufficient number of both paper ballots and electronic voting machines to allow voters the option of voting by hand-marking a paper ballot or by voting on the electronic voting machine; provide poll workers with ample opportunity to wash their hands, and; enable counties that need to revise election policies to protect voters' health to do so.

While this Court accepts as true all allegations in Plaintiffs' Complaint to determine this Motion to Dismiss, in the context of litigation, there are no judicially discoverable and measurable standards to ultimately determine if and which current election practices are discriminatory to

13

Black, Latino and Native American citizens because COVID-19 has a disparate effect on these protected classes. Plaintiffs' allegations are based upon conjecture and possibility, and therefore, are detached from the projected harm. In addition, there are no judicially manageable standards to determine a reasonable amount of poll workers and polling sites; to monitor wait times and adjust personnel; to determine what safety measures should be taken and how much safety is enough, and; what time frame is early enough for early voting to cure the speculated improprieties. *See Rucho*, 139 S. Ct. at 2500-01 (rejected efforts to have a federal court articulate the definition of "fairness" and "how much is too much" in the context of partisan gerrymandering). Because these burdens and dangers are based upon imprecise and hypothetical allegations and projected harm, Plaintiffs do not present any judicially enforceable rights upon which this Court can administer manageable standards for resolution.

For these reasons, the Court concludes this case presents a nonjusticiable political question.

### Persuasive Authority Pertaining to Parties' Arguments

Similarly, in a persuasive case, *Coalition for Good Governance v. Raffensperger*, the Plaintiffs complained the COVID-19 pandemic made in-person voting unsafe unless election officials adopted various changes to both in-person and mail-in voting. *See Coalition for Good Governance v. Raffensperger,* No. 1:20-cv-1677, 2020 WL 2509092, at *1 (N.D. Ga. May 14, 2020)(appeal filed June 26, 2020). There, as here, the Plaintiffs requested the Georgia District Court provide similar declaratory relief related to in-person voting by issuing an Order requiring polling locations to use paper ballots, adjusting the number of voting stations, expanding early voting, implementing curbside voting and temporary mobile voting centers, streamlining voter check-in, offering state-provided personal protective equipment ("PPE"), and increasing physical distancing. *Id.* The

Georgia Court concluded the issues presented to justify the specific declaratory relief requests were constitutionally committed to a coordinate political department and there was a lack of judicially discoverable and manageable standards for resolving the issues raised. *Id*. at *3-*4. The Georgia Court reasoned the Elections Clause "commits the administration of elections to Congress and state legislatures—not courts. The Framers of the Constitution did not envision a primary role for the courts in managing elections, but instead reserved election management to the legislatures. Absent pellucid proof provided by plaintiffs that a political question is not at issue, courts should not substitute their own judgments for state election codes." *Id*. at *3. Because the issues, claims and requested relief in this unique pandemic setting are similar, this Court finds *Coalition for Good Governance* to be persuasive.

The issues to be determined and relief requested in this case are distinguished from those in *Texas Democratic Party v. Abbott*, upon which Plaintiffs rely to support their position. *See Texas Democratic Party v. Abbott*, 961 F.3d 389 (5th Cir. 2020). In *Texas Democratic Party*, the Fifth Circuit distinguished *Coalition for Good Governance* because "[t]hat challenge was directed at the specific procedures Georgia planned to use to conduct the election, such as whether to use electronic voting machines or paper ballots," and found that suit necessarily "challenged the wisdom of Georgia's policy choices." *Id*. at 398-99. However, the issue before the Fifth Circuit did not require "consider[ing] the prudence of Texas's plans for combating the Virus when holding elections," which it found improper. Instead that court was appropriately asked to "decide only whether the challenged provisions of the Texas Election Code run afoul of the Constitution." *Id*. The Court held "[t]he standards for resolving such claims are familiar and manageable, and federal courts routinely entertain suits to vindicate voting rights." *Id*.

15

Here, Plaintiffs do not challenge the constitutionality of any specific Election Code provision, but challenge the prudence of Texas's policies, plans and procedures for combating the COVID-19 virus within the 2020 election. Plaintiffs generally challenge "Texas's election laws" and "Texas's election policies during the pandemic." Thus, as the Fifth Circuit explained in *Texas Democratic Party v. Abbott*, this case is more closely aligned with *Coalition for Good Governance*.

## CONCLUSION

This Court is cognizant of the urgency of Plaintiffs' concerns and does respect the importance of protecting all citizens' right to vote. Within its authority to do so, this Court firmly resolves to prevent any measure designed or disguised to deter this most important fundamental civil right. At the same time, the Court equally respects and must adhere to the Constitution's distribution and separation of power. To that end, the Elections Clause of the Constitution specifically commits the administration and management of federal legislative elections to the Texas legislative branch. Further, the issues to be resolved lack judicially discoverable and manageable standards. Consequently, determination of the causes of action asserted and requests for relief in this action would require this Court to overstep its constitutionally defined role, and therefore, present nonjusticiable political questions which this Court lacks subject matter jurisdiction to determine and impose remedy.

Albeit, the requests for relief do not appear unreasonable and can easily be implemented to ensure all citizens in the State of Texas feel safe and are provided the opportunity to cast their vote in the 2020 election. Unfortunately, under the confines of this procedural posture, Defendants' Motions to Dismiss for lack of subject matter jurisdiction are GRANTED on this issue alone. Because this Court lacks subject matter jurisdiction, the Court will not reach or decide the

remaining substantive issues raised in Defendants' Motion to Dismiss. Plaintiffs' Motion for Pre-

liminary Injunction is DENIED as moot without reaching any substantive issues. All other pending

motions are DENIED as moot. The Clerk is directed to close this case.

      It is so ORDERED.
      SIGNED this 7th day of September, 2020.


_____
      JASON  PULLIAM
UNITED STATES DISTRICT JUDGE