IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| MI FAMILIA VOTA, TEXAS STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, MICAELA RODRIGUEZ and GUADALUPE TORRES,<br><br>Plaintiffs<br><br>v.<br><br>GREG ABBOTT, Governor of Texas; RUTH HUGHS, Texas Secretary of State,<br><br>Defendants. | No. 5:20-cv-00830 |

**PLAINTIFFS' EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

TABLE OF CONTENTS

PAGE NO.

PRELIMINARY STATEMENT ...................................................................................1

FACTS ..........................................................................................................................3

    I.      THE COVID-19 PANDEMIC ................................................................3

    II.     THE IMPACT OF COVID-19 ON COMMUNITIES OF COLOR ......................4

    III.    TEXAS'S MASK MANDATE EXEMPTION FOR POLLING PLACES
         ENDANGERS VOTERS ..........................................................................8

    IV.    BLACK AND LATINO TEXAS VOTERS ALREADY ARE
         DISPROPORTIONATELY LIKELY TO VOTE IN CONDITIONS THAT
         CREATE HIGH RISK OF COVID-19 TRANSMISSION ...................................9

    V.     TEXAS HAS A HISTORY OF OFFICIAL DISCRIMINATION AGAINST
         BLACK AND LATINO TEXANS ..........................................................11

PROCEDURAL HISTORY ...........................................................................................12

RELIEF SOUGHT ........................................................................................................13

LEGAL STANDARD ...................................................................................................14

ARGUMENT ...............................................................................................................14

    I.      PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ......................14

         A.     The Executive Order's Exemption Places a Discriminatory Burden
              on Black and Latino Voters .......................................................17

         B.     The Order's Burden is Causally Linked to Historical Discrimination ......18

             1.     History of Official Discrimination ................................................19

             2.     Effects of Past Discrimination ......................................................20

             3.     Responsiveness of the Legislature to Black and Latino Voters.....21

             4.     Tenuousness of Policies Underlying the Law...............................22

    II.     PLAINTIFFS ARE LIKELY TO SUFFER IRREPARABLE HARM.................24

    III.    PROTECTING VOTING RIGHTS SERVES THE PUBLIC INTEREST
         AND WILL CAUSE NO HARM ..........................................................26

CONCLUSION..............................................................................................................................27

## PRELIMINARY STATEMENT

Last Wednesday, the Fifth Circuit remanded to this Court to resolve a limited question:

> Were the district court to conclude that the exemption from wearing a mask in public places contained in Executive Order GA-29 for poll workers, voters, and others in polling places violated section 2 of the Voting Rights Act, the district court might excise that provision if it concluded that this would redress the injuries the Plaintiffs have alleged. It is at least conceivable that such a remedy would not materially or substantially affect the ongoing election, but that would be a matter for the district court to determine.

Ex. 1.[1] Further indicating the urgency of this issue, last Friday the Circuit issued the mandate to permit this Court to immediately resolve Plaintiffs' challenge to the mask exemption just ninety minutes after Defendants filed their opposition. Plaintiffs now seek a temporary restraining order and preliminary injunction immediately excising the mask mandate exemption from the Executive Order.

Plaintiffs are likely to succeed on their Voting Rights Act "discriminatory effect" claim. The mask exemption threatens the health of all in-person voters, but not equally. Black and Latino Texans face increased risks due to the exemption: They are more likely to become infected and more likely to suffer severe illness or to die of COVID-19. Black and Latino voters in Texas also face longer lines at the polls, increasing their risk of transmission by exposing them to crowds of other voters and poll workers, none of whom are currently required to wear a mask. Under these conditions, Black and Latino voters must choose between not voting or risking their lives or the lives of their loved ones to vote. White voters do not face the same level of risk. They are less likely to have to wait in line to vote; are less likely to experience serious COVID-19 illness, hospitalization, or death; and are more likely to have access to testing sites and health

---

[1] Unless otherwise specified, all exhibits are attached to the October 20, 2020 declaration of Sean Lyons.

care. Black and Latino voters are much more concerned about the impacts of COVID-19 and the risk of exposure to unmasked persons while voting than white voters for the obvious reason that they are at much greater risk.

Excising the exemption would "redress the injuries": Requiring masks at polling places will protect Black and Latino voters. Black and Latino voters will face far less burden on their right to vote and be less likely to sacrifice their right to vote in the November 2020 election—for which early voting is already underway—altogether rather than enter a polling place where masks are optional. While requiring masks alone is not a panacea, polling places where everyone is masked limit the likelihood that infected individuals will transmit the virus to others at the polling place. Indeed, the Governor's Executive Order recognizes that public mask wearing is essential to fighting the pandemic, by requiring masks to be worn in almost all public places *other* than polling places.

The burdens and equities also support immediate relief. The Governor appropriately recognized the scientific consensus that masks likely will save lives, impose minimal burden, and should be required in public places. The Governor has explicitly acknowledged in a town hall that "we know that the safest way to go vote is by wearing a mask."[2] Yet he did not require mask-wearing at poll locations, apparently believing that would burden voters who did not wish to wear a mask. But wearing a mask during the pandemic places no more burden on voters than having to wear a shirt that does not contain a political endorsement on it, having to bring an identification to polling places, refraining from smoking at polling places, and refraining from carrying a firearm at polling places. And whatever burden there may be is far outweighed by the

---

[2] Patrick Svitek, *Texas Gov. Greg Abbott's statewide mask mandate exempts voting sites and churches*, Tex. Tribune (July 3, 2020), https://www.texastribune.org/2020/07/03/texas-mask-order-voting-chruches-greg-abbott/

burden that mask-less crowds at polling places will place on Black and Latino voters, warranting immediate injunctive relief.

Fundamentally, Congress has already resolved this issue: voting practices—like the polling place mask exemption—that interact with historical and societal practices of discrimination to disproportionately disenfranchise Black and Latino voters are prohibited by Section 2 of the Voting Rights Act.

Finally, Plaintiffs' requested remedy "would not materially or substantially affect the ongoing election," because it would not alter how Texas runs its elections. Plaintiffs ask only that the polling place exemption from the Texas mask wearing requirement be removed. Once the exemption is excised, the Governor's Executive Order will operate the same way at polling places as it does at almost all other public places in Texas, increasing consistency in the law and in practice for Texans.

## FACTS

### I.      THE COVID-19 PANDEMIC

Plaintiffs attach testimony from Dr. Catherine Troisi, an infectious disease epidemiologist and public health expert. *See* Declaration of Catherine L. Troisi ("Troisi Decl.") ¶ 1. As Dr. Troisi explains, Coronavirus Disease 2019 (COVID-19) is spreading rapidly throughout the United States: since the first case was reported in the United States in January, over 8 million Americans have been infected, and more than 219,000 have died.[3] In Texas alone, there have been more than 828,000 confirmed cases and over 17,000 confirmed fatalities.[4] New cases are

---

[3] CDC Covid Data Tracker, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last accessed Oct. 20, 2020, 2:13 PM).

[4] Tex. Dep't of State Health Services Covid Dashboard, https://bit.ly/2Y5wuxG (last accessed Oct. 20, 2020, 2:16 PM).

rising again in an autumn surge that is expected to continue or worsen through November 3; the positivity rate is now 8.6% and rising. Troisi Decl. ¶ 29. Texas now averages more than 4,100 COVID-19 cases per day, with a 24% increase in the rolling average of cases. Troisi Decl. ¶ 29. More than 470 people have died in the last week alone.[5] The fatality rate is approximately 2.1%. Troisi Decl. ¶ 29.

The main route of transmission is through the air between people. Troisi Decl. ¶¶ 11, 13. Anyone infected with the virus—regardless of whether they are experiencing symptoms—can transmit the virus for fourteen days after infection. Troisi Decl. ¶ 14. As the CDC has explained, "the more an individual interacts with others, and the longer that interaction, the higher the risk of COVID-19 spread." Troisi Decl. ¶ 26. Indoor spaces, close contact, crowding, and the duration of contact between individuals are all factors that increase risk of virus transmission. Troisi Decl. ¶ 12.  Face masks play a crucial role in protecting people from COVID-19; while a mask does confer some protection on the wearer, the primary protection they offer is that an infected person wearing a mask is much less likely to transmit the disease to others than one not wearing a mask. Troisi Decl. ¶¶ 2, 20, 22-23.

## II.    THE IMPACT OF COVID-19 ON COMMUNITIES OF COLOR

Communities of color, and particularly Black and Latino communities, have been disproportionately affected by the pandemic and are likely to experience serious COVID-19 illnesses at a disproportionate rate when compared to white COVID-19 patients. *See* Troisi Decl. ¶ 16. Across the United States, Black and Latino people are far more likely to be infected with

---

[5] Tex. Dep't of State Health Services Covid Dashboard, https://bit.ly/2Y5wuxG (last accessed Oct. 20, 2020, 2:16 PM). ; CDC Covid Data Tracker, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last accessed Oct. 20, 2020, 2:13 PM).

COVID-19, and once infected more likely to die of the disease, than white people.[6] Black and Latino people are also dying younger than white people from COVID-19.[7] The disparity is shocking: 1 in 920 Black Americans have died from COVID-19, two or more times as high as the rate for white Americans (which is 1 in 1,840); 1 in 1,360 Latinos have died.[8] "[N]early 1 in 3 black Americans know someone personally who has died of covid-19, far exceeding their white counterparts."[9]

In particular, Black and Latino Texans are disproportionately represented in terms of confirmed cases and fatalities. Troisi Decl. ¶ 18.[10] When adjusted for age, the COVID-19 mortality rate for Black people is more than twice as high, and the mortality rate for Latino

---

[6]Jeremy A.W. Gold, et. al., *Race, Ethnicity, and Age Trends in Persons Who Died from COVID-19—United States, May-August 2020*, CDC Morbidity and Mortality Weekly Report vol. 69, at 4 (Oct. 16, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6942e1-H.pdf (Ex. 5); Lindsay Kim, et. al., *Hospitalization Rates and Characteristics of Children Aged < 18 Years Hospitalized with Laboratory-Confirmed COVID-19*, CDC Morbidity and Mortality Weekly Report vol. 69, no. 32, at 1083 (Aug. 14, 2020), https://bit.ly/3dDfpBO (Ex. 6).

[7] Tifany Ford, et. al., *Race Gaps in COVID-19 Deaths are Even Bigger Than They Appear*, Brookings Inst. (June 16, 2020), https://brook.gs/3lXwgCk.

[8] APM Research Lab Staff, *The Color of Coronavirus: COVID-19 Deaths by Race and Ethnicity in the U.S.*, APM Research Lab, https://www.apmresearchlab.org/covid/deaths-by-race (last accessed Oct. 20, 2020, 2:43 PM) (Ex. 7(.

[9] Amy Goldstein & Emily Guskin, *Almost one-third of black Americans know someone who died of covid-19, survey shows*, Wash. Post (June 26, 2020), https://www.washingtonpost.com/health/almost-one-third-of-black-americans-know-someone-who-died-of-covid-19-survey-shows/2020/06/25/3ec1d4b2-b563-11ea-aca5-ebb63d27e1ff_story.html (the comparable data for other groups is "17 percent of adults who are Hispanic and 9 percent who are white").

[10] Racial Data Dashboard of *The COVID Tracking Project*, The Atlantic, https://covidtracking.com/race/dashboard#state-tx (last accessed Oct. 20, 2020, 8:05 PM).

people is more than four times as high, as the COVID-19 mortality rate for white people. Troisi Decl. ¶ 19.[11]

There are also serious disparities in access to testing. Testing sites are disproportionately located in predominantly white neighborhoods, while predominantly Black and Latino neighborhoods lack sufficient testing sites, even where outbreaks are occurring.[12] In the absence of testing, Black and Latino Texans are less likely to learn they are infected and more likely to unknowingly spread the virus in their community. *See* Troisi Decl. ¶¶ 29-30.

As the CDC concluded: "Inequalities in the social determinants of health, such as poverty and healthcare access, affecting these groups are interrelated and influence a wide range of health and quality-of-life outcomes and risks."[13] Black and Latino workers are more likely to work in essential jobs where they must appear in person to provide services for other Texans.[14] They are also more likely to be paid low wages and have less access to affordable healthcare. *Id*. Black and Latino people are also disproportionately likely to live in poverty in Texas.[15]

---

[11] APM Research Lab Staff, *The Color of Coronavirus: COVID-19 Deaths by Race and Ethnicity in the U.S.*, APM Research Lab, www.apmresearchlab.org/covid/deaths-by-race#rates (last accessed Oct. 20, 2020) (Ex. 7).

[12] *See* Stephanie Adeline, *In Large Texas Cities, Access To Coronavirus Testing May Depend On Where You Live*, NPR (May 27, 2020), https://n.pr/3ggSqfs; Soo Rin Kim, *Which Cities Have the Biggest Racial Gaps in COVID-19 Testing Access?*, FiveThirtyEight (July 22, 2020), https://53eig.ht/3j1USs5.

[13] *Health Equity Considerations and Racial and Ethnic Minority Groups,* CDC (July 24, 2020), https://bit.ly/2EjWE94 (Ex. 8).

[14] *See* Sherita Hill Golden, *Coronavirus in African Americans and Other People of Color,* John Hopkins Medicine (Apr. 20, 2020), https://bit.ly/32ix50u.

[15] *See* Most Recent Demographic Data on Poor People in Texas, U.S. Census Bureau, https://tinyurl.com/yy3q3ez7 (last accessed Oct. 20, 2020, 2:53 PM).

Approximately 8% of white people in Texas live below the poverty line, as compared with 20% of Black people and 21% of Latino people.[16]

These socioeconomic inequalities have not only placed Black and Latino people at increased risk of serious COVID-19 illness if they get the disease, but have also made them even more economically vulnerable than other groups. *See, e.g.*, Torres Aff. ¶¶ 14-16. These factors inform how voters assess whether they can risk going to vote during the pandemic.

Texas counties with large Black and Latino populations, already suffering from disproportionate levels of poverty, have been more severely impacted by COVID-19. For example, the two hardest hit zip codes in Dallas County are predominantly Black and Latino.[17] And Cameron County—whose population is 89% Latino, with nearly 1/3 of its population living below the poverty line—accounts for nearly 5% of all confirmed COVID-19 fatalities in the state, despite having just 1.5% of the state's population.[18] In cities and counties with high rates of virus transmission, voters face greater risk of infection from community spread.[19]

---

[16]*Poverty Rate by Race/Ethnicity,* Kaiser Family Foundation, https://bit.ly/35ipBvY (last visited Oct. 20, 2020, 2:56 PM).

[17] *See* PCCI COVID-19 Hub, https://covid-analytics-pccinnovation.hub.arcgis.com/ (last visited Oct. 20, 2020, 3:07 PM) (zip codes 75211 and 75217 under "Geospatial Drill Down of COVID Cases" and PCCI's Vulnerability Index).

[18] *See* Emma Platoff & Carla Astudillo, *Across Texas and the Nation, the Novel Coronavirus is Deadlier for People of Color*, Tex. Trib. (July 30, 2020), https://bit.ly/32foWtB.

[19] For example, in Dawson County (population is 58% Latino and 6.3% Black, and 22% live below the poverty line), there is a 99% likelihood that at least one person in a group of 25 has COVID-19. Other counties, like Lubbock County and Falls County, also have a more than 90% probability. These numbers get worse when factoring in larger crowds of people; in Dallas there is a 70% chance that at least one person in a crowd of 50 people will have COVID-19. Chande, A.T., Gussler, W., Harris, M., Lee, S., Rishishwar, L., Hilley, T., Jordan, I.K., Andris, C.M., and Weitz, J.S., *Interactive COVID-19 Event Risk Assessment Planning Tool*, http://covid19risk.biosci.gatech.edu/.

III.   **TEXAS'S MASK MANDATE EXEMPTION FOR POLLING PLACES ENDANGERS VOTERS**

Defendants themselves have recognized that face coverings are crucial to preventing COVID-19 transmission. In Executive Order GA-29 Governor Abbott noted that "requiring the use of face coverings is a targeted response that can combat the threat to public health using the least restrictive means," and that "wearing a face covering is important not only to protect oneself, but also to avoid unknowingly harming fellow Texans." Ex. 2 at 1. He therefore issued a face covering mandate. Inexplicably, however, Executive Order GA-29 exempts all people at polling places from the mandate by providing:

> Every person in Texas shall wear a face covering over the nose and mouth when inside a commercial entity or other building or space open to the public, or when in an outdoor public space, wherever it is not feasible to maintain six feet of social distancing from another person not in the same household; _provided, however, that this face-covering requirement does not apply to the following:_
>
> 8. any person who is voting, assisting a voter, serving as a poll watcher, or actively administering an election, but wearing a face covering is strongly encouraged.

Ex. 2 at 2 (emphasis in original). This exemption leaves voters and poll workers substantially more vulnerable to transmitting or being infected by the disease while voting than while going to the grocery store.

Defendant Hughs has reinforced this rule. Election Advisory No. 2020-19, issued by the Director of Elections under the authority of the Secretary of State, provides that "[t]here is no authority under Texas law to require voters to wear face coverings when presenting to vote." Ex. 3. In addition to prohibiting election officials from requiring voters to wear face coverings, Election Advisory No. 2020-19 specifically authorizes election judges to _require_ voters to remove their masks before poll workers who are not required to wear masks, regardless of the risks to that voter, other voters, and poll workers. _Id._

- 8 -

The health danger posed by Defendants' polling place exemption is compounded by the fact that Defendants have not taken other reasonable precautions to keep polling places safe. Against CDC guidance, Defendants have not spread out voting over different methods, times, and locations. *See Considerations for Election Polling Places and Voters*, CDC (June 22, 2020), https://bit.ly/3msvnCR. Defendants have refused to expand mail-in or absentee voting, substantially curtailed voters' ability to drop off their mail-in ballots, allowed counties in its Countywide Polling Place Program to shutter up to 50% of their polling places while prohibiting these same counties from offering paper ballots (which would allow polling places to increase the number of people voting simultaneously at each location), Tex. Elec. Code § 43.007(f), and limited curbside voting. Governor Abbott expanded early voting by only five days and maintained limitation on opening hours and the prohibition against mobile or temporary early voting sites. Tex. Elec. Code §§ 85.062-63. Moreover, Defendants merely recommend—but do not require—polling places to socially distance. *See* Election Advisory No. 2020-14, https://www.sos.texas.gov/elections/laws/advisory2020-14.shtml.

Under these conditions, face coverings at polling places become even more important for Black and Latino voters who want to exercise their franchise, but who are disproportionately likely to experience serious COVID-19 illness if they become infected, and who are more likely to be waiting in line alongside infected individuals due to community spread in their counties.

## IV.    BLACK AND LATINO TEXAS VOTERS ALREADY ARE DISPROPORTIONATELY LIKELY TO VOTE IN CONDITIONS THAT CREATE HIGH RISK OF COVID-19 TRANSMISSION

Black and Latino voters are disproportionately likely to wait in longer lines and travel farther to vote in Texas than white voters. Long lines mean that voters will have to wait in close proximity with potentially unmasked people for extended periods of time, both of which are factors that substantially increase the probability of COVID-19 transmission. Troisi Decl. ¶ 11.

Between 2012 and 2018, Texas shuttered more than 750 polling places.[20] 542 of these closures occurred in the 50 counties that gained the most Black and Latino residents between 2012 and 2018, which have contributed to a population increase of more than 2.5 million people. Comparatively, the 50 counties in Texas that have gained the fewest Black and Latino residents—whose total combined population has fallen by more than 13,000 people—closed only 34 polling places in the same time frame.[21] As a result of these changes, Texas went from having one polling place for every 4,000 residents in 2012, to having only one polling place per 7,700 residents just six years later. *Id*. And since then, more counties have joined the countywide polling place program, enabling them to close up to 50% of their polling places. Counties within the program now include El Paso County.[22]

There is significant overlap between counties that have closed dozens of polling places, counties experiencing COVID-19 outbreaks, and counties with large Black and Latino populations. For example, Harris County and Dallas County—which have the two highest number of COVID-19 cases by county in Texas—closed 52 and 74 polling places, respectively, between 2012 and 2018. In other words, Black and Latino voters who are disproportionately likely to experience long wait times to vote are also likely to live in communities with large or ongoing outbreaks. *See* Mi Familia Vota Decl. ¶ 17; NAACP Decl. ¶¶ 7, 16, 19; Torres Decl. ¶¶ 19, 22.

---

[20] Leadership Conf. Educ. Fund, *Democracy Diverted: Polling Place Closures and the Right to Vote*, at 12 (Sept. 2019), https://bit.ly/3chYUsQ.

[21] Richard Salame, *Texas Closes Hundreds of Polling Sites, Making it Harder for Minorities to Vote*, The Guardian (Mar. 2, 2020), https://bit.ly/37iiHJs (Ex. 10).

[22] Office of the Texas Secretary of State, *Counties Approved to Use the Countywide Polling Place Program (CWPP) for the November 3 2020 General Election*, https://bit.ly/2FGQtNl (last accessed Oct. 20, 2020, 9:01 PM)

## V.     TEXAS HAS A HISTORY OF OFFICIAL DISCRIMINATION AGAINST BLACK AND LATINO TEXANS

Texas has an "uncontroverted and shameful history" of state-sponsored voter suppression of Black and Latino residents. *See Veasey v. Perry*, 71 F. Supp. 3d 627, 633 (S.D. Tex. 2014), *aff'd in part, rev'd in part*, *Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016) (en banc). This history was exposed in litigation over Texas's 2011 voter identification act, held to be in violation of the Voting Rights Act. *Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016) (en banc). In the *en banc* ruling, the Fifth Circuit summarized some of the state's lengthy history of voter suppression, including all-White primaries, secret ballot provisions, poll taxes, re-registration requirements and voter purges, all of which were enacted allegedly to prevent voter fraud, and all of which actually suppressed votes by people of color. *Id*. at 237. Texas also has been found to violate the Voting Rights Act with racially gerrymandered districts in every redistricting cycle between 1970 and 2016. *Id*. at 240 (citing *Veasey v. Perry*, 71 F. Supp. 3d at 365-36, & n. 23 (collecting cases)). The Fifth Circuit held that the voter identification law had a disparate impact on Black and Latino voters, and on remand, the district court found that the law was passed with discriminatory purpose. *Id.* at 264; *Veasey v. Abbott*, 249 F. Supp. 3d 868 (S.D. Tex. 2017).[23]

In *Veasey*, the district court found that historic State-sponsored discrimination led to ongoing disparities in education, employment, housing, and transportation. *Veasey*, 830 F.3d at 259. Historic discrimination continues to shape and limit opportunities for Black and Latino

---

[23] After this ruling, Texas revised its voter identification law. The district court determined that its finding that the 2011 law was passed with discriminatory purpose applied to the new law and entered a permanent injunction barring enforcement of the 2017 law. This decision was reversed by the Fifth Circuit, which held that the 2017 law required its own analysis. *Veasey v. Abbott*, 888 F.3d 792 (5th Cir. 2018).

people in Texas.[24] In turn, these disparities and inequities have driven the way in which the pandemic has disproportionately affected Black and Latino people and communities.[25] Ongoing discrimination; lack of healthcare access (Black and Latino Texans are far more likely to be uninsured compared to white Texans and to forego health care due to costs[26]); economic disparities that meant that racial and ethnic minorities are "disproportionately represented in essential work settings" and less likely to be able to work from home or have paid sick days; gaps in education; income, and wealth; and issues with housing that lead to crowded housing conditions all create conditions for COVID-19 transmission and worse health outcomes for people with COVID-19. *Id.*

## PROCEDURAL HISTORY

Plaintiffs Mi Familia Vota, the Texas Conference of the National Association for the Advancement of Colored People ("NAACP"), Guadalupe Torres, and Micaela Rodriguez[27] filed this lawsuit, challenging several Texas election laws, practices, and Governor Abbott's Executive Order excluding votes and others at polling places from the state-wide mask mandate. Plaintiffs asserted constitutional claims as well as a Voting Rights Act claim. Plaintiffs also filed

---

[24] *See, e.g.*, Dan Zehr, "Inheriting Inequality," Austin-American Statesman, Jan. 18, 2015 (series tracking the way in which historic and ongoing housing segregation limits Black Texans' access to economic opportunities); Alex Samuels, "Black Texans Already Face Health Care Disparities, the Coronavirus is Making it Worse," Texas Tribune, Apr. 29, 2020, https://bit.ly/2HiOgrM (explaining that historic redlining and segregation led to current disparities, including inadequate healthcare and inadequate access to healthcare) (Ex. 9).

[25] Sean Price, "An Unfortunate Legacy: COVID-19 Reveals Long-Standing Health Inequities," 116(9) Tex Med. 18-23 (Sept. 2020); CDC, *Health Equity Considerations and Racial and Ethnic Minority Groups,* (July 24, 2020), https://bit.ly/2EjWE94 (Ex. 11).

[26] Commonwealth Fund 2020 Scorecard on State Health System Performance, Texas Ranking Highlights, https://2020scorecard.commonwealthfund.org/files/Texas.pdf; Edward R. Berchick et al, "Health Insurance Coverage in the United States: 2018," U.S. Census Bureau, Nov. 2019, https://bit.ly/34iz2fA.

[27] Ms. Rodriguez is no longer a Plaintiff.

a motion for a Preliminary Injunction, asserting First and Fourteenth Amendment violations as a basis for seeking injunctive relief. Without reaching the merits of Plaintiffs' claims or motion, this Court granted Defendants' motions to dismiss, holding that the case presented non-justiciable political questions.

After expedited briefing and a hearing, the Fifth Circuit affirmed dismissal of the constitutional claims, holding that these claims were barred by sovereign immunity, but reversed the dismissal of the Voting Rights Act claim. Examining the relief requested by Plaintiffs, the Court noted that certain of the relief would be beyond the authority of the Court to grant and certain relief would be "futile" so close to the election. The Court concluded, however, that these barriers did not apply to Plaintiffs' challenge to the voting exemption to the mask mandate and therefore remanded for determination whether the "exemption from wearing a mask in public places contained in Executive Order GA-29 for poll workers, voters, and others in polling places violated Section 2 of the Voting Rights Act." Ex. 1, at 17. The Fifth Circuit then granted Plaintiffs motion for immediate issuance of the mandate.

## RELIEF SOUGHT

Plaintiffs seek the excision of the exemption from wearing a mask in public places contained in Executive Order GA-29 for poll workers, voters, and others in polling places on the grounds that it violates Section 2 of the Voting Rights Act.[28] Ex. 2, at 2. Plaintiffs further seek to concomitant changes to Election Advisory No. 2020-19 to comply with the as-excised version of

---

[28] Rule 65 requires that a court may issue a preliminary injunction only if the movant provides "security… in such sum as the court deems proper" but "[t]he amount of security required is a matter for the discretion of the trial court; it may elect to require no security at all." *Laredo Road Co. v. Maverick County, Texas*, 389 F. Supp. 2d 729, 748 (W.D. Texas 2005) (citing *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996)). In light of the importance of the right to be vindicated and the fact that Plaintiffs are two not-for-profit public interest organizations and two individuals of limited means, Plaintiffs respectfully request that the Court waive the security requirement in this matter.

the Executive Order. Ex. 3. Without such changes to the Advisory, the Court's mandate to excise the polling place exemption from the Executive Order would effectively be nullified by the contradictory directive from the Secretary to the Counties. Plaintiffs' requested relief would still permit those with relevant medical conditions to remain exempt from the mask requirement as that is addressed by another provision of the Executive Order. Moreover, Plaintiffs are *not* asking this Court to order Defendants to make any changes to their election procedures. Plaintiffs ask only that state law treat polling places the same as other public locations where unmasked people can spread COVID-19.

## LEGAL STANDARD

The Court should issue a preliminary injunction if Plaintiffs establish "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 452 (5th Cir. 2014) (citation and internal quotation omitted); *see also Butts v. Aultman*, 953 F.3d 353, 361 n.6 (5th Cir. 2020) ("A temporary restraining order may be treated as a preliminary injunction when an adversarial hearing has taken place.").

## ARGUMENT

## I.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

Plaintiffs are likely to succeed in demonstrating that the exemption for voters, poll workers, and poll watchers in Executive Order GA 29's statewide mask mandate disproportionately burdens the rights of Black and Latino voters in violation of Section 2 of the

Voting Rights Act.[29] *See* Ex. 2 at 2. (Executive Order GA-29 (July 2, 2020)) (hereinafter

"Executive Order"). The Executive Order, which requires mandatory face coverings throughout

the state, acknowledges that face coverings have a public health benefit and reduce the

transmission of COVID-19. However, the order's exemption permitting mask-less voters, poll

workers, and poll watchers exposes Texans at the polls to increased risk of COVID-19

transmission. The consequences of the exemption fall disproportionately on Black and Latino

voters because those groups have had worse health outcomes with respect to COVID-19, as

detailed in the attached declaration from Dr. Troisi, an epidemiologist and public health expert.

As a result of the mask exemption to the Governor's order, Black and Latino voters' ability to

participate in the political process is disproportionately burdened because they face higher risks

of serious or fatal COVID-19 illness than white voters. These burdens are compounded by the

long lines at polling places in communities of color, which cause Black and Latino voters to

spend *more time* with unmasked voters and poll watchers, further increasing the risk of COVID-

19 infection. As a result, some Black and Latino voters will choose to not vote at all rather than

risk exposure to the disease.

      Section 2 of the Voting Rights Act proscribes any "voting qualification or prerequisite to

voting or standard, practice, or procedure . . . which results in a denial or abridgement of the

---

[29] Plaintiffs have standing to bring this action. Both organizations have diverted their resources to combat Defendants' actions; moreover, Plaintiff NACCP also has standing because of the harm to its members. *See Scott v. Schedler,* 711 F.3d 831, 836-39 (5th Cir. 2014) (NAACP had standing when it spent more time on voter registration drives after state's failure to provide them); *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 555 (1996) (plaintiff has associational standing if it has at least a single member with standing). While Defendants previously challenged Plaintiffs' standing to bring this action, including before the Fifth Circuit, the Fifth Circuit remanded the VRA claim for this Court's consideration, which necessarily required finding that Plaintiffs have standing. *See Haywood v. Drown,* 556 U.S. 729, 755 (2009) (explaining that because standing is jurisdictional prerequisite, court is without authority to consider claims where plaintiffs lack standing). That standing determination is binding on this Court.

right of any citizen . . . to vote on account of race or color." 52 U.S.C. § 10301(a). "Congress has clarified that violations of Section 2(a) can 'be proved by showing discriminatory effect alone,'" consistent with the Congress's broad "authority pursuant to the Fifteenth Amendment."[30] *Veasey v. Abbott*, 830 F.3d 216, 243 (5th Cir. 2016) (quoting *Thornburg v. Gingles*, 478 U.S. 30, 35 (1986)).

 In evaluating discriminatory effect claims under Section 2 of the Voting Rights Act, the Fifth Circuit adopted two-part test: First, "the challenged standard, practice, or procedure must impose a discriminatory burden on members of a protected class, meaning that members of the protected class have less opportunity than other members of the electorate to participate in the political process and to elect representative of their choice." *Id.* at 244. The inquiry is whether the "burden imposed . . . creates a disparate effect" on members of protected classes." *Id.* Second, "that burden must in part be caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class." *Id.*; *see also Mi Familia Vota v. Abbott,* No. 20-50793, 2020 WL 6058290, at *4 (5th Cir. Oct. 14, 2020) (citing *Veasey* as the applicable standard for evaluating Plaintiffs' claim that the mask exemption violations Section 2 of the Voting Rights Act).

 Here, the challenged procedure (the mask exemption at polling places) places a disparate burden on Black and Latino voters—members of a protected class—in two ways, each independently actionable. First, Black and Latino voters are much more likely to forego the opportunity to vote because of the polling place exemption than white voters because of their increased risks from COVID-19. *See* Ex. 4 (Stein Decl.) at 6, 9; Mi Familia Vota Decl. ¶¶ 15-16;

---

[30] The Fifteenth Amendment states that that the right to vote shall not be "abridged" "on account of race, color, or previous condition of servitude," and gives Congress the "power to enforce this article by appropriate legislation." U.S. Const. amend. XV.

NAACP Decl. ¶¶ 13, 15. Second, those Black and Latino voters who vote in-person despite the mask exemption face the disproportionate burden to their health of a greater risk of severe illness or even death than their white counterparts. These burdens arise in a context where, as the Fifth Circuit has found, the state has a long history of discriminating against minority voters. Moreover, while the *Veasey* analysis allows for a showing of either current *or* past disparities, the disproportional effects of the COVID-19 pandemic are both. The current disparate impact of the pandemic on minorities is rooted in longstanding historical, structural inequalities. As a result, the mask exemption places heavier burdens on Black and Latino voters.

**A.      The Executive Order's Exemption Places a Discriminatory Burden on Black and Latino Voters**

Courts in this circuit analyze the first element of the two-part test by considering the "nature of the burden imposed and whether it creates a disparate effect in that members of the protected class have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Veasey,* 830 F.3d at 244. The *Veasey* plaintiffs challenged a Texas state law requiring voters to present specified types of voter identification. The Fifth Circuit affirmed the district court's ruling that the state law imposed a discriminatory burden on Black and Latino voters in violation of Section 2 of the Voting Rights Act. The Court found that Texans living in poverty were less likely to possess qualified photo identification and that a disproportionate number of Texans living in poverty were Black and Latino. *Id*. at 264.

Like the disproportionate impact of voter ID requirements in *Veasy,* the mask exemption at the polls will disproportionately impact Black and Latino voters. Across the United States, Black and Latino people are far more likely to be infected with COVID-19, and once infected, more likely to die of the disease, than white people. Troisi Decl. ¶¶ 16, 17. Record voter turnout

in this year's election cycle, coupled with Texas's requirement that most voters must vote in person, means that Texans are being forced into long lines and crowded polling sites, where the Texas Governor's mask exemption will disproportionately endanger Black and Latino lives. NAACP Decl. ¶¶ 18-19. This dire reality is reflected in the lived experience of Black and Latino voters, poll workers, and poll watchers alike—who worry about COVID-19 exposure at the polls. Torres Decl. ¶¶ 17-23; Mi Family Vota Decl. ¶¶ 10-17. Exempting polling places from the statewide mask mandate will disproportionately impact the very communities the Voting Rights Act was intended to protect.

### B.    The Order's Burden is Causally Linked to Historical Discrimination

Applying the second element of the two-part test, the Fifth Circuit has adopted "the *Gingles* factors," *see Thornburg v. Gingles*, 478 U.S. 30, 36 (1986), to determine whether the discriminatory impact of the challenged law or practice "produces a discriminatory result that is actionable because it interacts with social and historical conditions in Texas to cause an inequality in the electoral opportunities" enjoyed by voters belonging to a protected class, *Veasey,* 830 F.3d at 253, 256. The Fifth Circuit expressly rejected the State's proposal that "so long as the State can articulate a legitimate justification for its election law and some voters are able to meet the requirements, there is no Section 2 violation." *Id.* at 247. That test, the Fifth Circuit explained, "effectively nullifies the protections of the Voting Rights Act by giving states a free pass to enact needlessly burdensome laws with impermissible racially discriminatory impacts." *Id*. Just so here: Texas should not be given a "free pass" to enact the burdensome mask exemption given its "racially discriminatory impacts."

While the *Gingles* factors have traditionally been applied to analyze claims of vote dilution, the Fifth Circuit, along with most other circuits, has held that in cases, such as this, alleging vote abridgment or denial, "the *Gingles* factors may be used to examine causality under

the second part of the two-part analysis." *Veasy,* 830 F.3d at 245. As the Fifth Circuit further

explained, however, "[n]ot every factor will be relevant in every case." *Id*. at 246.[31]

Here, the four most germane *Gingles* factors are: (i) the history of official discrimination;

(ii) the effects of past discrimination; (iii) the responsiveness of the legislature to the needs of

members of a protected class; and (iv) the tenuousness of policies underlying the law. *Veasey*,

830 F.3d at 257-263.

### 1. History of Official Discrimination

In considering the history of official discrimination factor, courts evaluate the extent of

any history of official discrimination in the state or political subdivision that touched the right of

the members of the minority group to register, to vote, or otherwise to participate in the

democratic process. *See Gingles*, 478 U.S. at 45. The *Veasey* Court relied on the district court's

"many examples of Texas's long history of state sponsored discrimination." *Veasey*, 830 F.3d at

265 (*citing Veasy v. Perry*, 71 F. Supp. 3d 627, 633-36 (S.D. Tex. 2014)). In holding that the first

*Gingles* factor weighed in favor of plaintiffs, the Court specifically cited to "the district court's

finding that in every redistricting cycle since 1970, Texas has been found to have violated the

VRA with racially gerrymandered districts." *Id.* at 240.

The Fifth Circuit's holding that Texas' history of official discrimination supports the first

*Gingles* factor applies equally here and binds this Court in analyzing this first factor. *See also*

*Conference of NAACP v. Husted*, 768 F.3d 524, 549-60 (6th Cir. 2014) (applying "*Gingles*

factors" and finding that plaintiffs were likely to succeed on their VRA Section 2 claim because

the challenged law's disparate impact on Black voters was linked to discriminatory "social and

---

[31] While there are nine *Gingles* factors, because the *Gingles* court created the test to analyze vote
dilution claims, courts have recognized that many factors are inapplicable to vote abridgment
claims, and instead focus on only the most relevant factors. *See, e.g.*, *Conference of NAACP v.*
*Husted*, 768 F.3d 524, 555 (6th Cir. 2014) (focusing on *Gingles* factors one, three, five, and nine).

historical conditions"). At a minimum, given the Fifth Circuit's holding, Plaintiffs are likely to succeed at trial in proving this fact.

### 2.    Effects of Past Discrimination

The next factor—the effects of past discrimination—is measured by "the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process." *Gingles*, 478 U.S. at 45. Like *Veasey*, where the court cited to expert testimony linking "the history of State-sponsored discrimination" to disparities in education, employment, and health outcomes, which hinder the ability of Black and Latino Texans to participate in the political process, here, the same history of State-sponsored discrimination works in concert with the pandemic's disproportionate impact on Black and Latino communities.

The data demonstrates the disproportional effect of the Executive Order's exemption on Black and Latino health. For instance, Latinos comprise 39% of the Texas population but 56% of the COVID-19 deaths, a 44% over-representation in deaths, indicating a disparity in outcomes. Troisi Decl. ¶ 17. Black and Latino people are far more likely to contract and die from the disease than white people, particularly when mortality rates are adjusted for age. Troisi Decl. ¶¶ 18-19. And as CDC has explained, "the more an individual interacts with others, and the longer that interaction, the higher the risk of COVID-19 spread." Troisi Decl. ¶ 26. Because the main route of transmission is through the air, indoor spaces, close contact, crowding, and the duration of contact between individuals are all factors that increase risk of virus transmission. Troisi Decl. ¶¶ 11-12, 32. And given the well-documented overcrowding and long lines at polling sites in Black and Latino neighborhoods, it is no surprise that "[t]ransmission is a significant risk at polling places because people who are asymptomatic or presymptomatic—and

therefore have not been tested or do not know that they have the disease—are contributing to spread of the virus." Troisi Decl. ¶ 33. These facts, coupled with the fact that polling sites in predominately Black and Latino neighborhoods have reported overcrowding[32] and long lines,[33] highlight the increased burden of the choice that voters of color are being faced with: the disproportionate chance of transmission of a potentially fatal disease or forfeiture of the right to vote. NAACP Decl. ¶ 18.

### 3. Responsiveness of the Legislature to Black and Latino Voters

The third relevant factor here—responsiveness to the needs of the protected classes—considers whether elected officials are unresponsive to the particularized needs of the members of the minority group. In *Veasey,* the court cited the district court's finding that, "the legislature knew that minorities would be most affected by the voter ID law" and that Representative Todd Smith, a proponent of the legislation, stated that it was "common sense" the law would have a disproportionate effect on voters of color. *Veasey*, 830 F.3d at 262. Rejected efforts to ameliorate the disproportionate impact of the law provided the court with sufficient evidence to support "a conclusion of lack of responsiveness." *Id.*

Here, the pandemic's disproportionate impact on communities of color is well-reported and irrefutable, as is the importance of mask wearing to prevent transmission. Troisi Decl. ¶¶ 16-19, 23. That making masks optional at polling places during the pandemic would increase the risk to Black and Latino voter's health and dissuade vulnerable members of our society from voting, is "common sense." *Veasey*, 830 F.3d at 262.

---

[32] Richard Salame, *Texas Closes Hundreds of Polling Sites, Making it Harder for Minorities to Vote*, The Guardian (Mar. 2, 2020), https://bit.ly/37iiHJs (Ex. 10).

[33] *See* Mi Familia Vota Decl. ¶ 17; Torres Decl. ¶ 22.

### 4.     Tenuousness of Policies Underlying the Law

The final relevant factor—the tenuousness of policies underlying the law—examines whether there is a "total disconnect between the State's announced interests and the statute enacted." *Veasey*, 830 F.3d at 262. In *Veasey,* the Court found that, while the State was entitled to make policy choices to address their stated interest in combating fraudulent absentee ballots, the State provided "no credible evidence" that the voter ID law at issue corresponded in any "meaningful way to the legitimate interests" the State was asserting.

Again, like the lack of credible evidence that the voter ID law would prevent fraudulent absentee ballots, here, the credible evidence indicates that the Executive Order at issue will disproportionately keep Black and Latino Texans away from polling places, in direct contradiction of the State's asserted interest. Governor Abbott's statewide mask mandate, which specifically exempted "any person who is voting, assisting a voter, serving as a poll watcher, or actively administering an election," was enacted with the stated purpose of ensuring that Texans' "constitutional rights [to vote] are not voided simply because of a pandemic."[34] However, the exemption itself will create the very set of circumstances for Black and Latino voters, including Plaintiff Torres and voting members of Plaintiff NAACP, that the exemption was purportedly designed to prevent. Torres Decl. ¶¶ 17-23; Mi Familia Vota Decl. ¶¶ 10-17; NAACP Decl. ¶¶ 18-19.

While voters and poll workers can easily don a "face covering" (not even necessarily a mask)—as they must to enter most every public location *other* than the polls—voters who wish to protect themselves from infected mask-less persons at the polls have no freedom to do so.

---

[34] Patrick Svitek, *Texas Gov. Greg Abbott's statewide mask mandate exempts voting sites and churches*, Tex. Trib. (July 3, 2020), https://www.texastribune.org/2020/07/03/texas-mask-order-voting-chruches-greg-abbott/.

Wearing a mask oneself is only limited protection: non-PPE masks primarily serve as "source control," meaning they protect others more than they protect the wearer. Troisi Decl. ¶ 23. It is no answer to say that the state's purpose was to protect voters' right to vote without masks when that purpose means that voters, and, especially Black and Latino voters, must risk unnecessary COVID-19 exposure to exercise the franchise. The Governor's mask exemption is a textbook example of a "total disconnect between the State's announced interests and the [policy] enacted." *Veasey*, 830 F.3d at 262. Black and Latino Texans are being dissuaded from voting precisely because the Governor's Executive Order is forcing them to choose between their right to live and their right vote.

At the same time, Defendants' purported rationale that the polling place exemption is necessary to protect the right to vote of persons who prefer not to wear a mask is neither substantial nor credible. Requiring voters to wear a mask places no greater burden on them than existing Texas requirements that voters be clothed when entering a polling place, that they not wear campaign logos, that they refrain from carrying a firearm, that they refrain from using a cell phone, or that they carry an identification with them in order to vote. Election Advisory No. 2020-30, Oct. 3, 2020, https://bit.ly/35kqUtZ; Tex. Elec. Code § 63.001(c). Individuals who cannot safely wear masks for medical reasons are still exempt from the mask requirement under a different provision of Executive Order GA-29—and indeed, these individuals will be safer when voting in public if the polling place exemption is excised.

Defendant Abbott's mask mandate will have been in effect for four months by election day, which means that voters and poll workers already have had to acquire face coverings and have been required to use them while buying groceries, riding the bus, or innumerable other activities. And Defendants can take additional steps, should they wish, to ensure that all voters

and poll workers have the ability to wear masks or to vote in the absence of a mask—for example, by providing local election officials with disposable masks to place at polling places or allowing people to vote curbside.

## II.   PLAINTIFFS ARE LIKELY TO SUFFER IRREPARABLE HARM

In the absence of a preliminary injunction, Plaintiffs, including Plaintiff Torres and voting members of Plaintiff NAACP—and Black and Latino voters across Texas—will be subjected to irreparable harm. "To show irreparable injury if the threatened action is not enjoined . . . [t]he movant need show only a significant threat of injury from the impeding action, that the injury is imminent, and that money damages will not fully repair the harm." *Casarez v. Val Verde Cty.*, 957 F. Supp. 847, 864-85 (W.D. Tex. 1997) (citing *Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*, 804 F.2d 1390, 1394 (5th Cir. 1986)).

It is well settled that "holding of an upcoming election in a manner that will violate the Voting Rights Act constitutes irreparable harm to voters." *United States v. Berks Cty.*, 250 F. Supp. 2d 525, 540 (E.D. Pa. 2003) (collecting cases); *see also Patino v. City of Pasadena*, 229 F. Supp. 3d 582, 590 (S.D. Tex. 2017) (irreparable harm to voters' voting rights outweighed harm to defendants who sought to stay an injunction); *Mich. State A. Philip Randolph Institute v. Johnson*, 833 F.3 656, 669 (6th Cir.), *stay denied*, 137 S. Ct. 28 (2016) (plaintiffs faced irreparable harm if not granted an injunction on their VRA § 2 claim that would prevent a restriction on their "fundamental right to vote"). Courts have consistently held that where voting rights are implicated, the injury is urgent and cannot be redressed by monetary damages. *See Casarez v. Val Verde County*, 957 F. Supp. at 864-65 (vote dilution would cause irreparable harm in a VRA case that monetary damages could not address); *see also League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) ("[O]nce the election occurs,

- 24 -

there can be no do-over and no redress. The injury to these voters is real and completely irreparable if nothing is done to enjoin this law.").

As described above, Texas voters will face irreparable harm during the November 2020 general election in the absence of a preliminary injunction. The current conditions for voting in Texas create serious, unacceptable, and unnecessary risk of virus transmission during the pandemic. Black and Latino people are disproportionately likely to live in communities that are experiencing COVID-19 outbreaks, and they face disproportionate risk of serious COVID-19 illness due to historical and socioeconomic conditions of inequality and poverty. They also are disproportionately likely to experience voting conditions that increase the likelihood of virus transmission, including farther travel, long wait times, and crowded polling places. As noted above, besides the risks that refusing to wear a mask poses to the refuser, it poses far greater risks (which are much harder to mitigate) to the people who must stand near the person who is unmasked.

Black and Latino voters, including Plaintiff Torres and voting members of Plaintiff NAACP, face a disproportionate burden. They face a disproportionate burden on their right to vote because they are more likely to give up the franchise and stay home in order to protect their health, in the absence of a mask mandate. And they face a disportionate burden if they vote in unsafe conditions, because COVID-19 results in disproportionate rates of serious illness, hospitalization, and death among Black and Latino patients. Given the unsafe voting conditions to which Black and Latino voters are subjected, a mask requirement will be critical to providing voters with assurance of transmission mitigation.

Voters who vote and contract COVID-19 as a result, or voters who must stay home in order to remain healthy, will not get a "do-over" after the pandemic. *See League of Women*

*Voters*, 769 F.3d at 247-48. An injunction is necessary to provide protection to Black and Latino voters during the November 2020 election and the early voting that is already occurring.

Moreover, Mi Familia Vota and the NAACP are also harmed directly, because the resources they are expending to address constituents concerns about COVID-19 exposures at the polls cannot be remedied at a later date. Because Section 2 of the VRA does not allow for damages, the harm that Plaintiffs face in the absence of a preliminary injunction will be irreparable. Voting is happening now and the election concludes in a matter of weeks—the diversion of resources during this critical period cannot be repaired.

## III.   PROTECTING VOTING RIGHTS SERVES THE PUBLIC INTEREST AND WILL CAUSE NO HARM

Finally, an injunction will serve the public interest and no harm will result from a preliminary injunction. *See, e.g.*, *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972) (right to vote is of particular public importance because it is "preservative of all rights"); *Rush v. Nat'l Bd. of Med. Examiners*, 268 F. Supp. 2d 673, 679 (N.D. Tex. 2003) (public interest served by preventing discrimination). "[T]he public interest always is served when public officials act within the bounds of the law and respect the rights of the citizens they serve." *Casarez*, 957 F. Supp. at 865 (quoting *Nobby Lobby, Inc. v. City of Dallas*, 767 F. Supp. 801, 821 (N.D. Tex. 1991), *aff'd*, 970 F.2d 82 (5th Cir. 1992)).

With COVID-19, the stakes could not be higher to ensure health and safety during voting. The injunction will serve the public interest. As Governor Abbot has himself acknowledged, universal and consistent use of masks is critically important to ensuring that asymptomatic or pre-symptomatic infected individuals do not spread COVID-19 to others. Executive Order GA-29. Masks provide protection against infection, particularly when the infected person is wearing

- 26 -

a mask; and when used consistently and widely, masks limit community spread. Troisi Decl. ¶¶ 2, 20.

Further, the relief requested poses no harm to the public or to Defendants. As discussed above, requiring masks at polling places presents no burden on the right to vote and, in any event, to the extent Defendants wish to preserve the option for some people to vote without a mask, they can readily do so, by allowing such people to vote curbside.

Consistent with the Fifth Circuit's holding last week that excising the mask exemption is *not* amongst the relief that would be "futile" so close to the election, excising the polling place exemption from Executive Order GA-29 at this stage "would not materially or substantially affect the ongoing election." Op. at 17. Voters will not be "confus[ed]" over a simple, effective, four-month-old statewide mandate being applied to polling places. *Cf. Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006). Defendants or local election officials may, if they choose, take proactive steps to supply disposable masks or to provide people with other options to vote. And as discussed above, the relief sought will redress the injury caused by Defendants' violation of the Voting Rights Act while also making polling places a safer public space for voters and poll workers. A far cry from a policy that might confuse voters and give them "incentive to remain away from the polls," *Purcell*, 549 U.S. at 5, the relief sought will reassure voters and encourage them to go to the polls during the pandemic.

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court grant their Motion.

Dated: October 20, 2020                    Respectfully submitted,


/s/ Sean Lyons
Sean Lyons, State Bar No. 00792280
Clem Lyons, State Bar No.12742000
LYONS & LYONS, P.C.
237 W. Travis Street, Suite 100
San Antonio, Texas 78205
Telephone: (210) 225-5251
Telefax: (210) 225-6545
sean@lyonsandlyons.com
clem@lyonsandlyons.com

Courtney Hostetler (pro hace vice)
John Bonifaz (pro hace vice)
Ben Clements (pro hace vice)
Ronald Fein (pro hace vice)
FREE SPEECH FOR PEOPLE
1320 Centre Street, Suite 405
Newton, MA 02459
Telephone: (617) 249-3015
chostetler@freespeechforpeople.org
jbonifaz@freespeechforpeople.org
bclements@freespeechforpeople.org
rfein@freespeechforpeople.org

Kelly M. Dermody (pro hace vice)
Yaman Salahi (pro hace vice)
Mike Sheen (pro hace vice)
Evan Ballan (pro hace vice)
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

Avery S. Halfon (pro hace vice)
LIEFF CABRASER HEIMANN &
BERNSTEIN LLP
250 Hudson Street, 8th Floor
New York, NY 10013
Telephone: (212) 355-9500
Facsimile: (212) 355-9592

Jonathan S. Abady*
Mathew D. Brinckerhoff*
O. Andrew F. Wilson*
Debra L. Greenberger*
EMERY CELLI BRINCKERHOFF ABADY
WARD & MAAZEL LLP
600 Fifth Avenue, 10th Floor
New York, NY 10020
Tel: 212-763-5000
jabady@ecbawm.com
mbrinckerhoff@ecbawm.com
awilson@ecbawm.com
dgreenberger@ecbawm.com
*(pro hac vice forthcoming)

*Counsel for Plaintiffs*