**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | |
|---|---|
| **MI FAMILIA VOTA, TEXAS STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, and GUADALUPE TORRES**<br><br>**Plaintiffs**<br><br>**vs.**<br><br>**GREG ABBOTT, Governor of Texas; RUTH HUGHS, Texas Secretary of State,**<br><br>**Defendants.** | **No.   5:20-cv-00830** |

---

## PLAINTIFFS' AMENDED COMPLAINT

---

## INTRODUCTION

1.      In this time of unprecedented crisis, as the novel coronavirus and the resulting respiratory illness, COVID-19, ravage our country and threaten the health and life of anyone who contracts the disease, Defendants have failed to ensure that voters in Texas will be able to safely cast their ballots in the upcoming election and, most egregiously, while requiring that masks be worn in almost all public places, have exempted polling places from that requirement. Specifically, exemption 8 in the Governor's Executive Order GA-29, which exempts poll workers, voters, and other people at polling places from complying with the statewide mask mandate, creates a discriminatory burden on Black and Latino voters.  As a result, voters in Texas will be forced to face a statutorily unacceptable choice: exercising their right to vote, or protecting their own lives and the lives of their loved ones and community.  Plaintiffs ask the

Court to excise the mask exemption for polling places from the Governor's state-wide mask mandate and excise concomitant language related to that exemption from Texas Election Advisory No. 2020-19.  While Plaintiffs challenge only the mask excision at this stage under the Voting Rights Act, the burden imposed by the mask mandate must be understood in light of Texas' other election practices.

2.      Across the country, as of the date this action was filed, more than 138,000 people had already died, and more than 3.4 million cases had been confirmed.

3.      There is no vaccine for the coronavirus, and there is likely not going to be one for at least another year, if then.  There is no cure, and only limited treatments.

4.      The Texas 2020 elections will put voters at risk of transmitting or being infected with the coronavirus.  But the risk will not be shared equally.  The burden will be particularly high for Black and Latino voters. Without the relief this lawsuit requests, voters' exercise of the franchise will be compromised.

5.      Black, Latino, and Native American voters have been disproportionately affected by the pandemic, experiencing higher incidences of coronavirus infection, hospitalization, and fatalities.  They also face greater risks to their health by voting, particularly because Defendants have reduced the number of polling places available in their communities, exacerbating the health and safety risks of overcrowding during the pandemic.

6.      In the last ten years, the State of Texas, by and through Defendants, has made participation in elections less accessible to voters in a variety of ways: it has shuttered more than 750 polling places, limited counties' ability to provide flexible early voting places and hours, and passed a rigid voter identification law repeatedly found to have violated Section 2 of the Voting Rights Act.  All of these actions create an election system in which the right to vote is already in

a precarious position.  In the midst of the pandemic, the exemption for polling places from the Governor's state-wide mask mandate will impose a burden on the right to vote in violation of the Voting Rights Act.

7.     Many counties in Texas require all voters to use electronic voting machines, forcing all voters to handle shared surfaces and often to be in close quarters with poll workers.

8.     Under normal conditions, the aforementioned measures already undermine the freedom and fairness of Texas elections.  For example, in Texas's most recent election, held on March 3, 2020 (before social distancing measures were put in place because of COVID-19), voters throughout Texas waited for hours after the polls closed to vote because of insufficient polling places, voting machines, and poll workers.  *See* Alex Ura, "Texas Lawmakers to Hold Hearing into Excessive Super Tuesday Voting Lines," Texas Tribune (Mar. 5, 2020), https://www.texastribune.org/2020/03/05/texas-lawmakers-excessive-voting-lines-primary/.

9.      Other states have failed to take appropriate steps to protect voters during the pandemic, and the results have been disastrous for voters and the states as a whole.  In April, ahead of its primary election, Wisconsin abruptly closed a number of its polling places and was unprepared for the deluge of vote-by-mail requests it received.  As a result, thousands of people were disenfranchised, and dozens of people can now trace their coronavirus infections directly to having voted in person in Wisconsin.  Nicholas Reimann, "Coronavirus Infections Spiked in Wisconsin After In-Person Election, Study Says," Forbes, May 19, 2020, https://bit.ly/31gjR5w.

## JURISDICTION AND VENUE

10.     Plaintiffs bring this action pursuant to Section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973.

11.     This Court has jurisdiction under Article III, § 2 of the United States Constitution, and pursuant to 28 U.S.C. §§ 1331 and 1343.

12.     Venue in this district is proper under 28 U.S.C. § 1391 because some of the parties, including at least one of the Defendants, reside in this District, and a substantial part of the events or omissions giving rise to this claim occurred in this District.

## PARTIES

### I.     Plaintiffs

13.     Plaintiff Mi Familia Vota is a national, non-profit civic engagement organization that unites Latino, immigrant, and allied communities to promote social and economic justice. Mi Familia Vota encourages voter registration and participation, and has challenged voter suppression around the nation. It has operations in six states, including Texas.

14.     Plaintiff Mi Familia Vota serves Latino voters, including many whose only option is to vote in person, and who will have to do so under the Governor's exemption of polling places from the statewide mask mandate absent Court relief. Mi Familia Vota has had to divert personnel, time, and resources away from its planned activities due to the conduct alleged here. Specifically, Mi Familia Vota has spent money, time, and other resources to provide voter registration support and educate voters about the voting restrictions listed above that already disparately impact Latino voters, to focus on Texas's failure to adequately prepare to hold elections during the pandemic, and to try to protect Latino and immigrant communities from contracting coronavirus on Election Day. Plaintiff Mi Familia Vota will continue to suffer such injuries, spending additional money and time, throughout the duration of the pandemic unless Texas takes appropriate steps to protect the free and fair exercise of the right to vote.

15.     Defendants' exemption of polling places from the mask requirement exposes Black and Latino voters to unnecessary and disproportionate health risks during the pandemic and, as such, has detracted from Mi Familia Vota's fundamental mission, which includes supporting Latino voters and encouraging voting. Mi Familia Vota will be injured by the

Defendants' continued implementation of the polling place exemption to the mask requirement, particularly given Defendants' failure to provide sufficient opportunities for early voting, to open additional polling locations, or to permit voting by paper ballot – all of which are likely to contribute to public distrust in the safety of polling locations as well as very long voting lines, increasing the amount of time voters may have to spend with unmasked individuals.  Thus, Mi Familia Vota will have to commit additional resources, and divert them from other programs, in order to educate voters about the best ways to vote safely and to encourage them to vote notwithstanding the unreasonable burdens imposed by Defendants, as alleged herein.

16.     Plaintiff Texas State Conference of the National Association for the Advancement of Colored People ("NAACP") brings this action on its own behalf and on behalf of its members and constituents.  The NAACP is a nonpartisan, nonprofit organization founded in 1909.  The first Texas branches of the NAACP were formed in 1915, and the Texas State Conference was formally organized in 1937.  The Texas State Conference of the NAACP's primary office is located in Austin, but the organization has over 100 units statewide, including in San Antonio.  A large portion of the organization's more than 10,000 members are Texas residents who are registered to vote in Texas.  The NAACP's membership consists largely of African Americans, and it considers its constituents and supporters to be people of color and/or members of other underrepresented and vulnerable populations, such as those with disabilities.  The NAACP's members and constituents are more likely than other populations to live in poverty, and suffer from underlying conditions that put them at risk of becoming more seriously ill from COVID-19.  The NAACP has Black and/or Latino members whose only option is to vote in person, who will have to do so under the Governor's polling place exemption from the statewide mask mandate absent Court relief.

17.     The NAACP's mission is to secure the political, educational, social, and economic equality of rights in order to eliminate race-based discrimination and ensure the health and well-being of all persons.  To achieve its mission, the NAACP engages in voter education and registration activities such as Project VIER ("Voter Information, Education, and Registration") in churches, neighborhoods, and on college campuses across the state to reach voters and help them to register and, eventually, to vote.  Project VIER was created in 2015 to celebrate the 100-year anniversary of the Voting Rights Act.  Defendants' voting procedures and acts and omissions described herein frustrate the NAACP's mission and cause the NAACP to divert resources from other programs and initiatives in order to assist the NAACP's members and constituents, and the public generally, in Texas with overcoming the burdens imposed on their right to vote by Defendants.  In the context of COVID-19, these burdens are even more severe, and the resources that NAACP will need to divert from its other programs in order to combat burdens imposed by Defendants' challenged actions are even more substantial.  For example, Defendants' failure to provide sufficient opportunities for early voting, to open additional polling locations, or to permit voting by paper ballot are all likely to contribute to public distrust in the safety of polling locations as well as very long voting lines which increase the risk from unmasked individuals.  Thus, NAACP will have to commit additional resources, and divert them from other programs, in order to educate voters about the best ways to vote safely and to encourage them to vote notwithstanding the unreasonable burdens imposed by Defendants, as alleged herein, including in particular the polling place exemption to the mask requirement.  NAACP has already done so by initiating campaigns calling on Election Officials to, among other things, enforce social distancing, introduce social barriers separating voters from election officials, provide readily available alcohol-based wipes known to kill the virus, retain

twice the number of poll workers as the 2016 elections, ensure sanitization of all areas likely to be touched by voters between uses, require persons at polling places to wear masks, supply poll workers with sufficient gloves and sanitizer for their personal use, use spacious locations with adequate room for lines, add additional polling places, allocate machines where there are slow lines and large crowds with adequate personnel to operate them, and permit curbside voting.

18.     Plaintiff Guadalupe Torres is a registered voter in Texas.  She is Latina and lives in Lewisville, Texas. She voted in person on Election Day in Texas during the 2018 general election and the 2020 primary election. She wants to vote in the 2020 general election. However, she lives with her parents, and her father is at high risk for serious COVID-19 illness. Her family is practicing social distancing and taking precautions to protect themselves from the coronavirus.  She does not currently qualify to vote by mail under Texas rules.  Thus, to exercise her right to vote, Texas officials require her to present in-person at a physical polling place. She will have to do so under the Governor's polling place exemption from the statewide mask mandate absent Court relief.

## II.     <u>Defendants</u>

19.     Defendant Greg Abbott is the Governor of Texas, who is sued in his official capacity.

20.     Defendant Ruth Hughs is the Texas Secretary of State, who is sued in her official capacity.

## FACTS

I.      **The COVID-19 Pandemic**

   A.      **General Background: The Contagious Virus Is Difficult to Stop and Masks Have Limited Effectiveness**

21.     The SARS-CoV-2 coronavirus ("coronavirus") causes Coronavirus Disease 2019 ("COVID-19"), which has been spreading throughout the United States since approximately January 2020.

22.     On March 11, 2020, the World Health Organization's Director-General declared that the rapid and global spread of SARS-CoV-2 could be characterized as a pandemic.[1]  The United States-based Centers for Disease Control and Prevention followed suit on March 27, 2020.[2]

23.     The coronavirus primarily spreads between people through respiratory droplets produced by the infected person.  The risk that the coronavirus will spread to another person increases when the infected person sneezes, coughs, exhales deeply, or speaks—whereby droplets with virus may be suspended in air for up to hours at a time—and when an infected person stands within six feet of other people for an extended period of time.  This means that a heavily trafficked voting machine will substantially increase the risk of COVID-19 transmission.

24.     The coronavirus can also spread when a person touches a surface or object that has the virus on it and then touches his or her own mouth, nose, or eyes.  The surface contamination may last several days.  For example, the coronavirus has been found to survive on plastic for 3 days.  Neeltje van Doremalen et al., "Aerosol and Surface Stability of SARS-CoV-2 as Compared With SARS-CoV-1," Letter to the Editor, New England Journal of Medicine (Mar.

---

[1]  https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020
[2]  https://wwwnc.cdc.gov/travel/notices/warning/coronavirus-global

17, 2020), https://bit.ly/2Uibd28.  Other coronaviruses have been found to survive for 4 to 5 days

on glass surfaces. G. Kampf et al., "Persistence of Coronaviruses on Inanimate Surfaces and

Their Inactivation With Biocidal Agents," 104 J. of Hospital Infection 246 (Mar. 2020),

https://bit.ly/3fnITn1.  Thus, without frequent disinfection, there is a significant risk that a

surface touched by an infected person will contaminate others.

      25.    Further, persons who contract the virus but do not exhibit symptoms can spread

the virus to others.  Thus, attempts to contain the virus merely by avoiding persons who show

symptoms have limited preventative effect because asymptomatic carriers play a significant role

in its spread.

      26.    To prevent infection, the CDC recommends that people wash their hands often,

maintain a distance of at least six feet from other people, refrain from gathering in groups or

going to crowded places (known as "social distancing"), routinely clean and disinfect frequently

touched surfaces, and wear cloth face covers.

      27.    Cloth face covers play a crucial role in protecting people from COVID-19; while

a mask does confer some protection on the wearer, the primary protection they offer is that an

infected person wearing a mask is much less likely to transmit the disease to others than one not

wearing a mask. The CDC cautions that wearing cloth face covers is not a substitute for social

distancing because masks merely mitigate, but do not eliminate, the risk of contracting or

spreading coronavirus.

      28.    Because of the highly contagious nature of the coronavirus, the CDC and the

Texas Health and Human Services Department instruct people who have COVID-19 to stay at

home except to seek medical care, and not to go to public places.  CDC, "What To Do If You

Are Sick," updated May 8, 2020, https://bit.ly/3d0WSxg; Texas Dep't Health and Human

Services, "Coronavirus Disease 2019 (Covid 19): What To Do If You Are Sick," https://bit.ly/2B1n39S (recommending that people with COVID-19 call their doctors and stay home, and follow CDC recommendations).

29.     The CDC recommends that people at higher risk for severe illness "stay home and avoid close contact" whenever possible.  This includes people over the age of 65, people who live in nursing homes and long-term care facilities, people with underlying medical conditions including chronic lung disease, moderate to severe asthma, and serious heart conditions, people who are immunocompromised (due to cancer treatment, smoking, bone marrow or organ transplants, immune deficiencies, HIV/AIDs, or prolonged use of corticosteroids and other immune weakening medications), people with severe obesity, people with diabetes, people with chronic kidney disease, and people with liver disease.  *See* CDC, "How to Protect Yourself & Others," https://bit.ly/3dS54Be; CDC, "People Who Are At Higher Risk for Severe Illness," https://bit.ly/3hip2r4.

30.     The CDC has recognized homeless people as being a "particularly vulnerable group" during the pandemic.  CDC, "People Experiencing Homelessness," https://bit.ly/3f93L18.

31.     The CDC also recommends that people should "Stay home and avoid close contact" if they "may have issues getting assistance if [they] get sick." CDC, "How to Protect Yourself & Others," https://bit.ly/3dS54Be.

**B.      Health Effects:  Death, Hospitalization, and Permanent Organ Damage**

32.     As the commissioner of Texas's Department of State Health Services declared on March 19, 2020, COVID-19 "has created an immediate threat, poses a high risk of death to a

large number of people, and creates a substantial risk of public exposure because of the disease's method of transmission and evidence that there is community spread in Texas."[3]

33.     According to the CDC, "anyone can have mild to severe symptoms," symptoms may appear 2-14 days after exposure to the virus, and symptoms may include: fever or chills, cough, shortness of breath, fatigue, muscle and body aches, headache, new loss of taste or smell, sore throat, congestion or runny nose, nausea or vomiting, and diarrhea.[4]

34.     Critical forms of the illness can result in respiratory failure, shock, or multi-organ system dysfunction.[5]

35.     Scientists continue to study the long-term health consequences of COVID-19 on individuals who recover, but early reports indicate that the virus may cause strokes and blood clots; renal failure; permanent damage to the cardiovascular system;  permanent damage to the lungs; and neurological complications such as muscular weakness, numbness, and burning or prickling sensations.[6]   Moreover, even people who are not in high risk categories—such as younger individuals who are otherwise healthy—may suffer these long-term health effects if they contract the coronavirus.

36.     COVID-19 also can be fatal.  As of the date this action was filed, the pandemic had killed more than 138,000 Americans.

37.     As of July 15, 2020, the Texas Department of Health and Human Services has reported more than 275,000 infections and 3,322 deaths from the novel coronavirus.

---

[3] https://dshs.texas.gov/news/updates.shtm
[4] https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html
[5] https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html
[6] https://www.advisory.com/daily-briefing/2020/06/02/covid-health-effects;
https://www.centralillinoisproud.com/news/local-news/surviving-covid-19-is-only-part-of-the-battle-health-officials-say-long-term-effects-will-determine-if-they-fully-recover/;
https://www.vox.com/2020/5/8/21251899/coronavirus-long-term-effects-symptoms.

38.     COVID-19 has a significantly higher mortality rate than the common flu, and it spreads more easily than the common flu.

39.     Finally, recent studies suggest that an infected person's immunity to the novel coronavirus may only last for a short time.  *See* Prof. Marina Pollan, MD and Miguel A. Hernan, *Prevalence of SARS-CoV-2 in Spain (ENE-COVID): a nationwide, population-based seroepidemiological study*, The Lancet (July 6, 2020), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(20)31483-5/fulltext (finding that a majority of the Spanish population did not test positive for the presence of antibodies, even in hotspot areas); *see also* Amanda Heidt, *Studies report rapid loss of COVID-19 antibodies*, The Scientist (June 19, 2020), https://www.the-scientist.com/news-opinion/studies-report-rapid-loss-of-covid-19-antibodies-67650 (reporting patients may lose antibodies associated with long-term immunity "within weeks or months after recovery").  This finding makes it all the more difficult for people to protect themselves and, as The Lancet researchers found, "emphasizes the need for maintaining public health measures to avoid a new epidemic wave."

### C.     Disproportionate Impact on Black, Latino, and underserved voters

40.     Black and Latino people are disproportionately likely to contract COVID-19 and, once they are infected, are disproportionately likely to die from the disease.  As Governor Abbott and the Texas Division of Emergency Management have acknowledged, "underserved and minority communities . . . have been disproportionately impacted by the virus," and, in June, they began working with local officials to establish better testing options for these cities and communities.  Press Release, "Governor Abbott, TDEM Announce Expanded Testing in Underserved Communities Disproportionately Impacted By COVID-19," June 8, 2020, https://bit.ly/2XOdhAV.

41.     Nationwide, as of the date of this action's filing, Black people accounted for 13% of the population but 24% of COVID-19 fatalities where the race is known, indicating that Black people are dying at a rate nearly two times higher than their population share.  Because of underreported race data, this rate may be higher than reported.  The COVID Racial Data Tracker, https://covidtracking.com/race.

42.     U.S. Surgeon General Jerome Adams explained in April that people of color are experiencing higher rates of infection, illness, and death because they are less likely to be able to work from home, and more likely to live in dense, multi-generational housing.  White House April 10, 2020 Press Briefing, https://bit.ly/2MoimJx.

43.     Recent investigations suggest that these disparities hold true nation-wide, and there is no reason to suspect that the results are different in Texas.  According to a study by The New York Times, the average rate of coronavirus infection is over three times higher for Black and Latino people than for white people.  Richard A. Oppel Jr., et al., *The Fullest Look Yet at the Racial Inequity of Coronavirus*, N.Y. Times (July 5, 2020), https://www.nytimes.com/interactive/2020/07/05/us/coronavirus-latinos-african-americans-cdc-data.html.  According to The New York Times:

> Early numbers had shown that Black and Latino people were being harmed by the virus at higher rates.  But the new federal data—made available after The New York Times sued the Centers for Disease Control and Prevention—reveals a clearer and more complete picture: Black and Latino people have been disproportionately affected by the coronavirus in a widespread manner that spans the country, throughout hundreds of counties in urban, suburban, and rural areas, and across all age groups.  Latino and African-American residents of the United States have been three times as likely to become infected as their white neighbors, according to the new data, which provides detailed characteristics of 640,000 infections detected in nearly 1,000 U.S. counties.  And Black and Latino people have been nearly twice as likely to die from the virus as white people, the data shows.

44.     Limited access to health and wealth have led to racial ethnic disparities in COVID-19 infection and fatality rates.  Black and Latino people are over-represented in essential jobs that require them to work out of the home, experience high rates of poverty, have less access to quality health care, and are more likely to live in multi-generational housing conditions, all of which increase the risk of exposure and community spread in Black and Latino communities, and increase the risk that exposure will result in serious COVID-19 illness.  Maria Goody, "What Do Coronavirus Racial Disparities Look Like State By State?" NPR, May 30, 2020, https://n.pr/2YymPAy.

45.     The same trends hold true in Texas, although the State of Texas has made it more difficult to track those trends by limiting the type of information collected from residents.

46.     Statewide, Texas has reported race and ethnicity data for only 8% of reported COVID-19 cases, and only 20% of COVID-19 fatalities, as of this date of this action's filing. COVID Tracking Project, Racial Data Dashboard, https://covidtracking.com/race/dashboard (last accessed July 15, 2020).

47.     Of the cases for which race and ethnicity data is available, Black and Latino Texans are disproportionately impacted by COVID-19.

48.     In Travis County, Latino residents comprise 51% of COVID-19 hospitalizations (as of May 2020) but only 33.9% of the population.  Alyssa Goard, "Hispanic and Black Residents Make Up a Disproportionate Number of Austin COVID-19 Hospitalizations," May 5, 2020, https://bit.ly/2AvHA6d.

49.     Further, Moore County, Texas, has one of the top twenty highest rates of infection in the country, as of this action's filing.  The COVID Racial Data Tracker,

https://covidtracking.com/race.   Approximately 55% of Moore County's population identify as

Hispanic or Latino.  U.S. Census, Moore County, Texas, https://bit.ly/3gM29vQ.

50.     Numbers of infection and fatality rates for Latino and Black people in Texas are

likely underreported due to unequal availability of testing.  For example, in four major cities in

Texas—Dallas, El Paso, Austin, and Fort Worth—public COVID-19 testing sites are

disproportionately distributed in whiter neighborhoods.  Stephanie Adeline, "In Large Texas

Cities, Access To Coronavirus Testing May Depend on Where You Live," NPR, May 27, 2020,

https://n.pr/2Y0ZIx3.

51.     Texas has not gathered demographic data on many COVID-19 patients and

fatalities and has failed to provide sufficient data to allow researchers to clearly distinguish

between Latino and non-Latino white Texans, which means that infections and fatalities may be

underreported in key communities, including amongst Latino Texans.  And Texas does not

report race and ethnicity according to U.S. Census categories.  For instance, Native Americans

with COVID-19 are labeled as "Other," which means that data on infections amongst Native

American voters are not being collected or reported.

52.     The disproportionate infection rate and the more severe health consequences that

Black and Latino people face from the coronavirus mean that voting procedures that fail to

provide the necessary health and safety protections to *all* voters in the context of this pandemic

will disproportionately burden the rights of Black and Latino voters, in particular.  Thus, Texas's

mask exemption for polling places a discriminatory burden on the Black and Latino

communities' right to participate in the voting process on account of their race.

53.     Voting in Texas is racially polarized: in 2014, the Pew Research Center reported

that 58% of white Texans identified as "Republican/lean Republican," in comparison with 9% of

Black Texans and 25% of Latino Texans.  *Party affiliation among adults in Texas by race/ethnicity*, PEW RESEARCH CENTER, https://www.pewforum.org/religious-landscape-study/compare/party-affiliation/by/racial-and-ethnic-composition/among/state/texas/.  In the 2016 Presidential election, 69% of white Texas voters voted for Donald Trump as compared to 11% of Black Texas voters and 34% of Latino Texas voters.  *Exit Polls*, CNN (Nov. 15, 2016, 1:01 PM), https://www.cnn.com/election/2016/results/exit-polls/texas/president.

54.     In addition, as the Fifth Circuit has acknowledged, Texas has a long and sordid history of racial discrimination impeding the right to vote, which "cannot be ignored."  *Veasey v. Abbott*, 830 F.3d 216, 257-58 & n.53 (5th Cir. 2016) (en banc) (affirming district court's finding of discriminatory effect of voter identification law, including historic and contemporary examples of official voting discrimination in Texas).  This history includes all-white primary elections, literacy and secret ballot restrictions, poll taxes in state and federal elections, unconstitutional voter purges, and redistricting plan after redistricting plan found to be in violation of the Voting Rights Act.  *Id.*  A report from the Texas Advisory Committee to the U.S. Commission on Civil Rights reported that Texas "ranks as the 44th worst state for voter registration in the 2016 election," and "the current Texas electorate does not adequately represent the State's citizen voting age population . . . .  Instead, those currently registered to vote are more likely to be Anglo (*i.e.*, non-Hispanic Caucasian) and more likely to be older than those who are not on the rolls."  ADVISORY MEMORANDUM OF THE TEXAS ADVISORY COMMITTEE TO THE U.S. COMMISSION ON CIVIL RIGHTS 5 (2018), https://www.usccr.gov/pubs/2018/07-23-TX-Voting-Rights.pdf.  These and other practices have enhanced the opportunity for discrimination throughout the State, and these disparities will only escalate if Texas's upcoming election proceeds under the current voting procedures.

D.      **The Pandemic Has Not Abated: It Continues to Spread in Texas**

55.     Despite the efforts of public health officials to contain the spread of the virus, it has not abated and does not show signs of doing so before the November 2020 elections.

56.     To the contrary, the number of infections increased by 71% over a rolling 14-day period ending on June 6, 2020, and the percentage of positive tests has risen approximately 62% over the same rolling 14-day period.  Carla Astudillo, "In Texas, COVID-19 Cases Totals and Hospitalizations Are Rising. The State Says Prisons and Meatpacking Plants are Key Factors," Texas Tribune (June 8, 2020), https://bit.ly/2XKEiVK.  As of July 14, there were 10,569 Texans hospitalized for the coronavirus (1,283 more than the prior week), 10,745 new cases reported on July 14 alone, and 3.322 deaths reported. "Coronavirus in Texas: How Many Cases, Deaths, and Tests," Texas Tribune, https://bit.ly/3htjBpl (last visited July 15, 2020).

57.     Because Texas has tested only a small percentage of residents for coronavirus infection, it is likely that the true rate of infection and fatalities is higher than reported.

58.     After Texas began to reopen its economy on May 1, 2020, the Texas Department of State Health Services reported record-breaking numbers of COVID-19 hospitalizations. Vanessa Romo, "Texas Reports Record-Breaking COVID-19 Hospitalizations As State Reopens," NPR.org, June 8, 2020, https://n.pr/3hboOSr.

59.     The first known case of COVID-19 in Texas was reported on March 4, 2020, and as of July 15, 2020, Texas had more than 275,000 reported cases of COVID-19, including approximately 129,000 active cases.

60.     As of the filing of this action, Texas had reported more than 3,000 new cases of COVID-19 each day since June 16, 2020.  Texas reported over 8,000 new cases per day for every day but one between July 7, 2020 and July 14, 2020.  Indeed, in that week alone, there were over 74,500 new cases reported.

61.     As of the filing of this action, hospitalizations due to COVID-19 had more than doubled since the beginning of June, and hospitals have treated a record number of COVID-19 patients for 13 days in a row. Sarah R. Champagne & Shannon Najmabadi, "Texas' Coronavirus Positive Rate Exceeds 'Warning Flag' Level Abbott Set as Businesses Reopened," Texas Tribune, June 24, 2020, https://bit.ly/3exXQTs.

62.     As of the filing of this action, many expected the United States to face an ongoing, second, or worse wave of coronavirus infections in the fall and winter of 2020.  *See* Audrey Cher, "WHO's Chief Scientist Says There's a 'Very Real Risk' of a Second Wave of Coronavirus as Economies Reopen," CNBC, June 9, 2020, https://cnb.cx/2MM8p97; Len Strazewski, "Harvard Epidemiologist: Beware COVID-19's Second Wave This Fall," American Medical Ass'n, May 8, 2020, https://bit.ly/36sTvh3; Zack Budryk, "CDC Director Warns Second Wave of Coronavirus Might Be 'More Difficult,'" The Hill, Apr. 21, 2020, https://bit.ly/3eLlWtr.

### E.     The Economic Consequences of the Pandemic Affect the Health of Voters and Their Access to Voting

63.     The pandemic has also had serious economic consequences for many people. Many people have lost their jobs or have had their work hours cut since March 2020, with federal data estimating (as of the date of filing this action) a loss of 2.3 million jobs in Texas and state data estimating a loss of nearly 3 million jobs since March.  Erin Douglas, "Texas Unemployment Benefits Extended, Jobless Claims Tick Up," Houston Chronicle, June 4, 2020, https://bit.ly/3e58i4k.

64.     Black, Asian, and Latino workers have experienced a disproportionate percentage of job losses during this time; nationwide in May, unemployment rates were 12.4% for white

people, 16.8% for Black people, 15% for Asian people, and 17.6% for Hispanic or Latino people. Bureau of Labor Statistics News Release June 5, 2020, https://bit.ly/2B3uope.

65.     Applications for unemployment and for Supplemental Nutrition Assistance Program (SNAP) benefits have also risen sharply since the pandemic began. Texas Workforce Commission, "Unemployment Claims By Numbers," https://bit.ly/3cUqKvo; Stacy Fernandez, "Texas Families Filing for SNAP Food Assistance Almost Doubled in April," Texas Tribune, May 21, 2020, https://bit.ly/2XRnzA6.

66.     The pandemic-related recession may create housing insecurity for thousands of Texans.

67.     Poverty, housing insecurity, and food insecurity increase voters' vulnerability to serious outcomes due to COVID-19 infections.

68.     People who experience housing insecurity and food insecurity are associated with poor access to health care and high use of acute care.  Margot Kushel et al., "Housing Instability and Food Insecurity as Barriers to Health Care Among Low-Income Americans," 21 J. Gen. Inter. Med. 71 (2006).

69.     People who are experiencing housing insecurity are unlikely to be able to vote by mail, even if otherwise eligible.  They will not have access to a stable address at which to receive their mailed ballot or be able to afford the costs associated with voting by mail.  Therefore, they will have to vote in person in order to be able to vote.

II.     **Texas's Election Policies During the Pandemic**

70.     On March 13, 2020, Texas declared a state of emergency in response to the pandemic, and on March 19, 2020, Texas declared a public health disaster.

71.     On March 20, Defendants deferred the state's primary election runoffs, previously scheduled for May 26, to July 14.

- 19 -

72.     On April 6, Director of Elections Keith Ingram issued Election Advisory No. 2020-14 to address COVID-19 (Coronavirus) Voting and Election Procedures ("April 6 Advisory"), https://www.sos.state.tx.us/elections/laws/advisory2020-14.shtml.

73.     The April 6 Advisory clarified, but authorized no changes to, the state's laws and rules regarding late voting, early voting, or curbside voting.

74.     The April 6 Advisory acknowledged that voting in person might not be an "available option for all voters, including those affected by quarantines," but did not authorize changes to voting laws or procedures.

75.     Instead, the April 6 Advisory recommends—but does not require—that county officials "consider seeking a court order to authorize exceptions to the voting procedures outlined in certain chapters of the Texas Election Code."

76.     The April 6 Advisory recommends—but does not require—that county election officials check with vendors about proper cleaning of voting equipment.

77.     The April 6 Advisory summarizes CDC guidelines for preventing the spread of coronavirus in election polling places, but provides no support or resources, nor mandates any requirement, for ensuring that counties can satisfy these suggestions, which include washing hands frequently, routinely cleaning frequently touched surfaces, and disinfecting surfaces.

78.     The April 6 Advisory recommends that county officials review and potentially relocate polling places, and that county officials set up voting stations to allow for six feet between voters and to otherwise maintain spacing between voters in the polling place, but the Advisory does not mandate these actions nor provide resources to ensure that polling places are safe and set up for social distancing.

79.     The April 6 Advisory does not provide guidance on how to maintain social distancing outside of the polling place or for long lines of voters, let alone require such safeguards.

80.     The April 6 Advisory recommends that counties recruit and train additional workers, but does not require such efforts, nor provide resources or support for counties to accomplish this recommendation.

81.     The April 6 Advisory does not require poll workers, voters, or any other persons at a polling site to wear a mask, although the overwhelming consensus of public health officials and professionals is that a mask is an important and minimally burdensome step for mitigating spread of the virus.

82.     Defendants have not made any changes to Texas's election laws or policies to accommodate the pandemic, despite being aware of the high risk of danger to the health and safety of voters if such action is not taken immediately.  Defendants have affirmatively decided not to expand voting by mail, reopen any closed voting places, or ensure that counties have sufficient resources to take precautionary steps to protect voters.

83.     Texas does not offer accessible mail-in vote options.  Individuals with disabilities who wish to vote in secret will have to vote in person.

84.     On June 18, 2020, Director of Elections Keith Ingram, acting under the authority of Defendant Hughs, issued Election Advisory No. 2020-19 to address Voting in Person During COVID-19 ("June 18 Advisory"), https://www.sos.state.tx.us/elections/laws/advisory2020-19.shtml.

85.     The June 18 Advisory recommends—but does not require—social distancing and processes for cleaning and sanitizing polling places.

86.     The June 18 Advisory recommends but does not require that polling locations be set up to allow voters to practice social distancing.

87.     Neither the June 18 Advisory nor any other Texas law or regulation requires voters to wear face coverings while voting, even where they are showing symptoms of COVID-19.

88.     On July 2, 2020, Governor Abbott issued a statewide mask mandate, but specifically exempted "any person who is voting, assisting a voter, serving as a poll watcher, or actively administering an election" from the requirement.  Executive Order GA-29. Governor Abbott stated that the exemption was meant to ensure that persons without a mask do not lose their right to vote, even though he acknowledged that "we know that the safest way to go vote is by wearing a mask."  Patrick Svitek, *Texas Gov. Greg Abbott's statewide mask mandate exempts voting sites and churches*, The Texas Tribune (July 3, 2020), https://www.texastribune.org/2020/07/03/texas-mask-order-voting-chruches-greg-abbott/.  But Governor Abbott did not consider how the failure of potential carriers of the coronavirus to wear a mask could put other voters at serious risk merely for exercising their right to vote.  As Governor Abbott stated, "[y]our constitutional rights [to vote] are not voided simply because of a pandemic."  The obvious (and lawful) solution to this problem, which would respect the health and safety of *all* voters, would be for the State to provide masks at polling sites to persons who do not already have one and/or to allow persons who wish to vote without a face covering to vote curbside.

89.     Under the June 18 Advisory, voters who present with COVID-19 symptoms can be encouraged to cover their faces, provided with a disposable face covering, given the chance to vote curbside, or the opportunity to move to the head of the voting line—but the Advisory does

not require any election administrators to provide these options, and permits voters to refuse these options.

90.     Election officials will not have the opportunity to assess a voter's health or symptoms until after the line reaches the voting place.

91.     The June 18 Advisory recommends but does not require jurisdictions to issue personal protective equipment (PPE) to election workers or to voters.

92.     The June 18 Advisory authorizes an election judge to ask a voter to lower or remove their face covering for the purpose of voter identification.  If a voter refuses, that voter will only be allowed to cast a provisional ballot, and can have their vote counted only if they later go to the voter registrar's office to "cure the deficiency."  Voters who cannot make this trip will not have their votes counted.

93.     Neither Advisory takes the steps necessary to protect Texas voters from unlawful burdens on their right to vote in the context of this pandemic.

III.    **Under Pandemic Conditions, Texas's In-Person Voting System Unlawfully Burdens the Right to Vote for Black and Latino Voters**

94.     The Governor's exemption from wearing a mask in public places contained in Executive Order GA-29 for poll workers, voters, and others in polling imposes a discriminatory increased health risk on Black and Latino voters and creates a discriminatory burden on Black and Latino voters.  This discriminatory burden is exacerbated by the following aspects of Texas election laws: (1) the requirement to physically touch and exchange physical identification documents; (2) the requirement to stand in the same physical space of multiple prior voters and physically touch voting machines which cannot be disinfected between uses; (4) the limited availability of curb-side voting, which drastically reduces the potential exposure of voters; (5) the limited availability of early voting which reduces long lines on Election Day; (6) the

reduction of polling places, increasing the risk that voters will need to travel long distances, take public transportation, or carpool with others, thus exacerbating the risk of infection; and (7) the likely overcrowding of polling places, further exacerbating the risk of infection due to such over-crowding.

95.     Because the polling place exemption to the statewide mask mandate has a discriminatory effect on Black and Latino voters, Plaintiffs specifically ask this Court to excise the exemption for polling places from the Governor's order mandating masks at public locations and excise concomitant language related to that exemption from Election Advisory No. 2020-19.

<u>**CLAIMS FOR RELIEF**</u>

**<u>COUNT ONE</u>**
**Race Discrimination**
**in Violation of Section 2 of the Voting Rights Act (52 U.S.C. § 10301)**
**as Applied to Polling Place Exemption from the Mask Requirement**

96.     Plaintiffs reallege and incorporate by reference as if fully set forth herein each of the preceding paragraphs and allegations.

97.     The Voting Rights Act prohibits any voting standard, practice, or procedure whose application "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color," 52 U.S.C. § 1030.

98.     Executive Order GA-29 exempts all people at polling places from the mandate by providing:

> "Every person in Texas shall wear a face covering over the nose and mouth when inside a commercial entity or other building or space open to the public, or when in an outdoor public space, wherever it is not feasible to maintain six feet of social distancing from another person not in the same household; *provided, however, that this face-covering requirement does not apply to the following*:
>
> 8. any person who is voting, assisting a voter, serving as a poll watcher, or actively administering an election, but wearing a face covering is strongly encouraged."

99.     The polling place exemption to the mask mandate in Executive Order GA-29 is a voting standard, practice, or procedure.

100.     The exemption from wearing a mask in public places contained in Executive Order GA-29 for poll workers, voters, and others in polling places violates Section 2 of the Voting Rights Act, by denying and/or abridging the right of Black and Latino Texans to vote.

101.     The June 18 Advisory (Election Advisory No. 2020-19), issued by the Director of Elections under the authority of the Secretary of State, provides that "[t]here is no authority under Texas law to require voters to wear face coverings when presenting to vote."

102.     The June 18 advisory is a voting standard, practice, or procedure.

103.     The exemption from wearing a mask in polling places contained in the June 18 advisory violates Section 2 of the Voting Rights Act, by denying and/or abridging the right of Black and Latino Texans to vote.

104.     The burden posed by the mask exemption falls disproportionally on Black and Latino voters due, at least in part, to social and historical conditions that have or currently produce discrimination against members of the protected class.

105.     Defendants' actions, including implementation of the exemption for polling places from the mask wearing requirement, have harmed Plaintiff Torres and the members of Plaintiff NAACP required to vote in person in Texas and have abridged their right to vote in violation of Section 2 of the Voting Rights Act.

106.      By their actions described above, which Defendants took despite knowledge that the risks and harms posed by the coronavirus pandemic disproportionately affected communities of color, the individual Plaintiff, members of Plaintiff NAACP, persons on whose behalf

Plaintiffs Mi Familia Vota and NAACP have diverted resources, and other minority voters have had their right to vote abridged and denied on account of race.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

a.      Order that the following exemption from wearing a mask in public places contained in Executive Order GA-29: "8. any person who is voting, assisting a voter, serving as a poll watcher, or actively administering an election" is invalid and shall be excised.

b.      Order that those provisions of Election Advisory No. 2020-19 providing that "There is no authority under Texas law to require voters to wear face coverings when presenting to vote" and that suggest face coverings are not mandatory at polling locations are invalid and shall be excised.

c.      Order Defendants to take all necessary and appropriate steps to implement the foregoing excisions.

d.      Retain jurisdiction to ensure all Defendants' ongoing compliance with the foregoing orders.

e.      Grant such other and further relief that this Court deems just and appropriate.

Dated: October 24, 2020

Respectfully submitted,


/s/ Sean Lyons
Sean Lyons, State Bar No. 00792280
Clem Lyons, State Bar No.12742000
LYONS & LYONS, P.C.
237 W. Travis Street, Suite 100
San Antonio, Texas 78205
Telephone: (210) 225-5251
Telefax: (210) 225-6545
sean@lyonsandlyons.com
clem@lyonsandlyons.com

Courtney Hostetler (*pro hace vice*)
John Bonifaz (*pro hace vice*)
Ben Clements (*pro hace vice*)
Ronald Fein (*pro hace vice*)
FREE SPEECH FOR PEOPLE
1320 Centre Street, Suite 405
Newton, MA 02459
Telephone: (617) 249-3015
chostetler@freespeechforpeople.org
jbonifaz@freespeechforpeople.org
bclements@freespeechforpeople.org
rfein@freespeechforpeople.org

Kelly M. Dermody (*pro hace vice*)
Yaman Salahi (*pro hace vice*)
Mike Sheen (*pro hace vice*)
Evan Ballan (*pro hace vice*)
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

Avery S. Halfon (*pro hace vice*)
LIEFF CABRASER HEIMANN &
BERNSTEIN LLP
250 Hudson Street, 8th Floor
New York, NY 10013
Telephone: (212) 355-9500
Facsimile: (212) 355-9592

Jonathan S. Abady*
Matthew D. Brinckerhoff*
O. Andrew F. Wilson*
Debra L. Greenberger*
EMERY CELLI BRINCKERHOFF ABADY
WARD & MAAZEL LLP
600 Fifth Avenue, 10th Floor
New York, NY 10020
Tel: 212-763-5000
jabady@ecbawm.com
mbrinckerhoff@ecbawm.com
awilson@ecbawm.com
dgreenberger@ecbawm.com
*(*pro hac vice*)

*Counsel for Plaintiffs*