**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

MI FAMILIA VOTA, TEXAS STATE
CONFERENCE OF THE NATIONAL
ASSOCIATION FOR THE
ADVANCEMENT OF COLORED
PEOPLE, MICAELA RODRIGUEZ AND
GUADALUPE TORRES,
                *Plaintiffs,*

v.

GREG ABBOTT, GOVERNOR OF TEXAS;
AND RUTH HUGHS, TEXAS SECRETARY
OF STATE,
                *Defendants.*

Civil Action No. 5:20-cv-00830

**DEFENDANTS' RESPONSE TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................ 2

    I.      Texas's Efforts to Combat COVID-19 ................................................................ 2

    II.    Millions of Texans Are Voting ....................................................................... 4

    III.   Procedural History ........................................................................................ 7

ARGUMENT ................................................................................................................... 8

    I.      This Court Should Not Alter Election Rules When the Election Is Already Underway ......................................................................................................... 8

          A.     Changing the Rules Halfway Through an Election Would Harm Voters ................................................................................................ 9

          B.     A Last-Minute Injunction Would Undermine Election Administration .................................................................................... 11

    II.    Plaintiffs Lack Standing ................................................................................ 12

          A.     Plaintiff Torres Lacks Standing ................................................... 13

          B.     Organizational Plaintiffs Do Not Have Associational Standing ..................... 16

          C.     Organizational Plaintiffs Do Not Have Organizational Standing ................. 18

          D.     Plaintiffs' Injuries Are Not Traceable to or Redressable By Defendants ............................................................................................ 21

    III.   Plaintiffs' Cannot Establish a Violation of the Voting Rights Act .................... 24

          A.     GA-29 Does Not Violate the Voting Rights Act ........................... 24

               1.     Section 2 Does Not Require Texas to Limit Voting ..................... 24

               2.     GA-29 Does Not Deny or Abridge the Right to Vote ..................... 25

               3.     GA-29 Does Not Discriminate on Account of Race .................... 26

          B.     Requiring Texas to Mandate Masks Would Be Unconstitutional ................. 30

          C.     Plaintiffs Do Not Have a Private Cause of Action ..................... 33

    IV.   Any Relief Must Be Limited to Plaintiffs with Standing ............................... 35

    V.    The Court should stay any injunction that it grants ....................................... 36

CONCLUSION ............................................................................................................... 36

CERTIFICATE OF SERVICE ............................................................................................. 37

## INTRODUCTION

Two-thirds of the way through an in-person voting period that has generated record voter turnout, Plaintiffs ask this Court to impose a requirement on voters that has been almost uniformly rejected at polling places around the country. The majority of States do not condition the right to vote on wearing a mask. Seventeen States have no statewide mask mandate. Of the thirty-three States that do, almost all have exemptions for voters casting in-person ballots at polling places. States across the country from California to North Carolina and Arkansas to Michigan recognize that they should not impose the requirement that Plaintiffs seek from this Court.

The timing of Plaintiffs' request makes it more egregious. Plaintiffs' original motion for a preliminary injunction, filed in August, did not raise their Voting Rights Act claim. Now, based on this once-neglected claim, Plaintiffs ask this Court to take the extraordinary step of changing the rules after 6.9 million Texans have already cast their ballots, more than 6 million in person. Texas is on track to smash its prior turnout record, even during the pandemic and in counties with large minority populations.

The officials charged with administering Texas's elections are unanimous: if courts change the rules now, it will cause voter confusion and tax resources that are already stretched thin. That is the precise result that the U.S. Supreme Court cautioned against in *Purcell v. Gonzales*, 549 U.S. 1, 4-5 (2006) (per curiam). Even a month ago, the Fifth Circuit stayed a preliminary injunction that changed the rules too close to the 2020 general election. *Tex. Alliance for Retired Ams. v. Hughs*, No. 20-40643, 2020 WL 5816887, at *1 (5th Cir. 2020) (per curiam). And it has consistently done so ever since. *See Richardson v. Texas Sec'y of State*, No. 20-50774, 2020 WL 6127721 (5th Cir. Oct. 19, 2020); *Tex. League of United Latin Am. Citizens v. Hughs*, No. 20-50867, 2020 WL 6023310 (5th Cir. Oct. 12, 2020).

The scope and timing of Plaintiffs' request is reason alone to deny their motion for preliminary injunction. In addition, Plaintiffs lack standing to pursue their one remaining claim, and that claim

fails on its merits as well. Defendants respectfully request that the Court deny Plaintiffs' motion for preliminary injunction.

**BACKGROUND**

## I.     Texas's Efforts to Combat COVID-19

"Governor Abbott has taken unprecedented steps in the wake of COVID-19 to expand voting opportunities generally, and mail-in voting options specifically." *Tex. LULAC v. Hughs*, No. 20-50867, 2020 WL 6023310, at *5 n.7 (5th Cir. Oct. 12, 2020). Using the emergency powers granted by the Texas Disaster Act, the Governor has expanded the early voting period and vote-by-mail delivery options. *See* Ex. 1 ¶ 5, Ex. 6 at 3; Ex. 7 at 3, Ex. 8 at 4. The Secretary has issued "recommended health protocols" for both voters and local election officials. *See generally* Ex. 9, Ex. 10; *see also* Ex. 1 ¶ 9. The local election officials who operate polling places have instituted numerous safety precautions, including sanitizing surfaces and promoting social distancing. *See*, *e.g.*, Ex. 11, Ex. 12.

But Plaintiffs complain about one thing Defendants have not done: mandate that all Texans entering a polling place wear a mask. Pursuant to Executive Order GA-29, "wear[ing] a face covering" is required in certain instances, but that requirement does not apply across the board. Ex. 23 at 3. For example, it does not apply when one is "seated at a restaurant to eat or drink," when one is engaged in religious worship, or when one "is giving a speech." *Id.* ¶¶ 3, 9–10. Indeed, GA-29 does not apply at all in 35 counties that meet certain health criteria. *See id.* ¶ 11; Ex. 1 ¶ 4; Ex. 31. Plaintiffs focus their fire on the exemption for "any person who is voting, assisting a voter, serving as a poll watcher, or actively administering an election." Ex. 23 at 3 ¶ 8. According to Plaintiffs, that GA-29 "strongly encouraged" "wearing a face covering" in polling places is not enough. *Id.*

By refusing to impose a new limitation on voting, GA-29 implements a nearly nationwide consensus. The majority of States do not require a mask to vote. *See generally* Ex. 22. Seventeen States

2

have no statewide mask mandate at all.[1] Two States vote entirely by mail. Four States (including Texas) have explicitly exempted voters from their mask mandates. *See* Ex. 23 at 3 ¶ 8; Ex. 24 at 3; Ex. 27 at 4; Ex. 32 at 3. And twenty have issued statements that declare their statewide mandates will not be enforced on voters attempting to cast a ballot in person without a mask. *See*, *e.g.*, Ex. 25 at 4, Ex. 26 at 4, Ex. 28 at 2; Ex. 30 at 1. Only six states and the District of Columbia require mask-less voters to use some alternative voting method, but even they do not turn away voters. *See*, *e.g.*, Ex. 29.[2]



Arkansas's mask mandate is almost identical to Texas's. *See* Ex. 24. It exempts all "[p]ersons voting, assisting voters, serving as poll watchers, or actively performing election administration duties; however, face coverings are strongly encouraged." *Id.* at 3. Other States are following suit. The California Secretary of State, for example, advises that elections workers must not turn a voter away

---

[1]  *See* Ballotpedia, State-level mask requirements in response to the coronavirus (COVID-19) pandemic, (updated Oct. 19, 2020), https://ballotpedia.org/State-level_mask_requirements_in_response_to_the_coronavirus_(COVID-19)_pandem ic,2020#Orders_by_state; Littler Mendelson, Facing Your Face Mask Duties – A List of Statewide Orders (Oct. 23, 2020), https://www.littler.com/publication-press/publication/facing-your-face-mask-duties-list-statewide-orders.

[2]  The chart is based on data from numerous sources, all of which are detailed in Exhibit 22.

for not having a mask because the right to vote takes precedence and because confrontation may lead to intense conversation and shouting which increases the risk of spreading COVID-19. Ex. 25 at 4.

## II.    Millions of Texans Are Voting

With more than 6 million in-person ballots cast so far, Texas is on pace for record levels of voter turnout. *See* Ex. 1 ¶¶ 12–13.[3] That includes minority voters. In the five counties with the highest concentration of Hispanic residents out of the fifteen most populous counties in Texas, turnout is already nearing or exceeding total early turnout from 2016, even though a week of early voting remains.[4]



Despite this data, Plaintiffs claim minority voters are deterred from voting because no one has mandated the wearing of masks in polling places. First, Plaintiffs offer Robert Stein—an expert in, among other things, "elections," "severe weather events," and "home weatherization programs"—to

---

[3] *See* Election Information & Turnout Data, November 03, 2020 GENERAL ELECTION, Cumulative Totals Thru Close of Business October 23, 2020, available at https://earlyvoting.texas-election.com/Elections/getElectionDetails.do.
[4] The chart is based on data from Texas Secretary of State Early Voting - November 4, 2016, https://www.sos.texas.gov/elections/earlyvoting/2016/nov4.shtml, and Texas Secretary of State Early Voting - October 22, 2020, https://earlyvoting.texas-election.com/Elections/getEVDetails.do. To see the demographic information for the listed counties, see U.S. Census Bureau, https://www.census.gov/quickfacts/fact/table/elpasocountytexas,nueces countytexas,bexarcountytexas,cameroncountytexas,hidalgocountytexas/RHI725219. *See* Ex. 19, Ex. 20, Ex. 21.

establish that Texas voters are concerned about COVID-19 and voting safety. ECF 53-5, Ex. 4 at 3. This Court should disregard Stein's opinion. For a survey to be valid, "the persons interviewed must adequately represent the opinions which are relevant to the litigation." *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 264 (5th Cir. 1980). Stein's survey fails to consider any voter outside of Harris County. ECF 53-5, Ex. 4 at 3. And even within Harris County, Stein admits that he had "a significant under sample of African-American voters." *Id.* at 4.

Second, Plaintiffs offer Catherine Troisi, who has served as a witness for multiple Plaintiffs' groups seeking sought voting changes prior to the November 3, 2020 election due to COVID-19. Troisi is, an epidemiologist not a medical doctor, provides mostly general information about COVID-19, but fails to address the effect (if any) of a mask mandate on the likelihood of becoming infected with the coronavirus during in-person voting voter turnout, and offers little analysis of polling locations in Texas or health policies already implemented at those locations. *See* ECF 53-3.

For example, Troisi's report, citing CDC guidance, lists factors that can lower risk the risk of infection at election polling settings which she notes includes locations that include  "a wide variety of voting options," "longer voting periods (more days and more hours)," and "any other feasible options for reducing the number of voters who congregate indoors in polling places at the same time". ECF 53-3 ¶ 26. And while Troisi, cites the above factors as virus transmission mitigation factors, she neither acknowledge the multitude of voting options available for Texas voters nor does she analyze protocols already in place at polling locations in Texas. *See generally* Ex. 9, Ex. 10, Ex 11.

Indeed, several proclamations issued by Governor Abbott have expanded voting opportunities for early voting statewide and earlier ballot delivery in Texas including proclamations that expanded voting opportunities beyond those provided for by the Texas Election Code. Ex. 1 ¶¶ 5-6. In fact, he July 27, 2020 and October 1, 2020 proclamations suspended sections of the Texas Election Code to allow an entire additional week for early in-person voting and extended the time

period for in-person delivery of marked mail ballots from election day by over *forty* days. Ex. 7, Ex. 8; *see also* Ex. 1 ¶ 5. Nor does Troisi account for the fact that the two groups most likely to have adverse health outcomes, the elderly and individuals with preconditions, already have the opportunity under Texas law to vote by mail and avoid in-person voting, if they so choose. *See* Tex. Elec. Code §§ 82.002, 82.003; *In re State*, 602 S.W.3d 549, 560 (Tex. 2020). In short, Troisi does not acknowledge nor analyze the facts on the ground at Texas polling places, the existing policies that expand the "wide variety of voting options", that by her own admission would act to reduce the number of voters who congregate indoors in polling places at the same time. ECF 53-3 ¶ 26.

Additionally, with respect to her conclusions about disparities seen in severe outcomes from COVID-19, Dr. Troisi cites primarily nationwide rather than Texas specific statistics, ECF 53-3 ¶¶ 14-16, and the Texas-based data she does use is, by her own admission, of limited value. *Id.* ¶ 17. Dr. Troisi, admits, her limited analysis "can't make valid comparisons based on who is getting infected." *Id.* ¶ 17. According to Troisi only 6% of reported cases in Texas indicate racial and/or ethnic background of the patient, which precludes a true apples-to- apples comparison.[5] *Id.* Finally, Plaintiffs' focus on "over-representation in deaths" and "disparity in outcomes" are statistically misleading. ECF 55 at 20; ECF 53-3 ¶ 17. Troisi does not address the fact that the vast majority of individuals survive COVID-19. According to one study, the survival rate of individuals over age-60 was 98.20% and for individuals under 40-years old, it was 99.99%.[6]

Finally, Troisi does not mention that over 6.9 million Texans have already cast their ballots in this election, and over 6 million of those voters voted in person. Nor does she acknowledge that Texas is on track to smash its prior turnout record in this election, even during the pandemic, and even in

---

[5] Texas Department of Health Services, COVID-19 Dashboard, Completed Case Investigations, https://txdshs.maps.arcgis.com/apps/opsdashboard/index.html#/ed483ecd702b4298ab01e8b9cafc8b83.
[6] Justin Blackburn, *et al.*, *Infection Fatality Ratios for COVID-19 Among Noninstitutionalized Persons 12 and Older: Results of a Random-Sample Prevalence Study* (Sept. 2, 2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7505013/ (last visited Oct. 21, 2020)

counties with large minority populations. Ex. 1 ¶ 13; *see also* Ex. 19, Ex. 20, Ex. 21. Texas voters are

voting in record number, further underscoring the effectiveness of state and local safety precautions,

as demonstrated by their record-breaking turnout in this election.

## III.   Procedural History

This Court previously granted Defendants' motions to dismiss for lack of subject-matter

jurisdiction. *See Mi Familia Vota v. Abbott*, No. SA-20-cv-830-JKP, 2020 WL 5366291, at *1 (W.D. Tex.

Sept. 7, 2020). The Fifth Circuit affirmed the dismissal of Plaintiffs' constitutional claims. Sovereign

immunity barred those claims because any "injunction must be directed to those who have the

authority to enforce" the challenged laws. *Mi Familia Vota v. Abbott*, No. 20-50793, 2020 WL 6058290,

at *5 (5th Cir. Oct. 14, 2020). "In the present case, that would be county or other local officials," not

the Governor or the Secretary. *Id.*

The court remanded Plaintiffs' VRA claim because of circuit precedent holding that the VRA

abrogates sovereign immunity, *see id.*, but it did not remand the entire claim. The court recognized that

"[m]uch of the relief sought by the Plaintiffs to remedy the alleged Voting Rights Act injuries . . . is

beyond the power of a court to grant." *Id.* at *6. Courts cannot "order state officials to promulgate

legislation, regulations or executive orders." *Id.* Moreover, the court was "mindful of the Supreme

Court's repeated admonishment that 'lower federal courts should ordinarily not alter the election rules

on the eve of an election.'" *Id.* at *7 (quoting *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S.

Ct. 1205, 1207 (2020)). With these considerations in mind, the court concluded that "remand[ing] the

Voting Rights Act claim for plenary consideration with regard to the November 2020 election" would

be "futile." *Id.*

The Fifth Circuit did identify "a *possible* exception" though. *Id.* (emphasis added). It remanded

Plaintiffs' challenge to the exemption of polling places from GA-29's mask requirement. The court

expressly described a few of the relevant issues on remand: whether the exemption "violated section

2 of the Voting Rights Act," whether the Court could "redress the injuries the Plaintiffs have alleged" by "excis[ing] that provision," and whether granting relief would "materially or substantially affect the ongoing election." *Id.*

Plaintiffs moved for a preliminary injunction. *See* ECF 53; ECF 62. Defendants oppose.

**ARGUMENT**

## I.     This Court Should Not Alter Election Rules When the Election Is Already Underway

The Supreme Court has "repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020). "Time and time again over the past several years, the Supreme Court has stayed lower court orders that change election rules on the eve of an election." *Tex. Alliance for Retired Ams. v. Hughs*, No. 20-40643, 2020 WL 5816887, at *1 (5th Cir. 2020) (per curiam). For example, in *Purcell v. Gonzalez*, the Supreme Court refused to alter the election rules concerning voter identification procedures several weeks before an election. 549 U.S. 1, 4-5 (2006) (per curiam). "Court orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase." *Id.* And just three days ago, the Supreme Court stayed yet another election-related injunction. *See Merrill v. People First of Ala.*, No. 20A67 (U.S. Oct. 21, 2020).

"The principle from these cases is clear: court changes of election laws close in time to the election are strongly disfavored." *Tex. Alliance for Retired Ams.*, 2020 WL 5816887, at *2. The Fifth Circuit has repeatedly "stayed orders changing election laws when an election is imminent." *Id.* Indeed, it has consistently stayed every injunction altering Texas's election rules in 2020. *See Richardson v. Texas Sec'y of State*, No. 20-50774, 2020 WL 6127721 (5th Cir. Oct. 19, 2020) (staying injunction regarding signature verification of mail-in ballots); *Tex. Alliance for Retired Ams.*, 2020 WL 5816887 (staying injunction regarding repeal of straight ticket voting); *Tex. League of United Latin Am. Citizens v. Hughs*,

No. 20-50867, 2020 WL 6023310 (5th Cir. Oct. 12, 2020) (staying injunction regarding locations for delivery of mail-in ballots); *Tex. Democratic Party v. Abbott*, 961 F.3d 389 (5th Cir. 2020) (staying injunction regarding eligibility to vote by mail).

In *Veasey v. Perry*, another Voting Rights Act case, the district court enjoined enforcement of Texas's voter-identification requirement "just nine days before early voting beg[an] and just 24 days before Election Day." *See* 769 F.3d 890, 891 (5th Cir. 2014). The Fifth Circuit stayed that injunction because "the district court erred in applying the injunction to this fast-approaching election cycle." *Id.* at 895. The court was troubled by the fact that the injunction "virtually guaranteed" "inconsistent treatment of voters," which "raises a significant constitutional concern." *Id.* at 894.

Those concerns are even more pressing here. The hearing on Plaintiffs' motion is scheduled for 13 days *after* early voting began and only 8 days before Election Day. *See* ECF 57. As a result, inconsistent treatment of voters is not "virtually guaranteed" but literally guaranteed. Millions upon millions of Texans have already voted under the existing rules. Changing those rules now would result in the same inconsistent treatment that the Fifth Circuit called "a significant constitutional concern." *See* Ex. 2 ¶ 6.

Moreover, a new judicially-imposed mask mandate would inevitably confuse voters, disrupt local administration of the election, and inject further chaos into an already tense election. "Changing the rules now would be shipwreck." Ex. 4 ¶ 3. This is precisely the danger that the Supreme Court's *Purcell* precedent guards against.

### A.     Court-Ordered Changes Halfway Through an Election Would Harm Voters

Since Governor Abbott's Executive Order went into effect on July 3, 2020, the Secretary of State has waged a public information campaign about the implementation of recommended public health protocols to keep voters safe. *See* Ex. 1 ¶ 9. Many of the 254 counties across Texas have engaged in similar educational campaigns, informing Texans that masks are encouraged but not required at

voting locations. *See, e.g.,* Ex. 2 ¶ 4 (stating that the county "significant time and effort to educate voters and poll workers"), Ex. 5 at 5 (explaining the "significant efforts" undertaken to inform voters about the rules). Now, months later and two-thirds of the way through early voting, Plaintiffs' urge this Court to change the rules.

First, election officials could not possibly inform voters of the requirement in time to effectively implement a new mask-requirement. *See* Ex. 2 ¶ 6, Ex. 3 ¶ 8. More than 6.9 million registered Texans have already cast ballots, and more than 6 million have done so in person.[7] Many more are no doubt planning to vote soon. As the Hays County Elections Administrator explained, if the Court ordered changes to the election rules, it would "take[] time to communicate those changes and make sure the voters are aware of them." Ex. 5 at 5. In this case, there is no time to effectively disseminate the information regarding a rule change, especially because many voters are already aware of the current rule. If an injunction issued now, in the middle of the election, local county election officials "would have to attempt to re-educate voters on the new requirement. It is virtually certain that messaging would not reach some voters at this late stage in the election." Ex. 5 at 5.

Second, even assuming the Secretary of State and local county election officials can inform some voters of the rule change, the last-second reversal would result in widespread voter confusion. *See* Ex. 3 ¶ 8; Ex. 5 ¶ 5. For months, Texas voters have been told that masks are encouraged but not required at the polls. *See* Ex. 3 ¶ 8, Ex. 5 ¶ 5. Voters know the masking requirement in GA-29 and its exceptions. Now, after two weeks of early voting and with only seven days left in the early voting period, all remaining voters would receive conflicting information. Ex. 5 ¶ 5 (emphasizing how "voters would be confused by the conflicting messages"). And the local election administrators would be ill-equipped to alleviate the voter confusion, themselves having only recently become aware of a new,

---

[7] *See* Election Information & Turnout Data, November 03, 2020 GENERAL ELECTION, Cumulative Totals Thru Close of Business October 23, 2020, available at https://earlyvoting.texas-election.com/Elections/getEVDetails.do.

court-ordered requirement. Ex. 2 ¶ 6 (stating poll watchers would need to be train "on how to deal with upset or disruptive voters"). As the Supreme Court recognized in *Purcell*, this kind of "voter confusion" creates an "incentive to remain away from the polls." 549 U.S. at 4–5. That concern is even more serious here since the election is already underway.

**B.      A Last-Minute Injunction Would Undermine Election Administration**

In addition to voter confusion, the Plaintiffs' requested injunction would also disturb local administration of the ongoing election. "[A]ny change now to the voting process would be detrimental to [local election officials'] ability to allocate [their] limited resources to administer this unprecedented election." Ex. 2 ¶ 7.

Local election officials have been working tirelessly for months to ensure the November 2020 election runs smoothly. They have been training and educating poll workers on the recommended health protocols. *See, e.g.*, Ex. 2 ¶ 6. A last-minute injunction would require local election officials to divert their already scarce resources to retraining poll workers on the new mask requirement. *See* Ex. 1 ¶ 10; Ex. 5 ¶ 6. And such training would not be trivial. It would require much "more than just informing [poll workers] of the new mask requirement." Ex. 5 ¶ 6. At the very least, it would require teaching poll workers how to police the mask requirement and instructing these same poll workers on de-escalation techniques in the event a voter refuses to comply with the new mask mandate. Ex. 3 ¶ 9 (expressing confusion on "who would enforce such a mandate" and how); Ex. 2 ¶ 6 (explaining how "a change implemented now, would cause some voters who are not aware of the newly implemented rules to become angry and confused and could cause some voters to become disruptive"). It would also require training regarding any exceptions to a new mandate, such as an exception for voters with medical reasons for not wearing a mask. Ex. 1 ¶ 11.

*      *      *

Both the Supreme Court and the Fifth Circuit have repeatedly rejected attempts to rewrite election rules on the eve of an election. This alone is enough to demonstrate that Plaintiffs are not likely to succeed on the merits. *See Tex. Alliance for Retired Ams.*, 2020 WL 5816887, at *2; *Veasey*, 769 F.3d at 895.

## II.     Plaintiffs Lack Standing

Plaintiffs have not made a "clear showing" that they have standing to secure a preliminary injunction. *Barber v. Bryant*, 860 F.3d 345, 352 (5th Cir. 2017). "A district court's obligation to consider a challenge to its jurisdiction is non-discretionary." *In re Gee*, 941 F.3d 153, 159 (5th Cir. 2019) (per curiam). That is especially true for standing, which "is perhaps the most important of the jurisdictional doctrines." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (quotation omitted).

Plaintiffs argue the Court does not need to consider standing because the Fifth Circuit implicitly resolved the issue when it remanded the case for further proceedings on the remaining VRA theory. *See* ECF 55 at 15 n.29. That is wrong for two reasons. First, "[t]here is no such thing as a precedential *sub silentio* jurisdictional holding." *Cuba v. Pylant*, 814 F.3d 701, 709 (5th Cir. 2016). The Fifth Circuit did not consider standing. *See Mi Familia Vota*, 2020 WL 6058290, at *7 (noting that the court decided whether Plaintiffs' claim "present[s] a political question and" whether it is "barred by sovereign immunity"). In fact, it expressly noted that this Court would need to consider redressability on remand. *See id.* (noting this Court "might" issue certain relief only "if it concluded that this would redress the injuries the Plaintiffs have alleged").

Second, even if the Fifth Circuit had resolved standing for purposes of the motions to dismiss at issue on appeal, it could not have resolved standing for purposes of a potential future motion for a preliminary injunction. "Each element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof"— "with the manner and degree of evidence required at the successive stages of the litigation" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).

At the preliminary injunction stage, Plaintiffs must make a "clear showing" based on "sufficient evidence." *Barber*, 860 F.3d at 352–53. Plaintiffs have not made that showing here.

### A.      Plaintiff Torres Lacks Standing

Plaintiff Torres has not identified a cognizable injury. *See Lujan*, 504 U.S. at 560. Her claim rests on speculation about how third parties may act while voting in-person and whether those actions will have an impact on her health. Plaintiff Torres does not contend that the exemption in GA-29 will prevent her from voting—nor could she. The Executive Order imposed no additional restrictions on voters. It in fact expressly refrained from placing an additional prerequisite on voters before exercising the franchise. Rather, Plaintiff Torres describes her injury as "the *risk* of infecting [herself] and elderly relatives" while voting.  ECF 27 at 6 (emphasis added), and that she does not "feel safe voting in person." ECF 27-4 ¶ 18; ECF 53-4 ¶ 21.

Plaintiff Torres's declaration highlights that her alleged injury is "conjectural or hypothetical," not "actual or imminent." *Pub. Citizen, Inc. v. Bomer*, 274 F.3d 212, 217 (5th Cir. 2001) (citing *Lujan*, 504 U.S. at 560); *see also Clapper*, 568 U.S. at 401 (distinguishing between a certainly impending injury and one based on subjective fear). Plaintiff Torres describes herself as "very worried" about her family catching COVID-19 again and "very concerned" that voters will not wear masks. ECF 27-4 ¶¶ 10, 15; ECF 53-4 ¶¶ 13, 18. Her purported injury is based on that "risk." ECF 27-4 ¶ 15; ECF 53-4 ¶ 18.

Plaintiff Torres's "subjective fear. . . does not give rise to standing." *Clapper*, 568 U.S. at 418. Because she seeks prospective relief, Plaintiff Torres must establish an "imminent" future injury. *Lujan*, 504 U.S. at 564. The Supreme Court has "repeatedly reiterated that threatened injury must be *certainly impending* to constitute injury in fact"— "[a]llegations of *possible* future injury are not sufficient." *Clapper*, 568 U.S. at 409 (quotations omitted). Even when a risk has materialized "in the past," and even when "general data" show the risk going forward, that is not enough. *Stringer v. Whitley*, 942 F.3d

715, 722 (5th Cir. 2019). There must be "Plaintiff-specific evidence" that the risk will materialize in the future. *Id.*

Thus, assertions that some voters may not wear mask, that transmission of the virus may occur, or that the virus can be dangerous do not establish standing. Plaintiff Torres must establish that each purported effect is certainly impending as applied to her. *See Prestage Farms, Inc. v. Bd. of Sup'rs of Noxubee Cty., Miss.*, 205 F.3d 265, 268 (5th Cir. 2000) ("While the risk of injury may be founded on a likely and credible chain of events, the injury must be 'certainly impending.'"); *Stringer*, 942 F.3d at 722–23 (requiring "Plaintiff-specific evidence"). She has not done so.

First, the vast majority of voters wear masks while voting. *See, e.g.* Ex.5 ¶ 3; Ex. 4 ¶ 6. State and local officials have encouraged voters to wear masks even though GA-29 does not require it. *See, e.g.*, Ex. 5 ¶ 5. For GA-29's exception to have any effect on Plaintiff Torres, she would have to vote in a location with unmasked individuals. But Plaintiff Torres has never alleged, much less proven, that she will do so.

Second, state and local officials have implemented a variety of safety precautions that will reduce the likelihood of transmission regardless of whether all voters are required to wear a mask. *See, e.g.*, Ex. 1. ¶¶ 5, 9; Ex 2 ¶¶ 3–4; Ex 3 ¶ 5.  Denton County, where Plaintiff Torres resides, sanitizes its equipment before every use. It also provides voters with sanitation stations at the entrance way, a stylus to use at check-in, gloves, and distance markers on the floor, among other safeguards. Ex. 11.[8] Other counties are taking similar steps. *See, e.g.*, Ex. 12.

Like many voters, Plaintiff Torres will have numerous polling places from which to choose. Denton County is hosting forty-six early voting locations—more than twice the number from 2016. *Compare* Ex. 14, *with* Ex. 13. Each location will be open a minimum of twelve hours each day, except

---

[8]*See also* Denton County, Texas, *Elections Sanitization Process*, YouTube (October 12, 2020), available at https://www.youtube.com/watch?v=YhIXqgEeJhY.

Sundays, when polling locations are open for five hours. *See* Ex. 14; Tex. Elec. Code § 85.064. In addition, each election precinct will have a polling location on election day, all of which will be open for twelve hours. *See* Ex. 15; Tex. Elec. Code § 41.031. Harris County is hosting 120 early voting polling places and 767 Election Day polling places. Ex. 16; Ex. 17. Each location will be open at least eight hours each day. *See* Tex. Elec. Code § 85.064.[9]

Third, Plaintiff Torres has not shown that she is likely to become infected with the coronavirus due to in-person voting. The risk of infection from any given outing is low. Moreover, as discussed above, Plaintiffs cannot rely on "general data." *Stringer*, 942 F.3d at 722. Plaintiffs present only "a generalized grievance available to all Texans." *Id.*

In fact, recent medical research suggests that Plaintiff Torres and her family likely have a "degree of immunity" considering they have already contracted and cleared the virus. ECF 27-4 ¶ 7. "[A]vailable evidence suggests that most recovered individuals would have a degree of immunity for at least 3 months following initial diagnosis of COVID-19." *Duration of Isolation and Precautions for Adults with COVID-19*, Centers for Disease Control and Prevention (Oct. 19, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/duration-isolation.html.

In the end, Plaintiff Torres cannot establish that GA-29's exemption for voting will cause her to be exposed to voters not wearing a mask or that she will suffer deleterious health consequences as a result. As in *Bruni v. Hughs*, her alleged injuries are premised on "numerous predicted effects," any one of which may not occur. No. 5:20-cv-35, 2020 WL 3452229, at *5 (S.D. Tex. June 24, 2020). When an injury depends on a "chain of possibilities," a plaintiff's failure to establish any individual "link" makes the injury *not* certainly impending. *Clapper*, 568 U.S. at 410.

---

[9] Multiple counties keep track of wait times on their website. For example, Harris County has an interactive feature that allows voters to enter in a polling location and determine the wait time. This allows the voter to determine which polling location would be most convenient to him or her. *See* HarrisVotes, *Wait time Feature on HarrisVotes.com*, YouTube (Jul 6, 2020), available at https://www.youtube.com/watch?v=OzEmjBSlcck.

**B.      Organizational Plaintiffs Do Not Have Associational Standing**

Organizational Plaintiffs have not established associational standing. A plaintiff cannot have associational standing unless one of its members independently satisfies the Article III standing requirements. *Ctr. for Biological Diversity*, 937 F.3d at 536. The plaintiff must establish two threshold facts. First, the plaintiff must establish that it has "members" within the meaning of the associational standing test articulated in *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 344 (1977) (requiring "indicia of membership"). Second, the plaintiff must identify specific members who have "suffered the requisite harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009).

The Plaintiff asserting associational standing, Texas State Conference of the NAACP, fails to satisfy either threshold inquiry. First, it has not established that the individuals it calls "members" "alone elect the" group's leadership, "alone may serve" in the group's leadership, or "alone finance [the group's] activities, including the costs of this lawsuit." *Hunt*, 432 U.S. at 344; *see also Ass'n for Retarded Citizens of Dall. v. Dall. Cty. Mental Health & Mental Retardation Ctr. Bd. of Trustees*, 19 F.3d 241, 244 (5th Cir. 1994) (concluding an individual was not a "member" because he was "unable to participate in and guide the organization's efforts"); *Tex. Indigenous Council v. Simpkins*, No. 5:11-cv-315, 2014 WL 252024, at *3 (W.D. Tex. Jan. 22, 2014) (rejecting associational standing because the plaintiff had "not demonstrated 'indicia of membership' to assure the Court that it is capable of representing the individuals that it claims as 'members' in this litigation").

Second, Plaintiff has not identified any injured members. The Supreme Court has unequivocally held that the "requirement of naming the affected members has never been dispensed with" except "where *all* the members of the organization are affected by the challenged activity." *Summers*, 555 U.S. at 498–99 (emphasis in original). Here, Plaintiff expressly acknowledges that only a portion of its purported membership is qualified and registered to vote in Texas. *See* ECF 1 ¶ 22

16

(acknowledging that not all of its members "are Texas residents who are registered to vote in Texas"); ECF 53-2 ¶ 3 (stating that "many" of its members are registered to vote in Texas).

To be sure, Plaintiff asserts that "[m]any of [its] members . . . fear contracting coronavirus if they vote in person under the State's current COVID-safety procedures," ECF 27-2 ¶ 10, and suggests that the Court can infer the existence of at least one injured member because Plaintiff "has more than 10,000 members." ECF 27 at 4. That would violate binding Supreme Court precedent. Even when a plaintiff group had "700,000 members," the Court refused to "engage in an assessment of statistical probabilities" or accept the group's "self-descriptions of [its] membership," even though "no one denie[d]" those descriptions. *Summers*, 555 U.S. at 497, 499. Plaintiff has failed to provide the required "individual affidavits" from its alleged members. *Id.* "Without individual affidavits, how is the court to assure itself that" Plaintiff really has members facing certainly impending injuries? *Id.* (asking similar questions about the Sierra Club).

The *dissent* in *Summers* would have "accept[ed] the organization's self-description of the activities of its members" and then determined whether "there is a statistical probability that some of those members are threatened with concrete injury." *Id.* at 497. But the majority explained that the "requirement of naming the affected members has never been dispensed with in light of statistical probabilities." *Id.* at 498-99. Even when "it is certainly possible—perhaps even likely—that one" member would have standing, "that speculation does not suffice." *Id.* at 499.

The only individual voters identified in the pleadings are Micaela Rodriguez, who has been dismissed as a plaintiff, and Plaintiff Torres. But they are not members of the NAACP. *See, e.g.*, ECF 1 ¶ 195 (distinguishing between "the individual Plaintiffs" and "members of Plaintiff NAACP"). As a result, Plaintiff cannot secure a preliminary injunction or maintain this suit.[10]

---

[10] *See, e.g.*, *City of Kyle*, 626 F.3d at 237 (requiring evidence of "a specific member"); *Waskul v. Washtenaw Cty. Cmty. Mental Health*, 900 F.3d 250, 257 (6th Cir. 2018) (affirming denial of a preliminary injunction because no "named member" had standing); *Ga. Republican Party v. SEC*, 888 F.3d 1198, 1203 (11th Cir. 2018); *Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016)

### C.       Organizational Plaintiffs Do Not Have Organizational Standing

Organizational Plaintiffs have not established that they, as organizations, will suffer injuries in-fact. That they have an "interest in a problem . . . is not sufficient" for standing, "no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem." *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972).

Organizational Plaintiffs contend that the State's decision not to mandate masks at polling places has forced the organizations to "divert personnel, time, and resources." ECF 1 ¶¶ 20–21, 23. Although the diversion of resources can constitute a requisite injury under certain circumstances, "[n]ot every diversion of resources to counteract [a] defendant's conduct . . . establishes an injury in fact." *City of Kyle*, 626 F.3d at 238.

First, Plaintiffs have not shown that GA-29's exemption injures them. Plaintiff Mi Familia Vota attributes its diversions of resources to "the lack of uniform policies from the Secretary of State and Governor" as well as the fact that "policies continue to change." ECF 27-1 ¶ 10. But "excising" GA-29's exemption, as Plaintiffs propose, would itself be a last-minute change creating a lack of uniformity between the rules before and after the injunction. Plaintiff Texas Branch of the NAACP says that its diversion of resources is "[d]ue to the State's insufficient pandemic voting plan." ECF 27-2 ¶ 11. Neither Organizational Plaintiff has established that it diverted resources because of GA-29's exemption, as opposed to other policies. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)

(Souter, J.) (affirming dismissal because "the complaint did not identify any member of the group"); *N.J. Physicians, Inc. v. President of U.S.*, 653 F.3d 234, 241 (3d Cir. 2011) (affirming dismissal due to a lack of "specific allegations" regarding "at least one identified member"); *Disability Rights Wis., Inc. v. Walworth Cty. Bd. of Supervisors*, 522 F.3d 796, 804 (7th Cir. 2008) (rejecting associational standing because the "Complaint does not identify any" member with standing); *Citizens Concerned for Separation of Church & State v. City & Cty. of Denver*, 628 F.2d 1289, 1295 (10th Cir. 1980) (rejecting associational standing for an injunction "simply because this record is barren of any identification of a single person qualifying as" a member). Plaintiffs have previously relied on *Hancock County Board of Supervisors v. Ruhr*, an unpublished opinion saying that the court was "aware of no precedent holding that an association must set forth the name of a particular member in its complaint." 487 F. App'x 189, 198 (5th Cir. 2012). Such precedent existed then, and more such precedent exists now. In any event, even if identifying specific members were not required at the pleading stage, it would still be required when Plaintiffs seek injunctive relief.

("[A] plaintiff must demonstrate standing for each claim he seeks to press" and "for each form of relief sought."); *In re Gee*, 941 F.3d at 160 ("[P]laintiffs must establish standing for each and every provision they challenge."). Regardless of whether other policies might injure Plaintiffs, GA-29's exemption does not.

Nor have Organizational Plaintiffs established that a preliminary injunction would allow them to shift resources back. Because Plaintiffs claim that they need to divert resources to voter education regardless of GA-29, they cannot claim that GA-29 injures them. *See Fair Elections Ohio v. Husted*, 770 F.3d 456, 459–60 (6th Cir. 2014) ("It is not an injury to instruct [voters] about absentee voting procedures when the [voters] are being trained in voting procedures already."). Indeed, the last-minute mandating of masks would exacerbate Organizational Plaintiffs' claimed injury by requiring them to divert further resources to inform voters about the new requirement.

Second, Plaintiffs' diversions of resources cannot qualify as injuries in fact because they were not necessary for avoiding another underlying injury. As the Fifth Circuit has recognized, "[t]he change in plans must still be in response to a reasonably certain injury imposed by the challenged law." *Zimmerman v. City of Austin*, 881 F.3d 378, 390 (5th Cir. 2018). Plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 402 (2013). A plaintiff must identify some "other injury" "that it would have suffered" "if it had not diverted [its] resources." *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010).

Here, Organizational Plaintiffs say that, if they "had not diverted [their] resources," voters "would have faced greater confusion and health risks," meaning Organizational Plaintiffs' "mission of fostering voter education and participation would have suffered." ECF 27-1 ¶ 18; ECF 27-2 ¶ 13. But the "abstract social interest in maximizing voter turnout . . . cannot confer Article III standing." *Fair Elections Ohio v. Husted*, 770 F.3d 456, 461 (6th Cir. 2014). And the risk that third parties will not vote

may be relevant to "group political interests," but that does not provide standing. *Gill v. Whitford*, 138 S. Ct. 1916, 1933 (2018).

If the rule were otherwise, an interested organization could always manufacture standing by spending a small amount of money trying to avoid a result it finds objectionable. Courts do not allow standing in such cases. *See, e.g.*, *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995) (holding that a "self-serving observation that [plaintiff] has expended resources to educate its members" about the challenged law does not support an injury in fact).

Moreover, the notion that Organizational Plaintiffs' diversions were necessary to support voter turnout is betrayed by the facts. *See* Ex. 1 ¶¶ 12–13. Since in-person early voting began, more than 6 million Texans (35.63% of registered voters) have cast ballots by personal appearance.[11] This is a significant increase compared to 2016 and represents a record turnout in many counties.[12]

Finally, Organizational Plaintiffs "have not identified any specific projects that [they] had to put on hold or otherwise curtail in order to respond to" GA-29. *City of Kyle*, 626 F.3d at 238; *accord Def. Distributed v. U.S. Dep't of State*, No. 1:15-cv-372, 2018 WL 3614221, at *4 (W.D. Tex. July 27, 2018). Organizational Plaintiffs refer only vaguely to their "normal work," ECF 27-1 ¶ 13, on "issues that are central to our organization mission," ECF 53-1 ¶ 19, and "standard activities," ECF 27-2 ¶ 14, but "those projects are not described with sufficient specificity to constitute an injury in fact." *Def. Distributed*, 2018 WL 3614221, at *4; *see also City of Kyle*, 626 F.3d at 238 (refusing to find standing based on "conjecture[] that the resources . . . could have been spent on other unspecified HBA activities").

---

[11] *See* Election Information & Turnout Data, November 03, 2020 GENERAL ELECTION, Cumulative Totals Thru Close of Business October 23, 2020, available at https://earlyvoting.texas-election.com/Elections/getEVDetails.do.

[12] In Denton County, for example, the 2016 November election included 228,928 in-person early voters (49.25 percent). As of Friday, October 23, with over a week left of early voting remaining, the 2020 November election has included [add] in-person early voters ([add]%). *Compare id.*, *with* Early Voting Total Archive, November 8, 2016 Early Voting Cumulative Totals Thru Close of Business October [add], 2016, available at https://www.sos.texas.gov/elections/earlyvoting/2016/index.shtml; *see also* Mandi Cai, Juan Pablo Garnham and Alex Samuels, *Two Key Texas Counties — Democratic Stronghold Harris and Traditionally Red Denton — are Setting Early Voting Records*, THE TEXAS TRIBUNE, Oct. 17, 2020, available at https://www.texastribune.org/2020/10/17/harris-denton-texas-early-voting/.

### D.     Plaintiffs' Injuries Are Not Traceable to or Redressable By Defendants

Plaintiffs lack standing for additional reasons: Defendants actions do not cause—and relief against Defendants could not redress—Plaintiffs' alleged injuries.

As the Fifth Circuit already recognized, Defendants do not enforce GA-29. Enforcement of GA-29 is "undertaken by local authorities." *Mi Familia Vota*, 2020 WL 6058290, at *4. The Governor has "no authority to fine those who" violate GA-29 himself. *Id.* "The Secretary of State of Texas similarly has no connection to the enforcement of Executive Order GA-29." *Id.* As a result, Defendants do not cause—and any relief ordered against them would not redress—the Plaintiffs' asserted injuries. *See Okpalobi v. Foster*, 244 F.3d 405, 426 (5th Cir. 2001) (en banc) ("The requirements of *Lujan* are entirely consistent with the long-standing rule that a plaintiff may not sue a state official who is without any power to enforce the complained-of statute."). The Fifth Circuit "has acknowledged that our Article III standing analysis and *Ex parte Young* analysis significantly overlap." *City of Austin v. Paxton*, 943 F.3d 993, 1002 (5th Cir. 2019) (quotation omitted).

Plaintiffs concede that redressing their alleged injuries would require that the Governor be "ordered to excise" a portion of GA-29, ECF 54, but the Fifth Circuit has already ruled that a federal court cannot order the Governor to amend GA-29. "[A] court cannot compel the Governor to issue orders as a means of redressing claims under the Voting Rights Act or the Constitution." *Mi Familia Vota*, 2020 WL 6058290, at *6. "[O]rder[ing] an executive performing executive functions, or an executive performing essentially legislative functions, to promulgate directives mandated by the court" would be "beyond the power of a court." *Id.* Just days later, the Fifth Circuit confirmed "that, at the very minimum, a court may not control [an officer] in the exercise of his discretion." *Richardson v. Texas Sec'y of State*, No. 20-50774, 2020 WL 6127721, at *16 (5th Cir. Oct. 19, 2020) (quotation omitted). Here, issuing executive orders is discretionary, not ministerial, so a court cannot control the process by injunction.

It likewise follows that Plaintiffs cannot obtain relief by having the Secretary issue a subsequent election advisory. "[T]he district court would not have authority to order the Governor or Secretary of State to promulgate regulations or legislation." *Mi Familia Vota*, 2020 WL 6058290, at *6. Not only would such an election advisory have no legal effect, but the Secretary has no authority to compel counties to take any action relevant to Plaintiffs' claim.

The Court also lacks authority to erase GA-29's exception on its own. Just as "a favorable declaratory judgment . . . cannot make even an unconstitutional statute disappear," *Steffel v. Thompson*, 415 U.S. 452, 469 (1974) (quotation omitted), it cannot "erase" the exemption in GA-29. Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 936 (2018); *see also Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1255 (11th Cir. 2020) ("The district court's decision rests on the flawed notion that by declaring the ballot statute unconstitutional, it eliminated the legal effect of the statute in all contexts.").

Plaintiffs make much of the Fifth Circuit's comment that this Court "might excise" GA-29's polling-place exception, *Mi Familia Vota*, 2020 WL 6058290, at *7, but that court recognized that the purported power "to strike down a law" is tied to the power "to enjoin a state official from enforcing it." *Id.* at *6; *see also Jacobson*, 974 F.3d at 1255. Indeed, as the Fifth Circuit recognized just yesterday, "[c]ourts hold laws unenforceable; they do not erase them." *Pool v. City of Houston*, No. 19-20828, 2020 WL 6253444, at *1 (5th Cir. Oct. 23, 2020). The claim "that courts 'strike down' laws when ruling them unconstitutional" is "not quite right." *Id.*

Even if federal courts otherwise had the power to erase statutes or executive orders, they still would not have the power to expand criminal liability. Erasing GA-29's polling-place exception would have the effect of creating a new criminal offense. *See* Tex. Gov't Code § 418.173. But this Court cannot create criminal law. The Supreme Court has long forbidden federal courts from establishing

common-law crimes. *See Whalen v. United States*, 445 U.S. 684, 689 (1980); *United States v. Hudson*, 11 U.S. 32, 34 (1812).

Creating such crimes under state law would be an even more significant violation of the Constitution considering the implications for federalism. "[E]ven where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit those acts." *New York v. United States*, 505 U.S. 144, 166 (1992). This Court, of course, has no authority to require voters to wear masks. Compelling the State to require it is even further beyond its reach.

As the Fifth Circuit explained, if this Court ruled "that the exclusion from the mask requirement in Executive Order GA-29" is unlawful, any injunction would have to address the "[e]nforcement actions [that] would be undertaken by local authorities," not anything Defendants do. *Mi Familia Vota*, 2020 WL 6058290, at *4. But Plaintiffs have not added any "local authorities" as defendants. So even if the Court purported to "excise" GA-29's polling-place exception, that judgment would not bind the only officials who enforce GA-29. *See* Fed. R. Civ. P. 65(d)(2). No local official would be bound to implement any court-ordered revisions to GA-29.

In any event, Plaintiffs also "have not proved that declaratory relief against [Defendants] will significantly increase the likelihood that [local officials] will ignore [GA-29's exception] and follow a federal decree that does not bind them." *Jacobson*, 974 F.3d at 1255 (quotation omitted). As a result, no preliminary injunction against the current defendants could have real-world effect sufficient to redress Plaintiffs' alleged injuries.

Even if Plaintiffs could show that local officials would defer to this Court's reasoning, it would not suffice. That "theory of redressability contravenes the settled principle that it must be *the effect of the court's judgment on the defendant*—not an absent third party—that redresses the plaintiff's injury." *Id.* a 1254 (quotations and brackets omitted).

III.     **Plaintiffs Cannot Establish a Violation of the Voting Rights Act**

Plaintiffs' claims fail on the merits for three reasons. First, the Voting Rights Act does not require Texas to mandate that voters wear masks. Second, if it did, the statute would be unconstitutional. Third, Plaintiffs do not have a private cause of action.

A.     **GA-29 Does Not Violate the Voting Rights Act**

Plaintiffs have not established a violation of the Voting Rights Act. It provides: "No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). First, GA-29's exception is not a "qualification or prerequisite to voting or standard, practice, or procedure" that is "imposed or applied." It is the absence of those things. Second, GA-29's exception is not "a denial or abridgement of the right . . . to vote" because it does not alter anyone's legal right to vote. Third, GA-29's exception does not operate "on account of race or color."

1.     **Section 2 Does Not Require Texas to Limit Voting**

As a threshold matter, the lack of a face-covering requirement is not a "voting qualification or prerequisite to voting or standard, practice, or procedure" covered by Section 2. 52 U.S.C. § 10301(a). No "qualification," "prerequisite," "standard, practice, or procedure" has been "imposed or applied." *Id.* Plaintiffs complain about the fact that GA-29 does *not* impose a new voting qualification.

The Supreme Court has never interpreted Section 2 to cover the *absence* of a practice. Even in an era when the Court was less focused on statutory text, it concluded that "[t]he legislative history on the whole supports the view that Congress intended to reach any state enactment which altered the election law of a covered State," not the lack of an alteration to the election laws. *Allen v. State Bd. of Elections*, 393 U.S. 544, 566 (1969), *abrogation recognized by Ziglar v. Abbasi*, 137 S. Ct. 1843, 1855 (2017). A "standard, practice, or procedure" is "properly understood" to "reach only state enactments that

limit citizens' access to the ballot." *Holder v. Hall*, 512 U.S. 874, 893 (1994) (Thomas, J., concurring in the judgment). But no matter how broadly one reads those terms, they cannot cover a *refusal* to limit unmasked citizens' access to the ballot.

In a sense, Plaintiffs are challenging the potential future "practice" of voters who may arrive at polling places without masks. But Section 2 applies only to "voting practices 'imposed or applied by any State or political subdivision.'" *Welch v. McKenzie*, 765 F.2d 1311, 1316 (5th Cir. 1985). An act taken by a third party "is not a Voting Rights Act infringement." *Id.*; *see also Leyva v. Bexar Cty. Republican Party*, No. 5:02-cv-408, 2002 WL 34729181, at *6 (W.D. Tex. Dec. 5, 2002) (three-judge district court).

In substance, Plaintiffs complain that the coronavirus makes in-person voting too risky. But the coronavirus is not a "voting qualification or prerequisite to voting or standard, practice, or procedure . . . imposed or applied by [the] State." 52 U.S.C. § 10301(a). In a recent case considering "the risks of venturing outside the home to vote in person," the Fifth Circuit explained that "the *state* has not placed any obstacles on the plaintiffs' ability to vote in person." *TDP v. Abbott*, 961 F.3d 389, 404 & n.32 (5th Cir. 2020). That is true here too. Federal courts "cannot hold private citizens' decisions to stay home for their own safety against the State." *Thompson v. Dewine*, 959 F.3d 804, 810 (6th Cir. 2020) (per curiam).

### 2.     GA-29 Does Not Deny or Abridge the Right to Vote

GA-29 does not "result[] in a denial or abridgement of the right of any citizen of the United States to vote." 52 U.S.C. § 10301(a). As the Fifth Circuit recently explained, a "denial" of the right to vote occurs only when a would-be voter is "absolutely prohibited" from voting. *TDP v. Abbott*, No. 20-50407, 2020 WL 6127049, at *13 (5th Cir. Oct. 14, 2020). Plaintiffs do not argue they are absolutely prohibited from voting. Nor could they. GA-29 does not alter anyone's eligibility to vote.

GA-29 also does not "abridge" the right to vote. Identifying an abridgment "necessarily entails a comparison" because "[i]t makes no sense to suggest that a voting practice 'abridges' the right to

vote without some baseline with which to compare the practice." *Reno v. Bossier Par. Sch. Bd.*, 528 U.S. 320, 334 (2000). First, Plaintiffs' rights were not "reduced" by the Proclamation. *TDP*, 2020 WL 6127049, at *14 (asking "whether younger voters' rights were reduced by the addition of a privilege for older voters"). Plaintiffs have the same rights to vote now that they did before GA-29. Second, Plaintiffs' rights have not been abridged relative to the rights of third parties. *See id.* Plaintiffs cannot claim that they "have less opportunity than other members of the electorate." *Veasey v. Abbott*, 830 F.3d 216, 244 (5th Cir. 2016) (en banc). GA-29 applies equally to all Texans.

Plaintiffs do not contend otherwise, and that is fatal to their claim. "Laws that neither eliminate opportunities that racial minorities disproportionately use, [n]or impose a requirement that they disproportionately lack, in other words, will not fail [the Fifth Circuit's] test." *Veasey v. Abbott*, 830 F.3d 216, 279 (5th Cir. 2016) (en banc) (Higginson, J., concurring) (quotation and footnote omitted).

Plaintiffs argue that the limited scope of GA-29 "reduce[s] the likelihood that they will use the opportunities they possess." *Luft v. Evers*, 963 F.3d 665, 672–73 (7th Cir. 2020). But even if that were true, it would not violate Section 2. Because "Plaintiffs do not contend that any of [GA-29's] changes reduces their (legal) opportunity to participate in the electoral process," their claim fails. *Id.*

### 3. GA-29 Does Not Discriminate on Account of Race

The Governor's order does not discriminate "on account of race or color." 52 U.S.C. § 10301(a). Plaintiffs have not made the two-part showing that Fifth Circuit precedent requires: (1) the existence of "a discriminatory burden on members of a protected class" and (2) that the burden is "caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class." *Mi Familia Vota v. Abbott*, 2020 WL 6058290, at *4 (5th Cir. Oct. 14, 2020) (quoting *Veasey*, 830 F.3d at 244).

Plaintiffs cannot establish a discriminatory burden because GA-29 applies equally to all Texans, providing the same benefits and imposing the same burdens on Texans of all races. Ignoring

that fact, Plaintiffs argue that, "[a]cross the United States, Black and Latino people are far more likely to be infected with COVID-19, and once infected, more likely to die of the disease, than white people." ECF 55 at 17. There are three problems with Plaintiffs' approach.

First, Plaintiffs have made no effort to show that minority voters are disproportionately likely to become infected *while voting due to the lack of a mask mandate.* They argue that minority Texans are disproportionately likely to become infected in general, but they attribute that disparity to differences in occupation and family size. *See* ECF 53-1 ¶ 8 ("essential workers" and "multi-generational households"); ECF 53-2 ¶ 7 ("their jobs and denser communities"). That says nothing about the effects, if any, of GA-29's polling-place exception on the risks faced by different demographic groups in polling places, where occupation and family size are irrelevant.

Second, Plaintiffs' own data undermine their claims. The website cited by their expert shows that African-American Texans are *underrepresented* among COVID-19 deaths. Although 12% of Texans are African-American, only 11% of Texans who have died from COVID-19 are African-American.[13] And Plaintiffs' expert concedes that she "can't make valid comparisons based on who is getting infected because" she has racial data for "only 6% of reported cases" in Texas. ECF 53-3 ¶ 17.

Third, even if Plaintiffs had data showing that a demographic group is over-represented in COVID-19 infections and COVID-19 deaths, it would not answer the question at hand. The truth is that people of all races and all ethnicities face very low and effectively identical risks. According to Plaintiffs' expert, 0.284% of African-American Texans, 0.204% of Hispanic Texans, and 0.143% of white Texans have developed cases of COVID-19. *See* ECF 53-3 ¶ 18. Thus, more than 99.7% of Texans in each racial group have not. And that data is based on infection from all sources, not the alleged difference in the likelihood of infection attributable to a mask mandate for polling places. The

---

[13] The COVID Tracking Project, Racial Data Dashboard: Texas, https://covidtracking.com/race/dashboard#state-tx (last visited Oct. 21, 2020).

overwhelming majority of voters, regardless of race, will not become infected due to GA-29's polling-place exception, and Plaintiffs do not contend otherwise.

Plaintiffs focus on alleged "over-representation in deaths," ECF 55 at 20, but regardless of race, someone infected with the coronavirus is overwhelmingly likely to survive. A study from Indiana provides a sense of scale. It found that 99.82% of white people and 99.41% of non-white people survive a coronavirus infection.[14] It also found that 99.96% of Hispanic people and 99.66% of non-Hispanic people survive a coronavirus infection.[15] Thus, survival rates are "effectively identical," regardless of race or ethnicity. *Frank v. Walker*, 768 F.3d 744, 753 n.3 (7th Cir. 2014).

The Seventh Circuit explained how to think about such percentages in a Voting Rights Act case about a voter-identification law: "If 99.9% of whites had photo IDs, and 99.7% of blacks did, [Plaintiffs'] approach would yield the statement 'blacks are three times as likely as whites to lack qualifying ID' (0.3 ÷ 0.1 = 3), but such a statement would mask the fact that the populations were effectively identical. That's why we do not divide percentages." *Id.* Plaintiffs' focus on "over-representation in deaths," ECF 57 at 20, "is a misuse of data" because it "divide[s] percentages." *Frank*, 768 F.3d at 753 n.3; *accord Greater Birmingham Ministries v. Sec'y of State for Ala.*, 966 F.3d 1202, 1233 (11th Cir. 2020) (explaining that "approximately 99% of white voters and 98% of black voters possess a photo ID" and that the plaintiffs' argument "that black and Latino voters are about twice as likely as white voters to lack a valid voter photo ID . . . . is a misuse of data").

Even if there were a disparate impact, that would not be enough. Disparate impact does not violate Section 2 unless it is "caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class." *Veasey*, 830 F.3d at 244.

---

[14] Justin Blackburn, *et al.*, *Infection Fatality Ratios for COVID-19 Among Noninstitutionalized Persons 12 and Older: Results of a Random-Sample Prevalence Study* (Sept. 2, 2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7505013/ (last visited Oct. 21, 2020) (table reporting infection fatality ratios of 0.18% and 0.59% for "Noninstitutionalized Persons Aged ≥12 Years in Indiana").
[15] *Id.* (table reporting infection fatality ratios of 0.04% and 0.34% for "Noninstitutionalized Persons Aged ≥12 Years in Indiana").

"Despite its broad language, Section 2 does not prohibit all voting restrictions that may have a racially disproportionate effect." *Johnson v. Gov. of State of Fla.*, 405 F.3d 1214, 1228 (11th Cir. 2005) (en banc). Section 2 "make[s] clear that an application of the results test requires an inquiry into the totality of the circumstances." *Chisom v. Roemer*, 501 U.S. 380, 394 (1991). In the Fifth Circuit, that requires analysis of "the *Gingles* factors." *Veasey*, 830 F.3d at 245.

Here, Plaintiffs have not established "the requisite causal link" to racial discrimination. *Id.* In fact, Plaintiffs' own evidence establishes the opposite. Plaintiff Mi Familia Vota says that "Latinos in Texas have suffered from COVID-19 at rates higher than the general population" for two reasons: (1) "because many [Latinos] are essential workers and work in crowded workplaces where social distancing is not possible" and (2) because "many [Latinos] live in large, multi-generational households," which promotes "the infection spread[ing] to family members." ECF 53-1 ¶ 8. Plaintiff Texas Branch of the NAACP similarly contends that "Black Texans are justifiably more wary of contracting the virus" "both because of their jobs and denser communities." ECF 53-2 ¶ 7. But Plaintiffs never argue, much less prove, that these conditions were "produced by discrimination." *Veasey*, 830 F.3d at 245 (requiring "a sufficient causal link between the disparate burden imposed and social and historical conditions produced by discrimination").

Invoking only four of the *Gingles* factors, Plaintiffs have forfeited any reliance on the remaining ones. *See* ECF 55 at 19. First, Plaintiffs cite *Veasey*'s discussion of past disparate impacts in legislative redistricting, *see id.* at 19–20, but they cite no "historical evidence [that] is reasonably contemporaneous with the challenged decision," *McCleskey v. Kemp*, 481 U.S. 279, 298 n.20 (1987), much less evidence relevant to these defendants or pandemic response. *See Lopez v. Abbott*, 339 F. Supp. 3d 589, 612 (S.D. Tex. 2018) (giving the first *Gingles* factor "only slight weight" because Plaintiffs had not "identified any specific history of official discrimination with respect to establishing or maintaining the multimember nature of voting for the State's high courts").

Second, Plaintiffs attribute health disparities to "the effects of past discrimination," ECF 57 at 20, but for COVID-19 in particular, Plaintiffs' evidence shows that the disparities are caused by being essential workers and having larger households. *See* ECF 53-1 ¶ 8; ECF 53-2 ¶ 7. Plaintiffs do not tie those conditions to past discrimination.

Third, Plaintiffs argue that the Legislature is not responsive to minority voters. *See* ECF 57 at 21. That is not true. In the last round of redistricting litigation, the Supreme Court found only one district unconstitutional, and that was because the Texas Legislature made impermissible changes "at the *behest of minority groups*, not out of an intent to discriminate. That is, [the chair of the redistricting subcommittee] was *too* solicitous of changes with respect to HD90." *Abbott v. Perez*, 138 S. Ct. 2305, 2329 n.24 (2018). In any event, Plaintiffs' assertions regarding the Legislature are irrelevant. Their sole remaining claim attacks an executive order, not a statute. And Plaintiffs cannot argue that Texas is unresponsive to minority citizens based on the refusal to enact a policy that no other State has enacted.

Fourth, Plaintiffs argue that the policy rationale for not mandating masks while voting is "tenuous[]." ECF 55 at 22. The vast majority of States disagree. As the Fifth Circuit has previously written, "the recognition and pursuit of the [Texas's] interest in other states" bolsters the conclusion that its interest "is substantial." *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 872 (5th Cir. 1993) (en banc). Protecting the right to vote for citizens who do not wear masks is not only a substantial interest but exactly the type of interest that voting-rights legislation is supposed to protect.

**B.     Requiring Texas to Mandate Masks Would Be Unconstitutional**

The VRA does not require Texas to mandate masks at polling places, but if it did, it would be unconstitutional. The canon of constitutional avoidance requires reading the statute more narrowly. *See Johnson*, 405 F.3d at 1229 (interpreting Section 2 narrowly because of the "long-standing rule of statutory interpretation that federal courts should not construe a statute to create a constitutional

question unless there is a clear statement from Congress endorsing this understanding"); *LULAC v. Abbott*, 369 F. Supp. 3d 768, 787 (W.D. Tex. 2019), *aff'd*, 951 F.3d 311 (5th Cir. 2020).

First, if Section 2 required the State to criminalize additional conduct, it would violate the anti-commandeering doctrine. As explained above, "even where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit those acts." *New York*, 505 U.S. at 166. Congress cannot require Texas to prohibit voting without a mask.

Plaintiffs seem to argue that there is a distinction between requiring the State to enact a new mask rule and prohibiting the State from keeping an exception to its current mask rule, but the anti-commandeering doctrine does not turn on such "empty" distinctions. *Murphy v. NCAA*, 138 S. Ct. 1461, 1478 (2018). The Supreme Court has already rejected the supposed distinction between ordering States "to take the affirmative step of criminalizing [certain] activity" and ordering States "to retain their laws prohibiting" such activity. Because both "would intrude [equally] on state sovereignty." *Id.* So too here. Requiring Texas to remove an exemption from its mandate intrudes on state sovereignty just as deeply as requiring it to enact a new mandate would. *See Mi Familia Vota*, 2020 WL 6058290, at *6 ("[A] court cannot compel the Governor to issue orders as a means of redressing claims under the Voting Rights Act or the Constitution."). Even Plaintiff Mi Familia Vota agrees that "[s]triking the carve-out" is just another way of "requiring masks to be worn at polling places." ECF 53-1 ¶ 18.

Second, incorrectly interpreting Section 2 to require the State to implement a mask mandate for polling places would take the statute beyond the scope of Congress's "power to enforce [the Fifteenth Amendment] by appropriate legislation." U.S. Const. amend. XV, § 2. At that point, Section 2 would represent "a substantive change in constitutional protections under the guise of enforcement." *Veasey v. Abbott*, 830 F.3d 216, 316 (5th Cir. 2016) (en banc) (Jones, J., concurring in part and dissenting in part) (quotation and citation omitted).

Allowing Section 2 to "prohibit[] certain types of laws may be appropriate when there is reason to believe that many of the laws affected by the congressional enactment have a significant likelihood of being unconstitutional." *City of Boerne v. Flores*, 521 U.S. 507, 532 (1997). But there is no reason to believe that a significant percentage of State policies responding to the pandemic are unconstitutional.

The Fifteenth Amendment prohibits only those laws enacted "with a discriminatory purpose," which Plaintiffs do not allege here. *Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 481 (1997). And the Constitution allows States wide discretion in responding to the pandemic. *See In re Abbott*, 954 F.3d 772, 778 (5th Cir. 2020) (citing *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905)). A State's "decision either to keep or to make changes to election rules to address COVID-19 ordinarily should not be subject to second-guessing by an unelected federal judiciary, which lacks the background, competence, and expertise to assess public health and is not accountable to the people." *Andino v. Middleton*, No. 20A55, 2020 WL 5887393, at *1 (U.S. Oct. 5, 2020) (Kavanaugh, J., concurring) (quotations omitted).

"The legislative record of the" VRA "simply fails to show that Congress did in fact identify a pattern of" Fifteenth Amendment violations regarding States failing to sufficiently combat a pandemic with alleged disparate racial impacts. *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 368 (2001); *see also Johnson*, 405 F.3d at 1231 ("[W]hen Congress enacted the VRA and its subsequent amendments, there was a complete absence of congressional findings that felon disenfranchisement laws were used to discriminate against minority voters.").

Third, broadening Section 2 to cover GA-29 would also violate the Equal Protection Clause. Requiring the State to criminalize mask-less voting because of disparate racial impacts would require the State to make decisions based on race. That runs counter to the Equal Protection Clause's "central mandate"—"racial neutrality in governmental decision-making." *Miller v. Johnson*, 515 U.S. 900, 904 (1995). "If § 2 were interpreted" too broadly, "it would unnecessarily infuse race into virtually every"

legislative debate about elections, "raising serious constitutional questions." *LULAC v. Perry*, 548 U.S. 399, 446 (2006) (plurality). Whatever the propriety of using disparate impact to limit enforcement of a challenged law, using disparate impact to effectively mandate the enactment of new laws would unnecessarily infuse race into even more governmental decisions.

### C.    Plaintiffs Do Not Have a Private Cause of Action

Plaintiffs cannot prevail on their Section 2 claim because they do not have a private cause of action. Plaintiffs rely on a supposed implied cause of action, but under the modern test for private causes of action, they cannot succeed. In *Alexander v. Sandoval*, the Supreme Court rejected the looser approach to implying causes of action prevalent in the 1960s. 532 U.S. 275, 287 (2001). Today, "private rights of action to enforce federal law must be created by Congress." *Id.* at 286. "The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." *Id.* Absent that intent, "a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." *Id.* at 286–87.

Section 2 contains no indication of an intent to create a private right, much less a private remedy. The statute's text is focused on the governmental officials it regulates, not individual voters: "No voting qualification or prerequisite to voting or standard, practice, or procedure s*hall be imposed or applied by any State or political subdivision* in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . . ." 52 U.S.C. § 10301(a) (emphasis added). "Statutes that focus on the person regulated rather than the individuals protected create no implication of an intent to confer rights on a particular class of persons." *Sandoval*, 532 U.S. at 289 (quotation omitted). Section 2 "is framed in terms of the obligations imposed on the regulated party" (government officials) while voters are "referenced only as an object of that obligation." *Logan v. U.S. Bank Nat'l Ass'n*, 722 F.3d 1163, 1171 (9th Cir. 2013). When a statute's "language is framed as

an instruction to the regulated entity, rather than to the person protected," it "do[es] not indicate a congressional intent to make a remedy available to private litigants." *Conservation Force v. Delta Air Lines, Inc.*, 190 F. Supp. 3d 606, 616 (N.D. Tex. 2016), *aff'd*, 682 F. App'x 310 (5th Cir. 2017).

Although Section 2 refers to "the right . . . to vote," 52 U.S.C. § 10301(a), it does not contain any "'rights-creating' language." *Sandoval*, 532 U.S. at 288. The underlying right to vote to which Section 2 refers is based on state law, *see Rodriguez v. Popular Democratic Party*, 457 U.S. 1, 9 (1982), and the Fifteenth Amendment. Referring to a right is not the same as creating a right. Because Section 2 does not create a federal right "in clear and unambiguous terms," *Gonzaga Univ. v. Doe*, 536 U.S. 273, 290 (2002), Plaintiffs cannot bring a private cause of action.

In addition, Section 2 does not create private remedies. Instead, the VRA authorizes civil and criminal enforcement actions by the federal government. *See* 52 U.S.C. § 10308. "The express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Sandoval*, 532 U.S. at 290.

To be sure, the Supreme Court has often "[a]ssum[ed], for present purposes, that there exists a private right of action to enforce" Section 2. *City of Mobile v. Bolden*, 446 U.S. 55, 60 (1980) (plurality). But the Court has never so held. Decisions that "never squarely addressed the issue," but "at most assumed" an answer, are not binding "by way of *stare decisis*." *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993); *see also Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 170 (2004).

Fractured opinions have suggested, in dicta, that private plaintiffs can enforce Section 2. *See Morse*, 517 U.S. at 232 (1996) (minority opinion of Stevens, J.) (quoting legislative history); *id.* at 240 (Breyer, J., concurring in the judgment) (same). But that dicta is inconsistent with the later majority opinion in *Sandoval*, which limited its "search for Congress's intent [to] the text and structure of" the statute. 532 U.S. 275, 288 (2001). "[D]ecisions before *Sandoval* frequently implied private rights of action without rigorous analysis; they did so by making a somewhat cursory inspection of the statute

and its legislative history." *Conservation Force*, 190 F. Supp. 3d at 616, *aff'd*, 682 F. App'x 310 (5th Cir. 2017) (affirming "[e]ssentially for the reasons stated in the district court's comprehensive and well-reasoned opinion"). Such pre-*Sandoval* opinions are "are not binding nor persuasive." *Id.* (declining to follow pre-*Sandoval* precedent).

Because Section 2 does not create an implied right of action, Plaintiffs' claim cannot succeed. But even if there were a private cause of action, it would apply only to voters, not non-voting organizations like Organizational Plaintiffs. An implied private cause of action is limited to the "particular class of persons." *Sandoval*, 532 U.S. at 289 (quoting *California v. Sierra Club*, 451 U.S. 287, 294 (1981)). Non-voting artificial entities are not included in "any particular class of beneficiaries whose welfare Congress intended to further" under Section 2. *California*, 451 U.S. at 294.

## IV.    Any Relief Must Be Limited to Plaintiffs with Standing

Plaintiffs appear to seek relief covering every voter and every polling place statewide. *See* ECF 54. That is legally impermissible. "[N]either declaratory nor injunctive relief can directly interfere with enforcement of contested statutes or ordinances except with respect to the particular federal plaintiffs." *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931 (1975). As the Fifth Circuit recently explained in another challenge to an executive order, when plaintiffs do "not sue as class representatives," a "district court lack[s] authority to enjoin enforcement of GA-[2]9 as to anyone other than the named plaintiffs." *In re Abbott*, 954 F.3d 772, 786 n.19 (5th Cir. 2020) (citing *Doran*, 422 U.S. at 931). "The fundamental problem with [Plaintiffs' requested] injunction is that plaintiffs lack standing to seek—and the district court therefore lacks authority to grant—relief that benefits third parties." *McKenzie v. City of Chicago*, 118 F.3d 552, 555 (7th Cir. 1997). An injunction prohibiting enforcement of Texas law as to non-plaintiffs would be improper.[16]

---

[16] Plaintiffs cannot use associational standing to evade the limits that would be placed on an action by their purported members. *See Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 24 (2000). "The remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Lewis v. Casey*, 518 U.S. 343, 357 (1996).

## V.      The Court should stay any injunction that it grants

If the Court grants Plaintiffs' motion, it should stay any injunction. "While an appeal is pending from an interlocutory order or final judgment that grants, continues, modifies, refuses, dissolves, or refuses to dissolve or modify an injunction, the court may suspend, modify, restore, or grant an injunction." Fed. R. Civ. P. 62(d). Courts "consider four factors in deciding whether to grant a stay pending appeal: (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 410 (5th Cir. 2013). For the reasons explained above, Defendants are likely to prevail on the merits, and a stay would promote the public interest without injuring other parties. An injunction against enforcement of Texas law would irreparably injure the State and her officials. *See Tex. Alliance for Retired Ams.*, 2020 WL 5816887, at *4; *Valentine v. Collier*, 956 F.3d 797, 803 (5th Cir. 2020) (per curiam).

### CONCLUSION

Defendants respectfully request that the Court deny Plaintiffs' motion.

---

Any injunction granted must be limited to the relief their identified members could obtain. *See Conservation Law Found. of New England, Inc. v. Reilly*, 950 F.2d 38, 41 (1st Cir. 1991) (rejecting "nationwide relief" for an associational plaintiff and limiting injunctive relief to what the plaintiff's ten identified members would have been able to obtain).

Date: October 24, 2020

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RYAN L. BANGERT
Deputy First Assistant Attorney General

Respectfully submitted.

*/s/ Patrick K. Sweeten*
PATRICK K. SWEETEN
Associate Deputy for Special Litigation

TODD LAWRENCE DISHER
Deputy Chief, Special Litigation Unit

WILLIAM T. THOMPSON
Special Counsel

ERIC A. HUDSON
Special Counsel

KATHLEEN T. HUNKER
Special Counsel

DYLAN FRENCH
Assistant Attorney General

JOSEPH SHANEYFELT
Assistant Attorney General

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Tel.: (512) 936-1414
Fax: (512) 936-0545
patrick.sweeten@oag.texas.gov
todd.disher@oag.texas.gov
will.thompson@oag.texas.gov
eric.hudson@oag.texas.gov
kathleen.hunker@oag.texas.gov
dylan.french@oag.texas.gov

**COUNSEL FOR DEFENDANTS**

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on October 24, 2020, and that all counsel of record were served by CM/ECF.

*/s/ Patrick K. Sweeten*
PATRICK K. SWEETEN

37