**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | |
|---|---|
| **MI FAMILIA VOTA, TEXAS STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, GUADALUPE TORRES,** | **NO.  SA-20-CV-00830-JKP** |
| **Plaintiffs,** | |
| **v.** | |
| **GREG ABBOTT, GOVERNOR OF TEXAS; AND RUTH HUGHS, TEXAS SECRETARY OF STATE;** | |
| **Defendants.** | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiffs Mi Familia Vota, Texas State Conference of the National Association for the Advancement of Colored People and Guadalupe Torres's Emergency Motion for Temporary Restraining Order and Preliminary Injunction and Defendants Governor Greg Abbott and Secretary of State Ruth Hughs' Response.[1] *ECF Nos. 53, 55*. At the status hearing held October 22, 2020, the parties agreed to address and present this motion as a Motion for Preliminary Injunction, only. Upon consideration of the Motion for Preliminary Injunction, briefs, evidence and arguments presented at a hearing held October 26, 2020, the Court concludes Plaintiffs' Motion for Preliminary Injunction shall be GRANTED in part and DENIED in part.

---

[1] In this Order, the Court will refer to the parties as follows:
(1) Plaintiffs Mi Familia Vota, Texas State Conference of the National Association for the Advancement of Colored People and Guadalupe Torres: collectively, "Plaintiffs";
(2) Plaintiffs individually: "Mi Familia Vota", "Texas NAACP", and "Ms. Torres"; and
(3) Defendants Greg Abbott and Ruth Hughs: collectively, "the State";
(4) Defendants individually: Greg Abbott, in his official capacity as Governor of the State of Texas: "Governor Abbott"; Ruth Hughs, in her official capacity as Texas Secretary of State: "Secretary Hughs".

The Court concludes Exemption 8 in Governor Abbott's Executive Order GA-29, which exempts those who are "voting, assisting a voter, serving as a poll watcher, or actively administering an election" from compliance with the statewide mask mandate, violates Section 2 of the Voting Rights Act because it creates a discriminatory burden on Black and Latino voters. For this reason, exemption 8 is invalid and void. The remaining provisions of Executive Order GA-29, including the enforcement provisions and other exemptions, remain intact.[2] All other requested injunctive relief is denied.

## PROCEDURAL BACKGROUND

Plaintiffs filed their Original Complaint on July 16, 2020. *ECF No. 1.* In this action, Plaintiffs generally contend Texas election procedures create unsafe conditions at polling sites which preclude certain protected classes of people from voting during the early voting period or in person on election day, November 3, 2020 (collectively "the 2020 election"). Plaintiffs bring this action to ensure "practical and constitutionally-required measures that both protect the public health and guarantee the right to vote" to all Texas citizens, specifically Black and Latino citizens.

On September 7, 2020, this Court granted the State's Motion to Dismiss Plaintiffs' Complaint based upon a finding the Court lacked subject matter jurisdiction. *ECF No. 44.* This Court concluded Plaintiffs did not challenge the constitutionality of any specific Election Code provision, but instead, generally challenged the prudence of "Texas's election laws" and

---

[2]Within its Article III powers, this Court has jurisdiction and power to pass upon the constitutionality of an act of Congress or Executive body; however, it may not "order relief that would require the Governor of a State to essentially enact legislation." *Mi Familia Vota v. Abbott*, 20-50793, 2020 WL 6058290, at *6 (5th Cir. Oct. 14, 2020). Consequently, this Court is not presented with and does not address the issue regarding the constitutionality of the issuance of the Executive Order. *See Tex. League of United Latin Am. Citizens v. Hughs*, 20-50867, 2020 WL 6023310, at *13 (5th Cir. Oct. 12, 2020)(Judge Ho concurrence stating, "under our Constitution, it is for the Texas Legislature through the legislative process—and not for the Governor or the judiciary by executive or judicial fiat—to determine how best to maximize voter access as well as ballot security.") For this reason, the Court makes clear it is not directing Governor Abbott to act nor endorsing the constitutionality of the Executive Order, but is merely acting within this Court's Article III power to "pass on the constitutionality" of Exemption 8 contained within the Executive Order. *See Mi Familia Vota v. Abbott*, 20-50793, 2020 WL 6058290, at *6;

"Texas's election policies" for combating the COVID-19 virus within the 2020 election. *Id.* This Court concluded it lacked Article III power to grant the injunctive relief Plaintiffs requested based upon the general challenge, finding the requested relief concerned the administration of elections and implementation of election procedures which are constitutionally committed to the state legislative branch and its designated governmental bodies. *Id.* Therefore, any judicial directive would require an initial policy determination outside of prescribed separation of power and allowed judicial discretion. *Id.* In addition, the requested judicial directive would require an undertaking that would inherently demonstrate a lack of respect due the legislative branch and its designated governmental actors. *Id.* Based upon these findings, this Court concluded the case, as plead and argued, presented a nonjusticiable political question – specifically, the relief sought to remedy the alleged injuries was beyond the Court's Article III power to grant. *See* ECF No. 44; *Mi Familia Vota v. Abbott*, SA-20-CV-00830-JKP, 2020 WL 5366291, at *4-8 (W.D. Tex. Sept. 7, 2020), aff'd in part, rev'd in part and remanded, 20-50793, 2020 WL 6058290 (5th Cir. Oct. 14, 2020).

On October 14, 2020, the Fifth Circuit Court of Appeals affirmed this Court's judgment in part and reversed and remanded this matter on a limited issue not previously presented to this Court, stating:

> Were the district court to conclude that the exemption from wearing a mask in public places contained in Executive Order GA-29 for pollworkers, voters, and others in polling places violated Section 2 of the Voting Rights Act, the district court might excise that provision if it concluded that this would redress the injuries the Plaintiffs have alleged. It is at least conceivable that such a remedy would not materially or substantially affect the ongoing election, but that would be a matter for the district court to determine.

*Mi Familia Vota v. Abbott*, No. 20-50793, 2020 WL 6058290, at *5 (5th Cir. Oct. 14, 2020).

In this instruction, the Fifth Circuit handed down three issues to be determined on remand: whether the mask-mandate Exemption 8 violates Section 2 of the Voting Rights Act as applied; whether this Court can resolve the injuries the Plaintiffs allege by "excising"

(invalidating) the mask-mandate Exemption 8 from the Executive Order, and; whether excising the mask-mandate Exemption 8 would "materially or substantially affect the ongoing election." *Id*.

## FACTUAL BACKGROUND

Upon the filing of Plaintiffs' Amended Complaint, this matter is now before this Court for determination of these three issues with Plaintiffs' Motion for Preliminary Injunction.

Texas government officials have taken steps to mitigate public health risks associated with the COVID-19 pandemic. *See Mi Familia Vota v. Abbott*, 2020 WL 6058290, at *1. Among these steps, are advisories from Secretary Hughes and Executive Orders issued by Governor Abbott. The Executive Order that is the subject of this action, GA-29, issued on July 2, 2020 ("the Executive Order"). In the Executive Order Governor Abbott expressed his views regarding ways in which Texas citizens can safely resume activities following the mandated extended quarantine and maintain public health by mitigating the risk of COVID-19 spread.[3] Governor Abbott stated,

- "as Texas reopens in the midst of COVID-19, increased spread is to be expected, and the key to controlling the spread and keeping Texans safe is for all people to consistently follow good hygiene and social-distancing practices,"

- "due to recent substantial increases in COVID-19 positive cases, and increases in the COVID-19 positivity rate and hospitalizations resulting from COVID-19, further measures are needed to achieve the least restrictive means for reducing the growing spread of COVID-19, and to avoid a need for more extreme measures,"

- "I have joined the medical experts in consistently encouraging people to use face coverings, and health authorities have repeatedly emphasized that wearing face coverings is one of the most important and effective tools for reducing the spread of COVID-19;"

- "given the current status of COVD-19 in Texas, requiring the use of face coverings is a targeted response that can combat the threat to public

---

[3] Executive Order GA-29 (July 2, 2020): https://open.texas.gov/uploads/files/organization/opentexas/EO-GA-29-use-of-face-coverings-during-COVID-19-IMAGE-07-02-2020.pdf.

> health using the least restrictive means, and if people follow this requirement, more extreme measures may be avoided," and

- "wearing a face covering is important not only to protect oneself, but also to avoid unknowingly harming fellow Texans, especially given that many people who go into public may have COVID-19 without knowing it because they have no symptoms."

Executive Order GA-29; *see Mi Familia Vota v. Abbott*, 2020 WL 6058290, at *1–2.

> Based upon these assessments, Governor Abbott required

> Every person in Texas shall wear a face covering over the nose and mouth when inside a commercial entity or other building or space open to the public, or when in an outdoor public space, wherever it is not feasible to maintain six feet of social distancing from another person not in the same household.

Executive Order GA-29; *see Mi Familia Vota v. Abbott*, 2020 WL 6058290, at *1–2. The Executive Order then enumerated eleven exemptions from the mask mandate, which include children younger than ten, those with medical conditions or disabilities, while seated at a restaurant to eat or drink, while engaging in exercise outdoors, and while engaging in religious worship. The exemptions also provided the option for counties to opt-out of the mask mandate if a county judge certified it met requisite criteria to do so.[4] The mask-mandate exemption that is the subject of this action is Exemption 8:

---

[4] The exemptions from the mandatory mask mandate are:
1. any person younger than 10 years of age;
2. any person with a medical condition or disability that prevents wearing a face covering;
3. any person while the person is consuming food or drink, or is seated at a restaurant to eat or drink;
4. any person while the person is (a) exercising outdoors or engaging in physical activity outdoors, and (b) maintaining a safe distance from other people not in the same household;
5. any person while the person is driving alone or with passengers who are part of the same household as the driver;
6. any person obtaining a service that requires temporary removal of the face covering for security surveillance, screening, or a need for specific access to the face, such as while visiting a bank or while obtaining a personal care service involving the face, but only to the extent necessary for the temporary removal;
7. any person while the person is in a swimming pool, lake, or similar body of water;
. . .
9. any person who is actively providing or obtaining access to religious worship, but wearing a face covering is strongly encouraged;
10. any person while the person is giving a speech for a broadcast or to an audience; or
11. any person in a county (a) that meets the requisite criteria promulgated by the Texas Division of Emergency Management (TDEM) regarding minimal cases of COVID-19, and (b) whose county judge has affirmatively opted-out of this face-covering requirement by filing with TDEM the required face-covering attestation form—

> 8.  any person who is voting, assisting a voter, serving as a poll watcher, or actively administering an election, but wearing a face mask is strongly encouraged.

Executive Order GA-29. Finally, the Executive Order declared a person's failure to wear a mask under these conditions cannot be punishable by criminal offense or penalty, directing,

> Local law enforcement and other local officials, as appropriate, can and should enforce this executive order, . . . as well as local restrictions that are consistent with this executive order and other effective executive orders. But no law enforcement or other official may detain, arrest, or confine in jail any person for a violation of this executive order or for related non-violent, non-felony offenses that are predicated on a violation of this executive order . . . This executive order hereby prohibits confinement in jail as a penalty for the violation of any face-covering order by any jurisdiction. Executive Order GA-28 is hereby amended to delete from paragraph number 15 the phrase: ", but no jurisdiction can impose a civil or criminal penalty for failure to wear a face covering."

*Id.*

Plaintiffs filed suit in July, shortly after the Executive Order issued.[5] In their Amended Complaint, Plaintiffs narrow the challenged action to mask-mandate Exemption 8 in the Executive Order as violative of Section 2 of the Voting Rights Act, as applied. *ECF No. 64, pars. 96-106*. Plaintiffs base their cause on the premise that Black and Latino voters experience a disproportate adverse effect than other races caused by the COVID-19 pandemic because these minority groups experience higher incidences of infection, hospitalization, and fatalities, and contraction of the disease creates higher incidences of serious illness over mild or asymptomatice response. Based upon this increased risk to their good health and well-being to themselves and their families, Plaintiffs allege these protected racial classes face greater risk of exposure and contraction of the disease by voting in person due to the exposure to large groups of people in this setting. *Id. at pars. 1-9, 21-95*. Given this heightened risk of exposure

---

provided, however, that wearing a face covering is highly recommended, and every county is strongly encouraged to follow these face-covering standards.

[5] Plaintiffs originally challenged advisories issued by Secretary Hughes; however, on appeal, they narrowed the challenge to the Executive Order, only, and cited specific Election Code provisions. Following direction from the Fifth Circuit and in the Amended Complaint, the challenged action is now limited to mask-mandate Exemption 8 in the Executive Order as violative of Section 2 of the Voting Rights Act.

to COVID-19, Plaintiffs posit that Exemption 8, which allows people to not wear masks while at a polling site presents substantial health risks that creates fear of voting in the Black and Latino people. As a result, Plaintiffs argue Black and Latino voters in Texas are forced to make an unacceptable choice with respect to the 2020 election: exercising their right to vote - or - protecting their own health and lives and that of their loved ones and community by staying home. *Id.* Because the increased health risk and physical health barriers will *de facto* force voters represented by Plaintiffs out of the political process if left unmitigated, Plaintiffs contend the mask-mandate exemption to GA-29 violates Section 2 of the Voting Rights Act, as applied. Specifically, the foundation of Plaintiffs' cause of action is

> "[t]he disproportionate infection rate and the more severe health consequences that Black and Latino people face from the coronavirus mean that voting procedures that fail to provide the necessary health and safety protections to *all* voters in the context of this pandemic will disproportionately burden the rights of Black and Latino voters, in particular. Thus, Texas's mask exemption for polling places a discriminatory burden on the Black and Latino communities' right to participate in the voting process on account of their race.

*Id.* at par. 52. To eliminate this racially-discriminatory deterrence on protected classes of people within the context of the 2020 election, Plaintiffs contend an adequate remedy of this disparate impact would be to invalidate Exemption 8. This invalidation would provide Plaintiffs the same opportunity as all other classes of people: the opportunity to vote in as safe an environment as possible by taking proven measures that alleviate the risk of infection and spread of COVID-19.

Plaintiffs seek to eliminate the alleged discriminatory deterrence from voting and disparate impact created by Exemption 8 of the Executive Order by seeking preliminary injunction, requesting this Court:

> a. Order that the following exemption from wearing a mask in public places contained in Executive Order GA-29: "8. any person who is voting, assisting a voter, serving as a poll watcher, or actively administering an election" is invalid and shall be excised;

    b. Order that those provisions of Election Advisory No. 2020-19 providing that "There is no authority under Texas law to require voters to wear face coverings when presenting to vote" and that suggest face coverings are not mandatory at polling locations are invalid and shall be excised;

    c. Order Defendants to take all necessary and appropriate steps to implement the foregoing excisions;

    d. Retain jurisdiction to ensure all Defendants' ongoing compliance with the foregoing orders;

    e. Grant such other and further relief that this Court deems just and appropriate.

*ECF No. 64, p. 26.*

## ANALYSIS

### I.    STANDING

Before addressing the sustantive merits of Plaintiffs' claims, the Court must take up the State's challenge to Plaintiffs' standing to bring the asserted cause of action because standing is a threshold determination. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998); *United States v. 2004 Ferrari 360 Modeno*, 902 F. Supp. 2d 944, 951 (S.D. Tex. 2012), aff'd, 544 Fed. Appx. 545 (5th Cir. 2013).

The State contends all three plaintiffs lack Article III standing to challenge the Executive Order. The State argues the Organizational Plaintiffs lack standing because they cannot show they, as organizations, will suffer an injury-in-fact. Further, while a diversion of resources can constitute a requisite injury, the Organizational Plaintiffs fail to satisfy this injury under these circumstances. The State further contends the injury of disparate impact of Exemption 8 cannot be traced to Governor Abbott or Secretary Hughs. Rather, the disparate impact can only be created by COVID-19. Finally, the State argues there is no possibility of redressing Plaintiff's asserted injury of disparate impact because Governor Abbott does not

have the power to enforce the Executive Order and exemptions within the Executive Order; only local officials hold that power, and these officials are not a party in this action.

"The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017); *Inclusive Communities Project, Inc. v. Dep't of Treasury*, 946 F.3d 649, 655 (5th Cir. 2019). If challenged, to establish this Article III standing, a plaintiff must demonstrate: (1) it suffered (or will suffer) an injury in fact; (2) that is fairly traceable to the challenged conduct of the defendant (causation); and (3) that is likely to be redressed by a favorable judicial decision (redressability). *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). The same requirements also apply to entities, such as the Organizational Plaintiffs, who seek to establish they have standing as a representative of individual members or class. *See OCA-Greater Houston v. Texas*, 867 F.3d 604, 609-10 (5th Cir. 2017). In the preliminary-injunction context, plaintiffs must make a "clear showing" of standing to maintain the injunction. *Tex. Democratic Party v. Abbott*, 20-50407, 2020 WL 6127049, at *4 (5th Cir. Oct. 14, 2020); *Barber v. Bryant*, 860 F.3d 345, 352 (5th Cir. 2017).

Even though Article III requires a causal connection between a plaintiff's injury and the defendant's challenged conduct, it doesn't require a showing of proximate cause or that "the defendant's actions are the very last step in the chain of causation." *Bennett v. Spear*, 520 U.S. 154, 169 (1997). Causation, for example, exists when the defendant's actions produce a "determinative or coercive effect upon the action of someone else," resulting in injury; however, it does not exist when the Plaintiff's injuries are "the result of the independent action of some third party not before the court." *Id.* at 167. Nor can any asserted injury be "self-inflicted." *Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 358 (5th Cir. 1999).

The instant case has two types of plaintiffs: the individual plaintiff and the two Organization Plaintiffs. "[I]n the context of injunctive relief, one plaintiff's successful demonstration of standing 'is sufficient to satisfy Article III's case-or-controversy requirement.'" *Tex. Democratic Party v. Abbott*, 2020 WL 6127049, at *5 (quoting *Texas v. United States*, 945 F.3d 355, 377–78 (5th Cir. 2019)); *see also Richardson v. Tex. Sec'y of State*, SA-19-CV-00963-OLG, 2020 WL 5367216, at *6 (W.D. Tex. Sept. 8, 2020). Review of the record and the parties' arguments reveal Mi Familia Vota satisfies the three elements to establish standing to bring this action. Accordingly, the Court will explain why this Plaintiff satisfied its burden, and for efficiency, the Court will decline to specifically analyze whether the remaining Plaintiffs also satisfy the three elements to establish standing.

### 1. First Element: Injury In Fact

Organizations can establish the first standing element, injury in fact, under two theories: "associational standing" or "organizational standing." *OCA-Greater Hous.*, 867 F.3d at 612; *Tenth St. Residential Ass'n v. City of Dallas, Texas*, 968 F.3d 492, 500 (5th Cir. 2020). The Court will determine, first, whether organizational standing exists.

"For a threatened future injury to satisfy the imminence requirement, there must be at least a 'substantial risk' that the injury will occur." *Stringer v. Whitley*, 942 F.3d 715, 721 (5th Cir. 2019) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). Further, "[t]he injury alleged as an Article III injury-in-fact need not be substantial; it need not measure more than an identifiable trifle." *OCA-Greater Hous.*, 867 F.3d at 612. To establish organizational standing, "an organization may establish injury in fact by showing it diverted significant resources to counteract the defendant's conduct; hence, the defendant's conduct significantly and 'perceptibly impaired' the organization's ability to provide its 'activities— with the consequent drain on the organization's resources ....'" *N.A.A.C.P. v. City of Kyle, Tex.*, 626 F.3d 233, 238 (5th Cir. 2010) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363

(1982)). Such injury must be "concrete and demonstrable." *Id*. "The fact that the added cost has not been estimated and may be slight does not affect standing, which requires only a minimal showing of injury." *Crawford v. Marion Cty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007), *aff'd*, 553 U.S. 181 (2008).

Through the declaration of Angelica Razo, its Texas Director, Mi Familia Vota presents evidence its primary mission is "to build Latino political power by expanding the electorate, strengthening local infrastructures, and through year-round voter engagement." This mission consists of public education, voter registration, and voter engagement, with operations in Texas, Arizona, California, Colorado, Florida, and Nevada. Its "election-related work usually involves facilitating voter registration and voter education, voter outreach and civic education, particularly 'getting out the vote' among its members." *See ECF No. 53-1, Declaration of Angelica Razo (version submitted at Hearing on 10/2/6/2020).*

Through this same declaration, Mi Familia presents sufficient evidence its injury-in-fact is the additional time, effort and money expended to try to make polling places safer for its targeted voters and these resources would have otherwise been spent educating targeted voters on issues central to its mission. *Id*. Through her declaration, Ms Razo demonstrates Mi Familia Vota has been forced to expend additional time and resources to try to make polling places safer and this time would have been otherwise spent educating voters on issues central to its mission. *Id*. This additional time and resources entailed seeking redress from Secretary Hughs by letter in March 2020, urging her to take immediate action to make voting safer, including by making in-person voting safer; working with county election officials, county by county, to learn what their varying pandemic election policies are in order to accurately inform voters; participating with Dallas V.O.T.E.S. (Voting Openly Trouble-Free Equitably Safely) Coalition to work with the Dallas County Elections Department and the Dallas County Commissioners Court to require and provide voters and poll workers with masks at polling

locations, and; fielding many more calls from voters in the communities they serve, who are extremely concerned about how to vote during the pandemic. *Id*.

The demonstrated additional resources exhausted is in line with other recent persuasive findings of injury-in-fact by organizational plaintiffs in similar context. *See e.g. OCA*, 867 F.3d at 612 (injury was not large, but challenged statute perceptibly impaired OCA's ability to "get out the vote"); *Scott v. Schedler*, 771 F.3d 831, 836-39 (5th Cir. 2014)(NAACP spent more time on voter registration drives); *Lewis v. Hughs*, No. 5:20-CV-00577-OLG, 2020 WL 4344432, at \*10 (W.D. Tex. July 28, 2020) (NAACP's educational efforts to counteract restrictions' effect on right to vote); *Common Cause Ind. v. Lawson*, 937 F.3d 944, 952 (7th Cir. 2019) (citing cases recognizing standing with similar diversions of resources).

For these reasons, Ms. Razo's declaration is sufficient to establish Mi Familia Vota holds organizational standing, and therefore, satisfies the first element.

### 2. Elements Two and Three: Traceability (Causation) and Redressability

The State argues Plaintiffs cannot satisfy the two prongs of traceability and redressability to establish standing. The State contends the mask-mandate exemption in the Executive Order will not cause the harm Plaintiffs allege and cannot be traced to Governor Abbott or Secretary Hughs. The State contends any injunctive relief will not redress Plaintiffs' alleged discriminatory harm because they make a personal choice to sacrifice their right to vote that is not caused by Exemption 8 but by COVID-19.

To establish the "traceability" causal connection between the injury and the conduct complained of, the injury must be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court*." Lujan v. Defs. of Wildlife*, 504 U.S. at 560–61; *Simon v. Eastern Ky. Welfare Rights Organization,* 426 U.S. 26, 41–42 (1976).

To satisfy redressability, a plaintiff must show "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). The relief sought need not completely cure the injury, however; it is enough if the desired relief would lessen it. *See Sanchez v. R.G.L.*, 761 F.3d 495, 506 (5th Cir. 2014). However, "[r]elief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court." *Steel Co.*, 523 U.S. at 107.

The racial-bias challenge of Exemption 8 in the Executive Order issued by Governor Abbott is traceable to him and redressable by him, as well as by the Secretary of State who serves as the "chief election officer of the state." Governor Abbott is the author and executive who promulgated the Executive Order and all exemptions and enforceability provisions therein. Consequently, any unconstituional racially-disparate effect of the mandates therein are certainly traceable to Governor Abbott as the author. Similarly, as the author and executive who promulgated the Executive Order, Governor Abbott holds the power to omit any portion found to be in violation of the Voting Rights Act as racially discriminatory in its application, thereby redressing any alleged injury. Within the Executive Order, itself, Governor Abbott pronounces his authority to enforce the mandates therein and pronounces how such mandates shall be enforced.[6] In any event, if the requested relief of invalidation of Exemption 8 were granted, this invalidation can redress the alleged injury by simply nullifying that portion of the Executive Order.

Further, within the Executive Order, Governor Abbott orders that failure to comply with the mask mandate is not a criminal offense and may not be punishable by criminal penalty, detention, arrest or confinement in jail "or for related non-violent, non-felony offenses that are

---

[6] The Executive Order states Governor Abbott "'is responsible for meeting ...the dangers to the state and people presented by disasters' under Section 418.011 of the Texas Government Code, and the legislature has given the governor broad authority to fulfill that responsibility;" and "NOW, THEREFORE, I, Greg Abbott, Governor of Texas, by virtue of the power and authority vested in me by the Constitution and laws of the State of Texas, do hereby order the following on a statewide basis …."

predicated on a violation of this executive order." Executive Order GA-29. Therefore, any ruling in favor of Plaintiffs would not create a criminal offense to anyone by the language and terms of the Executive Order, itself. All other provisions would remain in place were the Court to rule in Plaintiffs' favor.

The Secretary "is the 'chief election officer of the state' and is instructed by statute to 'obtain and maintain uniformity in the application, operation, and interpretation of this code and of the election laws outside this code.'" *OCA*, 867 F.3d at 613-14 (citing Tex. Elec. Code §§ 31.001(a), 31.003). Substantial recent opinions pertaining to other challenges to Secretary Hughs's actions within the context of the 2020 election rejected the exact same traceability and redressability arguments by the Secretary and concluded those organizational plaintiffs satisfied the second and third elements to establish standing as to Secretary Hughs. *Id.*; *Lewis v. Hughs*, 2020 WL 4344432, at *9.

Therefore, the Court finds Plaintiffs made a clear showing they meet all three requirements for standing at this stage in the litigation. *See Lujan v. Defs. of Wildlife*, 504 U.S. at 560–61. Plaintiffs plausibly allege an injury in fact which is fairly traceable to the conduct of the individual defendants, and a favorable order imposing injunctive relief would redress Plaintiffs' alleged injuries.

## II.     FOUNDATION AND DIRECTIVES DERIVED FROM FIFTH CIRCUIT OPINION

This Court begins analysis of Plaintiffs' cause of action under several directives and holdings set forth in the Fifth Circuit's opinion in this case. The Court sets out these directives, as they establish a foundation and determination of this Court's jurisdiction and authority to act, as well as establish guidance and parameters for this Court's action.

First, the single cause of action asserted, that the mask-mandate Exemption 8, as applied, is a racially-discriminatory violation of Section 2 of the Voting Rights Act, presents a

justiciable question. *Mi Familia Vota v. Abbott*, 2020 WL 6058290, at *3-4. In its opinion, the Court of Appeals concluded "the Plaintiffs' racial discrimination and Voting Rights Act claims do not present political questions." *Id*. (citing *Rucho v. Common Cause*, 139 S. Ct. 2484, 2491 (2019)). Therefore, on this remand to determine the viability of this cause of action, this Court holds jurisdiction to determine whether mask-mandate Exemption 8 in the Executive Order violates the Voting Rights Act. If the Court so finds, it has the jurisdiction to "excise that provision" should this Court conclude such "excision" would resolve the injuries the Plaintiffs allege. *Id*. at *3-4, *7.

Second, Governor Abbott and Secretary Hughs do not hold sovereign immunity from litigation of this Voting-Rights-Act cause of action. *Id.* at *4-5. While the Eleventh Amendment generally bars all the claims against Governor Abbott and Secretary Hughs, there is no sovereign immunity with respect to the Voting Rights Act claims. *Id*. The Fifth Circuit concluded "the Voting Rights Act, . . . validly abrogated state sovereign immunity." *Id*. at *5. Consequently, Governor Abbott and Secretary Hughs are proper defendants and are not immune from the Voting Rights Act claim in this case. *See id*.

Third, this Court "cannot compel the Governor to issue orders as a means of redressing claims under the Voting Rights Act or the Constitution", nor can this Court "dictate to legislative bodies or executives what laws and regulations they must promulgate." *Id.* at *6. However, this Court does have "jurisdiction and power to pass upon the constitutionality of Acts of Congress." *Id*. (impliedly equating the Executive Order to an "Act of Congress.") (quoting *Smith & Lee Assoc., Inc. v. City of Taylor*, 102 F.3d 781, 797 (6th Cir. 1996)). Thus, the Fifth Circuit established this Court does have the jurisdiction and authority to determine whether Exemption 8 of the Executive Order violates the Voting Rights Act as having a discriminatory effect. In fact, the Fifth Circuit remanded this cause for determination of that specific and limited issue. *See id*. In this sense, determination of the "constitutionality" of

Exemption 8 is essentially determination whether it violates Section 2 of the Voting Rights Act because it levies a racially discriminatory imposition on Black and Latino voters.

Finally, any finding by this Court that mask-mandate exemption 8 violates the Voting Rights Act would not run afoul of the long-standing principle that "lower federal courts should ordinarily not alter the election rules on the eve of an election." *Mi Familia Vota v. Abbott*, 2020 WL 6058290 at \*7 (quoting *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020). Specifically, the Fifth Circuit found an exception in this case for this limited issue, stating:

> [i]n large measure, it would be a futile act to remand the Voting Rights Act claim for plenary consideration with regard to the November 2020 election because it would be inappropriate for the district court to grant much of the requested relief with the election ongoing.
>
> We see a possible exception, however, with regard to the November 2020 election.

*Id*. at \*7 After outlining the remanded issue for determination to be whether the subject mask-mandate exemption for polling sites is a violation of the Voting Right Act, the Fifth Circuit stated, "[i]t is at least conceivable that such a remedy would not materially or substantially affect the ongoing election, but that would be a matter for the district court to determine." *Id*. Therefore, leaving to this Court the determination whether invalidating Exemption 8 would resolve the alleged discriminatory injury, the Fifth Circuit stated any decision in favor of Plaintiffs on the remanded issue is "conceivably" compliant with, and excepted from, the established "*Purcell* doctrine" requiring judicial constraint on such issues within an ongoing election. *See id*.

### III.    CHALLENGE TO MASK-MANDATE EXEMPTION 8 IN EXECUTIVE ORDER GA-29

#### <u>Preliminary Injunction Legal Standard</u>

To obtain a preliminary injunction, the movant must demonstrate the following equitable factors: "(1) a substantial likelihood of success on the merits; (2) a substantial threat of

irreparable injury if the injunction is not issued; (3) the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted; and (4) the grant of the injunction will not disserve the public interest." *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011) (citing *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009)); *accord Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 452 (5th Cir. 2014); *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see* Fed. R. Civ. P. 65. While the movant must prove all four elements, none of these elements is controlling. *Florida Med. Ass'n v. United States Dep't of Health, Educ. & Welfare*, 601 F.2d 199, 203 n.2 (5th Cir. 1979). Rather, this Court must consider the elements jointly, and a strong showing of one element may compensate for a weaker showing of another. *Id.*

The established irreparable injury must occur "during the pendency of the litigation." *Justin Indus., Inc. v. Choctaw Secs., L.P.,* 920 F.2d 262, 268 n.7 (5th Cir. 1990). For this reason, "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). "A preliminary injunction is an extraordinary remedy and should only be granted if the [movant has] clearly carried the burden of persuasion on all four requirements." N*ichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008)(internal quotation marks omitted). Granting such "injunction is to be treated as the exception rather than the rule." *Healthpoint, Ltd. v. Stratus Pharm., Inc.*, 273 F. Supp. 2d 769, 777 (W.D. Tex. 2001). Each case requires the courts to "balance the competing claims of injury and . . . consider the effect on each party of the granting or withholding of the requested relief." *Id.*

Whether to grant or deny a preliminary injunction lies within the sound discretion of the district courts. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982). When, "exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24.

Given its limited purpose and "the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Univ. of Tex.*, 451 U.S. at 395.

### 1.  Substantial Likelihood of Success on the Merits

Again, Plaintiffs challenge Exemption 8 as violative of Section 2 of the Voting Rights Act. Specifically, Plaintiffs' allegation is

> "[t]he disproportionate infection rate and the more severe health consequences that Black and Latino people face from the coronavirus mean that voting procedures that fail to provide the necessary health and safety protections to *all* voters in the context of this pandemic will disproportionately burden the rights of Black and Latino voters, in particular. Thus, Texas's mask exemption for polling places a discriminatory burden on the Black and Latino communities' right to participate in the voting process on account of their race."

Within the context of this Motion for Preliminary Injunction, Plaintiffs must show a substantial likelihood of success on the merits of this cause of action. To do so, Plaintiffs "must present a prima facie case, but need not prove [entitlement] to summary judgment." *Daniels Health Scis., L.L.C.*, 710 F.3d at 582.

Section 2 of the Voting Rights Act proscribes any "voting qualification or prerequisite to voting or standard, practice, or procedure ... which results in a denial or abridgement of the right of any citizen ... to vote on account of race or color." 52 U.S.C. § 10301(a). A plaintiff may prove violation of Section 2 "by showing discriminatory effect alone" without showing discretionary intent. *Thornburg v. Gingles*, 478 U.S. 30, 35 (1986); *see also* 52 U.S.C. § 10301(b). In the seminal case, *Veasey v. Abbott*, the Fifth Circuit established an analytical framework for a claim of a discriminatory effect in violation of Section 2 of the Voting Rights Act:

> (1) the challenged standard, practice, or procedure must impose a discriminatory burden on members of a protected class, meaning that members of the protected

class have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice, and

(2) that burden must in part be caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class.

*Veasey v. Abbott*, 830 F.3d 216, 243–44 (5th Cir. 2016); *Mi Familia Vota v. Abbott*, 2020 WL 6058290, at *4. Using this framework, to prove that a law has a discriminatory effect, a plaintiff must show not only that the challenged provision, practice or procedure imposes a discriminatory burden on minorities, but also that it "interacts with social and historical conditions *to cause* an inequality in the opportunities" enjoyed by different classes of people to participate in the election process. *Gingles*, 478 U.S. at 47 (emphasis added); *Veasey v. Abbott*, 830 F.3d at 243–44. As guided by *Veasey*, the first part of this two-part framework inquires about the nature of the burden imposed and whether it creates a disparate effect. The second part "draws on the Supreme Court's guidance in *Gingles* and provides the requisite causal link between the challenged practice or structure and the alleged inequality in opportunities enjoyed by members of different classes of people to engage in the political process. *See Gingles*, 478 U.S. at 47; *Veasey*, 830 F.3d at 244–45.

### a.   Factor One: Discriminatory Effect

To establish Exemption 8 imposes a discriminatory burden on Black and Latino voters Plaintiffs present declarations of the representative Plaintiffs.

In her declaration, Guadalupe Torres declares she is Latina and lives with her parents. All three contracted COVID-19 in June 2020. *See ECF No. 53-4, Declaration of Guadalupe Torres (version submitted at Hearing on 10/2/6/2020), pars*. 9-11. Their illness caused great financial strain because they were not able to work, which included inability to pay rent and her college tuition. *Id. at pars. 14-16*. She knows many who suffered and experienced a death in the family caused by COVID-19. This experience and her susceptibility to COVID-19, coupled with her fear of infecting her parents creates concern about going out in public. *Id. at*

*pars. 14-17*. Ms. Torres declares she is worried about the risk of infection created at polling places because people are not required to wear facial masks. Because polling places inherently include a large number of people standing in line, and she is not certain whether others will wear masks while she is in their presence, Ms. Torres declares she does not feel safe voting in person during the pandemic and is concerned she will get sick again or will carry the infection to her parents. *Id. at pars. 18-21*. Ms. Torres has not voted yet because she is worried about standing in line with people who aren't wearing masks. If she knew everyone would wear a mask, she "would definitely go out to vote. I would still be worried about the lines, but I know masks make the chances of transmission drastically lower." *Id. at par. 23-24*.

Gary Bledsoe is President of the Texas NAACP. Mr. Bledsoe declares voting is very important to the Texas NAACP members, and many do not qualify to vote absentee. *See ECF No. 53-2, Declaration of Gary Bledsoe (version submitted at Hearing on 10/2/6/2020), pars.* 8-11. Many of the constituents and members suffer from underlying health conditions which put them at higher-than-average risk for becoming seriously ill from COVID-19. Mr. Bledsoe declares many Black Texans are concerned about the impact of COVID-19 to a greater degree than the general population "because of higher rates of infection of the disease amongst communities of color, worse outcomes once infected, and widespread reporting on these dangers, people in the Black community experience the dangers and devastation of the virus differently." *Id. at pars. 12-15*. Many of the members and constituents told him they fear contracting coronavirus if they vote in person because other voters and poll workers will not be required to wear masks. The lack of a mandate to wear a face covering in polling stations "could produce crowds that could become a 'super spreader' event." *Id. at pars. 16-20*. Mr. Bledsoe declares the fear created by the lack of a mask mandate at polling stations requires Black Texans to choose between not voting or risking their lives or the lives of their loved ones. For these reasons, Mr. Bledsoe declares the Executive Order's Exemption 8 will dissuade

some Black Texans, including some of the Texas NAACP's members, from voting. *Id*. He concludes "[t]he chill from the Executive Order's exemption is born disproportionately by Black Texans because of the mutually exacerbating combination of worse outcomes for Black Texans once infected, greater risk of infection from longer lines, and greater societal repercussions to their work and home communities once infected. *Id.*

Angelica Razo presents a similar declaration on behalf of Mi Familia Vota. *See ECF No. 53-1, Declaration of Angelica Razo (version submitted at Hearing on 10/2/6/2020).* Ms. Razo declares members of the Black and Latino communities with which her organization works suffer from COVID-19 at rates higher than the general population, have worse health outcomes and higher fatality rates. *Id. at pars. 6-9.* Additionally, many live in large, multi-generational households so if one person gets infected the infection spreads to family members. Ms. Razo declares Exemption 8 of the Executive Order, which allows people to not wear a facial mask at polling sites, disproportionately burdens Latinos and other minority groups because they are concerned of increased risk of exposure to COVID-19 in order to vote in-person and the risk this places on their health and their families' health. *Id. at pars. 9-17.* Ms. Razo declares Latino poll workers have also expressed the same concerns. As a result, "Latino voters-more than other Texans-fear the risk of exposure to COVID-19 from voting without a mask mandate. *Id*. Latinos have to choose between not voting or risking their lives, or the lives of their loved ones, to vote. This difficult choice will dissuade some Latinos from voting." A requirement that all persons wear a mask while at a polling site would allow Latino voters "feel safer and minimize the risk that Latinos and other people of color will avoid voting to keep themselves safe from the virus." *Id. at pars. 16-18.*

Finally, Catherine Troisi, an epidemiologist, opines: (1) Racial and ethnic minority groups have an increased risk of severe outcomes should they become infected with COVID-19; (2) There are ways to mitigate the risk of virus transmission at polling places, including

requiring wearing of masks by both voters and poll workers; (3) COVID-19 will continue to spread throughout the fall and winter; and (4) COVID-19 is spread from person to person, through the air, and on environmental surfaces. *See ECF No. 53-3, Declaration of Catherine Troisi (version submitted at Hearing on 10/2/6/2020), par. 2.* Therefore, gatherings such as at polling places contribute to virus spread. *Id.* Ms. Troisi provides substantiation for these opinions. Ms. Troisi recommends, in her "expert opinion (and consistent with CDC guidelines)," given that COVID-19 is highly likely to be circulating during voting season, especially at polling sites where large numbers of people are gathered, "masks are a critical precaution to prevent the spread of the virus." *Id. at pars. 31-34.*

These declarations establish a prima facie case that Exemption 8 has a discriminatory effect on Black and Latino voters because they have less opportunity than other members of the electorate to participate in the political process. These Plaintiff representatives set out the fear of their minority members of the greater severity of and fatality from the disease, their substantiated understanding that the wearing of masks by all people minimizes the risk of spread of the disease, their desire to vote, and the unfortunate choice required between voting and minimizing their risk caused by Exemption 8 of the Executive Order.

Based upon these declarations, the Court concludes Plaintiffs show a prima facie case that Exemption 8 imposes a discriminatory burden on members of the Black and Latino protected classes because of their race. Accordingly, Plaintiffs satisfy the first prong of the *Veasey* two-part framework.

### b.  Factor Two: Causal Link

In *Gingles*, the Supreme Court established factors to help examine whether any alleged discriminatory burden imposed on members of the protected class is partly caused by or linked to current social conditions. *Gingles*, 478 U.S. at 47; *Veasey*, 830 F.3d at 244–45. These factors include:

(1) the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process; (2) the extent to which voting in the elections of the state or political subdivision is racially polarized; (3) the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group; (4) if there is a candidate slating process, whether the members of the minority group have been denied access to that process; (5) the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process; (6) whether political campaigns have been characterized by overt or subtle racial appeals; (7) the extent to which members of the minority group have been elected to public office in the jurisdiction; (8) whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; and (9) whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*Gingles,* 478 U.S. at 36–37. These factors are not exclusive, and "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." *Gingles*, 478 U.S. at 45; *Veasey*, 830 F.3d at 244–46.

These *Gingles* factors focus primarily on historical conditions in a particular geographical region that create the alleged racial polarization. However, historical data and conditions are not necessarily at play under these facts, nor do they adequately apply to analysis of causation based upon the specific claim. Here, within the environment of the unprecedented pandemic, Plaintiffs can only rely primarily on current statistical data and analysis of infection rates by class to support their cause of action. While the Supreme Court endorsed these *Gingles* factors to discern whether a challenged practice or procedure has a discriminatory impact, courts also regularly utilize statistical analyses to make this determination. *Veasey*, 830 F.3d 216, 243-44; *see, e.g.*, *Mississippi State Chapter, Operation Push, Inc. v. Mabus*, 932 F.2d 400, 410-11 (5th Cir. 1991). Consequently, this Court will utilize and consider the *Gingles* factors as guidance, especially factors 5 and 9 in this setting, but not necessarily strictly apply them or enumerate them in this context.

To establish a prima facie case that the alleged discriminatory burden imposed on members of the protected Latino and Black classes is partly caused by or linked to current social conditions, Plaintiffs rely primarily upon the declaration of Catherine Troisi. Ms. Troisi declares that Black and Latino minority groups experience an increased risk of severe outcomes should they become infected with COVID-19. *See ECF No. 53-3, Declaration of Catherine Troisi (version submitted at Hearing on 10/2/6/2020), par. 2.* She substantiates this opinion with statistical data which shows Black and Latino classes experience proportionally larger numbers of COVID-19 cases and more severe outcomes and greater fatality rates than other classes. To set the framework of current social conditions, Ms. Troisi declares COVID-19 will continue to spread in the coming weeks, rather than decline. *Id.* In addition, COVID-19 is spread through the air, and on environmental surfaces. Therefore, places where large numbers of people gather, such as polling places, present heightened risk of contagion and contribute to virus spread. Finally, Ms. Troisi opines that an effective and critical way to mitigate the risk of virus transmission at polling places includes wearing of masks by all people present. *Id.*

Ms. Troisi's declaration, in conjunction with Plaintiffs' declarations establish a discriminatory effect of Exemption 8. Ms. Troisi establishes the heightened risk to health experienced by these minority groups and the wearing of masks by all people is critical to prevent exposure and spread of COVID-19. Plaintiffs declare they fear the risk to their health caused by exposure at polling sites because people may not be wearing masks, they cannot vote because exercising this right will create too great of a risk, and if they were assured all people will wear masks, they will exercise their right to vote.

Based upon these declarations, the Court concludes Plaintiffs establish a prima facie case that the discriminatory burden that deters Black and Latino voters is at least in part caused by social conditions of the environment of the COVID-19 pandemic, these minority groups experience greater risk of contraction and severity of the disease and this discriminatory effect

can be eliminated, or at least mitigated, if all people wear masks at polling sites. As a result, of this discriminatory effect, these minority groups have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. Accordingly, Plaintiffs satisfy the second prong of the *Veasey* two-part framework.

By establishing a prima facie case of each of the two prongs of the Veasey test, Plaintiffs show a substantial likelihood of success on the merits of their cause of action that Exemption 8 creates a violation of Section 2 of the Voting Rights Act.

### 2.   Substantial Threat of Irreparable Injury

To satisfy the second prong of the preliminary-injunction test, Plaintiffs must show that in the absence of an injunction they are "likely to suffer irreparable harm." *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013). Irreparable harm refers to harm for which there is no adequate remedy at law. *Id.* The party seeking a preliminary injunction must prove irreparable harm is likely, not merely possible. *Winter,* 555 U.S. at 20.

In opposition, the State contends Plaintiffs' only injury is one due to personal preference and choice; any decision to stay home and not vote is not caused by the mask-mandate exemption. The State also contends Plaintiffs have other options to vote, such as mail-in ballots and early voting at a site of their choice that is not crowded.

Plaintiffs show they will experience irreparable harm in the absence of an injunction because their fundamental right to vote is threatened by the mask-mandate exemption. In the declarations enumerated above, the representative Plaintiffs all stated their right to vote is threatened by the health risk created by Exemption 8 to the mask mandate.

In her declaration, Ms. Torres states voting is important to her but she does not want to risk her and her parents' health by participating in the voting process. She states she does not feel safe voting in person during the pandemic because people are not required to wear masks

at polling sites, but will feel safe to vote if she were assured all people were wearing a facial mask to minimize the spread of COVID-19. *See ECF No. 53-4, Declaration of Guadalupe Torres (version submitted at Hearing on 10/2/6/2020), pars. 21-24.*

Ms. Razo states members of the Latino community also express the same concerns and declares the mask exemption will disproportionately burden Latinos and other minority groups. She states many Latinos in her constituency expressed concern because they want to vote, but fear increased risk of exposure to COVID-19 based upon personal experience and knowledge that the disease affects Latinos more severely than other classes of people. For this reason, Latinos "have to choose between not voting or risking their lives, or the lives of their loved, ones to vote. This difficult choice will dissuade some Latinos from voting." Ms. Razo concludes "[s]triking the carve-out—in other words, requiring masks to be worn at polling places, just like other public places—will make those voting in-person safer and minimize the risk that Latinos and other people of color will avoid voting to keep themselves safe from the virus." *See ECF No. 53-1, Declaration of Angelica Razo (version submitted at Hearing on 10/2/6/2020), par. 14-23.*

Mr. Bledsoe declares that "without basic protections like mandatory face coverings at the polls, Black Texans must choose between not voting or risking their lives or the lives of their loved ones to vote. This burden will dissuade some Black Texans, including some of our members, from voting." Further, the dissuasion created by the mask mandate exemption for polling places "is born disproportionately by Black Texans because of the mutually exacerbating combination of worse outcomes for Black Texans once infected, greater risk of infection from longer lines, and greater societal repercussions to their work and home communities once infected." Mr. Bledsoe declares "[t]he public interest and all voters will be greatly served by a sensible and reasonable order that protects the lives of people. Excising the

exception for face coverings in polling places is an important step." *See ECF No. 53-2, Declaration of Gary Bledsoe (version submitted at Hearing on 10/2/6/2020), par.12-20.*

Plaintiffs already established a substantial likelihood of success on their discriminatory challenge to the mask-mandate exemption. The right to vote and have one's vote counted is undeniably a fundamental constitutional right, the violation of which cannot be adequately remedied at law or after the violation occurred. *Reynolds v. Sims*, 377 U.S. at 554; *see*, *e.g., Obama for Am. v. Husted,* 697 F.3d 423, 436 (6th Cir. 2012); *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986); *League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014). "Federal courts at all levels have recognized that violation of constitutional rights constitutes irreparable harm as a matter of law." *De Leon v. Perry*, 975 F. Supp. 2d 632, 663 (W.D. Tex. 2014), aff'd sub nom. *De Leon v. Abbott*, 791 F.3d 619 (5th Cir. 2015). Even the violation of fundamental constitutional rights for minimal periods of time "unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. Unit B. Nov. 1981); *see also Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."). The existence of alternative means of exercising one's fundamental rights "does not eliminate or render harmless the potential continuing constitutional violation of a fundamental right." *Deerfield Med. Ctr.*, 661 F.2d at 338.

This Court concludes Plaintiffs present sufficient evidence to show a substantial threat of irreparable injury in the absence of injunctive relief. Plaintiffs present evidence of the disparate impact Exemption 8 has on Black and Latino citizens because it precludes an opportunity to vote. This opportunity to vote cannot be remedied by law or otherwise renewed. Once lost, the opportunity to vote is lost. While a showing of a violation of a constitutional

right is sufficient to establish irreparable injury as a matter of law, Plaintiffs also present sufficient evidence of irreparable injury.

Accordingly, the Court concludes this factor weighs in favor of a preliminary injunction.

### 3. Balance of Equities: Threatened Injury Outweighs Harm if Injunction is Granted

Plaintiffs argue the equities greatly favor an injunction, as there is no harm from issuing a preliminary injunction that prevents the enforcement of a likely unconstitutional state law. *See Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002).

The State conflates part of its argument pertaining to this element with that of the first element (on the merits) and the fourth element (on the effect on public interest). The State contends an injunction at this point in the election process would cause voter confusion and would undermine the integrity of election administration. This harm outweighs the threatened injury of discriminatory preclusion of Plaintiffs' ability to vote without harm to their health. This Court considered and heavily weighed the implications of any injunctive relief at this juncture in the election process and will discuss this deliberation and its significance within the context of the fourth element.

The State also argues the requested injunction would create harm of necessary extra time involved to educate the voters and personnel and the expense of providing a mask or alternative voting mechanism to any person who does not wish to comply with the Executive Order's mask mandate.

Plaintiffs' request for relief to protect all citizens' right to vote and to dispel any inequality in citizens' opportunity to cast a vote outweighs the State's harm in facilitating any needed voter education, training, and provisions. "The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them

beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts." One's fundamental rights is one such liberty intended to be undeniably sacred. *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 638 (1943).

Accordingly, the Court concludes the balance of equities favors a preliminary injunction.

### 4. Injunction will not Disserve the Public Interest

Injunctions preventing the violation of constitutional rights are "always in the public interest." *See Ingebretsen on behalf of Ingebretsen v. Jackson Public Sch. Dist.*, 88 F.3d 274, 280 (5th Cir. 1996); *see also, e.g., G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071 (6th Cir. 1994); *Charles H. Wesley Educ. Fdn., Inc. v. Cox*, 408 F.3d 1349, 1355 (11th Cir. 2005). *Deerfield Med. Ctr.*, 661 F.2d at 338-39. Further, protecting the right to vote is of particular public importance. *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013); *c.f. Dunn v. Blumstein*, 405 U.S. 330, 336 (1972)(citing *Reynolds*, 377 U.S. at 562). *Tex. Democratic Party v. Abbott*, 2020 WL 2541971, at *33.

However, even with the established import of protecting a person's fundamental right to vote, a court must weigh any protective action against the potential confusion and disruption of the election administration caused when doing so in the middle of an election cycle. *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). Thus, the Fifth Circuit recognizes the *Purcell* principle warns "lower federal courts should ordinarily not alter . . . election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. at 1207; *Tex. Democratic Party v. Abbott*, 2020 WL 6127049, at *8; *Mi Familia Vota v. Abbott*, 2020 WL 6058290, at *7. In making this determination, a court should consider and heavily weigh the potential chaos and confusion created to determine whether injunctive relief "would materially or substantially affect the ongoing election." *Id*.

Courts generally, and can, consider the *Purcell* principle within the fourth element of a motion for preliminary injunction to examine whether a requested injunction that changes an ongoing state election procedure serves the public interest. *See, e.g., Benisek v. Lamone*, 138 S. Ct. 1942, 1945 (2018); *League of Women Voters of United States v. Newby*, 838 F.3d at 13; *Ohio Coal. for Homeless & Serv. Employees Int'l Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1012 (6th Cir. 2006). Historically, typical court actions that do not pass the *Purcell* principle touch on the protection of the security and integrity of an election process, or involve the ability of Election Administrators to ensure an accurate and reliable count of the ballots. The *Purcell* principle seeks to protect this integrity by providing sufficient time, in advance of an election, to notify voters and election officials, to provide training of poll workers, and to prevent disruptive changes. Examples of the types of changes to the impending election process that do not pass *Purcell*-principle scrutiny appear in these demonstrative cases: (1) *Veasey*, 769 F.3d at 893–95 (involving an injunction that would require a new procedure nine days before the election period and require the State to "train 25,000 polling officials at 8,000 polling stations); (2) *Democratic Nat'l Comm. v. Bostelmann*, 451 F. Supp. 3d 952, 974 (W.D. Wis. 2020)(invoking *Purcell* in deciding not to "delay the date of an impending, state-wide election"); (3) *Fair Maps Nevada v. Cegavske*, No. 320CV00271-MMDWGC, 2020 WL 2798018, at *16 (D. Nev. May 29, 2020)( invoking *Purcell* principle when Plaintiffs who sought to place initiative on general election ballot that would amend state constitution asked court to waiver in-person requirements regarding signature collection); (4) *Bryan v. Fawkes*, 61 V.I. 416, 469 (V.I. 2014) (collecting cases showing the *Purcell* principle is particularly pertinent where plaintiffs ask courts to "impose large-scale changes to the election process."); *accord Self Advocacy Sols. N.D. v. Jaeger*, No. 3:20-CV-00071, 2020 WL 2951012, at *11 (D.N.D. June 3, 2020)(Court found "the countervailing threat of the deprivation of the fundamental right to vote more significant" than the *Purcell* doctrine concerns in holding a

"voter filling out an absentee ballot will be entirely unaffected by an order enjoining the signature-matching requirement.")

In this situation, invalidating Exemption 8, which would make polling sites subject to the statewide mask mandate, is not akin to these traditional *Purcell* principle infringements. Placing polling sites within the statewide mask mandate does not diminish the integrity of counting ballots, nor does it require significant effort to inform voters and Election Administrators. Plaintiffs' requested injunctive relief does not require the Court to impose large-scale changes to the ongoing election process or create distinct and drastic changes to an established procedure. Any injunctive relief would simply place polling sites within the already imposed statewide mask mandate, making these public places consistent with that required in all other public settings. Any voided exemption from this established mask mandate will not require extensive training and expense typical in other *Purcell* principle violations. Moreover, making polling sites subject to the statewide mask mandate will not dissuade citizens from voting due to disruption, but will provide the opportunity to vote to an otherwise burdened class.

As stated previously, even while in the middle of *this* election cycle, the Fifth Circuit foresaw a potential exception to the *Purcell* principle in this particular case, stating:

> [i]n large measure, it would be a futile act to remand the Voting Rights Act claim for plenary consideration with regard to the November 2020 election because it would be inappropriate for the district court to grant much of the requested relief with the election ongoing.
>
> We see a possible exception, however, with regard to the November 2020 election.

*Mi Familia Vota v. Abbott*, 2020 WL 6058290, at *7. The Fifth Circuit stated, "[i]t is at least conceivable that such a remedy would not materially or substantially affect the ongoing election, but that would be a matter for the district court to determine." *Id*.

This Court carefully measured the evidence presented by the State consisting of declarations from Election Administrators in four Texas cities regarding the adverse effects of

invalidation of Exemption 8. The Court understands and hears the issues they raise, empathizes with their concerns, and appreciates the importance these Election Administrators place on ensuring a well-organized, efficient, and smooth election process for all Texans. The Court strongly considered the public interest in preventing confusion and disruption during the ongoing election, and yet, maintains the mask-mandate exemption which impedes certain citizens' fundamental right and equal opportunity to exercise this right creates greater harm.

For these reasons, this Court concludes the injunctive relief Plaintiffs seek will not disserve the public interest, and, to the contrary, will serve the public interest because it will prevent any discriminatory imposition on Plaintiffs' right to vote. Invalidation of Exemption 8 will result in a familiar and consistent mandate that is required in most public settings and that has been in place since July. In addition, invalidation of Exemption 8 is not of the same nature or complicated or different as the requested changes in cases following the *Purcell* doctrine. This Court is not ordering a drastic change in rules or requirements that are contrary or drastically different than the procedures already in place. Those citizens who arrive at a polling site while not wearing a facial mask will be easily recognized and options for compliance or redirection are not complicated or extensive. For example, Jacquelyn Callanen, Elections Administrator for Bexar County declared that in Bexar County

> [f]or voters who refuse [to wear a mask]—which to date has been a small fraction of the overall number of in person voters—each of our polling places has one machine that is set up farther away from other machines. Those isolated machines are typically set up near the exits of the polling places. That allows voters who are not wearing masks to cast their ballots in relative isolation. It also allows those voters to leave the polling place quickly, further minimizing their contact with other voters and poll workers.

*See ECF No. 66-2; Declaration of Jacquelyn Callanen, Elections Administrator*

As such, the Court's injunction supports the *Purcell* principle that courts should avoid issuing orders that cause voters to become confused and stay away from the polls. To the extent this Court's injunction invalidating Exemption 8, and thus subjecting polling sites to the

already-established mask mandate does potentially cause confusion, the Court is satisfied this confusion will be minimal and outweighed by the opportunity created for non-discriminatory access to the voting process.

For these reasons, the Court concludes invalidation of Exemption 8 as violative of Section 2 of the Voting Rights Act will not disserve the public interest. This factor weighs in favor of a preliminary injunction.

### Conclusion

Plaintiffs established the four elements of preliminary injunction. Plaintiffs hold a substantial likelihood of success on the merits of their cause of action that Exemption 8 of Executive Order GA-29, which exempts from the mask mandate therein those persons who are "voting, assisting a voter, serving as a poll watcher, or actively administering an election" violates Section 2 of the Voting Rights Act. Accordingly, this Court concludes injunctive relief is warranted and thereby holds Exemption 8 of Executive Order GA-29 is invalid and void. The Court declines to reach the remaining requests for injunctive relief, as these requests are not within the Court's power to impose a remedy or are no longer pertinent to the narrowed focus of the cause of action presented in the Amended Complaint and briefed and argued before the Court. To the extent not reached here, all other requests for injunctive relief have not been presented or proven to this Court and are denied.


### IV.     PRIVATE CAUSE OF ACTION

The State argues Plaintiffs have no private cause of action to sue for violation of Section 2 of the Voting Rights Act. This argument has no merit.

The Voting Rights Act "was drafted to make the guarantees of the Fifteenth Amendment finally a reality for all citizens" and [t]he achievement of the Act's laudable goal could be severely hampered, however, if each citizen were required to depend solely on

litigation instituted at the discretion of the Attorney General." *Allen v. State Bd. of Elections*, 393 U.S. 544, 556 (1969)(abrogated by *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1855 (2017)). Recently, the Fifth Circuit held in a similar voting rights case that citizens hold a private right of action to bring suit under the Voter Rights Act, stating, "[n]either the Supreme Court nor the Fifth Circuit prohibit bringing a private cause of action; many courts have recognized a private right of action; and Congress did not intend to foreclose private causes of action by *also* granting the Attorney General enforcement authority." *See Texas Democratic Party v. Hughs*, 2020 WL 4218227 at *6 (W.D. Tex. 2020) (emphasis in original).

This Court concludes Plaintiffs have a private cause of action to sue for violation of Section 2 of the Voting Rights Act.

## V.    STAY OF THE COURT'S ACTION

Finally, in its Response to Plaintiffs' Motion for Preliminary Injunction, the State contends if this Court should grant Plaintiffs' motion, it should stay any injunctive relief granted pending any appeal. For the reasons explained above, Plaintiffs are substantially likely to prevail on the merits of their cause. Because Plaintiffs seek to protect a most important and fundamental civil right, a stay of this Court's ruling would not promote the public interest without injuring other parties to a greater degree. *See Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 410 (5th Cir. 2013)(outlining discretionary factors).

The Court, therefore, declines to exercise its discretion to stay this ruling.

## <u>CONCLUSION</u>

As discussed, this Court considered three issues the Fifth Circuit directed to be determined on remand. *Mi Familia Vota v. Abbott*, 2020 WL 6058290, at *7. First, the Court concludes Plaintiffs satisfied their preliminary-injunction burden to show the mask-mandate Exemption 8 in Executive Order GA-29 violates section 2 of the Voting Rights Act as applied. Exemption 8 imposes a "voting practice or procedure which results in a denial or abridgement

of the right of Black and Latino citizens to vote on account of race or color. Second, this Court concludes Plaintiffs' alleged injury of disparate impact can be resolved by declaring Exemption 8 invalid and void as a violation of Section 2 of the Voting Rights Act. Third, this Court concludes its finding that the mask-mandate Exemption 8 is invalid and void does not "materially or substantially affect the ongoing election," and any disruption is outweighed by the racially discriminatory deterrent effect on Black and Latino citizens' fundamental right to vote.

For the reasons stated, Plaintiffs' Motion for Preliminary Injunction is **GRANTED IN PART and DENIED IN PART**. Exemption 8, which exempts from the mask mandate imposed by Executive Order GA-29 those persons who are "voting, assisting a voter, serving as a poll watcher, or actively administering an election" is invalid and void. The enforcement provisions of the mask mandate contained within the Executive Order remain intact as do the remaining exemptions.

Plaintiffs' Motion for Preliminary Injunction is **DENIED IN PART**, as all other requested injunctive relief is denied. All other requests by Plaintiffs and the State contained within the briefs and motion are **DENIED**, and all other arguments presented by Plaintiffs and the State not specifically addressed in this opinion are **OVERRULED**.

IT IS SO ORDERED.
SIGNED this 27th day of October, 2020.


JASON PULLIAM
UNITED STATES DISTRICT JUDGE